FILED
2026 Sep-03 AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**THE SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,

Plaintiff,

v.

**LOUISIANA STATE UNIVERSITY**; **BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE**; **WADE ROUSSE**, in his official capacity as President of Louisiana State University; **VERGE AUSBERRY**, in his official capacity as Vice President and Director of Athletics of Louisiana State University; and **LANE KIFFIN**, in his official capacity as Head Football Coach of Louisiana State University,

Defendants.

Case No.:

## COMPLAINT

Plaintiff the Southeastern Conference ("SEC" or the "Conference") brings this action seeking declaratory and injunctive relief against Defendants Louisiana State University ("LSU"), the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, Wade Rousse, in his official capacity as

President of LSU, Verge Ausberry, in his official capacity as Vice President and Director of Athletics of LSU, and Lane Kiffin, in his official capacity as Head Football Coach of LSU.

## INTRODUCTION

1. For more than ninety years, the Southeastern Conference has stood at the intersection of higher education and elite athletic competition. Founded in 1933 by university presidents who believed that athletics should promote and serve educational values, the SEC is now the nation's premier intercollegiate athletic conference.

2. Today, the SEC is a sixteen-member association. The Presidents and Chancellors of the SEC's member institutions have governed together across generations, operating under a set of shared rules that have shaped the athletic and educational paths of thousands of student-athletes and provided the competitive integrity and fair competition necessary for the SEC to thrive. Those rules are not fine print. They are the governing framework that keeps college sports unique, protects opportunities for high school and college student-athletes, and preserves competitive equity and fair competition.

3. The SEC has endured and thrived for nearly a century because its members have adhered to that common set of rules, which each member institution, and every coach at those institutions, has agreed to follow.

4. Among the most fundamental of those rules are the longstanding provisions that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics (the "Professionalism Rules"). These rules are built upon an essential principle: college athletics is reserved for students who are actively pursuing an education while competing for their universities. The Professionalism Rules preserve competitive fairness, protect opportunities for high school students and current college athletes, and maintain the distinction between college and professional sports. That distinction is critical to the SEC's member institutions, their Presidents and Chancellors, and their fans.

5. This case arises from Defendants' violation of the SEC's First Amendment right of expressive association.

6. Specifically, Defendants waged a deliberate and coordinated campaign to recruit professional athletes to play football for LSU during the 2026-27 season, including players who had signed NFL contracts with the Cleveland Browns, New Orleans Saints, and Tampa Bay Buccaneers. Numerous reports have shown that at least two of these professional athletes are on campus and actively practicing with LSU's football team. Defendants have also expressed their unequivocal intent to place those athletes on LSU's official football roster and allow them to participate in football games during the upcoming season.

7. Every SEC member institution—including LSU—has affirmed that individuals who choose to leave college athletics, sign professional playing contracts, and compete professionally should not then be permitted to return to college competition. Just days ago, on August 25, 2026, LSU (through Defendant Rousse) voted in favor of the SEC issuing a policy statement clarifying that its longstanding rules prohibit an SEC institution from having a professional athlete on its roster.

8. Nevertheless, Defendants have continued their campaign to engage in willful efforts to recruit and soon roster professional athletes in direct defiance of the Professionalism Rules. This conduct is detrimental to the Conference and contrary to its core purpose. Defendants' conduct has already harmed the Conference and threatens to cause further substantial harm if not curbed. Through their actions, Defendants have compelled the SEC and each of its member institutions to associate with conduct that every member institution—including, until recently, LSU—has expressly and unanimously repudiated. As a result, Defendants have violated the SEC's expressive association rights under the First Amendment of the United States Constitution.

9. The SEC brings this action to vindicate its First Amendment right of expressive association, *i.e.* its right not to be forced to associate its competitions, brand, and championships with conduct that it has expressly condemned since the

SEC's founding. The SEC also seeks declaratory and injunctive relief to vindicate the SEC's right to disassociate from conduct that directly undermines the SEC's organizational purpose and core values.

10. The SEC does not bring this action to declare any student-athlete ineligible or to prevent any student-athlete from participating in any athletic competition. This action is directed solely at the member institution and athletic department personnel that have violated the SEC's rights under the First Amendment.

## PARTIES

11. Plaintiff the Southeastern Conference is the nation's premier intercollegiate athletic conference. Founded in 1933, it is an unincorporated nonprofit association organized under Alabama law and headquartered at 2201 Richard Arrington Jr. Boulevard North, Birmingham, Alabama 35203.

12. The SEC has sixteen member institutions, fifteen of which are state universities: the University of Alabama, Auburn University, the University of Arkansas, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri, the University of Oklahoma, the University of South Carolina, the University of Tennessee, Texas A&M University, the University of Texas, and Vanderbilt University (the only private institution).

13. Defendant Louisiana State University is a public university located in Baton Rouge, Louisiana and organized under the laws of the State of Louisiana. LSU has been a member of the SEC since the Conference's founding in 1933 and is bound by the Conference's Constitution and Bylaws.

14. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is a public university system board responsible for supervising and managing the institutions within the system, including LSU.

15. Defendant Wade Rousse is the President of Louisiana State University. He is named only in his official capacity.

16. Defendant Verge Ausberry is the Vice President and Director of Athletics of Louisiana State University. He is responsible for the development, management, and supervision of LSU's athletics program. He is sued only in his official capacity.

17. Defendant Lane Kiffin is the head football coach at Louisiana State University. He is sued only in his official capacity.

## JURISDICTION AND VENUE

18. Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction over the SEC's claims under the First Amendment to the United States Constitution,

enforceable through 42 U.S.C. § 1983, and over its claim for declaratory relief, which is authorized by 28 U.S.C. §§ 2201 and 2202.

19. Because each Defendant is a state actor and the SEC seeks redress for the deprivation of its constitutional rights under color of state law, the SEC's claims are cognizable under 42 U.S.C. § 1983. *Lindke v. Freed*, 601 U.S. 187, 195 (2024); *see also Ex parte Young*, 209 U.S. 123, 159 (1908).

20. Venue is proper in the Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the SEC's claims occurred in this District. The SEC is headquartered within this district, in Birmingham, Alabama. The SEC's governance deliberations, the actions taken by the Conference's Presidents and Chancellors (including Defendant Rousse) and Commissioner as described further below, and the issuance of the memoranda described herein all occurred in or were directed from this District. The injuries to the SEC's expressive association rights were suffered at the SEC's headquarters in this District.

21. This Court has personal jurisdiction over Defendant LSU because of LSU's continuous and systematic membership and governance activities within the SEC. These continuous and systematic activities in Alabama arise out of LSU's membership in and management of the Conference. Since 1933, LSU has been a voluntary member of the SEC, which is headquartered in this District. LSU agreed

to the SEC's Constitution and Bylaws, which are administered from this District. LSU regularly participates in Conference governance meetings held in this District, sends athletic teams to this District for intercollegiate competitions and SEC events located in Alabama (including football games against the University of Alabama and the SEC Baseball Tournament held annually in Hoover, Alabama), and derives substantial revenue from Conference media agreements entered in and administered from this District. LSU's membership in the SEC and its obligations under the Conference's governing documents are administered and enforced from this District.

22. This Court has personal jurisdiction over Defendants Rousse, Ausberry, and Kiffin. In their official capacities, jurisdiction over these Defendants is coextensive with jurisdiction over LSU. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

23. Defendant Rousse regularly attends meetings of the SEC's Presidents and Chancellors, including in-person meetings in this District, and takes action at those meetings in his capacity as a Chief Executive Officer of the Conference.

24. Indeed, Defendant Rousse was physically present in Birmingham, Alabama recently when he attended a two-day meeting of the Conference's Presidents and Chancellors, participated in Conference governance decisions, and engaged in conduct that is at the heart of this lawsuit.

25. Defendant Ausberry regularly attends meetings of the SEC's Athletic Directors, including in-person meetings in this District.

26. Defendant Kiffin regularly attends meetings of the SEC's head football coaches and has attended an in-person meeting in this District. Defendant Kiffin has also appeared in this District for intercollegiate competitions against another SEC member institution located in this District, the University of Alabama.

## FACTUAL BACKGROUND

### The SEC's Mission and Governance Structure

27. The SEC was founded on the principle that intercollegiate athletics serves an educational purpose. The Conference aims to facilitate and assist its member institutions in maintaining intercollegiate athletic programs compatible with the highest standards of education and competitive sports.

28. From its founding, the SEC's governance has rested in the hands of its member institutions. Under Article 4 of the SEC Constitution, the Presidents and Chancellors of those institutions serve as the Conference's Chief Executive Officers ("CEOs"), with plenary power over all Conference affairs. The role of the Presidents and Chancellors as CEOs is equivalent to the role served by directors serving on a corporation's board of directors. This structure reflects a deliberate choice that the rules governing SEC competition should be made by the leaders of the educational institutions whose students compete under those rules. Through this governance

structure, the member institutions collectively control the Conference and establish its policies and procedures. The Presidents and Chancellors make all final decisions regarding material and fundamental Conference matters.

29. Article 6 of the SEC Constitution charges the Chief Executive Officer of each member institution, including LSU, with "full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution." A copy of the SEC's Constitution and Bylaws is attached as Exhibit A. This obligation to exercise institutional control reflects the SEC's model of shared governance. The Conference enacts rules and each member institution is responsible for ensuring that its employees follow them. This includes the Professionalism Rules at issue in this action.

30. The SEC's governance framework depends on compliance by both member institutions and their athletics employees. Each member institution is bound by the SEC Constitution and Bylaws as a condition of its membership in the Conference. LSU, as a member institution, has agreed to comply with all Conference rules and to enforce those rules at its institution. Ex. A at Bylaw 19.8.1 ("It is the obligation of each member institution to enforce and comply with the Rules.")

31. The SEC and its members are also members of the NCAA. The Conference and its members are subject to NCAA rules and regulations, but the

NCAA does not control the Conference. The Conference and the NCAA are separate and independent entities.

32. The Conference and the NCAA each establish rules delineating eligibility requirements for student-athletes to participate in Conference and NCAA competitions. The NCAA rules apply to all NCAA member institutions. The Conference rules supplement the NCAA rules and apply only to the SEC's member institutions.

**The SEC's Professionalism Rules**

33. Both the NCAA and the SEC have long maintained rules that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from competing in college athletics. Among those rules is NCAA Bylaw 12.2.4, which provides that a student-athlete "shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." This NCAA Bylaw is incorporated by reference and is effective as an SEC Bylaw pursuant to SEC Bylaw 14.01.1. *See* Exhibit A.

34. The SEC's Professionalism Rules are not new. They have been a cornerstone of the college athletics model since its inception, are fundamental to the SEC's mission, and reflect the core expressive message of the Conference: that collegiate athletics serves an educational mission and is distinct from professional

sports. The rules are grounded in the principle that college athletics are reserved for students who are actively pursuing a degree while also participating in college sports and for future college athletes who seek to benefit from the unique educational, athletic, and leadership opportunities provided through college sports.

35. The SEC's Professionalism Rules also promote competitive fairness in the context of college athletics. They recognize that an athlete who has pursued a professional career, with the benefit of professional-level training, resources, and competition, occupies a fundamentally different position than a student-athlete who has remained within the collegiate model.

36. These Professionalism Rules also create and preserve opportunities for high school student-athletes and current college athletes. Each roster spot filled by a professional athlete is one that becomes unavailable to a high school student-athlete or another less-developed athlete who would benefit from the educational and athletic growth opportunities uniquely available through collegiate athletics.

37. The Professionalism Rules also promote roster stability and the settled expectations of student-athletes and institutions that have planned their programs around an established set of rules. Without consistent application of these rules, college athletes cannot have confidence in the rules of the competition in which they are engaged or the real-world effects of their decision to pursue a professional sports career; college coaches do not receive clear guidance on actions they can and cannot

take to build their rosters for effective and compliant competition; and entering college freshmen face uncertainty about their opportunities to join a roster and benefit from the experience of participating in college athletics.

38. The Professionalism Rules further promote competitive equity and fair competition among the SEC's member schools by ensuring that each member institution is engaged in competition with other institutions governed by, subject to, and compliant with the same foundational set of rules and requirements.

39. The SEC has publicly, consistently, and through formal governance action, expressed its institutional position on the issues at the heart of this dispute. These expressions are not incidental to the Conference's operations. They are integral to the SEC's organizational purpose and identity and the message it communicates to the public.

40. The SEC's Commissioner has repeatedly emphasized that the Conference's Professionalism Rules are essential to the integrity of college sports and grounded in the principle that athletics are an integral part of the academic experience. He has made clear that, in the view of the SEC and its member institutions, permitting professional athletes to return to competition creates a competitive disadvantage and fundamental unfairness for current student-athletes who have not pursued a professional sports career but instead have maintained their commitment to the collegiate athletics model.

**Defendants' Recruitment of Professional Football Players and Intent to Roster Them**

41. In June 2026, the NCAA adopted a new age-based eligibility model, commonly referred to as the "5-for-5" rule, that allows student-athletes up to five seasons of competition within a five-year period beginning when they enroll in college.

42. Beginning in the summer of 2026, certain student-athletes who first enrolled in college in 2022 and had exhausted their eligibility by spring of 2026 (the "2022 Class") began filing lawsuits across the country challenging the NCAA's decision to implement the 5-for-5 rule and not to grant an additional year of eligibility to the 2022 Class. Among those athletes were several former college football players who had signed professional contracts with NFL teams during the 2026 NFL Draft and undrafted free agency period.

43. Despite the SEC's longstanding rules prohibiting professional athletes from returning to college athletics, Defendants saw this as an opportunity to be exploited. They began an orchestrated campaign to recruit professional athletes to join LSU's football roster for the 2026-27 season.

44. These efforts included recruiting players who had signed contracts with the NFL's Cleveland Browns, New Orleans Saints, and Tampa Bay Buccaneers and were actively participating in NFL training camps.

45. Defendant Kiffin has publicly confirmed that professional players are now practicing with LSU's football team and that he intends to play them during the upcoming season.[1]

46. On August 19, 2026, a group of professional athletes filed a lawsuit in Louisiana state court, seeking a fifth year of eligibility to participate in college athletics.

47. Three of those professional athletes had signed contracts with NFL teams but nevertheless sought the ability to return to college competition if they did not ultimately make a final professional roster.

48. In the days that followed, public reporting indicated that LSU and Defendant Kiffin recruited the three professional athletes to play football at LSU even though they would not be eligible to participate in college athletics pursuant to longstanding NCAA and SEC rules, including the Professionalism Rules. For example:

(a) During his August 24, 2026 press conference, Defendant Kiffin said, in reference to the professional players: "They're available to recruit. **So, ourselves, like many places around the country,**

[1] *See*, *e.g*., Heather Dinich, *LSU's Lane Kiffin says his players pursuing ex-NFLers*, ESPN (Aug. 31, 2026, 3:00 PM), https://www.espn.com/college-football/story/_/id/49785035/lsu-lane-kiffin-says-players-endorse-pursing-ex-nflers (Defendant Kiffin confirms that at least one former player is practicing with LSU's football team); Seth Emerson, *Lane Kiffin met with LSU's player leadership before adding returning pro players, he said*, New York Times (August 31, 2026), https://www.nytimes.com/athletic/7553369/2026/08/31/lane-kiffin-eligibility-lsu-college-football/ (quoting Defendant Kiffin stating, with regard to adding former professional players to LSU's team, "this is how the real world works. They can bring employees into certain jobs to help the company.").

**are recruiting them**."[2] He also said, "[a]t the end of the day, you know, because of these rulings, they're either going to play for you or they're going to play somewhere else around the country. **So, we've made the decision to recruit them like probably most people are**."

(b) On August 25, 2026, on *The Pat McAfee Show*, Defendant Kiffin went considerably further. Kiffin said, "I said to our staff, I said, whoever the first player commits to will be the poster child . . . [and] the player chose us."[3] Defendant Kiffin stated that multiple schools were recruiting the player and "offering him a lot of money, **and he decided to come play for us**." He also told his staff, "**Get ready, guys. . . . This will be Lane Kiffin, LSU . . . doing something nobody else is doing**." Defendant Kiffin defended the decision to recruit and roster the professional athletes by saying "Our players know that, and I think our fans and administration . . . understand that [we]'re doing what's best for their program."

(c) *CBS Sports* reported on August 25, 2026 that sources indicated Defendants Kiffin and LSU "reached out to multiple players on NFL rosters or their representation" with the purpose of getting them to pursue litigation that could enable them to return to college.[4]

(d) During his August 31, 2026 press conference at LSU, Defendant Kiffin said he met with LSU's player leadership committee and asked them whether the team wanted the former NFL players

---

[2] Lane Kiffin Press Conference (August 24, 2026) available at https://www.youtube.com/watch?v=e0V4ZUVdGps&t=14s

[3] *See Lane Kiffin Responds To Critics Of NFL Players Returning To Play At LSU*, THE PAT MCAFEE SHOW (August 25, 2026) available at https://www.youtube.com/watch?v=YXL-8iDvIsY.

[4] *See* John Talty and Chris Hummer, *How Lane Kiffin and LSU triggered a national showdown over NFL-to-college transfer*, CBS SPORTS (Aug. 25, 2026, 10:59 AM), available at https://www.cbssports.com/college-football/news/lane-kiffin-lsu-nfl-players-college-football-eligibility-loophole/.

added.[5] He described their response as, **"every one of them was emphatic about, 'if they can help us win, bring 'em.'"**

49. On August 24, 2026, in response to this public reporting, the SEC's Presidents and Chancellors unanimously affirmed the Conference's longstanding position that individuals who choose to leave college athletics, sign professional contracts, and compete professionally should not subsequently be permitted to return to college competition. *See* Exhibit B, SEC's Professionalization Memorandum dated August 26, 2026.

50. The Presidents and Chancellors explained that allowing professional athletes to compete in college sports would "blur the line between college and professional sports, create significant competitive equity concerns, and reduce opportunities for high school and current college athletes." Ex. B. at 1.

51. On August 25, 2026, the SEC's Presidents and Chancellors released a policy statement clarifying that its longstanding Professionalism Rules prohibit an SEC institution from having an athlete on its roster who has: "1. Previously declared for the NFL, NBA, or WNBA draft and did not appropriately withdraw; 2. Signed a contract with an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate team), or 3. Been listed on an NFL (or other professional football

[5] *See* The Lane Kiffin Press Conference (Aug. 31, 2026) available at https://www.youtube.com/watch?v=IHGfBUnAXEk.

league), NBA/G-League, or WNBA (or affiliate) roster." Even Defendant Rousse, in his capacity as a CEO of the Conference, voted in favor of the Conference's policy affirming that college sports are for college athletes.

52. The viewpoints expressed by the SEC as expressed above reflect a core tenet of the Conference's institutional identity. The SEC holds itself out to its student-athletes, its fans, its media partners, and the public as an organization committed to competitive integrity, educational values, and the principle that collegiate athletics is distinct from professional sports.

**The SEC's First Amendment Rights**

53. Defendant LSU is a public university and an instrumentality of the State of Louisiana. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is likewise an instrumentality of the State of Louisiana. As state institutions, these Defendants and their officials acting in their official capacities, including Defendants Rousse, Ausberry, and Kiffin, are state actors whose decisions are made under color of state law. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) (holding that a state employee acts under color of state law when exercising responsibilities pursuant to state employment).

54. By recruiting professional athletes in contravention of the SEC's longstanding principles and rules and reiterating their intent to add these players to their roster for the 2026-27 football season, Defendants forced the SEC to associate

its competitions, its brand, its championships, and its media properties with conduct that the Conference has expressly, unanimously, and publicly rejected and repudiated since its inception. Defendants have forced the SEC to associate its athletic competitions and the conduct of the Conference with professional athletes over the express and unanimous objection of every member institution aside from LSU. Such forced association undermines the SEC's identity and purpose and impairs the Conference's ability to express the values it has publicly espoused.

55. The First Amendment protects not only the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), but also the corresponding right not to associate. *Id*. at 623; *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all"). Where, as here, a group is forced to accept certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Defendants' recruitment of, and stated intent to roster, professional athletes in SEC competition, over the express and unanimous objection of every SEC member institution other than LSU, "significantly affect[s]" the SEC's ability to express its longstanding values. *See id*. at 650.

**Harm to the SEC**

56. Defendants' conduct has caused and continues to cause significant harm to the Conference.

57. Defendants' conduct has infringed the SEC's First Amendment right of expressive association by forcing the Conference to associate itself and its competitions with conduct that it has expressly repudiated.

58. Defendants' conduct has created competitive imbalance among SEC member institutions. LSU's stated intent to roster professional athletes in contravention of the Professionalism Rules, while other institutions have followed the rules and rostered only college athletes, provides an unfair competitive advantage to LSU.

59. Defendants' conduct has disrupted the settled expectations of student-athletes at other SEC institutions who relied on the rules governing roster composition and competitive fairness. Current college athletes who planned their careers around an established set of rules now face the prospect of being displaced by professional athletes.

60. Defendants' conduct has eroded public confidence in the integrity of SEC competition, confidence on which the Conference's brand, its media partnerships, and its educational mission depend.

61. Defendants' conduct has damaged the Conference's ability to fulfill the purpose for which it was created: to maintain intercollegiate athletic programs compatible with the highest standards of education and competitive sports.

62. These harms are ongoing. They will continue for as long as Defendants are free to engage in conduct that contradicts and undermines the Conference's longstanding purpose and mission.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY AND INJUNCTIVE RELIEF BASED ON ACTUAL AND THREATENED VIOLATIONS OF THE FIRST AMENDMENT AND 42 U.S.C. § 1983

(Against All Defendants)

63. The SEC incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

64. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. CONST. amend. I. The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 749 n.1 (1976).

65. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to

associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. "Freedom of association therefore plainly presupposes a freedom not to associate." *Id.* at 623.

66. "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 647–48. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Id*. at 648. As Justice Jackson emphasized, "[i]f there is any fixed star in our constitutional constellation, it is that *no official*, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

67. The Conference engages in expressive association. As set forth above, the Conference has repeatedly and publicly expressed its position that professional athletes should not be permitted to return to college competition and that the integrity of college athletics depends on maintaining the distinction between college and professional sports. These values are embodied in the Conference's Constitution and Bylaws, in formal governance actions of its Presidents and Chancellors, in public statements by the SEC's Commissioner, and in the Conference's communications with its member institutions, student-athletes, fans, and media partners.

68. Further, Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

69. Each Defendant is a "person" within the meaning of Section 1983. Defendant LSU is a public university and an instrumentality of the State of Louisiana. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is a public university system board and an instrumentality of the State of Louisiana. Defendants Rousse, Ausberry, and Kiffin are state officials sued in their official capacities. Each Defendant acted and continues to act under color of state law in carrying out the conduct described herein. *See West*, 487 U.S. at 50.

70. Defendants, each of them a state actor, have through their conduct forced the Conference to associate its competitions, brand, and championships with conduct that the Conference has expressly repudiated by recruiting professional athletes, publicly announcing the intent to roster them, and permitting them to actively practice with LSU's football team, all over the Conference's express and unanimous objection. A state university and its public employees cannot force an

athletic conference to associate its competitions with conduct antithetical to the conference's expressed values. *See West*, 487 U.S. at 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.") Such a forced association "significantly affect[s]" the Conference's ability to express its views. *Dale*, 530 U.S. at 650.

71. The Conference has a constitutional right to determine the values that it expresses, to disassociate from conduct that contradicts those values, and to enforce its Constitution and Bylaws that give effect to those values. Defendants' conduct infringes those rights and therefore violates the First Amendment.

72. Defendants' actions were taken under color of state law. Defendants LSU and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College are state institutions. The remaining Defendants carried out the challenged conduct in their official capacities as state employees exercising authority vested in them by the State of Louisiana. Their decisions to recruit professional athletes to LSU's football team and allow them to practice with the team, along with their announced plan to place them on LSU's official football roster, were made pursuant to their state-authorized responsibilities over LSU's athletics program.

73. The State of Louisiana itself has weighed in on this issue. On September 2, 2026, the Attorney General of the State of Louisiana filed an amicus brief in the pending Louisiana state court lawsuit advocating in favor of allowing LSU to add former professional players to its football roster.

74. The deprivation of the SEC's constitutional rights was caused by Defendants' conduct, including Defendants' recruitment of professional athletes, Defendants' decision to have them practice with the football team, and Defendants' stated intent to add these professional athletes to LSU's official football roster. The First Amendment claim is ripe for adjudication now. Defendants' conduct infringes on the SEC's expressive association rights.

75. Further, Defendants' public, unequivocal commitment to place the recruited professional athletes on LSU's official football roster creates a real and immediate threat of further forced association with conduct contrary to the Conference's stated principles. Defendants have gone beyond mere public statements: they have permitted professional athletes to actively practice with LSU's football team, an affirmative step toward culmination of the wrongful forced association. The infringement of the SEC's expressive association rights is not conjectural or hypothetical.

76. As a direct and proximate result of Defendants' violation of 42 U.S.C. § 1983, the SEC has suffered and continues to suffer injury, including the

infringement of its First Amendment rights, competitive imbalance among its member institutions, and harm to its institutional identity and public reputation.

77. The SEC therefore requests that the Court enter a declaratory judgment that the First Amendment protects the SEC's right to disassociate from Defendants' conduct.

78. The SEC is entitled to declaratory and injunctive relief, as well as an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT II**
**INJUNCTIVE RELIEF**
(Preliminary and Permanent Injunction)
(Against All Defendants)

79. The SEC incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

80. The SEC is entitled to preliminary and permanent injunctive relief.

81. ***Likelihood of Success on the Merits.*** As set forth above, the Conference is likely to succeed on its claims that Defendants have infringed the SEC's First Amendment rights.

82. ***Irreparable Harm.*** Absent injunctive relief, Defendants' ongoing violations will cause continuing and irreparable harm to the Conference. The infringement of the SEC's First Amendment right of expressive association constitutes irreparable harm per se. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.”). Competitive imbalance introduced during the 2026-27 season cannot be undone. Student-athletes displaced from rosters by professionals cannot recover those lost opportunities. And the damage to the confidence of the public and the SEC’s member institutions in the integrity of SEC competition, once inflicted, is difficult if not impossible to repair.

83. ***Balance of Equities.*** The Conference’s interest in protecting its First Amendment rights outweighs Defendants’ interest in recruiting professional athletes and openly violating longstanding Conference rules—rules that LSU itself reaffirmed as recently as August 25, 2026. The Conference does not ask this Court to prevent any student-athlete from competing. It asks this Court to declare that Defendants cannot violate the SEC’s First Amendment right to freedom of association.

84. ***Public Interest.*** The public has a strong interest in the integrity of college athletics. The Professionalism Rules protect opportunities for current and incoming student-athletes, maintain competitive fairness, and preserve the character of college sports as distinct from professional sports. Enforcing those rules serves the public interest. Moreover, the public has an independent interest in ensuring that First Amendment protections are upheld against state encroachment.

85. The SEC requests that this Court enter:

(a) A preliminary and permanent injunction prohibiting Defendants from violating the Conference's First Amendment rights by compelling the Conference to associate with conduct that is contrary to the Conference's purpose and mission;

(b) A preliminary and permanent injunction barring Defendants from seeking to deter, coerce, prevent, or punish the Conference for exercising its First Amendment rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff the Southeastern Conference respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A. Enter a declaratory judgment that the First Amendment protects the Conference's right to disassociate from Defendants' conduct;

B. Enter a preliminary and permanent injunction prohibiting Defendants from violating the Conference's First Amendment rights by compelling the Conference to associate with conduct that is contrary to the Conference's purpose and mission;

C. Enter a preliminary and permanent injunction barring Defendants from seeking to deter, coerce, prevent, or punish the Conference for exercising its First Amendment rights; and

D. Grant such other and further relief as this Court deems just and proper.

This the 3rd day of September, 2026.

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: *_/s/ Robert W. Fuller_*
Robert W. Fuller*
N.C. Bar No. 10887
Amanda P. Nitto*
N.C. Bar No. 45158
Travis S. Hinman*
N.C. Bar No. 50779
600 S. Tryon Street, Ste. 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
Email: rfuller@rbh.com
anitto@rbh.com
thinman@rbh.com

* *pro hac vice forthcoming*

**BRADLEY ARANT BOULT CUMMINGS LLP**

By: *_/s/ R. Thomas Warburton_*
R. Thomas Warburton
T. Brooks Proctor
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: 205.521.8000
Fax: 205.521.8800
twarburton@bradley.com
bproctor@bradley.com

*Attorneys for Plaintiff the Southeastern Conference*