FILED
2026 Sep-08 AM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,

Plaintiff,

v.

**WADE ROUSSE**, in his official capacity as President of Louisiana State University; **VERGE AUSBERRY**, in his official capacity as Vice President and Director of Athletics of Louisiana State University; **LANE KIFFIN**, in his official capacity as Head Football Coach of Louisiana State University; **LEE MALLETT**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **JOHN H. CARMOUCHE**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **RODERICK ALVENDIA**, **JOHN BALLARD**, **BEN BAROUSSE**, **REBECCA F. BONIOL**, **JOHN R. CONDOS**, **VALENCIA SARPY JONES**, **CHARLES A. MOODY III**, **ESPERANZA E. MORAN**, **RAYMOND R. MORRIS**, **JENNIFER B. SETTOON**, **REMY VOISIN STARNS**, **COLLIS B. TEMPLE JR.**, **JAMES M. WILLIAMS**, and **JOSEPH BLAISE**

**Case No.: 2:26-cv-01586-ACA**

**ZUSCHLAG**, in their official capacities as Members of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; and **ELIZABETH B. MURRILL**, in her official capacity as Attorney General of the State of Louisiana,

Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff Southeastern Conference (the "SEC" or "Conference") hereby amends its Complaint in this action as a matter of right under Rule 15(a) of the Federal Rules of Civil Procedure. This Amended Complaint stems from events that have occurred since the SEC's initial Complaint was filed with the Court on September 3, 2026.

Pursuant to Section 4.1.2 of the SEC Constitution, the Conference's CEOs are vested with "plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever," including the power to "[t]ake all actions specified and contemplated in Article 3 [of the Constitution] in their sole discretion." Section 3.1.5 of the SEC Constitution and Bylaws provides in full that:

> Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any

> motion to terminate membership shall specify the effective date of the proposed termination.

Pursuant to notice properly given under Section 5.1 contemporaneously with the filing of this First Amended Complaint, the CEOs will meet on September 10, 2026, to decide whether to terminate Louisiana State University ("LSU") as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws.

Contemporaneously with the filing of this First Amended Complaint, the SEC is filing a motion for a temporary restraining order ("TRO") pursuant to 42 U.S.C. § 1983 to ensure that neither Defendants, their officers, agents, servants, employees, and attorneys, nor any person in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys, take any action to block or interfere with the meeting scheduled for September 10th or with the exercise by the Conference and its member institutions of their First Amendment rights.

This Amended Complaint also clarifies that the SEC brings this suit against officers and agents of LSU in their official capacities, as permitted by applicable precedent, and not directly against LSU. The Amended Complaint seeks declaratory and injunctive relief and a temporary restraining order against Wade Rousse, in his official capacity as President of LSU; Verge Ausberry, in his official capacity as Vice President and Director of Athletics of LSU; Lane Kiffin, in his official capacity as Head Football Coach of LSU; Lee Mallett, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural

and Mechanical College (the "Board"); John H. Carmouche, in his official capacity as Vice Chair and Member of the Board; Roderick Alvendia, John Ballard, Ben Barousse, Rebecca F. Boniol, John R. Condos, Valencia Sarpy Jones, Charles A. Moody III, Esperanza E. Moran, Raymond R. Morris, Jennifer B. Settoon, Remy Voisin Starns, Collis B. Temple Jr., James M. Williams, and Joseph Blaise Zuschlag, in their official capacities as Members of the Board; and Elizabeth B. Murrill, in her official capacity as Attorney General of the State of Louisiana.

Now, therefore, the SEC alleges:

## INTRODUCTION

1. For more than ninety years, the Southeastern Conference has stood at the intersection of higher education and elite athletic competition. Founded in 1933 by university presidents who believed that athletics should promote and serve educational values, the SEC is now the nation's premier intercollegiate athletic conference.

2. Today, the SEC is a sixteen-member association. The Presidents and Chancellors of the SEC's member institutions have governed together across generations, operating under a set of shared rules that have shaped the athletic and educational paths of thousands of student-athletes and provided the competitive integrity and fair competition necessary for the SEC to thrive. Those rules are not fine print. They are the governing framework that keeps college sports unique,

protects opportunities for high school and college student-athletes, and preserves competitive equity and fair competition.

3. The SEC has endured and thrived for nearly a century because its members have adhered to that common set of rules, which each member institution, and every coach at those institutions, has agreed to follow.

4. Among the most fundamental of those rules are the longstanding provisions that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics (the "Professionalism Rules"). These rules are built upon an essential principle: college athletics are reserved for students who are actively pursuing an education while competing for their universities. The Professionalism Rules preserve competitive fairness, protect opportunities for high school students and current college athletes, and maintain the distinction between college and professional sports. That distinction is critical to the SEC's member institutions, their Presidents and Chancellors, and their fans.

5. This case arises from Defendants' ongoing and threatened violations of the SEC's First Amendment right of expressive association.

6. Specifically, Defendants waged a deliberate, coordinated, and public campaign to recruit professional athletes to play football for LSU during the 2026-27 season, including players who had signed National Football League ("NFL")

contracts with, or appeared on the NFL rosters of, the Cleveland Browns, Philadelphia Eagles, New Orleans Saints, and Tampa Bay Buccaneers. At least two of these professional athletes are on LSU's campus, enrolled at LSU, and actively practicing with LSU's football team. Defendants have indicated their intent to place those athletes on LSU's official football roster and, after the deadline for finalizing its NCAA football roster on September 4, 2026, specifically left two roster spots open so that these former professional athletes could later be added to LSU's roster for the 2026-27 football season.

7. Every SEC member institution—including LSU—has affirmed that individuals who choose to leave college athletics, sign professional playing contracts, and compete professionally should not then be permitted to return to college competition. Just days ago, at a regularly scheduled meeting on August 25, 2026, LSU (through Defendant Rousse) voted in favor of the SEC issuing a policy statement clarifying that its longstanding rules prohibit an SEC institution from having a professional athlete on its roster in the sports of football, men's basketball, and women's basketball.

8. Nevertheless, Defendants have continued their public efforts to recruit professional athletes and eventually allow them to participate in official team activities in direct defiance of the Professionalism Rules. This conduct is detrimental

to the Conference and contrary to its core purpose. Defendants' conduct has already harmed the Conference and threatens to cause further substantial harm if not curbed.

9. Through their actions, Defendants have compelled the SEC and each of its member institutions to associate with conduct that every member institution—including, until recently, LSU—has expressly and unanimously repudiated. As a result, Defendants have violated the SEC's expressive association rights under the First Amendment to the United States Constitution.

10. The SEC brings this action to vindicate its First Amendment right of expressive association, *i.e.* its right not to be forced to associate its competitions, its name, its reputation and brand, and its championships with conduct that the Conference has expressly condemned and that directly contradicts the stated values and viewpoints of the SEC and its member institutions. The SEC also seeks declaratory and injunctive relief to vindicate the SEC's right to disassociate from conduct that directly undermines the SEC's organizational purpose and core values.

11. The SEC does not bring this action to declare any student-athlete ineligible or to prevent any student-athlete from participating in any athletic competition. This action is directed solely at the state actors who have violated, continue to violate, and threaten to further violate the SEC's rights under the First Amendment.

## PARTIES

12. Plaintiff Southeastern Conference is the nation's premier intercollegiate athletic conference. Founded in 1933, it is an unincorporated nonprofit association organized under Alabama law and headquartered at 2201 Richard Arrington Jr. Boulevard North, Birmingham, Alabama 35203.

13. The SEC has sixteen member institutions, fifteen of which are state universities: the University of Alabama, Auburn University, the University of Arkansas, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri, the University of Oklahoma, the University of South Carolina, the University of Tennessee, Texas A&M University, the University of Texas, and Vanderbilt University (the only private institution).

14. Louisiana State University is a public university located in Baton Rouge, Louisiana and organized under the laws of the State of Louisiana. LSU has been a member of the SEC since the Conference's founding in 1933 and is bound by the Conference's Constitution and Bylaws. LSU is not a defendant in this case.

15. The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College is a public university system board responsible for supervising and managing the institutions within the system, including LSU. The Board itself is not a defendant in this case.

16. Defendant Wade Rousse is the President of LSU. He is sued only in his official capacity.

17. Defendant Verge Ausberry is the Vice President and Director of Athletics of LSU. He is responsible for the development, management, and supervision of LSU's athletics program. He is sued only in his official capacity.

18. Defendant Lane Kiffin is the head football coach at LSU. He is sued only in his official capacity.

19. Defendant Lee Mallett is the Chair and a Member of the Board. He is sued only in his official capacity.

20. Defendant John H. Carmouche is the Vice Chair and a Member of the Board. He is sued only in his official capacity.

21. Defendants Roderick Alvendia, John Ballard, Ben Barousse, Rebecca F. Boniol, John R. Condos, Valencia Sarpy Jones, Charles A. Moody III, Esperanza E. Moran, Raymond R. Morris, Jennifer B. Settoon, Remy Voisin Starns, Collis B. Temple Jr., James M. Williams, and Joseph Blaise Zuschlag are Members of the Board. They are sued only in their official capacities.

22. Defendant Elizabeth B. Murrill is the Attorney General of the State of Louisiana. She is sued only in her official capacity.

## JURISDICTION AND VENUE

23. Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction over the SEC's claims under the First Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983, and over its claim for declaratory relief, which is authorized by 28 U.S.C. §§ 2201 and 2202.

24. Because each Defendant is a state actor and the SEC seeks prospective redress for the deprivation of its constitutional rights under color of state law, the SEC's claims are cognizable under 42 U.S.C. § 1983. *Lindke v. Freed*, 601 U.S. 187, 195 (2024); *see also Ex parte Young*, 209 U.S. 123, 159 (1908).

25. Venue is proper in the Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the SEC's claims occurred in this District. The SEC is headquartered within this district, in Birmingham, Alabama. The SEC's governance deliberations, the actions taken by the Conference's Presidents and Chancellors (including Defendant Rousse) and Commissioner as described further below, and the issuance of the memoranda described herein all occurred in or were directed from this District. The injuries to the SEC's expressive association rights were suffered at the SEC's headquarters in this District.

26. This Court has personal jurisdiction over all of the LSU-affiliated Defendants in their official capacities as agents of LSU, as persons with authority to

act on behalf of LSU, and as its governing board because this case arises out of and relates to LSU's continuous and systematic contacts with Alabama and this District. These continuous and systematic contacts with Alabama and this District include contacts that arise out of LSU's membership in and management of the Conference. Since 1933, LSU has been a voluntary member of the SEC, which is headquartered in this District. LSU agreed to the SEC's Constitution and Bylaws, which are administered from this District. LSU regularly participates in Conference governance meetings held in this District, sends athletic teams to this District for intercollegiate competitions and SEC events located in Alabama (including football games against the University of Alabama and the SEC Baseball Tournament held annually in Hoover, Alabama), and derives substantial revenue from Conference media agreements entered in and administered from this District. LSU's membership in the SEC and its obligations under the Conference's governing documents are administered and enforced from this District.

27. Because this case arises out of LSU's continuous and systematic contacts with Alabama and this District, this Court has personal jurisdiction over the LSU-affiliated Defendants in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

28. Certain Defendants have additional contacts with Alabama and this District. The claims in this action also arise out of and relate to these contacts.

29. For example, Defendant Rousse regularly attends meetings of the SEC's Presidents and Chancellors, including in-person meetings in this District, and takes action at those meetings in his capacity as one of 16 Chief Executive Officers ("CEOs") of the Conference. Under the SEC Constitution, each President or Chancellor of the 16 member institutions is designated as a CEO pursuant to nomenclature adopted in 1933 when the Conference was founded. The role is equivalent to the role of directors serving on a board of directors of a corporation.

30. Indeed, Defendant Rousse was physically present in Birmingham, Alabama recently when he attended a two-day meeting of the Conference's Presidents and Chancellors, participated in Conference governance decisions, and engaged in conduct that is at the heart of this lawsuit.

31. Defendant Ausberry regularly attends meetings of the SEC's Athletic Directors, including in-person meetings in this District.

32. Defendant Kiffin regularly attends meetings of the SEC's head football coaches and has attended an in-person meeting in this District. Defendant Kiffin has also appeared in this District for intercollegiate competitions against another SEC member institution located in this District, the University of Alabama.

33. Apart from the LSU-affiliated Defendants, this Court also has personal jurisdiction over Defendant Murrill in her official capacity as Attorney General of the State of Louisiana based on her own deliberate and intentional conduct that was

expressly aimed at the SEC and at this District. Defendant Murrill deployed the official powers of the Attorney General's office in coordination with, and in furtherance of, the other Defendants' campaign to compel the SEC to associate with conduct that violates its core principles.

34. Specifically, Defendant Murrill filed an amicus brief in the *Pyburn* Action, as described below, supporting the *Pyburn* Plaintiffs' effort to enjoin the SEC and its Commissioner from enforcing the Conference's Professionalism Rules. Defendant Murrill personally appeared at the preliminary injunction hearing, sat with counsel for the *Pyburn* Plaintiffs, and advocated (through her amicus brief) for relief that directly restrained the SEC, an Alabama-headquartered association, from exercising its constitutional rights. Defendant Murrill's actions were taken in active concert with the other Defendants and in furtherance of a coordinated effort by Louisiana state actors, including the Governor and officials at LSU, to override the SEC's governance of its own association.

35. Each of the other Defendants' contacts with Alabama and this District, as described above, are attributable to Defendant Murrill insofar as she knowingly joined and advanced the common course of conduct that gave rise to the SEC's claims. *See Calder v. Jones*, 465 U.S. 783 (1984). Here, Defendant Murrill wielded the official authority of her office to support litigation expressly aimed at preventing the SEC, an entity headquartered in this District, from exercising its First

Amendment right to disassociate from conduct it has publicly repudiated. The effect of Defendant Murrill's actions was directed at and felt in this District, where the Conference is organized, where its governance decisions are made, and where its expressive association rights are centered.

## FACTUAL BACKGROUND

### The SEC's Mission and Governance Structure

36. The SEC was founded on the principle that intercollegiate athletics serves an educational purpose. The Conference facilitates and assists its member institutions in maintaining intercollegiate athletic programs compatible with the highest standards of education and competitive sports.

37. Article 1 of the Constitution sets forth the purpose and mission of the Conference in Section 1.2:

> The purpose and mission of the Southeastern Conference is educational within the meaning of Section 501(c)(3) of the Internal Revenue Code. Intercollegiate athletics programs provide fundamental lessons in leadership and teamwork, and about winning and losing that have an irreplaceable role in the greater world of business, government, military, and academic pursuits. In no event shall the Conference engage in any activity or take any action inconsistent with its educational purpose and mission, and nothing in this Constitution, or in the Bylaws or Regulations, shall authorize any such activity or action.
>
> To further its educational purpose and mission, the Conference shall direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe eligibility rules for contestants. The Conference shall also facilitate and assist its member institutions in maintaining intercollegiate athletic programs compatible with the

> highest standards of education and competitive sports. Through the orderly enactment and enforcement of legislation, the Conference aims:
>
> (a) To encourage sound academic practices for student-athletes;
>
> (b) To foster strong competition among the teams of its member institutions in a broad spectrum of amateur sports and championships;
>
> (c) To assure proper emphasis on the funding of athletic activities;
>
> (d) To stimulate good sportsmanship;
>
> (e) To provide leadership and a voice in the development of public attitudes toward intercollegiate sports generally; and
>
> (f) To address the future needs of athletics in a spirit of cooperation and mutual benefit of the member institutions and their student-athletes.

A copy of the SEC's Constitution and Bylaws is attached as Exhibit A to the Declaration of Greg Sankey, which is filed contemporaneously herewith as **Exhibit A**.

38. From its founding, the SEC's governance has rested in the hands of its member institutions. Under Article 4 of the SEC Constitution, the Presidents and Chancellors of those institutions serve as the Conference's CEOs with plenary power over all Conference affairs. This structure reflects a deliberate choice that the rules governing SEC competition should be made by the leaders of the educational institutions whose students compete under those rules. Through this governance structure, the member institutions collectively control the Conference and establish

its policies and procedures. The Presidents and Chancellors make all final decisions regarding material and fundamental Conference matters.

39. Article 6 of the SEC Constitution charges the CEOs of each member institution, including LSU, with "full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution." This obligation to exercise institutional control reflects the SEC's model of shared governance. The expectation and requirement set forth in this Article is a foundational principle of fundamental importance to the fulfillment by the Conference of its purpose and mission as set forth in the Constitution and Bylaws.

40. The SEC's governance framework depends on compliance by both member institutions and their athletics employees and athletics representatives. Each member institution is bound by the SEC Constitution and Bylaws as a condition of its membership in the Conference. LSU, as a member institution, has agreed to comply with all Conference rules and to enforce those rules at its institution. Bylaw 19.8.1.1 provides that, "[i]t is the obligation of each member institution to enforce and comply with the Rules."

41. The SEC and its members are also members of the NCAA. The Conference and its members are subject to NCAA rules and regulations, but the

NCAA does not control the Conference. The Conference and the NCAA are separate and independent entities.

42. The Conference and the NCAA each establish rules delineating eligibility requirements for student-athletes to participate in Conference and NCAA competitions. The NCAA rules apply to all NCAA member institutions. The Conference rules supplement the NCAA rules and apply only to the SEC's member institutions.

**The SEC's Professionalism Rules**

43. Both the NCAA and the SEC have long maintained rules that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from competing in college athletics. Among those rules is NCAA Bylaw 12.2.4, which provides that a student-athlete "shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." This NCAA Bylaw is incorporated by reference and is effective as an SEC Bylaw pursuant to SEC Bylaw 14.01.1.

44. The SEC's Professionalism Rules are not new. They have been a cornerstone of the college athletics model since at least 1933, are fundamental to the SEC's mission, and reflect the core expressive message of the Conference: that collegiate athletics serves an educational mission and is distinct from professional

sports. The rules are grounded in the principle that college athletics are reserved for students who are actively pursuing a degree while also participating in college sports and for future college athletes who seek to benefit from the unique educational, athletic, and leadership opportunities provided through college sports.

45. The SEC's Professionalism Rules also promote competitive fairness in the context of college athletics. They recognize that an athlete who has pursued a professional career, with the benefit of professional-level training, resources, and competition, occupies a fundamentally different position than a student-athlete who has remained within the collegiate model or who is entering the collegiate model from high school.

46. These Professionalism Rules also create and preserve opportunities for high school student-athletes and current college athletes. Each roster spot filled by a professional athlete is one that becomes unavailable to a high school student-athlete or another less-developed athlete who would benefit from the educational and athletic growth opportunities uniquely available through collegiate athletics.

47. The Professionalism Rules also promote roster stability and the settled expectations of student-athletes and institutions that have planned their programs around an established set of rules. Without consistent application of these rules, college athletes cannot have confidence in the rules of the competition in which they are engaged or the real-world effects of their decision to pursue a professional sports

career; college coaches do not receive clear guidance on actions they can and cannot take to build their rosters for effective and compliant competition; and entering college freshmen face uncertainty about their opportunities to join a roster and benefit from the experience of participating in college athletics.

48. The Professionalism Rules further promote competitive equity and fair competition among the SEC's member schools by ensuring that each member institution is engaged in competition with other institutions governed by, subject to, and compliant with the same foundational set of rules and requirements.

49. The SEC has publicly, consistently, and through formal governance action expressed its institutional position on the issues at the heart of this dispute. These expressions are not incidental to the Conference's operations. They are integral to the SEC's organizational purpose and identity and the message it communicates to the public.

50. The SEC's Commissioner has repeatedly emphasized that the Conference's Professionalism Rules are essential to the integrity of college sports and grounded in the principle that athletics are an integral part of the academic experience. He has made clear that, in the view of the SEC and its member institutions, permitting professional athletes to return to competition creates a competitive disadvantage and fundamental unfairness for current student-athletes

who have not pursued a professional sports career but instead have maintained their commitment to the collegiate athletics model.

**Challenges to Professionalism Rules**

51. In June 2026, the NCAA adopted a new age-based eligibility model, commonly referred to as the "5-for-5" rule, that allows student-athletes up to five seasons of competition within a five-year period beginning when they enroll in college.

52. Beginning in the summer of 2026, certain student-athletes who first enrolled in college in 2022 and had exhausted their eligibility by spring of 2026 (the "2022 Class") began filing lawsuits across the country challenging the NCAA's decision to implement the 5-for-5 rule and not to grant an additional year of eligibility to the 2022 Class. Among those athletes were several former college football players who had been placed on an NFL roster or who had signed professional contracts with NFL teams during the 2026 NFL Draft and undrafted free agency period.

53. Disregarding the SEC's longstanding rules prohibiting professional athletes from returning to college athletics, Defendants saw this as an opportunity to be exploited. They began an orchestrated campaign to recruit professional athletes to join LSU's football roster for the 2026-27 season.

54. These efforts included recruiting players who had signed NFL contracts with or appeared on the NFL rosters of the Cleveland Browns, Philadelphia Eagles, New Orleans Saints, and Tampa Bay Buccaneers and were actively participating in NFL training camps.

55. On or about August 19, 2026, thirty-two former student-athletes brought an action captioned *Pyburn, et al. v. National Collegiate Athletic Association* (the "*Pyburn* Action"), Case No. C-783299, in the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana. In the action, the plaintiffs (the "*Pyburn* Plaintiffs") sought injunctive relief effectively requiring the NCAA to take all actions necessary to make the *Pyburn* Plaintiffs eligible to compete in intercollegiate athletics during the 2026-27 academic year.

56. Two of the *Pyburn* Plaintiffs, Zxavian Harris and Dae'Quan Wright, are former student-athletes who played football at the University of Mississippi in and prior to the 2025-26 academic year under Defendant Kiffin. Jack Pyburn is a former student-athlete who played football at the University of Florida from 2022-2024 and at LSU during the 2025 football season.[1] Harris, Wright, and Pyburn all entered the NFL draft and signed NFL contracts. Some of them engaged in practices with an NFL team and appeared on NFL rosters. All three sought and obtained an

[1] It appears based on public reports that Pyburn was claimed on waivers after being released by the Tampa Bay Buccaneers and will play for the Kansas City Chiefs in the NFL. Counsel for the *Pyburn* Plaintiffs dismissed Pyburn from the action on September 3, 2026.

injunction in the *Pyburn* Action for the stated purpose of joining LSU's football team for the 2026-27 season.

57. On August 24, 2026, the SEC CEOs (*i.e.*, the SEC's Presidents and Chancellors) met to address media reports and lawsuits filed against the NCAA, including the *Pyburn* Action, that revealed some NCAA member institutions were engaged in conversations with current or former professional athletes who were not eligible for competition in the SEC or the NCAA under the Professionalism Rules.

58. The CEOs unanimously concluded that these developments placed at risk the foundational principles and policies of the SEC as set forth in the Conference's Constitution and Bylaws. The CEOs concluded that it was important to affirm the Conference's longstanding position that individuals who choose to leave college athletics, sign professional contracts, appear on professional team rosters, and compete professionally should not subsequently be permitted to return to college competition.

59. The Conference's CEOs and Athletic Directors had a regularly scheduled in-person meeting in Birmingham on August 25 and 26, 2026.

60. On August 25, 2026, the first day of the regularly scheduled meeting, the CEOs addressed the recent litigation challenges to the validity of the Professionalism Rules and unanimously instructed the Conference office to issue a

public policy statement that same day. The SEC's Policy Statement is attached to Commissioner Sankey's Declaration as Exhibit C. *See* **Ex. A** at pp. 69-70.

61. All sixteen CEOs, including Defendant Rousse, voted in support of the SEC's Policy Statement.

62. The CEOs directed the issuance of the Policy Statement to publicly reaffirm the foundational principles of the Conference, as reflected in the Conference's Constitution and Bylaws. The SEC's Policy Statement reiterated that the long-standing Professionalism Rules prohibit an SEC institution from placing on its roster an athlete who previously declared for the NFL, NBA, or WNBA draft and did not appropriately withdraw, signed a contract with an NFL or other professional football league, NBA/G-League, or WNBA (or affiliate) team, or was listed on an NFL or other professional football league, NBA/G-League, or WNBA (or affiliate) roster.

63. A violation of the Professionalism Rules by a member institution is both a violation of NCAA Bylaws and a violation of the SEC Bylaws. On August 26, 2026, in a continuation of the regularly scheduled meeting referenced above, the CEOs instructed Commissioner Sankey, using his authority as SEC Commissioner, to impose specified penalties on any SEC member institution that took action contrary to the Policy Statement in violation of the Professionalism Rules. The CEOs directed the Commissioner on the specific minimum penalties to be imposed.

64. Acting pursuant to direction from the CEOs, Commissioner Sankey issued a memorandum that same day to all SEC member institutions and coaching personnel that is attached to his Declaration as Exhibit D (the "Professionalism Memorandum"). *See* **Ex. A** at pp. 71-73. The Professionalism Memorandum provided guidance and notice from the SEC office, as directed by the CEOs, on the penalties that would be imposed against SEC member institutions, CEOs, coaches, and other SEC athletics personnel if a member institution added a football or basketball player to its roster in disregard of the longstanding Professionalism Rules.

65. The CEOs unanimously directed the Commissioner to issue the Professionalism Memorandum, except for Defendant Rousse, who abstained from the vote authorizing the specific penalties set forth in the memorandum.

66. The viewpoints expressed by the SEC, as described above, reflect a core tenet of the Conference's institutional identity. The SEC holds itself out to its student-athletes, its fans, its media partners, and the public as an organization committed to competitive integrity, educational values, and the principle that collegiate athletics is distinct from professional sports.

67. During and after the meetings of the SEC CEOs summarized in the prior paragraphs, LSU officials and representatives continued publicly to indicate that they intended to and would persist in seeking to roster professional athletes to play football at LSU in violation of the Professionalism Rules. For example:

(a) During his August 24, 2026, press conference, Defendant Kiffin said, in reference to the professional players: "They're available to recruit. **So, ourselves, like many places around the country, are recruiting them**."[2] He also said, "[a]t the end of the day, you know, because of these rulings, they're either going to play for you or they're going to play somewhere else around the country. **So, we've made the decision to recruit them like probably most people are**."

(b) On August 25, 2026, on *The Pat McAfee Show*, Defendant Kiffin went considerably further. Kiffin said, "I said to our staff, I said, whoever the first player commits to will be the poster child . . . [and] the player chose us."[3] Defendant Kiffin stated that multiple schools were recruiting the player and "offering him a lot of money, **and he decided to come play for us**." He also told his staff, "**Get ready, guys. . . . This will be Lane Kiffin, LSU . . . doing something nobody else is doing**." Defendant Kiffin defended the decision to recruit and roster the professional athletes by saying "Our players know that, and I think our fans and

[2] Lane Kiffin Press Conference (August 24, 2026) available at https://www.youtube.com/watch?v=e0V4ZUVdGps&t=14s

[3] *See Lane Kiffin Responds To Critics Of NFL Players Returning To Play At LSU*, THE PAT MCAFEE SHOW (August 25, 2026) available at https://www.youtube.com/watch?v=YXL-8iDvIsY.

administration . . . understand that [we]'re doing what's best for their program."

(c) *CBS Sports* reported on August 25, 2026, that sources indicated Defendants Kiffin and LSU "reached out to multiple players on NFL rosters or their representation" with the purpose of getting them to pursue litigation that could enable them to return to college.[4]

(d) During his August 31, 2026, press conference at LSU, Defendant Kiffin said he met with LSU's player leadership committee and asked them whether the team wanted the former NFL players added.[5] He described their response as, **"every one of them was emphatic about, 'if they can help us win, bring 'em.'"**

68. Defendant Kiffin also publicly confirmed that professional players practiced with LSU's football team and that he intended to play them during the upcoming season.[6]

---

[4] *See* John Talty and Chris Hummer, *How Lane Kiffin and LSU triggered a national showdown over NFL-to-college transfer*, CBS SPORTS (Aug. 25, 2026, 10:59 AM), available at https://www.cbssports.com/college-football/news/lane-kiffin-lsu-nfl-players-college-football-eligibility-loophole/.

[5] *See* The Lane Kiffin Press Conference (Aug. 31, 2026) available at https://www.youtube.com/watch?v=IHGfBUnAXEk.

[6] *See*, *e.g.*, Heather Dinich, *LSU's Lane Kiffin says his players pursuing ex-NFLers*, ESPN (Aug. 31, 2026, 3:00 PM), https://www.espn.com/college-football/story/_/id/49785035/lsu-lane-kiffin-says-players-endorse-pursing-ex-nflers (Defendant Kiffin confirms that at least one former player is practicing with LSU's football team); Seth Emerson, *Lane Kiffin met with LSU's player leadership before adding returning pro players, he said*, New York Times (August 31, 2026), https://www.nytimes.com/athletic/7553369/2026/08/31/lane-kiffin-eligibility-lsu-college-

### The Louisiana Preliminary Injunction

69. On August 27, 2026, the *Pyburn* Plaintiffs filed an Amended Petition adding the Conference and the SEC's Commissioner as Defendants. On August 28, the Louisiana Court entered an Amended Temporary Restraining Order ("Amended TRO") and a Show Cause Order that are attached to the Sankey Declaration as Exhibit E and Exhibit F. *See* **Ex. A** at pp. 74-83. The Louisiana court scheduled a hearing on the *Pyburn* Plaintiffs' preliminary injunction motion for September 3, 2026.

70. The Show Cause Order, TRO, Amended TRO, and Preliminary Injunction (the last of which is described below) are all official actions of a court that is an official state agency of the State of Louisiana.

71. At the September 3 hearing, the Louisiana court orally granted the motion for a preliminary injunction and instructed the *Pyburn* Plaintiffs to prepare a formal order. The *Pyburn* Plaintiffs have circulated a proposed order, which is expected to be submitted to the Louisiana court on September 8, 2026. The Amended TRO and (as drafted by the *Pyburn* Plaintiffs) the Preliminary Injunction Order both provide that:

> Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or

football/ (quoting Defendant Kiffin stating, with regard to adding former professional players to LSU's team, "this is how the real world works. They can bring employees into certain jobs to help the company.").

participation with are further temporarily restrained and enjoined from enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, and/or any SEC rule or proposed penalty against:

a. Plaintiffs;

b. Any NCAA member institution or coach for which Plaintiffs choose to compete during the 2026–2027 season; and

c. Any NCAA member institution or coach that competes against Plaintiffs.

The Amended TRO and proposed order are attached to the Sankey Declaration as Exhibit E (Amended TRO) and Exhibit G (Proposed Preliminary Injunction Order). *See* **Ex. A** at pp. 74-77, 84-87.

72. The Amended TRO and the oral Preliminary Injunction, which is expected to be formally entered on September 8, 2026, effectively prohibit the SEC and its member institutions from imposing penalties on its member institutions or their coaches consistent with the SEC's Constitution and Bylaws, including the penalties summarized in the Professionalism Memorandum. Imposition of those penalties would have the effect of disassociating the Conference and its other fifteen member institutions from the actions and statements of LSU through Defendant Kiffin.

73. During the September 3 Preliminary Injunction hearing, the Louisiana Court criticized the public statements of the SEC and its Commissioner, including the SEC's expressions made in the SEC's Policy Statement and the SEC's

Professionalism Memorandum. The SEC does not and did not view these expressions as prohibited by the TRO entered against the NCAA. The SEC did not coordinate its actions or statements with the NCAA and acted and made statements consistent with and pursuant to its own Constitution and Bylaws to fulfill its mission and goals as set forth therein.

74. Neither the TRO, the Amended TRO, nor the Preliminary Injunction (when entered) impose or can impose prior restraints on speech in violation of the First Amendment's guarantee of freedom of speech or impose a viewpoint- and content-based ban on speech by the SEC, its Commissioner, or its member institutions. Those orders similarly do not and cannot restrain the rights of the SEC and the 15 member institutions other than LSU to disassociate themselves from LSU by terminating LSU's membership in the Conference.[7]

75. Defendant Murrill, acting in her official capacity as Attorney General, submitted an amicus brief supporting the *Pyburn* Plaintiffs prior to the preliminary injunction hearing, joined the *Pyburn* Plaintiffs' counsel at their counsel table, and made a series of public statements in her official capacity criticizing the SEC, its Commissioner, and this lawsuit. The amicus brief is attached to Commissioner Sankey's Declaration as Exhibit H. *See* **Ex. A** at pp. 88-102. These statements were

[7] A transcript from the September 3, 2026, preliminary injunction hearing in Louisiana is not currently available. When it becomes available, the SEC will provide a copy to this Court.

not personal commentary. They were official acts by the State's chief legal officer that were calculated to deter, chill, and obstruct the SEC's exercise of its First Amendment rights. Examples of Defendant Murrill's official conduct include:

(a) Defendant Murrill posted on the social media platform X (formerly known as Twitter) in support of the *Pyburn* Plaintiffs, stating: "Dae'Quan Wright, who played for Ole Miss, says he lost out on seven-figure NIL money in a fifth year. Mississippi didn't fight for him, but Louisiana will."

(b) Defendant Murrill posted on X:"The conference's reliance-be-damned response is not a lawful answer. These changing rules are promulgated and enforced against young people and schools making decisions about real life that have real, irreparable consequences. Plaintiffs need to be able to rely on a court's decision on these issues without fear of reprisal in the future."

(c) While walking into the preliminary injunction hearing, Defendant Murrill began her comments to the media by saying "Geaux Tigers." She then explained that her amicus brief was about "giving these players a fair forum and opportunity to be heard." She described the NCAA's and SEC's actions as "unfair" to the players and said that the

players "deserve a forum where they can have a fair hearing about how they are being treated and by the NCAA and the SEC."[8]

(d) When the SEC filed its initial complaint in this action, Defendant Murrill called it "legal garbage." She also stated on X that the lawsuit was "garbage & frivolous."

(e) After the preliminary injunction hearing, Defendant Murrill criticized the Commissioner for leaving the courtroom after he testified for several hours, despite the fact that the Court and all parties agreed that the Commissioner's testimony was concluded and that he was free to leave.

(f) Defendant Murrill also mischaracterized the Commissioner's testimony and publicly criticized him. She posted on X: "the SEC Commissioner astonishingly said he had never read the relevant rules until today." During the press conference that followed the preliminary injunction hearing, Defendant Murrill further stated: "I think there were a lot of things he said today that were rather offensive."

(g) Defendant Murrill posted on X: "These athletes were seeking a fair forum and a neutral decision-maker, and I'm very pleased that they obtained that, as well as relief."

---

[8] https://www.instagram.com/reel/Dc1LLp3x_OA/.

Defendant Murrill's X posts are attached to Commissioner Sankey's Declaration as Exhibit I. *See* **Ex. A** at pp. 103-107.

76. The Governor of Louisiana also made public statements supporting LSU and criticizing the SEC during or after the preliminary injunction hearing.

77. Further, Defendant Kiffin has repeatedly and publicly declared that he has actively "fought" for the *Pyburn* Plaintiffs, including on September 5, 2026, on ESPN's College GameDay program, and on the Marty & McGee show that same day.

**Informal Meeting on September 4, 2026**

78. On September 4, 2026, the 15 other SEC CEOs met informally without LSU's CEO present. Because of the obvious conflict between the positions of LSU and those of the SEC and its other 15 member institutions, and to ensure compliance with the Preliminary Injunction, Defendant Rousse was not included in the informal September 4 meeting, and no official action was taken at the meeting.

79. During the meeting, the SEC CEOs discussed the Defendants' conduct and the Preliminary Injunction. Specifically, the CEOs:

(a) Expressed great concern that the Amended TRO and Preliminary Injunction were preventing and would prevent the SEC from imposing penalties if the LSU Defendants violated the Professionalism Rules by placing Harris, Wright, or other professional football players on their

football team roster, which had to be finalized by midnight on September 4.

(b) Expressed great concern that the Show Cause Order and the statements of the Louisiana Court had a chilling effect on the SEC and its member institutions' First Amendment rights, including the right to free speech and right of expressive association.

(c) Expressed great concern that Defendant Kiffin was working in concert with counsel for the *Pyburn* Plaintiffs, with the support and involvement of Defendant Murrill and the Louisiana Governor.

(d) Expressed great concern that Defendants Rousse and Ausberry have no meaningful control over Defendant Kiffin or the football program at LSU, even though Section 6.1 of the SEC Constitution specifies that the "Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution."

(e) Specifically noted that Defendant Rousse had voted for the issuance of the SEC's Policy Statement, but that LSU had taken no action to comply with the Professionalism Rules and in fact was in active concert with the *Pyburn* Plaintiffs.

(f) Expressed concern that the conduct of LSU and Defendant Kiffin was inconsistent with the principles and values set forth in Section 1.2 of the Conference Constitution, reflecting adversely on the reputation and values of the Conference and its other member institutions.

80. No penalties or sanction of any kind were imposed on LSU at or in connection with the September 4 meeting.

81. Although no official action was taken at the September 4 meeting, the consensus of the CEOs was and continues to be that LSU's continued membership in the Conference would be inconsistent with the publicly stated values and principles of the Conference and its remaining member institutions, whether or not LSU ever includes Harris, Wright, or other football players who are ineligible under the Professionalism Rules on its football team roster.

82. The consensus at the September 4 meeting was and continues to be that LSU's demonstrated lack of institutional control at the University level—including complete lack of control over Defendant Kiffin's actions—and other conduct alleged herein that is inconsistent with the principles and purposes of the Conference as set forth in Section 1.2 of the Constitution, made it imperative for a meeting to be called to consider the termination of LSU's membership in the Conference pursuant to Section 3.1.5 of the Constitution.

83. Section 3.1.5 of the SEC Constitution provides that:

> Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any motion to terminate membership shall specify the effective date of the proposed termination.

Any action taken by the SEC's CEOs under Section 3.1.5 is pursuant to the plenary power and authority of the CEOs to regulate the SEC as a voluntary membership association as reflected and confirmed in Section 4.1.2 of the Conference's Constitution.

84. The exercise of this right of termination is not a penalty nor is it the enforcement of a rule. Instead, it is a right that is granted to the CEOs to employ under Section 4.1.2 of the SEC Constitution.

85. Section 4.1.1 of the SEC Constitution provides that action by the CEOs to terminate the membership of an institution must occur at a Regular or Special meeting of the Conference (*i.e.*, a meeting of the CEOs) called in accordance with Section 5.1 of the Constitution. Section 5.1.4 of the Constitution permits the President of the Conference (currently Chancellor Plowman of the University of Tennessee) or the Commissioner acting in consultation with the President to call a Special Meeting. Section 5.1.5 of the Constitution requires "notice of each special meeting that is reasonable under the circumstances giving rise to the meeting" which "shall, to the extent practicable, specify the nature of the matters to be considered at the meeting."

86. Based on the significant concerns expressed by the CEOs, the Conference's President has directed the Commissioner to give formal notice that a previously scheduled meeting of the CEOs on September 10, 2026, will be a Special Meeting of the Conference for the purpose of considering termination of LSU's membership in the SEC pursuant to Section 3.1.5 of the Constitution.

**LSU's Conduct on September 4 and 5, 2026**

87. LSU did not include professional players on its football roster on September 4, 2026, but left open two roster spots so that professional players could be added to the roster later.

88. Adding players after the deadline for finalizing a roster, which was midnight on September 4, 2026, is permitted by SEC and NCAA Bylaws if there are open roster spots.

89. Officials speaking on behalf of LSU continued publicly to derogate the Professionalism Rules and the positions and actions taken by the SEC CEOs during the week of August 24, 2026.

90. In a halftime interview at the football game between LSU and Clemson when LSU had a substantial lead in the game, in an interview with ABC sports, Defendant Kiffin commented that the score differential would have been even greater if LSU had played professional players ("Imagine if we had pro players.").

91. After the Clemson game, Defendant Kiffin reiterated his disagreement with and objections to the Professionalism Rules and to the position of the SEC.[9]

92. Defendant Kiffin's statements and position, along with the numerous other statements and actions by Defendants alleged herein, stand in sharp contrast to the silence by the President and Athletic Director of LSU after Defendant Rousse voted for the Policy Statement on August 25, 2026. And they confirm the lack of institutional control over the athletics program at LSU that is required by Article 6 of the SEC Constitution and by the remaining provisions of the Constitution and Bylaws referenced above.

93. LSU's conduct and statements in derogation and disregard of the provisions in the Conference Constitution and Bylaws establishing the Professionalism Rules and requiring institutional controls have the effect of associating the Conference and its remaining member institutions with conduct and publicity with which the Conference and its remaining members do not want to be associated.

94. In light of the recalcitrance, lack of institutional control, and serious harm caused by the statements and conduct of LSU, the 15 SEC CEOs (other than LSU) have informally told the Commissioner (and President Plowman has directed the Commissioner) to issue a notice of the Special Meeting to be conducted on

---

[9] Available at: https://www.youtube.com/watch?v=8k5PwrWks8o.

September 10, 2026, to consider the termination of LSU's membership in the SEC, whether LSU renounces its intention to roster and play professional players on its football team, or not.

**Harm to the SEC**

95. Defendants' conduct has caused, continues to cause, and threatens to cause significant harm to the Conference and to its 15 member institutions other than LSU.

96. As state officials and employees, Defendants are all state actors whose official actions are taken under color of state law. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) (holding that a state employee acts under color of state law when exercising responsibilities pursuant to state employment).

97. By publicly and repeatedly recruiting professional athletes in contravention of the SEC's longstanding principles as alleged above, evidencing a lack of institutional control, and publicly reiterating their intent to add these players to their roster for the 2026-27 football season, Defendants have forced the SEC to associate its competitions, its brand, its championships, and its media properties with conduct that the Conference has expressly, unanimously, and publicly rejected and repudiated since its inception.

98. Indeed, the SEC's athletic competitions are one of its primary expressive platforms. Forcing the SEC to include professional athletes in those

competitions directly contradicts the Conference's message that college sports are reserved for college athletes.

99. Forcing the SEC and its other members to associate with an institution that by its actions has disregarded the provisions in the SEC Constitution and Bylaws requiring that each member institution maintain institutional control over its athletics program and conform to the rules and bylaws of the SEC and the NCAA also associates the SEC and its members with conduct and messages with which they do not want to be associated.

100. Defendants have forced the SEC and its members other than LSU to associate its athletic competitions and the conduct of the Conference with professional athletes and an uncontrolled athletics program despite the well-established viewpoint of the Conference and its member institutions. Such forced association undermines the SEC's identity and purpose and impairs the Conference's ability to express the values it has publicly espoused.

101. The First Amendment protects not only the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), but also the corresponding right not to associate. *Id*. at 623; *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all"). Where, as here, a group

is forced to accept certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Defendants' recruitment of, and stated intent to roster, professional athletes in SEC competition, contradicts the foundational viewpoints and stated values of the SEC and its member institutions, which "significantly affect[s]" the SEC's ability to express its longstanding values. *Id*. at 650.

102. Defendants' conduct infringes the SEC's First Amendment right of expressive association by forcing the Conference to associate itself and its competitions with conduct and publicity that it has expressly repudiated.

103. Defendants' conduct creates competitive imbalance among SEC member institutions. LSU's stated intent to roster professional athletes in contravention of the Professionalism Rules, while other institutions have followed the rules and rostered only college athletes, provides an unfair competitive advantage to LSU.

104. Defendants' conduct disrupts the settled expectations of student-athletes at other SEC institutions who relied on the rules governing roster composition and competitive fairness. Current college athletes who planned their careers around an established set of rules now face the prospect of being displaced by professional athletes.

105. Defendants' conduct erodes public confidence in the integrity of SEC competition, confidence on which the Conference's brand, its media partnerships, and its educational mission depend.

106. Defendants' conduct damages the Conference's ability to fulfill the purpose for which it was created: to maintain intercollegiate athletic programs compatible with the highest standards of education and competitive sports.

107. These harms are ongoing. They will continue for as long as Defendants are free to engage in conduct that contradicts and undermines the Conference's longstanding purpose and mission.

108. These ongoing and threatened harms will be compounded if Defendants or others acting in concert with them block or interfere with the SEC's consideration at its September 10 meeting whether to disassociate from LSU, Defendants, and their conduct, by terminating LSU's membership in the Conference.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY RELIEF BASED ON ACTUAL AND THREATENED VIOLATIONS OF THE FIRST AMENDMENT AND 42 U.S.C. § 1983

(Against All Defendants)

109. The SEC incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

110. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press;

or the right of the people peaceably to assemble." U.S. CONST. amend. I. The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 749 n.1 (1976).

111. The First Amendment protects both the freedom of speech and the freedom to associate with others for the purpose of speaking. *Roberts*, 468 U.S. at 618. In other words, the First Amendment safeguards a right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id*. at 622. "Freedom of association therefore plainly presupposes a freedom not to associate." *Id.* at 623.

112. "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 647–48. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Id*. at 648. As Justice Robert Jackson emphasized, "[i]f there is any fixed star in our constitutional constellation, it is that *no official*, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

113. The SEC is an expressive association. As set forth above, the Conference has repeatedly and publicly expressed its view that professional athletes should not be permitted to return to college competition and that the integrity of college athletics depends on maintaining the distinction between college and professional sports. These values are embodied and expressed in the Conference's Constitution and Bylaws, in formal governance actions of its Presidents and Chancellors, in public statements by the SEC's Commissioner, and in the Conference's communications with its member institutions, student-athletes, fans, and media partners.

114. Further, Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

115. Each Defendant is a "person" within the meaning of Section 1983. Each Defendant is a state official or employee sued in his or her official capacity. Each Defendant acted and continues to act under color of state law in carrying out the conduct described herein. *See West*, 487 U.S. at 50.

116. Defendants, each of them a state actor, are forcing the Conference to associate its competitions, brand, and championships with conduct that the Conference has expressly repudiated. Defendants are doing so by recruiting professional athletes, publicly announcing the intent to roster them, and permitting them to actively practice with LSU's football team, all over the Conference's express and unanimous objection. State officials and employees cannot force an athletic conference to associate its competitions with conduct antithetical to the conference's expressed values. *See West*, 487 U.S. at 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Such a forced association "significantly affect[s]" the Conference's ability to express its views. *Dale*, 530 U.S. at 650.

117. The Conference has the constitutional rights to determine the values that it expresses, to disassociate from conduct that contradicts those values, and to enforce its Constitution and Bylaws that give effect to those values. Defendants' ongoing and threatened conduct infringes those rights and therefore violates the First Amendment.

118. Defendants are taking their relevant actions under color of state law. Defendants are carrying out the challenged conduct in their official capacities as state officials and employees exercising authority vested in them by the State of Louisiana. Their decisions to recruit professional athletes to LSU's football team

and allow them to practice with the team, along with their announced plan to place them on LSU's official football roster, are made pursuant to their state-authorized responsibilities over LSU's athletics program.

119. As Defendant Murrill's actions show, the State of Louisiana itself has weighed in on this issue. On September 2, 2026, Defendant Murrill, the Attorney General of the State of Louisiana, filed an amicus brief in the *Pyburn* Action advocating in favor of allowing LSU to add former professional players to its football roster. Defendant Murrill's public statements surrounding the Preliminary Injunction hearing leave no doubt that the State of Louisiana is actively fighting against the Professionalism Rules.

120. Defendants' ongoing and threatened conduct is depriving the SEC of its constitutional rights. That conduct includes Defendants' recruitment of professional athletes, Defendants' decision to have them practice with the football team, Defendants' stated intent to add these professional athletes to LSU's official football roster, and Defendants' anticipated attempt to block or interfere with the SEC's consideration on September 10 whether to disassociate from LSU, Defendants, and their conduct. The First Amendment claim is ripe for adjudication now. Defendants' ongoing and threatened conduct infringes on the SEC's expressive association rights.

121. Further, Defendants' public, unequivocal commitment to place the recruited professional athletes on LSU's official football roster creates a real and immediate threat of further forced association with conduct contrary to the Conference's stated principles. Defendants have gone beyond mere public statements: they have permitted professional athletes to actively practice with LSU's football team and held two spots open on their roster for the professional athletes. These are affirmative steps toward culmination of the wrongful forced association. The infringement of the SEC's expressive association rights is not conjectural or hypothetical.

122. As a direct and proximate result of Defendants' conduct, the SEC has suffered and continues to suffer injury, including the infringement of its First Amendment rights, competitive imbalance among its member institutions, and harm to its institutional identity and public reputation.

123. The SEC therefore requests that the Court enter a declaratory judgment that the First Amendment protects the SEC's right to disassociate from LSU, Defendants, and their conduct.

124. The SEC is entitled to declaratory and injunctive relief, as well as an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT II**
**TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF ENSURING AND PRESERVING FIRST AMENDMENT RIGHTS OF THE SEC AND ITS MEMBER INSTITUTIONS**
(Against All Defendants)

125. The SEC incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

126. The SEC is entitled to temporary, preliminary, and permanent injunctive relief.

127. ***Likelihood of Success on the Merits.*** As set forth above, the Conference is likely to succeed on its claims that Defendants' conduct infringes the SEC's First Amendment rights.

128. ***Irreparable Harm.*** Absent injunctive relief, Defendants' ongoing violations will cause continuing and irreparable harm to the Conference.

129. The infringement of the SEC's First Amendment right of expressive association constitutes irreparable harm per se. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

130. Competitive imbalance introduced during the 2026-27 season cannot be undone. Student-athletes displaced from rosters by professionals cannot recover those lost opportunities. And the damage to the confidence of the public in the SEC's

member institutions and the integrity of SEC competition, once inflicted, is difficult if not impossible to repair.

131. Pursuant to notice properly given under Section 5.1 of the SEC Constitution contemporaneously with the filing of this First Amended Complaint, the CEOs will conduct a Special Meeting of the Conference on September 10, 2026 to decide whether to terminate LSU as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws. Based on Defendants' conduct to date, there is a clear, present, and irreparable threat that Defendants or persons who are in active concert or participation with them, such as the *Pyburn* Plaintiffs, will try to enjoin, block, delay, or interfere with the September 10 meeting.

132. If such meeting is enjoined or if any other action is taken by Defendants or other persons who are in active concert or participation with them, such as the *Pyburn* Plaintiffs, to block, delay, enjoin, or otherwise prevent consideration by the CEOs of the SEC whether to terminate the membership of LSU, both the Conference and its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights. Likewise, if those actors take any action to undermine any decision by the CEOs to terminate LSU's membership in the Conference, other than any challenge or counterclaim brought solely in this action, both the Conference and its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights.

133. ***Balance of Equities.*** The Conference's interest in protecting its First Amendment rights outweighs Defendants' interest in recruiting professional athletes and openly violating longstanding Conference rules—rules that LSU itself reaffirmed as recently as August 25, 2026. The Conference does not ask this Court to prevent any student-athlete from competing. It asks this Court to protect the SEC's First Amendment right to freedom of association.

134. ***Public Interest.*** The public has a strong interest in the integrity of college athletics. The Professionalism Rules protect opportunities for current and incoming student-athletes, maintain competitive fairness, and preserve the character of college sports as distinct from professional sports. Enforcing those rules serves the public interest. Moreover, the public has an independent interest in ensuring that First Amendment protections are upheld against state encroachment.

135. Accordingly, the SEC requests that this Court enter:

(a) A temporary restraining order and a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, the *Pyburn* Plaintiffs—from violating the Conference's First Amendment

rights by compelling the Conference to associate with conduct that is contrary to the Conference's purpose and mission;

(b) A temporary restraining order and a preliminary and permanent injunction barring Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, the *Pyburn* Plaintiffs—from seeking to deter, coerce, prevent, or punish the Conference for exercising its First Amendment rights.

(c) A temporary restraining order and a preliminary and permanent injunction barring Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, the *Pyburn* Plaintiffs—from blocking, delaying, enjoining, or otherwise preventing, including through court action or proceedings, consideration by the CEOs of the SEC whether to terminate the membership of LSU at their September 10 meeting or otherwise; and

(d) A temporary restraining order and a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants,

employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, the *Pyburn* Plaintiffs—from blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the CEOs to terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, supplementing and in addition to the relief requested in the Complaint, Plaintiff Southeastern Conference respectfully requests that this Court:

A. Enter a declaratory judgment that the First Amendment protects the Conference's right to disassociate from LSU, Defendants, and their conduct;

B. Enter the temporary restraining orders, preliminary injunctions, and permanent injunctions requested above;

C. Grant such other and further relief as this Court deems just and proper.

This the 8th day of September, 2026.

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: */s/ Robert W. Fuller*
Robert W. Fuller*
N.C. Bar No. 10887
Amanda P. Nitto*
N.C. Bar No. 45158
Travis S. Hinman*
N.C. Bar No. 50779
600 S. Tryon Street, Ste. 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@rbh.com
anitto@rbh.com
thinman@rbh.com

* *pro hac vice forthcoming*

**BRADLEY ARANT BOULT CUMMINGS LLP**

By: */s/ R. Thomas Warburton*
R. Thomas Warburton
T. Brooks Proctor
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
twarburton@bradley.com
bproctor@bradley.com

*Attorneys for Plaintiff Southeastern Conference*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and served the filing via FedEx and private process server on the following Defendants:

**Wade Rousse**, in his official capacity as President of Louisiana State University

**Verge Ausberry**, in his official capacity as Vice President and Director of Athletics of Louisiana State University

**Lane Kiffin**, in his official capacity as Head Football Coach of Louisiana State University

**Lee Mallett**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John H. Carmouche**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Roderick Alvendia**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John Ballard**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Ben Barousse**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Rebecca F. Boniol**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John R. Condos**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Valencia Sarpy Jones**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Charles A. Moody III**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Esperanza E. Moran**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Raymond R. Morris**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Jennifer B. Settoon**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Remy Voisin Starns**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Collis B. Temple Jr**., in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**James M. Williams**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Joseph Blaise Zuschlag**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Elizabeth B. Murrill**, in her official capacity as Attorney General of the State of Louisiana

*/s/ R. Thomas Warburton*
OF COUNSEL