FILED
2026 Sep-08 AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,

Plaintiff,

v.

**WADE ROUSSE**, in his official capacity as President of Louisiana State University; **VERGE AUSBERRY**, in his official capacity as Vice President and Director of Athletics of Louisiana State University; **LANE KIFFIN**, in his official capacity as Head Football Coach of Louisiana State University; **LEE MALLETT**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **JOHN H. CARMOUCHE**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **RODERICK ALVENDIA**, **JOHN BALLARD**, **BEN BAROUSSE**, **REBECCA F. BONIOL**, **JOHN R. CONDOS**, **VALENCIA SARPY JONES**, **CHARLES A. MOODY III**, **ESPERANZA E. MORAN**, **RAYMOND R. MORRIS**, **JENNIFER B. SETTOON**, **REMY VOISIN STARNS**, **COLLIS B. TEMPLE JR.**, **JAMES M. WILLIAMS**, and **JOSEPH BLAISE ZUSCHLAG**, in their official

**Case No.: 2:26-cv-01586-ACA**

**OPPOSED**

capacities as Members of the Board of )
Supervisors of Louisiana State )
University and Agricultural and )
Mechanical College; and )
**ELIZABETH B. MURRILL**, in her )
official capacity as Attorney General of )
the State of Louisiana, )
)
Defendants. )

**PLAINTIFF SOUTHEASTERN CONFERENCE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff Southeastern Conference (the "SEC" or the "Conference") moves the Court for a temporary restraining order ("TRO") and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys from taking any action, including filing, prosecuting, or participating in lawsuits or otherwise seeking judicial intervention, to deter, coerce, prevent, or punish the Conference for exercising its First Amendment right of free association, including through potential termination of Louisiana State University ("LSU") as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws at a properly scheduled and noticed September 10, 2026, Special Meeting of the Conference, and from blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the Conference's CEOs to

terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action. While counsel for the Conference has not had discussions with Defendants about whether they oppose the relief requested, the Conference has made substantial efforts to resolve the underlying issues with Defendants, as detailed below.

Forced association with a member whose conduct is antithetical to the SEC's mission and core values violates the Conference's fundamental First Amendment rights. LSU has rejected those core values repeatedly and publicly. An injunction is necessary to prevent the irreparable harm that the SEC will suffer if it cannot remove a member to avoid association of the Conference's name, brand, championships, and media properties with conduct and views that the Conference and its member institutions have condemned for decades. Defendants should accordingly be enjoined from taking any action that would prevent the SEC from disassociating itself from a member based on such conduct. This Motion is based on the First Amended Complaint in this matter, the incorporated Memorandum in Support, and the exhibits attached thereto.

Respectfully submitted this 8th day of September, 2026.

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: */s/ Robert W. Fuller*
Robert W. Fuller*
N.C. Bar No. 10887
Amanda P. Nitto*
N.C. Bar No. 45158
Travis S. Hinman*
N.C. Bar No. 50779
600 S. Tryon Street, Ste. 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@rbh.com
anitto@rbh.com
thinman@rbh.com

* *pro hac vice forthcoming*

**BRADLEY ARANT BOULT CUMMINGS LLP**

By: */s/ R. Thomas Warburton*
R. Thomas Warburton
T. Brooks Proctor
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
twarburton@bradley.com
bproctor@bradley.com

*Attorneys for Plaintiff Southeastern Conference*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,

Plaintiff,

v.

**WADE ROUSSE**, in his official capacity as President of Louisiana State University; **VERGE AUSBERRY**, in his official capacity as Vice President and Director of Athletics of Louisiana State University; **LANE KIFFIN**, in his official capacity as Head Football Coach of Louisiana State University; **LEE MALLETT**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **JOHN H. CARMOUCHE**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **RODERICK ALVENDIA**, **JOHN BALLARD**, **BEN BAROUSSE**, **REBECCA F. BONIOL**, **JOHN R. CONDOS**, **VALENCIA SARPY JONES**, **CHARLES A. MOODY III**, **ESPERANZA E. MORAN**, **RAYMOND R. MORRIS**, **JENNIFER B. SETTOON**, **REMY VOISIN STARNS**, **COLLIS B. TEMPLE JR.**, **JAMES M. WILLIAMS**, and **JOSEPH BLAISE ZUSCHLAG**, in their official

**Case No.: 2:26-cv-01586-ACA**

**OPPOSED**

capacities as Members of the Board of )
Supervisors of Louisiana State )
University and Agricultural and )
Mechanical College; and )
**ELIZABETH B. MURRILL**, in her )
official capacity as Attorney General of )
the State of Louisiana, )
)
Defendants. )

**PLAINTIFF SOUTHEASTERN CONFERENCE'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Since its inception in 1933, Plaintiff Southeastern Conference (the "SEC" or the "Conference") has stood for competitive integrity, fair competition, and the healthy integration of athletics and academics. Among the most fundamental of the shared rules that govern its member institutions are the longstanding provisions that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics (the "Professionalism Rules") and the corresponding responsibility of each member institution's President or Chancellor to ensure that the institution and its athletics personnel comply with those Rules. The Professionalism Rules are built upon an essential principle: college athletics is reserved for students who are actively pursuing an education while competing for their universities. The Professionalism Rules preserve competitive fairness, protect

opportunities for high school students and current college athletes, and maintain the distinction between college and professional sports. That distinction is critical to the SEC's member institutions, their Presidents and Chancellors, and their fans. Its destruction, threatened by the actions of Defendants, will irreparably harm the Conference.

Article 6 of the SEC Constitution requires the CEO of each member institution to maintain institutional control, *i.e.*, to ensure that all athletics personnel at the institution respect and comply with all NCAA and SEC Bylaws and rules (the "Institutional Control Rules"). The expectations and requirements set forth in that Article are foundational principles of fundamental importance to the fulfillment by the Conference of its purpose and mission as set forth in the Constitution and Bylaws. This expectation is reinforced by Bylaw 19.8.1.1, which provides that "It is the obligation of each member institution to enforce and comply with the Rules."

This action arises out of brazen violations of the Professionalism Rules as well as the disregard and derogation of the Institutional Control Rules by Defendants. Defendants' actions have caused and are causing irreparable harm to the SEC because, and as long as, the SEC is forced to remain associated with Louisiana State University ("LSU"), Defendants, and their actions.

To vindicate its First Amendment right not to associate with LSU or Defendants in light of their violations of the Professionalism Rules and disregard for

the Institutional Control Rules, the Conference seeks a TRO and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys from taking any action—including filing, prosecuting, or participating in lawsuits—to deter, coerce, prevent, or punish the Conference for exercising its First Amendment right of free association, including considering the termination of LSU as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws at a properly scheduled and noticed September 10, 2026, Special Meeting of the Conference, and from blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the CEOs to terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action.

The ability to determine its own membership is fundamental to the SEC's right of free association under the First Amendment. Absent a TRO and injunction, the SEC and its member institutions will suffer irreparable harm from forced association of its competitions, brand, championships, and media properties with conduct it has expressly, unanimously, and publicly rejected for decades. The balance of equities and the public interest unquestionably favor vindication of the Conference's First Amendment rights over Defendants' efforts to compel the SEC to associate with

conduct that is antithetical to its mission and values. The Conference is accordingly entitled to a TRO and preliminary injunction.

## II. FACTUAL BACKGROUND

### A. The SEC's Mission and Governance

The Southeastern Conference is the nation's premier intercollegiate athletic conference. At present, it has sixteen member institutions, fifteen of which are state universities: the University of Alabama, Auburn University, the University of Arkansas, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri, the University of Oklahoma, the University of South Carolina, the University of Tennessee, Texas A&M University, the University of Texas, and Vanderbilt University (the only private institution). **Exhibit A**, Declaration of Greg Sankey, at ¶ 4. The Presidents and Chancellors of the SEC's member institutions have governed together across generations, operating under a set of shared rules that have shaped the athletic and educational paths of thousands of student-athletes and provided the competitive integrity and fair competition necessary for the SEC to thrive. The SEC has endured for nearly a century because its members have adhered to that common set of rules, which each member institution, and every coach at those institutions, has agreed to follow—until now.

The SEC is an Alabama unincorporated association. **Ex. A** at ¶ 3. It operates under the direction and control of the President or Chancellor of each of its member universities, who serve as the "Chief Executive Officers" or "CEOs" of the Conference. *Id*. at ¶ 5. The Conference and its members are also members of the NCAA, but the NCAA does not control the Conference or *vice-versa*; instead, the Conference and the NCAA are separate and independent entities. *Id*. at ¶ 9.

**B. The SEC's Professionalism Rules**

Both the NCAA and the SEC have long maintained rules that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from competing in college athletics. Among those rules is NCAA Bylaw 12.2.4, which provides that a student-athlete "shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." This NCAA Bylaw is incorporated by reference and is effective as an SEC Bylaw pursuant to SEC Bylaw 14.01.1. *See* **Exhibit B**, SEC Constitution and Bylaws.

The principles reflected in the SEC's Professionalism Rules have been a cornerstone of the college athletics model since its inception, are fundamental to the SEC's mission and organizational identity, and reflect the core expressive message of the Conference: that collegiate athletics serve an educational mission and are distinct from professional sports. The rules are grounded in the principle that college

athletics are reserved for current college athletes who are actively pursuing a degree while also participating in college sports and for future college athletes who seek to benefit from the unique educational, athletic, and leadership opportunities provided through college sports. **Ex. A** at ¶ 16.

The importance of the Professionalism Rules to the SEC's mission and identity flows from their promotion of several foundational goals. The Professionalism Rules foster competitive fairness in the context of college athletics by recognizing that an athlete who has pursued a professional career, with the benefit of professional-level training, resources, and competition, occupies a fundamentally different position than a student-athlete who has remained within the collegiate model. *Id.* at ¶ 16. Thus, a central goal of the Professionalism Rules is avoiding competitive disadvantage and fundamental unfairness for current student-athletes who have not pursued a professional sports career and had access to professional sports opportunities and benefits but instead have maintained their commitment to the collegiate athletics model by fulfilling academic standards and participating actively in an educational community while participating in college sports. They also prevent similar unfairness to college sports programs that have operated within the existing framework for college athletics and thus have not sought to add former professional athletes to their rosters. *Id.* at ¶ 17. In addition, the Professionalism Rules promote fairness among the SEC's member schools, ensuring that each

member institution is engaged in competition with other institutions governed by, subject to, and compliant with the same foundational set of rules and requirements.

The Professionalism Rules also create and preserve opportunities for high school student-athletes and current college athletes. Each roster spot filled by a former professional athlete (or left open for such an athlete) is one that becomes unavailable to a high school student-athlete or another less-developed athlete who would benefit from the educational and athletic growth opportunities uniquely available through collegiate athletics. **Ex. A** at ¶ 18. Further, without consistent application of these rules, college athletes cannot have confidence in the rules of the competition in which they are engaged or the real-world effects of their decision to pursue a professional sports career; college coaches do not receive clear guidance on actions they can and cannot take to build their rosters for effective and compliant competition; and entering college freshmen face uncertainty about their opportunities to join a roster and benefit from the experience of participating in college athletics.

### C. Defendants' Recruitment of Professional Athletes and Intent to Roster Them

In June 2026, the NCAA adopted a new age-based eligibility model, commonly referred to as the "5-for-5" rule, that allows student-athletes up to five seasons of competition within a five-year period beginning when they enroll in college. Beginning in the summer of 2026, certain student-athletes who first enrolled

in college in 2022 and had exhausted their eligibility by spring of 2026 (the "2022 Class") began filing lawsuits across the country challenging the NCAA's decision to implement the 5-for-5 rule and not to grant an additional year of eligibility to the 2022 Class. Among those athletes were several former college football players who had signed professional contracts with NFL teams during the 2026 NFL Draft and undrafted free agency period.

Despite the SEC's longstanding rules prohibiting professional athletes from returning to college athletics, Defendants saw this as an opportunity to be exploited. They began an orchestrated campaign to recruit professional athletes to join LSU's football roster for the 2026-27 season. These efforts included recruiting players who had signed NFL contracts with, or appeared on the NFL rosters of, the Cleveland Browns, Philadelphia Eagles, New Orleans Saints, and Tampa Bay Buccaneers and were actively participating in NFL training camps.

On August 19, 2026, a group of professional athletes filed a lawsuit in Louisiana state court, seeking a fifth year of eligibility to participate in college athletics. *See Pyburn v. Nat'l Collegiate Athletic Ass'n*, No. C-783299, Div. D (19th Judicial District Court, Parish of East Baton Rouge, Louisiana) ("*Pyburn*"). Three of those professional athletes had signed contracts with NFL teams but nevertheless sought the ability to return to college competition if they did not ultimately make a final professional roster. In the days that followed, public reporting indicated that

Defendant Kiffin and others associated with LSU recruited the three professional athletes to play football at LSU even though they would not be eligible to participate in college athletics pursuant to longstanding NCAA and SEC rules, including the Professionalism Rules. For example:

(a) During his August 24, 2026, press conference, Defendant Kiffin said, in reference to the professional players: "They're available to recruit. **So, ourselves, like many places around the country, are recruiting them**."[1] He also said, "[a]t the end of the day, you know, because of these rulings, they're either going to play for you or they're going to play somewhere else around the country. **So, we've made the decision to recruit them like probably most people are**."

(b) On August 25, 2026, on *The Pat McAfee Show*, Defendant Kiffin went considerably further. Kiffin said, "I said to our staff, I said, whoever the first player commits to will be the poster child . . . [and] the player chose us."[2] Defendant Kiffin stated that multiple schools were recruiting the player and "offering him a lot of money, **and he decided to come play for us**." He also told his staff, "**Get ready, guys. . . . This will be Lane Kiffin, LSU . . . doing something nobody else is doing**." Defendant Kiffin defended the decision to recruit and roster the professional athletes by saying "Our players know that, and I think our fans and administration . . . understand that [we]'re doing what's best for their program."

(c) *CBS Sports* reported on August 25, 2026, that sources indicated Defendants Kiffin and LSU "reached out to multiple players on NFL rosters or their representation" with the purpose of getting them to pursue litigation that could enable them to return to college.[3]

---

[1] Lane Kiffin Press Conference (August 24, 2026) available at https://www.youtube.com/watch?v=e0V4ZUVdGps&t=14s.

[2] *See Lane Kiffin Responds To Critics Of NFL Players Returning To Play At LSU*, THE PAT MCAFEE SHOW (August 25, 2026) available at https://www.youtube.com/watch?v=YXL-8iDvIsY.

[3] *See* John Talty and Chris Hummer, *How Lane Kiffin and LSU triggered a national showdown over NFL-to-college transfer*, CBS SPORTS (Aug. 25, 2026, 10:59 AM), available at

(d) During his August 31, 2026, press conference at LSU, Defendant Kiffin said he met with LSU's player leadership committee and asked them whether the team wanted the former NFL players added.[4] He described their response as, **"every one of them was emphatic about, 'if they can help us win, bring 'em.'"**

Defendant Kiffin also publicly confirmed that professional players were practicing with LSU's football team and that he intended to play them during the upcoming season.[5]

### D. The SEC's Efforts to Protect its Expressive Identity

On August 24, 2026, in response to the lawsuits filed by professional athletes, the SEC's Presidents and Chancellors unanimously affirmed the Conference's longstanding position that individuals who choose to leave college athletics, sign professional contracts, and compete professionally should not subsequently be permitted to return to college competition. **Ex. A** at ¶ 27; *see also* **Exhibit C**, SEC's Professionalism Memorandum dated August 26, 2026. The Presidents and

---

https://www.cbssports.com/college-football/news/lane-kiffin-lsu-nfl-players-college-football-eligibility-loophole/.

[4] *See* The Lane Kiffin Press Conference (Aug. 31, 2026) available at https://www.youtube.com/watch?v=IHGfBUnAXEk.

[5] *See*, *e.g.*, Heather Dinich, *LSU's Lane Kiffin says his players pursuing ex-NFLers*, ESPN (Aug. 31, 2026, 3:00 PM), https://www.espn.com/college-football/story/_/id/49785035/lsu-lane-kiffin-says-players-endorse-pursing-ex-nflers (Defendant Kiffin confirms that at least one former player is practicing with LSU's football team); Seth Emerson, *Lane Kiffin met with LSU's player leadership before adding returning pro players, he said*, New York Times (August 31, 2026), https://www.nytimes.com/athletic/7553369/2026/08/31/lane-kiffin-eligibility-lsu-college-football/ (quoting Defendant Kiffin stating, with regard to adding former professional players to LSU's team, "this is how the real world works. They can bring employees into certain jobs to help the company.").

Chancellors explained that, consistent with their and the Conference's long-held beliefs, allowing professional athletes to compete in college sports would "blur the line between college and professional sports, create significant competitive equity concerns, and reduce opportunities for high school and current college athletes." **Ex. C** at 1.

Recognizing the importance of the Professionalism Rules, the SEC Presidents and Chancellors conducted a regularly scheduled, in-person meeting on August 25, 2026, addressed recent litigation challenges to the validity of the Rules, and unanimously instructed the Conference office to issue a public policy statement, which is attached as **Exhibit D**, that same day. **Ex. A** at ¶¶ 28-29. Every one of the sixteen CEOs voted for the public statement, including Defendant Rousse on behalf of LSU. **Ex. A** at ¶ 30. The policy statement clarified that the SEC's longstanding Professionalism Rules prohibit an SEC institution from having an athlete on its roster who has: "1. Previously declared for the NFL, NBA, or WNBA draft, and did not appropriately withdraw, 2. Signed a contract with an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) team, or 3. Been listed on an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) roster." **Ex. D**.

The SEC Presidents and Chancellors also instructed the Commissioner to provide interpretive guidance concerning the Conference's longstanding

Professionalism Rules. On August 26, 2026, consistent with the Presidents and Chancellors' direction, Commissioner Sankey issued a memorandum to all SEC member institutions providing guidance concerning the enforcement of the SEC's Professionalism Rules and available sanctions against SEC member institutions, CEOs, coaches, and other SEC athletics personnel for violations of those Rules. *See* **Ex. C**. This memorandum noted that "[p]ermitting professional athletes to return to college sports would also be contrary to the Conference's mission and purpose which is to sponsor intercollegiate athletics with competition by student-athletes who are not professionals." *Id*. at 1. It stressed that "[i]nstitutions and coaching staff members who promote, pursue, or engage in the recruitment or rostering of former professional athletes on a college team engage in conduct that is detrimental to the Southeastern Conference and contrary to the Conference's core purpose and mission." *Id*. In recognition that promoting, pursuing, and engaging in the recruitment or rostering of professional athletes on a college team is detrimental to the Conference and contrary to its purpose and mission, the memorandum stated that "an institution that includes an athlete on its roster who has taken steps to become a professional athlete in a manner inconsistent with existing SEC Bylaws . . . shall be subject to penalties as determined by the Commissioner as established under SEC Bylaw 4.4.3." *Id*. at 1-2.

The memorandum further explained that "if a member institution violates SEC rules by adding an individual who has become professional to its designated roster, the Commissioner shall impose the following penalties: [t]he head coach in the sport in which the violation occurred shall be suspended from all coaching, recruiting, and administrative duties for 50% of the respective sport's playing season (e.g. six games/weeks of a 12-game season in football); [a] fine of equal to 50% of the respective sport's annual budget; [r]emoval of voting privileges on items of Conference business for the member institution; and, [a]ny other penalty as deemed appropriate under the circumstances by the Commissioner or the SEC Presidents & Chancellors." *Id*. at 2. All of these penalties were already authorized pursuant to SEC Bylaws 4.4.3 (providing the Commissioner with powers and authority to impose penalties and sanctions) and 4.1.2 (setting forth the plenary power and authority of the Conference CEOs, including as they relate to penalties against member institutions). *See* **Ex. B**. The SEC CEOs expressly directed Commissioner Sankey to impose these penalties upon a violation of the Professionalism Rules. **Ex. A** at ¶¶ 32, 34.

Although LSU, through Defendant Rousse, voted in favor of the Conference's statement that professional athletes should not be permitted to participate in college sports, it abstained from the vote authorizing the specific penalties set forth in the memorandum, forecasting the now-clear intent of its agents to flout the

Professionalism Rules. **Ex. A** at ¶ 34. The viewpoints expressed in this memorandum and other statements by the SEC as expressed above reflect a core tenet of the Conference's institutional identity (and a core requisite for membership). The SEC holds itself out to its student-athletes, its fans, its media partners, and the public as an organization committed to competitive integrity, educational values, and the principle that collegiate athletics is distinct from professional sports—a tenet to which LSU has made clear it no longer holds.

### E. The SEC's Institutional Control Rules

Article 6 of the Constitution requires each CEO to enforce the Conference Bylaws at his or her member institution. In addition, SEC Bylaw 19.8.1.2 provides that each member institution must include in each contract with every athletic department employee an agreement to be bound by and comply with the enforcement, penalty, and other disciplinary provisions and procedures of the NCAA and of the Conference. *See* **Ex. B** at Bylaw 19.8.1.2. The SEC Bylaws further provide that all coaches "shall comply with and promote compliance with all rules and regulations of the Conference and the NCAA." *Id*. at Bylaw 10.2.1.

These provisions reflect the expectation and requirement that each member institution maintain institutional control, *i.e.*, that it ensure all athletics personnel at the respective member institution respect and comply with all NCAA and SEC Bylaws and rules. That is a foundational principle of fundamental importance to the

fulfillment by the Conference of its purpose and mission as set forth in the Constitution and Bylaws and is reinforced by Bylaw 19.8.1.1, which provides that "It is the obligation of each member institution to enforce and comply with the Rules." *See* **Ex. B** at Bylaw 19.8.1.1.

### F. The SEC's First Amendment Rights

The First Amendment protects not only the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), but also the corresponding right not to associate. *Id*. at 623; *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all"). Where, as here, a group is forced to continue association with certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Being forced to retain as a member an institution that no longer aligns with the SEC's values expressed in the Professionalism Rules—given the institution's recruitment of professional athletes and other public statements and actions in opposition to those rules—"significantly affect[s]" the SEC's ability to express its longstanding values. *Id*. at 650.

As state officials acting in their official capacities, Defendants are all state actors whose official actions are taken under color of state law. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) (holding that a state employee acts under color of state law when exercising responsibilities pursuant to state employment). The SEC has clearly and consistently expressed its view that professionals should not be permitted to return to college competition. When an SEC member publicly rejects this stance, the Conference is forced to associate its institutional identity with the very conduct it has openly condemned. That forced association impairs the SEC's message and undermines the expressive identity it has built over more than ninety years. Moreover, the forced association and resulting harm would be furthered and amplified if the SEC cannot enforce the Professionalism Rules by disassociating itself from members that undermine its core values and identity.

**G. The Louisiana Preliminary Injunction**

The SEC is presently prevented from distancing itself from Defendants' conduct through the penalties authorized by the SEC Constitution and Bylaws. In August 2026, numerous athletes seeking to return from professional sports brought the *Pyburn* lawsuit against the NCAA and the SEC in Louisiana state court seeking declaratory and injunctive relief making them eligible to compete in the 2026-2027 season. The *Pyburn* plaintiffs filed an Amended Petition adding the Conference and the SEC's Commissioner as Defendants on August 27, 2026. **Ex. A** at ¶ 35. Shortly

after the Petition was filed, the Louisiana Court entered an Amended Temporary Restraining Order ("Amended TRO") and a Show Cause Order. *Id.*; *see also* **Exhibit E** (Amended TRO), **Exhibit F** (Show Cause Order). At a September 3, 2026, hearing on the *Pyburn* plaintiffs' Motion for a Preliminary Injunction and the related motions of the *Pyburn* defendants to set aside the Amended TRO, the Louisiana Court orally granted the *Pyburn* plaintiffs' Motion for Preliminary Injunction and instructed the *Pyburn* plaintiffs to prepare a formal order. *Id.* at ¶ 36. The *Pyburn* plaintiffs tendered the Preliminary Injunction Order, which is attached as **Exhibit G**, to SEC counsel the next day and are expected to submit it to the Louisiana court this week.[6]

Among other provisions, the Amended TRO and the tendered Preliminary Injunction Order prohibit the defendants in that case, including the Conference and Commissioner Sankey, from "enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, ***and/or any SEC rule or proposed penalty***" not only against the plaintiffs in that case but against "[a]ny NCAA member institution or coach for which Plaintiffs choose to compete during the 2026-2027 season." **Ex. E** at ¶ 6, **Ex. G** at ¶ 7 (emphasis added); *see also* **Ex. A** at ¶ 36. As such, the SEC is enjoined from imposing penalties on LSU for its conduct and has no option to

---

[6] It appears based on public reports that Jack Pyburn, was claimed on waivers after being released by the Tampa Bay Buccaneers and will play for the Kansas City Chiefs in the NFL. At the hearing on September 3, counsel for the *Pyburn* plaintiffs dismissed Pyburn from the action.

exercise its First Amendment Rights other than by terminating LSU's membership in the Conference. **Ex. A** at ¶ 37.

### H. The SEC's Intent to Consider Removal of LSU

On September 4, 2026, the other 15 SEC CEOs met informally without LSU's CEO present to discuss Defendants' conduct and the Preliminary Injunction. **Ex. A** at ¶¶ 41-42. At that meeting, the other 15 SEC CEOs expressed great concern about those issues, including that (1) the Amended TRO and Preliminary Injunction were preventing the SEC from imposing penalties if Defendants violated the Professionalism Rules, (2) Defendant Kiffin was working in concert with counsel for the *Pyburn* plaintiffs, with the support and involvement of Defendant Attorney General Murrill, and (3) Defendants Rousse and Ausberry have no meaningful control over Defendant Kiffin or the football program at LSU, even though Section 6.1 of the SEC Constitution specifies that the "Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution." **Ex. A** at ¶ 42; *see also* **Ex. B**.

The SEC CEOs noted in particular that Defendant Rousse had voted for the issuance of the SEC's Policy Statement, but that LSU had taken no action to comply with the Professionalism Rules and in fact Defendant Kiffin was in active concert

with the *Pyburn* plaintiffs, as evidenced by his statements that he would wait for the court to rule to determine whether the *Pyburn* plaintiffs seeking to join the LSU football team roster were eligible. *Id*. at ¶ 42(e). They further expressed concern that the conduct of LSU and Defendant Kiffin was inconsistent with the principles and values set forth in Section 1.2 of the Conference Constitution, reflecting adversely on the reputation and values of the Conference and its other member institutions. *Id*. at ¶ 42(f). Because of the obvious conflict between LSU's position and that of the SEC and its other 15 member institutions, and to ensure compliance with the Preliminary Injunction, Defendant Rousse was not included in the informal September 4 meeting, and no official action was taken at the September 4 meeting. *Id.* at ¶ 41. No penalties were imposed on LSU at or in connection with the September 4 meeting. *Id*. at ¶ 43. Even though no official action was taken at the September 4 meeting, the consensus of the CEOs was and continues to be that LSU's continued membership in the Conference would be inconsistent with the publicly stated values and principles of the Conference and its remaining member institutions, whether or not LSU includes football players who are ineligible under the Professionalism Rules on its football team roster. *Id*. at ¶ 44.

Over the past weekend, officials speaking on behalf of LSU publicly continued to criticize the Professionalism Rules and the positions and actions taken by the SEC CEOs during the week of August 24, 2026. After the Clemson game,

Defendant Kiffin reiterated his disagreement with and objections to the Professionalism Rules and the SEC's position in a press conference reported on X (formerly known as Twitter). **Ex. A** at ¶ 51. Further, Defendant Kiffin has repeatedly and publicly declared that he "fought" for the *Pyburn* plaintiffs, including on September 5, 2026, on ESPN's College GameDay program and on the Marty & McGee show that same day. Defendant Kiffin's statements and position, along with the numerous other statements and actions by Defendants described herein, stand in sharp contrast to the silence of LSU's President and Athletic Director after Defendant Rousse voted for the Policy Statement on August 25, 2026. Together, they confirm the lack of institutional control over LSU's athletics program that is required by Article 6 of the SEC Constitution and by the remaining provisions of the Constitution and Bylaws referenced above. *Id*. at ¶ 52.

The consensus at the September 4 meeting was and remains that LSU's demonstrated lack of institutional control at the university level—including a complete lack of control over Defendant Kiffin's actions—and other conduct noted above that is inconsistent with the principles and purposes of the Conference as set forth in Section 1.2 of the Constitution, made it imperative for a meeting to be called to consider the termination of LSU's membership in the Conference pursuant to Section 3.1.5 of the Constitution. *Id*. at ¶ 45. Based on the significant concerns expressed by the CEOs and in light of Defendants' recalcitrance, lack of institutional

control, and the serious harm caused by Defendants' statements and conduct, the Conference's President has, consistent with Sections 4.1.1 and 5.1.4 of the SEC Constitution, directed the Commissioner to give formal notice that a Special Meeting of the Conference will be conducted on September 10, 2026 (at the time when a meeting of the CEOs had already been scheduled), to consider the termination of LSU's membership in the SEC pursuant to Section 3.1.5 of the Constitution. *Id*. at ¶¶ 48, 53.

Pursuant to Section 4.1.2 of the SEC Constitution, the CEOs are vested with "plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever," including the power to "[t]ake all actions specified and contemplated in Article 3 [of the SEC Constitution] in their sole discretion." **Ex. B**. Under Section 3.1.5 of the SEC Constitution, "[m]embership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers," with a two-thirds vote required to terminate membership. *Id*. Any action taken by the SEC's CEOs under Section 3.1.5 is pursuant to the CEOs' plenary power and authority to regulate the SEC as a voluntary membership association. It does not enforce an SEC rule and is not a penalty. Pursuant to notice properly given under Section 5.1 contemporaneously with the filing of the First Amended Complaint, the meeting scheduled for September 10, 2026, will be a Special Meeting of the Conference to

decide whether to terminate LSU as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws. *See* **Ex. A** at ¶¶ 53, 65.

### I. Harm to the SEC

Defendants' conduct has caused and continues to cause significant harm to the Conference. Defendants' conduct has infringed the SEC's First Amendment right of expressive association by forcing the Conference to associate itself and its competitions with conduct that it has expressly repudiated. *See* **Ex. A** at ¶¶ 54-58. The Conference's only recourse is to remove LSU to preserve its expressive identity, a step it will consider at the upcoming September 10 meeting. Based on their conduct to date, there is a clear, present, and irreparable threat that Defendants or persons who are in active concert or participation with them, such as the *Pyburn* plaintiffs, will try to enjoin, block, delay, or interfere with the September 10 meeting.

If the meeting is enjoined or if any other action is taken by Defendants or other persons who are in active concert or participation with them, such as the *Pyburn* plaintiffs, to block, delay, enjoin, or otherwise prevent consideration by the CEOs of the SEC whether to terminate the membership of LSU, both the Conference and its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights. Likewise, if those actors take any action to undermine any decision by the CEOs to terminate LSU's membership in the Conference, other than any challenge or counterclaim brought solely in this action, both the Conference and

its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights.

## III. ARGUMENT

"A TRO or preliminary injunction is appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphasis in original). The relief requested by the Conference satisfies each of the required elements here.

### A. The Conference is likely to prevail on the merits.

Because Defendants' actions violate the long-established right of expressive association under the First Amendment, the Conference has a substantial likelihood of success on the merits. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend.

I. The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976).

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" As set out below, Defendants here are state actors who are acting to deprive the Conference of its First Amendment rights and therefore should be enjoined as authorized by § 1983.

**1. Defendants are state actors.**

The threshold requirement of state action is easily satisfied here. All Defendants are sued in their official capacities as officials of Louisiana State University or the State of Louisiana and are accordingly state actors. "State employment is generally sufficient to render the defendant a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation omitted, alteration adopted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity" as Defendants are here. *Id.* at 50. Any action Defendants might take to prevent the

SEC from exercising its First Amendment rights by terminating LSU's SEC membership would necessarily be undertaken in their capacities as state officials.

**2. The First Amendment protects the right of non-association.**

The Conference's right not to associate with those who express viewpoints and engage in conduct contrary to its core values is protected by the First Amendment. The United States Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. As the Court has explained, that "[f]reedom of association . . . plainly presupposes a freedom *not* to associate." *Id*. at 623 (emphasis added); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all").

In the same vein, the United States Supreme Court has held that the First Amendment prevents a state actor from infringing an organization's right to express only the views that it intends to express. *Dale*, 530 U.S. at 648. As the Court explained in *Dale*, the right of non-association "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Id*. at 647–48. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it

intends to express." *Id*. at 648. Under these precedents, the SEC must be free from state action that prevents it from removing members whose actions are contrary to its mission, values, and expressive identity.

**3. Forcing the SEC to associate with members whose conduct is antithetical to its mission violates the Conference's First Amendment rights.**

The SEC is an expressive association. Since its founding in 1933 by university presidents committed to the principle that athletics should promote and serve educational values, the Conference has organized collegiate athletic competition around a core set of shared principles. Its CEOs have collectively and repeatedly expressed the Conference's institutional position that college sports must be reserved for college athletes. The SEC's expressive character is not incidental to its operations. It is integral to the Conference's organizational purpose and identity.

The Conference's Professionalism Rules, which prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics, embody the SEC's core expressive message: that collegiate athletics serve an educational mission and are fundamentally distinct from professional sports. The Institutional Control Rules requiring members to ensure compliance with the Professionalism Rules further reflect the SEC's commitment to that message. The SEC has repeatedly expressed its view on this important issue. The Conference's values are embodied

and expressed in its Constitution and Bylaws, in formal governance actions of its Presidents and Chancellors, in public statements by the SEC's Commissioner, and in the Conference's communications with its member institutions, student-athletes, fans, and media partners. In *Dale*, the Supreme Court held that the Boy Scouts had engaged in protected expression regarding its values through the Boy Scouts' mission statement, the Scout Oath, the Scout Law, and the activities in which scouts participate. 530 U.S. at 649-50. The Professionalism Rules and the SEC's repeated statements of its commitment to reserving college athletics for non-professionals are likewise protected expression core to the SEC's institutional identity.

The Conference's ability to maintain its expressive identity depends on compliance with the Conference's rules by its members and on each member institution maintaining institutional control. The Conference's power to determine its own membership, including the power to remove members, is likewise essential to its control over its message, mission, and identity. But, absent an injunction from this Court, when the Conference gives notice of its intent to exercise its right of non-association by meeting on September 10 to consider removal of LSU from the Conference, the Conference anticipates that Defendants, in concert with others, will attempt to prevent it from doing so. Those efforts would be direct state action seeking to prevent the Conference from exercising its right of non-association by compelling

it to continue associating with a member engaged in conduct it has long condemned and which is antithetical to its mission.

This forced association is precisely the type of governmental compulsion the Supreme Court held unconstitutional in *Dale*. There, the Court held that New Jersey's public accommodations law could not be applied to force the Boy Scouts to accept a member whose presence would "significantly affect" the organization's ability to express its views. 530 U.S. at 650. The Court emphasized that "[t]he ***forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association*** if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id*. at 648 (emphasis added). Thus, where a group is forced to accept certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Id*. Preventing the SEC from removing a member whose views and conduct no longer align with the Conference's mission "significantly affect[s]" the SEC's ability to express its longstanding values. *Id*. at 650.

The Supreme Court's decision in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), is also instructive. In *Hurley*, the Court unanimously held that a state could not require parade organizers to include a group whose message the organizers did not wish to convey. *Id*. at 573. "[T]his use

of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id*. In the same way, preventing the SEC from removing a member that acts in contradiction to its long-held core beliefs forces it to associate its competitions—one of its primary expressive platforms—with conduct that directly contradicts the Conference's message that college athletics are reserved for college athletes. That forced association destroys the SEC's autonomy to choose the content of its message, and injunctive relief is necessary to preserve the Conference's ability to protect its expressive identity without reprisal by state actors.

**4. The Anti-Injunction Act and the doctrine of *Younger* abstention are not implicated here.**

The Anti-Injunction Act ("AIA"), 28 U.S.C. § 2283, presents no bar to the TRO and preliminary injunction that the Conference seeks, including enjoining Defendants from initiating lawsuits or engaging in further conduct aimed at preventing the Conference from exercising its First Amendment right of disassociation. The AIA generally prohibits federal courts from issuing "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The U.S. Supreme Court, however, has recognized that 42 U.S.C. § 1983, under which the Conference seeks relief here, is an "expressly authorized" exception to the AIA. *Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972)

("[W]e conclude that, under the criteria established in our previous decisions construing the anti-injunction statute, [§] 1983 is an Act of Congress that falls within the 'expressly authorized' exception of that law.").

Moreover, *Pyburn*—a suit by private plaintiffs against private defendants—does not fall within the narrow, "exceptional" circumstances that trigger *Younger* abstention: "state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (internal quotation marks and citation omitted). Accordingly, this case is no exception to the Court's "virtually unflagging" obligation to hear cases over which it has jurisdiction. *Id*. at 77 (quotation omitted).

### B. The Conference will suffer irreparable harm without injunctive relief.

Absent injunctive relief, the Conference will continue to suffer irreparable harm. The infringement of the SEC's First Amendment right of expressive association constitutes irreparable harm *per se*. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("There can be no question that the challenged restrictions [on First Amendment rights], if enforced, will cause irreparable harm."); *Speech First, Inc. v. Cartwright*, 32 F.4th

1110, 1128 (11th Cir. 2022) ("We have expressly held that an ongoing violation of the First Amendment constitutes an irreparable injury.") (quotation marks and citation omitted). As the Eleventh Circuit has explained, violations of First Amendment rights, "because of their intangible nature, could not be compensated for by monetary damages" and thus necessarily constitute irreparable injury. *Ne. Fla. Chapter of Ass'n of General Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1239 (M.D. Ala. 2000) ("In short, irreparable harm is not difficult to establish when the impairment of First Amendment rights is at issue.").

The harms the SEC will suffer if it is prevented from determining its own membership fit squarely within the rationale articulated by the Eleventh Circuit in *City of Jacksonville*. If the Conference cannot remove a member whose conduct it condemns, the harm from forced association with that unwanted member cannot be undone after the fact or compensated by monetary damages. And the damage to the confidence of the public in the SEC's member institutions and in the integrity of SEC competition, once inflicted, is difficult if not impossible to repair. Each game in which professional athletes participate under the SEC's banner without the Conference being able to remove the member engaging in such direct violations of its Professionalism Rules compounds the Conference's constitutional injury by forcing it to associate its competitions and brand with conduct it has expressly

rejected. This is not harm that can be undone after the fact or for which monetary relief could make the Conference whole. *City of Jacksonville*, 896 F.2d at 1285 (noting that First Amendment violations, "because of their intangible nature, could not be compensated for by money damages"). The harm the SEC would suffer is therefore irreparable and warrants a preliminary injunction.

### C. The balance of equities favors a preliminary injunction.

When a plaintiff has shown likelihood of success on the merits of a claim that the defendant is violating its First Amendment rights, as the SEC has done above, the injury to the plaintiff "is not outweighed by any threatened harm to [the defendants] because [they] ha[ve] 'no legitimate interest' in" violating the Constitution. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). Moreover, the Conference's freedom of expressive association is a core American constitutional right. The equities clearly favor an injunction protecting that right.

### D. The public interest favors a preliminary injunction.

The public has a strong interest in ensuring that fundamental First Amendment protections are upheld against state encroachment. *Honeyfund.com*, 94 F.4th at 1283 ("[A] preliminary injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights."); *see also Butler*, 111 F. Supp. 2d at 1240 ("[the] public interest is well served when the application of potentially unconstitutional laws is enjoined"). By contrast, the public has no interest in

Defendants compelling the Conference to associate with LSU or with Defendants. The rights vindicated in this action include those held sacrosanct by the American system of jurisprudence. Failure to protect those rights here would permit state actors to override the expressive choices of a private association. This precedent would chill the exercise of expressive association rights far beyond the SEC, reaching any private organization whose membership or eligibility standards a state actor might wish to override. Accordingly, granting the requested relief strongly serves public interests in protecting foundational constitutional rights.

**E. The Court should waive the bond requirement.**

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). However, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (alterations in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)); *L.W. v. Comm'r of Ga. Dep't of Cmty. Health*, 176 F.4th 635, 646 (11th Cir. 2026) ("Our caselaw establishes that the district court may properly determine that no bond is required and set the security amount

at $0."); *Leeds v. Bd. of Dental Examiners of Ala.*, 2018 WL 10593812, at *2 (N.D. Ala. Oct. 16, 2018) (declining to require bond).

"Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009); *see also Honeyfund.com*, 622 F. Supp. 3d at 1186 (indirectly quoting *Complete Angler* and waiving bond); *Johnston v. Tampa Sports Auth.*, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006) ("[I]n a case where, as here, Plaintiff's fundamental constitutional rights are at issue, imposing a financial burden on a plaintiff as a condition to protecting fundamental constitutional rights would create an unfair hardship on that plaintiff."). Because the Conference has demonstrated a strong likelihood of success on the merits and seeks to vindicate its fundamental First Amendment rights, the Court should exercise its discretion to waive the bond requirement.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant this motion and enter a temporary restraining order and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, the *Pyburn* plaintiffs—from (1) violating the Conference's First Amendment rights

by compelling the Conference to associate with conduct that is contrary to the Conference's purpose and mission; (2) seeking to deter, coerce, prevent, or punish the Conference for exercising its First Amendment rights; (3) blocking, delaying, enjoining or otherwise preventing, including through court action or proceedings, consideration by the CEOs of the SEC whether to terminate the membership of LSU at the September 10 Special Meeting, any adjournment thereof, or otherwise; or (4) blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the CEOs to terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action.

Respectfully submitted this 8th day of September, 2026.

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: */s/ Robert W. Fuller*
Robert W. Fuller*
N.C. Bar No. 10887
Amanda P. Nitto*
N.C. Bar No. 45158
Travis S. Hinman*
N.C. Bar No. 50779
600 S. Tryon Street, Ste. 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@rbh.com
anitto@rbh.com
thinman@rbh.com

* *pro hac vice forthcoming*

**BRADLEY ARANT BOULT CUMMINGS LLP**

By: */s/ R. Thomas Warburton*
R. Thomas Warburton
T. Brooks Proctor
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
twarburton@bradley.com
bproctor@bradley.com

*Attorneys for Plaintiff Southeastern Conference*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and served the filing via FedEx and private process server on the following Defendants:

**Wade Rousse**, in his official capacity as President of Louisiana State University

**Verge Ausberry**, in his official capacity as Vice President and Director of Athletics of Louisiana State University

**Lane Kiffin**, in his official capacity as Head Football Coach of Louisiana State University

**Lee Mallett**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John H. Carmouche**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Roderick Alvendia**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John Ballard**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Ben Barousse**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Rebecca F. Boniol**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**John R. Condos**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Valencia Sarpy Jones**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Charles A. Moody III**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Esperanza E. Moran**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Raymond R. Morris**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Jennifer B. Settoon**, in her official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Remy Voisin Starns**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Collis B. Temple Jr.**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**James M. Williams**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Joseph Blaise Zuschlag**, in his official capacity as Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**Elizabeth B. Murrill**, in her official capacity as Attorney General of the State of Louisiana

*/s/ R. Thomas Warburton*
OF COUNSEL