FILED
2026 Sep-08 AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,<br><br>Plaintiff,<br><br>v.<br><br>**WADE ROUSSE**, in his official capacity as President of Louisiana State University, *et al*.<br><br>Defendants. | ) | **Case No.: 2:26-cv-01586-ACA** |

**Declaration of Greg Sankey**

1. I am the Commissioner of the Southeastern Conference (the "SEC" or the "Conference"). I have personal knowledge of the facts set forth below and, if called on to do so, would testify competently to the facts stated herein under oath.

2. I received my undergraduate degree from the State University of New York at Cortland in 1987 and earned my Master's degree at Syracuse University in 1993. I began my career in athletics administration as Director of Intramural Sports at Utica College in upstate New York (1987-89). After I left Utica College, I served as an athletics department intern (1989-90), as well as coach of the golf team at Northwestern State University in Natchitoches, LA, and then served as Director of Compliance and Academic Services at Northwestern State University (1990-92). I moved to the Southland Conference (an NCAA Division I Conference located in

Texas) as an Assistant Commissioner in 1992. I advanced to Associate Commissioner and was eventually named the Commissioner of the Southland Conference in 1996. In 2002, I joined the SEC as Associate Commissioner for Governance and Compliance, a position I held until 2012, when I became the Executive Associate Commissioner and Chief Operating Officer. I held that position until I was named Commissioner of the SEC in March 2015.

3. The Conference is an Alabama unincorporated association that is tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code. The Conference was founded in 1933. The current Constitution and Bylaws of the SEC are attached to this Declaration as Exhibit A.

4. The Conference has sixteen (16) member institutions, fifteen (15) of which are state universities. The Conference's members are the University of Alabama, Auburn University, the University of Arkansas, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri, the University of Oklahoma, the University of South Carolina, the University of Tennessee, Texas A&M University, the University of Texas, and Vanderbilt University.

5. The Conference operates under the direction and control of the President or Chancellor of each of its member universities. (Some member

institutions use the term "President" and some use the term "Chancellor.") Under Article 4 of the SEC Constitution, the Presidents/Chancellors serve as the "Chief Executive Officers" or "CEOs" of the Conference. The CEO nomenclature (dating back to 1933) is no longer in common use, even though it remains in the Constitution and Bylaws. Under the Constitution, the CEO role of the Presidents and Chancellors is equivalent to the role of directors serving on a board of directors of a corporation. In addition, on a rotating basis, one of the Presidents or Chancellors serves as the "President" of the Conference (a position equivalent to the chairman of the board of a corporation).

6. I report to and serve at the pleasure of the Chief Executive Officers. The SEC Constitution specifically provides that the "Chief Executive Officers shall have plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws." Ex. A, Art. 4.1.2.

7. Article 5 of the Constitution establishes the rules for Conference governance. Unless subject to penalties or sanctions, the members of the Conference, acting through their respective Presidents or Chancellors (*i.e.*, their CEOs), each have one vote on each matter that comes before the Conference for action. As set forth in the Constitution and Bylaws, before a Conference rule can be adopted, the proposed rule must garner at least a majority (and in some instances, as specified in

the Constitution and Bylaws, a super-majority) of votes from the members of the Conference.

8. The Conference does not control its member institutions; to the contrary, the member institutions collectively control the Conference and establish all policies and procedures of the Conference. The SEC member institutions, acting through their respective Presidents or Chancellors, as CEOs of the Conference, define the role of the Conference office and determine the manner in which the Conference will be operated, providing direction to me and the Conference staff in fulfilling the roles and responsibilities assigned to the Conference, and make all final decisions concerning all material and fundamental Conference matters.

9. The Conference and its members are also members of the NCAA, but do not control the NCAA. The NCAA governance structure is set forth in the NCAA Manual, which is available on the internet. The Conference and its members are subject to NCAA rules and regulations, but the NCAA does not control the Conference. The Conference and the NCAA are separate and independent entities.

10. The Conference and the NCAA each establish rules delineating eligibility requirements for student-athletes to participate in Conference and NCAA competitions. The NCAA rules apply to all NCAA member institutions. The Conference rules supplement the NCAA rules and apply only to the SEC member institutions. In some instances, as reflected in Exhibit A, the Conference has chosen

to adopt NCAA rules as Conference rules. In other instances, as also reflected in Exhibit A, the Conference has adopted additional rules that govern the Conference member institutions, their CEOs, athletic administrators, and coaches.

11. In my capacity as Commissioner, I understand that, for more than ninety years, the SEC has stood at the intersection of higher education and elite athletic competition. Founded in 1933 by university presidents who believed that athletics should promote and serve educational values, the Conference's purpose and mission are educational within the meaning of Section 501(c)(3) of the Internal Revenue Code.

12. Article 1 of the Constitution sets forth the purpose and mission of the Conference in Section 1.2:

> The purpose and mission of the Southeastern Conference is educational within the meaning of Section 501(c)(3) of the Internal Revenue Code. Intercollegiate athletics programs provide fundamental lessons in leadership and teamwork, and about winning and losing that have an irreplaceable role in the greater world of business, government, military, and academic pursuits. In no event shall the Conference engage in any activity or take any action inconsistent with its educational purpose and mission, and nothing in this Constitution, or in the Bylaws or Regulations, shall authorize any such activity or action.
>
> To further its educational purpose and mission, the Conference shall direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe eligibility rules for contestants. The Conference shall also facilitate and assist its member institutions in maintaining intercollegiate athletic programs compatible with the highest standards of education and competitive sports. Through the orderly enactment and enforcement of legislation, the Conference aims:

> (a) To encourage sound academic practices for student-athletes;
>
> (b) To foster strong competition among the teams of its member institutions in a broad spectrum of amateur sports and championships;
>
> (c) To assure proper emphasis on the funding of athletic activities;
>
> (d) To stimulate good sportsmanship;
>
> (e) To provide leadership and a voice in the development of public attitudes toward intercollegiate sports generally; and
>
> (f) To address the future needs of athletics in a spirit of cooperation and mutual benefit of the member institutions and their student-athletes.

Ex. A, §1.2

13. Article 6 of the Constitution requires each CEO to enforce the Conference Bylaws at his or her member institution. In addition, SEC Bylaw 19.8.1.2 provides that:

> Each member institution must include in each contract with every athletic director, coach, senior woman administrator, and other employee of its athletic department a specific provision obligating the employee to comply with the Rules and specifying that the employee agrees to be bound by and will comply with the enforcement, penalty, and other disciplinary provisions and procedures of the NCAA and of the Conference, including but not limited to the provisions of Article 4 of the Constitution and of this Bylaw 19.8.

Ex. A, § 19.8.1.2.

14. The Bylaws also provide that:

> Coaches shall comply with and promote compliance with all rules and regulations of the Conference and the NCAA and are accountable for the highest standards of honesty and integrity in order to provide a fair and equitable opportunity for each prospective student-athlete to make

> an informed and properly-considered commitment to the university of his/her choice.

Ex. A, § 10.2.1.

15. To maintain eligibility to participate in college athletics, NCAA Bylaw 12.2.4 (Contracts and Compensation) provides that a student-athlete "shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." This Bylaw is incorporated by reference and is also effective as an SEC Bylaw pursuant to SEC Bylaw 14.01.1. SEC Bylaw 14.01.1 has not been amended or revised since 2011, as reflected at the end of that Bylaw. The amendment in 2011 was a wording clarification. At all times since I have been employed by the SEC, the SEC has adopted NCAA Bylaw 12.2.4 (which has been in effect, except for renumbering, without modification) as an SEC Bylaw (referred to herein as the "Professionalism Rules"). The NCAA website indicates that NCAA member institutions have been prohibited from rostering and playing professional athletes since 1922. *See* https://www.ncaa.org/about-us/history/.

16. NCAA Bylaw 12.2.4, as incorporated by SEC Bylaw 14.01.1, is grounded in the principle that college athletics are reserved for current college athletes who are actively pursuing a degree while also participating in college sports and for future college athletes who seek to benefit from the unique educational, athletic, and leadership opportunities provided through college sports. These Bylaws

promote competitive fairness in the context of college athletics. The Bylaws reflect the recognition that an athlete who has pursued a professional sports career, whether domestically or internationally, will have benefitted from the structure of professional sports, which permits athletes to focus solely on sports development and competition, stepping away from the educational requirements of college sports and engaging the opportunity to mature in a new environment with the benefit of dedicated athletic resources.

17. These Bylaws reflect that permitting former professional athletes to return to competition also creates a competitive disadvantage and fundamental unfairness for current student-athletes who have not pursued a professional sports career and had access to professional sports opportunities and benefits, but instead have maintained their commitment to the collegiate athletics model, fulfilling the academic standards and participating actively in an educational community while also participating in college sports. It is also unfair to college sports programs that have operated within the existing framework for college athletics and thus have not sought to add former professional athletes to their rosters.

18. These Bylaws preserve and create opportunities for high school student-athletes to access the benefits of participation in college athletics. Each roster spot filled by a former professional athlete is a roster spot that becomes unavailable to a high school student-athlete or another less-developed athlete who

would benefit from the educational and athletic growth opportunities uniquely available through college sports.

19. Adoption of these Bylaws embodies the purpose and mission of the Conference as set forth in Section 1.2 of the Constitution and reflects the informed judgment of our SEC member institutions to protect the distinctive character of collegiate athletics and the opportunities provided for current and future college athletes. Consistent application of these Bylaws promotes fair competition, supports sound program planning and administration across institutions and conferences, and sustains the differentiated product that is college sports.

20. The Professionalism Rules apply to every person who is or wants to be or return to be a student-athlete. Inconsistent application of these Bylaws—through court rulings or otherwise—fuels disruption in college sports. Without consistent application, college athletes cannot have confidence in the rules of competition in which they are engaged or the real-world effects of their decision to pursue a professional sports career; college coaches do not receive clear guidance on actions they can and cannot take to build their rosters for effective and compliant competition; and entering college freshmen face unclear limitations on their opportunities to join a roster and benefit from the experience of participating in college sports.

21. Member institutions recruit student-athletes and build rosters against a common set of rules, including these Bylaws, and in doing so create expectations upon which current and prospective student-athletes rely, including expectations that the individual will be included on a roster and will likely enjoy time on the court or field of play. Allowing individuals who have entered into professional sports to return to college, impacting these expectations and in many instances displacing student-athletes from rosters, would create adverse and material impacts to other student-athletes who have reasonable expectations of participation based on the established Bylaws of the NCAA and SEC. Allowing those individuals who have entered into professional agreements to return to college also would adversely impact institutions that have relied on the applicable Bylaws to construct their rosters, adversely impact competitive balance on the court or field of play, and undermine confidence in and respect for the rules of competition.

22. As referenced above, Article 6 of the SEC Constitution requires the CEO of each member institution to maintain institutional control, *i.e.*, to ensure that all athletics personnel at the respective member institution respect and comply with all NCAA and SEC Bylaws and rules. The expectation and requirement set forth in this Article is a foundational principle of fundamental importance to the fulfillment by the Conference of its purpose and mission as set forth in the Constitution and

Bylaws. This expectation is reinforced by Bylaw 19.8.1.1, which provides that "It is the obligation of each member institution to enforce and comply with the Rules."

23. Under SEC Bylaw 4.4.2, I am charged with the duty of implementing, administering, and enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA. I am vested with broad discretionary authority to carry out those duties. I am the official Conference interpreter of the Constitution, Bylaws, Commissioner's Regulations, and other rules, regulations, legislation, and policies of the Conference and the NCAA. I also have authority to issue interpretations, rules, regulations, memoranda, instructions, forms, procedures, and guidance necessary or appropriate to perform my duties, including memoranda or guidance providing direction and information concerning enforcement of the Constitution, Bylaws, and rules and regulations of the Conference. Ex. A, § 4.4.2.

24. Under SEC Bylaw 4.4.3, I may impose, in my discretion, a fine or other appropriate penalty or sanction against a member institution that violates the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA. I may also impose such penalties or sanctions against an athletic director, coach, or other member of a member institution's athletics department who commits such a violation. The penalties may include suspension from contests or other

athletically related activities, limitations on coaching duties (including recruiting), and public or private reprimands. Ex. A, § 4.4.3.

25. On or about August 19, 2026, thirty-two former student-athletes filed the action captioned *Pyburn, et al. v. National Collegiate Athletic Association*, Case No. C-783299, in the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana (the "*Pyburn* Action"). The *Pyburn* Plaintiffs sought injunctive relief effectively requiring the NCAA to take all actions necessary to make them eligible to compete in intercollegiate athletics during the 2026–27 academic year. The Louisiana court entered the Temporary Restraining Order attached as Exhibit B.

26. Several of the *Pyburn* Plaintiffs, including Zxavian Harris, Dae'Quan Wright, and Jack Pyburn, had entered the NFL draft, signed NFL contracts, and some appeared on the NFL rosters before seeking relief for the stated purpose of joining LSU's football team.

27. On August 24, 2026, the CEOs (*i.e.*, the SEC's Presidents and Chancellors) met via videoconference to address media reports and lawsuits filed against the NCAA, including the *Pyburn* Action, that revealed that some NCAA member institutions were engaged in conversations with current or former professional athletes who were not eligible for competition in the SEC or the NCAA under the Professionalism Rules. The CEOs unanimously concluded that these developments placed at risk the foundational principles and policies of the SEC, as

reflected in the SEC Constitution and Bylaws. The CEOs concluded that it was important to affirm the Conference's longstanding position that individuals who choose to leave college athletics, sign professional contracts, and compete professionally should not subsequently be permitted to return to college competition.

28. The SEC's CEOs and Athletic Directors had a regularly scheduled in-person meeting in Birmingham on August 25 and 26, 2026.

29. On the first day of the regularly scheduled meeting, on August 25, 2026, the CEOs addressed the recent litigation challenges to the validity of the Professionalism Rules and unanimously instructed the Conference office to issue a public policy statement that same day. The SEC's Policy Statement is attached as Exhibit C.

30. All sixteen CEOs, including LSU President Rousse, voted in support of the SEC's Policy Statement.

31. The CEOs directed the issuance of the Policy Statement to publicly reaffirm the foundational principles of the Conference, as reflected in the Conference's Constitution and Bylaws. The SEC's Policy Statement reiterated that the long-standing Professionalism Rules prohibit an SEC institution from placing on its roster an athlete who previously declared for the NFL, NBA, or WNBA draft and did not appropriately withdraw, signed a contract with an NFL or other professional football league, NBA/G-League, or WNBA (or affiliate) team, or was listed on an

NFL or other professional football league, NBA/G-League, or WNBA (or affiliate) roster.

32. A violation of the Professionalism Rules by a member institution is both a violation of NCAA Bylaws and a violation of the SEC Bylaws. At the meeting, the CEOs instructed me, using my authority as SEC Commissioner, to impose specified penalties on any SEC member institution that took action contrary to the Policy Statement in violation of the Professionalism Rules.

33. Acting pursuant to direction I received on August 26, 2026, in a continuation of the official meeting referenced above, I issued a memorandum that same day to all SEC member institutions and coaching personnel that is attached as Exhibit D (the "Professionalism Memorandum"). The Professionalism Memorandum provided guidance and notice from the SEC office, as directed by the CEOs, so there would be no misunderstanding as to the penalties that would be imposed against SEC member institutions, CEOs, coaches, and other SEC athletics personnel in circumstances where a member institution added a football or basketball player to its roster in disregard of the Professionalism Rules.

34. The CEOs unanimously specified and directed me to include the specific penalties for violation of the Professionalism Rules that are set forth in the Professionalism Memorandum, except for LSU President Rousse, who abstained from the vote authorizing the specific penalties set forth in the Memorandum.

35. On August 27, 2026, the *Pyburn* Plaintiffs filed an Amended Petition adding the SEC and me as defendants. On August 28, the Louisiana court entered an Amended Temporary Restraining Order and a Show Cause Order, both of which are attached as Exhibit E (Amended TRO) and Exhibit F (Show Cause Order). The court scheduled a September 3, 2026, hearing on the *Pyburn* Plaintiffs' motion for a preliminary injunction and on motions by the SEC to set aside the Amended TRO.

36. At the September 3 hearing, the court orally granted the motion for a preliminary injunction and instructed the *Pyburn* Plaintiffs to prepare a formal order. I understand that the *Pyburn* Plaintiffs have circulated a proposed order, which is expected to be submitted to the Louisiana court on September 8, 2026. The Amended TRO and (as drafted by the *Pyburn* Plaintiffs) the Preliminary Injunction Order provide that the SEC and those acting on its behalf may not enforce NCAA Bylaw 12.9.4.2, the ghost-transfer rule, any SEC Professionalism Rule, any other SEC rule, or any proposed SEC penalty against (a) the *Pyburn* Plaintiffs, (b) any NCAA member institution or coach for which they choose to compete during the 2026–27 season, or (c) any NCAA member institution or coach that competes against them. The Proposed Preliminary Injunction Order is attached as Exhibit G.

37. The Amended TRO and the Preliminary Injunction effectively prohibit the SEC and its member institutions from imposing penalties consistent with the SEC's Constitution and Bylaws, including the penalties summarized in the

Professionalism Memorandum. Imposition of those penalties would have the effect of disassociating the Conference and its other fifteen member institutions from the actions and statements of LSU through Coach Kiffin.

38. I attended and testified for between three and four hours at the preliminary injunction hearing in Louisiana on September 3.

39. Before the hearing, Louisiana Attorney General Murrill, acting in her official capacity as Attorney General, submitted an amicus brief supporting the *Pyburn* Plaintiffs, which is attached hereto as Exhibit H.

40. During the preliminary injunction hearing, Louisiana Attorney General Murrill joined the *Pyburn* Plaintiffs' counsel at their counsel table. She did not speak at the hearing, but during breaks and after the hearing, she made a series of public statements in her official capacity criticizing the SEC, me, and the SEC's decision to file the lawsuit in which I am providing this Declaration, as follows:

(a) Attorney General Murrill posted on the social media platform X in support of the *Pyburn* Plaintiffs, stating: "Dae'Quan Wright, who played for Ole Miss, says he lost out on seven-figure NIL money in a fifth year. Mississippi didn't fight for him, but Louisiana will."

(b) Attorney General Murrill posted on X that "The conference's reliance-be-damned response is not a lawful answer. These changing rules are promulgated and enforced against young people and schools making

decisions about real life that have real, irreparable consequences. Plaintiffs need to be able to rely on a court's decision on these issues without fear of reprisal in the future."

(c) While walking into the preliminary injunction hearing, Attorney General Murrill began her comments to the media by saying "Geaux Tigers." She then explained that her amicus brief was about "giving these players a fair forum and opportunity to be heard." She described the NCAA's and SEC's actions as "unfair" to the players and said that the players "deserve a forum where they can have a fair hearing about how they are being treated and by the NCAA and the SEC."[1]

(d) When the SEC filed this lawsuit, Attorney General Murrill called it "legal garbage." She also posted on X that the lawsuit was "garbage & frivolous."

(e) After the preliminary injunction hearing, Attorney General Murrill criticized me for leaving the courtroom with the judge's permission after I testified for several hours.

(f) Attorney General Murrill also mischaracterized my testimony. She posted on X: "the SEC Commissioner astonishingly said he had never read the relevant rules until today." During the press conference that

[1] https://www.instagram.com/reel/Dc1LLp3x_OA/

followed the preliminary injunction hearing, Attorney General Murrill further stated: "I think there were a lot of things he said today that were rather offensive."

(g) Attorney General Murrill posted on X: "These athletes were seeking a fair forum and a neutral decision-maker, and I'm very pleased that they obtained that, as well as relief."

Attorney General Murrill's X posts are attached as Exhibit I. The statement referring to me having not read the rules is a complete mischaracterization of my testimony.

41. On September 4, 2026, the 15 other SEC CEOs met informally without LSU's CEO present. Because of the obvious conflict between the positions of LSU and those of the SEC and its other 15 member institutions, and to ensure compliance with the Preliminary Injunction, LSU President Rousse was not included in the informal September 4 meeting, and no official action was taken at the September 4 meeting.

42. During the September 4 meeting, the SEC CEOs discussed the Defendants' conduct and the Louisiana Preliminary Injunction. At that meeting, those CEOs:

(a) Expressed great concern that the Amended TRO and Preliminary Injunction were preventing and would prevent the SEC from imposing penalties if Defendants violated the Professionalism Rules by placing

Harris, Wright, or other professional football players on their football team roster, which had to be finalized by midnight on September 4.

(b) Expressed great concern that the Show Cause Order and the statements of the Louisiana Court had a chilling effect on the SEC and its member institution's First Amendment rights, including the right to free speech and right of expressive association.

(c) Expressed great concern that, based on the circumstances, past practices of Defendant Kiffin, statements and actions of the Defendant Murrill, and communications of Defendant Kiffin with SEC staff members prior to the entry of the TRO, Coach Kiffin was working in concert with counsel for the *Pyburn* Plaintiffs, with the support and involvement of Attorney General Murrill and the Louisiana Governor.

(d) Expressed great concern that LSU President Rousse and Athletic Director Ausberry have no meaningful control over Coach Kiffin or the football program at LSU, even though Section 6.1 of the SEC Constitution specifies that the "Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution."

(e) Specifically noted that LSU President Rousse had voted for the issuance of the SEC's Policy Statement, but that LSU had taken no action to comply with the Professionalism Rules and in fact was in active concert with the *Pyburn* Plaintiffs, as evidenced by Coach Kiffin's statements that he would wait for the Court to rule to determine whether the *Pyburn* Plaintiffs seeking to join the LSU football team roster were eligible.

(f) Expressed concern that the conduct of LSU and Coach Kiffin was inconsistent with the principles and values set forth in Section 1.2 of the Conference Constitution, reflecting adversely on the reputation and values of the Conference and its other member institutions.

43. No penalties were imposed on LSU at or in connection with the September 4 meeting.

44. Although no official action was taken at the September 4 meeting, the consensus of the CEOs was and continues to be that LSU's continued membership in the Conference would be inconsistent with the publicly stated values and principles of the Conference and its remaining member institutions, whether or not LSU ever includes Harris, Wright, Pyburn, or other football players who are ineligible under the Professionalism Rules on its football team roster.

45. The consensus at the September 4 meeting was and continues to be that LSU's demonstrated lack of institutional control at the university level—including complete lack of control over Coach Kiffin's actions—and other conduct alleged herein that is inconsistent with the principles and purposes of the Conference as set forth in Section 1.2 of the Constitution, made it imperative for a meeting to be called to consider the termination of LSU's membership in the Conference pursuant to Section 3.1.5 of the Constitution.

46. The SEC Constitution provides that:

> Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any motion to terminate membership shall specify the effective date of the proposed termination.

Ex. A, § 3.1.5. The exercise of this right of termination is not a penalty, but is a right that is granted to the CEOs and which they have "plenary power" to employ under § 4.1.2 of the Constitution.

47. Section 4.1.1 of the SEC Constitution provides that action by the CEOs to terminate the membership of an institution must occur at a Regular or Special meeting of the Conference (*i.e.*, a meeting of the CEOs) called in accordance with Section 5.1 of the Constitution. Section 5.1.4 of the Constitution permits the President of the Conference (currently Chancellor Plowman of the University of Tennessee) or the Commissioner acting in consultation with the President to call a

Special Meeting. Section 5.1.5 of the Constitution requires reasonable notice of the Special Meeting that "shall, to the extent practicable, specify the nature of the matters to be considered at the meeting."

48. Based on the significant concerns expressed by the CEOs, the Conference's President directed me, as Commissioner, to give formal notice that a Special Meeting of the Conference will be conducted on September 10, 2026 (at the time when a meeting of the CEOs had already been scheduled), to consider the termination of LSU's membership in the SEC pursuant to Section 3.1.5 of the Constitution.

49. LSU did not include professional players on its football roster on September 4, 2026, but left open roster spots so that professional players could be added to the roster later. Adding players after the deadline for finalizing a roster, which was September 4, 2026, is permitted by SEC and NCAA Bylaws if there are open roster spots and the players are enrolled as students at the institution.

50. Officials speaking on behalf of LSU continued publicly to criticize the Professionalism Rules and the positions and actions taken by the SEC CEOs during the week of August 24, 2026. In a halftime interview at the football game between LSU and Clemson when LSU had a substantial lead in the game, in an interview with ABC sports, Coach Kiffin commented that the score differential would have been even greater if LSU had played the professionals.

51. After the Clemson game in a publicly distributed press conference reported on X, Coach Kiffin reiterated his disagreement with and objections to the Professionalism Rules and to the position of the SEC.

52. Coach Kiffin's statements and position, along with the numerous other statements and actions by Defendants alleged hereinabove, as contrasted with the silence by the President and Athletic Director of LSU after the President of LSU voted for the Policy Statement on August 25, 2026, confirm the lack of institutional control over the athletics program at LSU that is required by Article 6 of the SEC Constitution and by the remaining provisions of the Constitution and Bylaws referenced above.

53. In light of the recalcitrance, lack of institutional control, and serious harm caused by the statements and conduct of LSU, the fifteen (15) SEC CEOs other than LSU have informally told me (and President Plowman has directed me, as Commissioner) to issue a notice that the meeting scheduled for September 10, 2026 will be a Special Meeting of the Conference for the purpose of considering termination of LSU's membership in the SEC, whether LSU renounces its intention to roster and play professional players on its football team, or not.

54. The SEC markets and promotes the principles set forth in its Constitution and associates those principles with its brand in the SEC region, nationally, and in other countries through public statements, including by licensing

broadcast rights for sports competitions of the SEC and its members in a way designed to promote these principles. By publicly recruiting professional athletes in contravention of the SEC's longstanding principles and rules and publicly reiterating their intent to add these players to their roster for the 2026-27 football season, Defendants have forced the SEC to associate its competitions, its brand, its championships, and its media properties with conduct that the Conference has expressly, unanimously, and publicly rejected and repudiated since its inception.

55. By publicly and repeatedly recruiting professional athletes in contravention of the SEC's longstanding principles as alleged above, evidencing a lack of institutional control, and publicly reiterating their intent to add these players to their roster for the 2026-27 football season, Defendants have effectively put the SEC in a position where its competitions, its brand, its championships, and its media properties are associated with conduct that the Conference has expressly, unanimously, and publicly rejected and repudiated since its inception.

56. The SEC's athletic competitions are one of its primary expressive platforms. Forcing the SEC to include professional athletes in those competitions directly contradicts the Conference's message that college sports are reserved for college athletes.

57. Forcing the SEC and its other members to associate with an institution that by its actions has disregarded the provisions in the SEC Constitution and Bylaws

requiring that each member institution keep institutional control over its athletics program and conform to the rules and bylaws of the SEC and the NCAA also associates the SEC and its members with conduct and messages with which they do not want to be associated.

58. Defendants have forced the SEC and its members other than LSU to associate its athletic competitions and the conduct of the Conference with professional athletes and an uncontrolled athletics program despite the well-established viewpoint of the Conference and its member institutions. Such forced association undermines the SEC's identity and purpose and impairs the Conference's ability to express the values it has publicly espoused.

59. Defendants' conduct creates competitive imbalance among SEC member institutions. LSU's stated intent to roster professional athletes in contravention of the Professionalism Rules, while other institutions have followed the rules and rostered only college athletes, provides an unfair competitive advantage to LSU.

60. Defendants' conduct disrupts the settled expectations of student-athletes at other SEC institutions who relied on the rules governing roster composition and competitive fairness. Current college athletes who planned their careers around an established set of rules now face the prospect of being displaced by professional athletes.

61. Defendants' conduct erodes public confidence in the integrity of SEC competition, confidence on which the Conference's brand, its media partnerships, and its educational mission depend.

62. Defendants' conduct damages the Conference's ability to fulfill the purpose for which it was created: to maintain intercollegiate athletic programs compatible with the highest standards of education and competitive sports.

63. Statements made by Coach Kiffin to SEC personnel strongly imply, if not confirm, that he has been in direct communication and coordination with the *Pyburn* Plaintiffs to facilitate and support the *Pyburn* Action.

64. The SEC is requesting a temporary restraining order from this Court contemporaneously with giving notice of the meeting to consider termination of LSU's membership in the Conference because the actions of Defendants, and those acting with the Defendants, such as the *Pyburn* Plaintiffs, create an imminent and substantial risk that such persons will seek injunctive relief or otherwise attempt to prevent the meeting from occurring.

65. I will issue a notice that the meeting scheduled for September 10, 2026, will be a Special Meeting of the Conference for the purpose of considering termination of LSU's membership contemporaneously with the filing of the First Amended Complaint in this matter.

Executed under penalty of perjury, this 7th day of September, 2026.

Greg Sankey
Southeastern Conference, Commissioner

# EXHIBIT A

CONSTITUTION, ARTICLE 1

# Name, Purposes and Fundamental Policy

1.1 Name ........................................ 1
1.2 Purposes ........................................ 1

## *1.1 NAME

The name of this association shall be the Southeastern Conference.

## *1.2 PURPOSES

The purpose and mission of the Southeastern Conference is educational within the meaning of Section 501(c)(3) of the Internal Revenue Code. Intercollegiate athletics programs provide fundamental lessons in leadership and teamwork, and about winning and losing that have an irreplaceable role in the greater world of business, government, military, and academic pursuits. In no event shall the Conference engage in any activity or take any action inconsistent with its educational purpose and mission, and nothing in this Constitution, or in the Bylaws or Regulations, shall authorize any such activity or action.

To further its educational purpose and mission, the Conference shall direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe eligibility rules for contestants. The Conference shall also facilitate and assist its member institutions in maintaining intercollegiate athletic programs compatible with the highest standards of education and competitive sports. Through the orderly enactment and enforcement of legislation, the Conference aims:

(a) To encourage sound academic practices for student-athletes;

(b) To foster strong competition among the teams of its member institutions in a broad spectrum of amateur sports and championships;

(c) To assure proper emphasis on the funding of athletic activities;

(d) To stimulate good sportsmanship;

(e) To provide leadership and a voice in the development of public attitudes toward intercollegiate sports generally; and

(f) To address the future needs of athletics in a spirit of cooperation and mutual benefit of the member institutions and their student-athletes. [*Adopted: 6/15/06*]

CONSTITUTION, ARTICLE 2

# Principles for the Conduct of Intercollegiate Athletics

The Southeastern Conference subscribes to the principles for the conduct of intercollegiate athletics set forth in the NCAA Constitution and assists its member institutions in promoting these principles.

CONSTITUTION, ARTICLE 3

# SEC Membership

3.0 General Principle ........................................ 3
3.1 Membership, Termination, Suspension and Dues ........................................ 3

## 3.0 GENERAL PRINCIPLE

The Southeastern Conference is both a competitive body and a legislative body, as defined in Articles 3.02.1 and 3.02.2 of the NCAA Constitution.

## 3.1 MEMBERSHIP, TERMINATION, SUSPENSION

***3.1.1 Number of Members.** The number of members of the Conference shall be set by the Chief Executive Officers. [*Revised: 5/30/91*]

***3.1.2 Granting of Membership.** Membership may be granted by invitation of the Conference at a meeting of the Chief Executive Officers. A vote of at least three-fourths of the members is required to extend an invitation for membership. [*Revised: 5/30/91*] [*Clarified/Conformed: 6/1/11*]

***3.1.3 Suspension of Membership.** Membership may be suspended at a meeting of the Chief Executive Officers. A member may be suspended at any time by a vote of at least two-thirds of the members, either indefinitely or for a stated period, for any conduct deemed to be incompatible with membership. [*Clarified/Conformed: 6/1/11*]

***3.1.4 Withdrawal from Membership.** A member may only withdraw from membership in the Conference after providing written notice to the President and the Commissioner of the date of its withdrawal at least two years prior to the date on which the withdrawal will be effective. The withdrawal notice must specify a withdrawal date of July 15 in the year in which the withdrawal will be effective. [*Adopted: 1/14/21*]

(a) A member shall be deemed to have withdrawn from the Conference if and when the member either (i) fails or refuses, or renounces its obligation, to field a team to compete in Conference football competition or basketball competition, or (ii) fails or refuses to fulfill or renounces its obligations to field teams and participate in Conference sports competitions and championships, including but not limited to its obligations under SEC Bylaws 22.1.1 or 22.1.2, as such SEC Bylaws may be renumbered or amended from time to time, or NCAA Bylaw 20.9.6, as such NCAA Bylaw may be renumbered or amended from time to time. Any determination that a deemed withdrawal has occurred shall be made by the Commissioner and shall specify the effective date of such deemed withdrawal (which date may be prior to the date of determination by the Commissioner).

(b) In the event that, upon request of the member deemed to have withdrawn pursuant to Section 3.1.4(a), the Commissioner determines that a failure of the member to fulfill its obligations is attributable to and caused by circumstances or events beyond the reasonable control of the member, the member shall not be deemed to have withdrawn from the Conference under Section 3.1.4(a) and the prior determination of withdrawal shall be deemed rescinded, provided that the member comes into full compliance with such obligations at such time as the Commissioner determines that the circumstances or events no longer prevent fulfillment of such obligations.

(c) Any member may appeal any determination of the Commissioner under this Section 3.1.4 to the Chief Executive Officers. A quorum of the Chief Executive Officers may, by a vote of a majority of all the Chief Executive Officers, reverse or modify any determination of the Commissioner. The Chief Executive Officer of a member that has failed, refused, or renounced its obligations shall be eligible to vote.

***3.1.5 Termination of Membership.** Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any motion to terminate membership shall specify the effective date of the proposed termination. [*Revised: 1/14/21*]

***3.1.6 Effect of Withdrawal from or Termination of Membership.** As of the effective date of the termination, withdrawal, or deemed withdrawal of a member of the Conference, such member shall not have a right to receive and will not be paid any distributions of revenue from the Conference, including but not limited to distributions pursuant to Bylaw 31. [*Adopted: 1/14/21*]

## 3.2 WITHDRAWAL FEE

***3.2.1 Obligation to Pay Withdrawal Fee.** A member that provides notice of withdrawal from the Conference as required by Section 3.1.4 shall pay a withdrawal fee to the Conference of $30 million on or before the effective date of the withdrawal. [*Adopted: 1/14/21*]

***3.2.2 Additional Withdrawal Fee.** A member that withdraws from the Conference without providing notice of withdrawal as required by Section 3.1.4 shall pay a withdrawal fee of $40 million to the Conference immediately upon providing notice of withdrawal (or if no notice is provided, as of the effective date of such withdrawal). [*Adopted: 1/14/21*]

***3.2.3 Withdrawal Fee—Member Deemed to Have Withdrawn.** A member deemed to have withdrawn from the Conference shall pay a withdrawal fee of $45 million to the Conference immediately upon being informed that the Commissioner has determined that the member is deemed to have withdrawn. [*Adopted: 1/14/21*]

***3.2.4 Reduction of Distributions to Withdrawing Member.** The Commissioner may, at any time (including prior to the effective date of any withdrawal or deemed withdrawal), reduce any distributions otherwise payable to a member that has provided notice of withdrawal or who has been deemed to have withdrawn, including but not limited to distributions otherwise provided for in Bylaw 31, and apply such distributions to the withdrawal fee payable by the member to the Conference. [*Adopted: 1/14/21*]

CONSTITUTION, ARTICLE 4

# Organization


4.1 Chief Executive Officers ........ 5
4.2 Conference Officers ........ 5
4.3 Committees ........ 6
4.4 Commissioner ........ 6


## 4.1 CHIEF EXECUTIVE OFFICERS

***4.1.1 Chief Executive Officers.** The President or Chancellor of each member shall be a Chief Executive Officer of the Conference. Accordingly, there shall be one Chief Executive Officer for each member. The Chief Executive Officers shall act at the regular annual meeting of the Conference or at specially called meetings of the Conference, as set forth in Article 5. [*Clarified/Conformed/Renumbered 6/1/11*]

***4.1.2 Powers and Duties.** The Chief Executive Officers shall have plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws. Without limitation, the Chief Executive Officers may: [*Revised/Clarified/Conformed/Renumbered 6/1/11*]

(a) Take all actions specified and contemplated in Article 3, in their sole discretion.

(b) Place on probation until the next regular annual meeting of the Conference any member that violates any provision of the Constitution, Bylaws, or other rules, regulations, legislation or policies of the Conference or of the NCAA (which probation shall be on such terms, conditions, restrictions, and pursuant to such other parameters as may be deemed appropriate under the circumstances);

(c) Prohibit any member's team from being recognized as Conference champion;

(d) Prohibit any member's team from participating in Conference sponsored games, events, meets or tournaments;

(e) Prohibit any member's team from participating in pre-season or post-season athletic events, including Conference championships;

(f) Prohibit any institution from participating in the distribution of Conference funds (including funds from bowls, television or tournaments);

(g) Impose any other penalty which they consider appropriate; and

(h) Hear and decide appeals from decisions and actions of the Commissioner and the Executive Committee in disciplinary and enforcement matters under procedures specified in the Bylaws.

## 4.2 CONFERENCE OFFICERS

**4.2.1 Composition.** The three officers of the Conference shall be a President and a Vice-President, who shall be selected from the Chief Executive Officers, and a Secretary, who shall be a Faculty Athletics Representative. [*Clarified/Conformed 6/1/11*]

***4.2.2 Election/Term of Office.** The three officers shall be elected by the Chief Executive Officers at each regular annual meeting of the Conference, to take office immediately. They shall be elected to serve for a period of one year, and the President and Vice-President shall not be eligible to serve for more than two terms in succession. The Secretary shall serve unlimited terms if so elected. Each officer shall be elected from a different member institution. *[Revised: 5/30/91*] [*Clarified/Conformed 6/1/11*]

**4.2.3 Powers and Duties.** [*Clarified/Conformed 6/1/11*]

**4.2.3.1 President.** The President shall preside at all meetings of the Conference and the Executive Committee, may call a meeting of the Conference or of the Executive Committee, shall be the official representative of the Conference in all its business and other relations with persons or organizations concerning intercollegiate athletics, and, in conjunction with the Commissioner, shall take such other actions and have such other authority as shall be directed/conferred by the Conference or the Executive Committee.

**4.2.3.2 Vice-President.** The Vice-President shall perform the duties of the President in the latter's absence or disability and shall assist the President in the performance of Conference business when called upon to do so.

**4.2.3.3 Secretary.** The Secretary shall keep the minutes of all meetings of the Conference and the Executive Committee.

## 4.3 COMMITTEES

**4.3.1 Executive Committee.** There shall be an Executive Committee of the Conference. The members of the Executive Committee shall be the three officers of the Conference and four individuals elected at the regular annual meeting of the Conference. The four elected members shall be from different institutions and from institutions other than those of the three officers. The four elected members shall serve staggered terms of no more than three years, as determined by the Conference, with at least one member rotating off each year. One and only one of the elected members shall be a Chief Executive Officer who is not an officer of the Conference. One and only one of the elected members shall be a Director of Athletics. One and only one of the elected members shall be a Senior Woman Administrator or shall have primary responsibility for the administration of women's athletics. One and only one of the elected members shall be a Faculty Representative. [*Clarified/Conformed/Revised: 6/1/11*]

**4.3.1.1 Powers and Duties.** The powers and duties of the Executive Committee shall be as follows: [*Clarified/Conformed: 6/1/11*]

(a) It shall meet at the regular annual meeting of the Conference and at other times on the call of the President or the Commissioner;

(b) It shall fix the times and the places of the regular annual meeting of the Conference;

(c) It shall hear and decide appeals from Adverse Actions of the Commissioner in disciplinary and enforcement matters as is provided in Bylaw 19;

(d) Between regular annual meetings, it shall fill any vacancy which may occur in any of the three officer positions or in its own membership;

(e) Unless the Constitution or Bylaws require action by the Chief Executive Officers, and unless a meeting of the Chief Executive Officers is called, it shall, as necessary or appropriate, approve all contracts and agreements of the Conference, authorize or ratify actions of the Commissioner and otherwise determine and direct the policy of the Conference on any matter which may arise between regular annual meetings, if such matter cannot be disposed of satisfactorily by an existing rule or precedent;

(f) It shall approve the annual operating budget of the Conference, and shall oversee all financial and fiscal affairs of the Conference as administered by the Commissioner; and

(g) It shall take such other actions and make such other decisions as may be specified in other provisions in the Constitution, Bylaws, and Commissioner's Regulations.

***4.3.3 Special Committees.** The Conference may create other regular or special committees from time to time. [*Clarified/Conformed/Renumbered: 6/1/11*]

## *4.4 COMMISSIONER

**4.4.1 Election.** The Commissioner shall be elected by a majority vote of the Chief Executive Officers at a regular or called meeting for a term not to exceed six years. [*Revised: 5/30/91*] [*Clarified/Conformed: 6/1/11*]

**4.4.2 Authority, Duties and Responsibilities.** [*Revised/Clarified/Conformed: 6/1/11*]

(a) The Commissioner shall be responsible for and have authority for the administration and operations of the Conference;

(b) The Commissioner shall be charged with the duty of implementing, administering and enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA, and shall be vested with broad discretionary authority to carry out the duties of the position, including the authority to assess penalties and sanctions as contemplated and authorized in the Constitution and Bylaws;

(c) The Commissioner shall have authority to determine whether any student-athlete is eligible for intercollegiate athletic competition, athletically-related aid, and for practice in each sport in which a member institution sponsors a varsity or junior varsity team (whether the Conference declares a Champion in that sport or not), which authority shall include the power to declare a student-athlete ineligible as a result of a violation of any of the provisions of the Constitution, Bylaws, and other

rules, regulations, and legislation of the Conference and the NCAA, as well as the power and discretion to restore the eligibility of a student-athlete;

(d) When it comes to the attention of the Commissioner that a student-athlete may be guilty of committing a flagrant, disqualifying foul on the field of play or at a contest site, or may be guilty of any unsportsmanlike act, the Commissioner may rule the student-athlete ineligible permanently or for a fixed period, or the Commissioner may, with or without publicity, warn the student-athlete and the student-athlete's coach and member institution that, if there is a repetition of such conduct, the student-athlete could be ruled ineligible permanently;

(e) The Commissioner is the official Conference interpreter of Constitution, Bylaws, Commissioner's Regulations, and other rules, regulations, legislation and policies of the Conference and the NCAA;

(f) The Commissioner shall present an operating budget to the Executive Committee each year for approval and shall act as custodian of all Conference funds;

(g) The Commissioner shall furnish each member with copies of the Constitution and Bylaws annually and shall provide to all members copies of the minutes of all meetings of the Conference and Executive Committee as soon after the meetings as may be practicable;

(h) The Commissioner shall arrange suitable accommodations for all in-person meetings of the Conference and the Executive Committee, and attend to such other details with reference thereto as may be necessary;

(i) With the approval of the Executive Committee, the Commissioner may appoint and employ such personnel as may be necessary to the performance of the functions of the Conference office;

(j) The Commissioner may call meetings of the Executive Committee or, after consultation with the President, of the Conference;

(k) The Commissioner may enter into contracts and agreements on behalf of and to bind the Conference, either in specific instances as authorized by, or pursuant to authority generally granted by, the Chief Executive Officers or the Executive Committee; and

(l) The Commissioner shall have authority to issue such interpretations, rules, regulations, memoranda, instructions, forms and procedures as may be necessary or appropriate in the performance of these duties, and in standardizing practices of the Conference, including memoranda or guidance to provide direction and information concerning the enforcement of the Constitution, Bylaws, and rules and regulations of the Conference and of the NCAA.

**4.4.3 Penalties and Sanctions.** Without limitation, the Commissioner shall have the following powers and authority with respect to penalties and sanctions: [*Revised/Clarified/Conformed: 6/1/11*]

(a) The Commissioner may impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any member institution that violates any of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA.

(b) The Commissioner may impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any Athletic Director, coach, or other member of the athletics department of a member institution who violates any of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA. The penalties that the Commissioner may impose include but are not limited to, singly or in combination:

  (1) Suspension from contests or other athletically related activities;

  (2) Limiting coaching duties, including those related to recruiting; and

  (3) Public or private reprimands.

(c) The Commissioner may declare ineligible, either permanently or for such shorter period as the Commissioner in his or her discretion may determine to be appropriate, any student-athlete or prospective student-athlete who violates (or who was actively involved in a violation of) any of the provisions of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA.

(d) The Commissioner shall impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any staff member, sport program, or member institution who is found by the NCAA to have had impermissible recruiting contact with a student-athlete at another Conference institution. [*Adopted: 6/3/21*]

(e) The Commissioner shall not impose the penalties/sanctions or take the actions contemplated or specified in Article 3 or in Article 4.1.2 (b) – (e), with respect to which authority is specifically reserved to the Chief Executive Officers.

CONSTITUTION, ARTICLE 5

# Legislative Authority and Process


5.0 General Principles.... 8
5.1 Meetings of the Conference.... 8
5.2 Meetings of the Executive Committee.... 9
5.3 Amendment and Suspension.... 9


## *5.0 GENERAL PRINCIPLES

**5.01.1 Governance.** The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA.

**5.01.2 Legislative Authority.** All sports sponsored by members of the Conference shall be subject to the applicable academic provisions of the Conference's Constitution and Bylaws, including those sports in which the Conference does not sponsor a championship. [*Revised: 5/30/03 effective for student-athletes first entering a member institution on or after August 1, 2003*]

## 5.1 MEETINGS OF THE CONFERENCE [*Article 5.1 -- Revised/Clarified/Conformed 6/1/11*]

**5.1.1 Voting.** Each member of the Conference shall be entitled to one vote at meetings of the Conference; provided, however, that a member may not vote if the member is not in good standing. A vote of a majority of the members present and voting at a duly convened meeting at which a quorum is present shall constitute action of the Conference unless a supermajority vote is otherwise required by the Constitution or Bylaws. A member shall not be in good standing if the member has been suspended from membership or if a vote has been taken at which its membership has been terminated. The vote of each member shall be cast by the Chief Executive Officer who is the President or Chancellor of the member; provided, however, that a Chief Executive Officer may designate another representative of the member to attend or participate in meetings of the Conference and vote on behalf of the member. References in the Constitution and Bylaws to action or a vote of the "Conference" indicates that an action or vote of the Chief Executive Officers, or their designees, is contemplated and required. References in the Constitution and Bylaws to action being taken by the Conference indicate that action has been or shall be taken by the Chief Executive Officers, or their designees.

**5.1.2 Regular Annual Meeting.** The Conference shall hold one regular annual meeting each calendar year. This meeting shall be held in conjunction with the spring meeting of the Directors of Athletics. The exact time and place shall be determined by the Executive Committee.

**5.1.3 Special Meetings.** Special meetings of the Conference may be held from time to time, as necessary or appropriate. Special meetings may be conducted/attended in person, by telephone/conference call, or by use of video-conferencing services if such services are arranged by the Commissioner.

**5.1.4 Authority to Call Special Meetings.** The President or the Commissioner (acting in consultation with the President) may call a special meeting of the Conference. In addition, upon the request of the Executive Committee or upon written request of at least a majority of the Chief Executive Officers of the Conference, the Commissioner shall call a special meeting of the Conference.

**5.1.5 Notice of Special Meetings.** The President or Commissioner, as the case may be, shall provide notice of each special meeting that is reasonable under the circumstances giving rise to the meeting. The notice shall, to the extent practicable, specify the nature of the matters to be considered at the meeting.

**5.1.6 Quorum.** A majority of the members entitled to vote shall constitute a quorum at any meeting of the Conference.

**5.1.7 Parliamentary Procedure.** Upon request, the parliamentary procedure of the Conference shall be governed by Robert's Rules of Order, Newly Revised.

**5.1.8 Order of Business.** The usual order of business at regular annual meetings of the Conference shall be determined by the President in consultation with the Commissioner.

**5.1.9 Nature of all Meetings.** All meetings of the Conference shall be transacted in executive session.

## 5.2 MEETINGS OF THE EXECUTIVE COMMITTEE [*Clarified/Conformed/Renumbered 6/1/11*]

**5.2.1 Meetings of the Executive Committee.** The President or the Commissioner may call a meeting of the Executive Committee. Any member of the Committee employed by a member directly interested in any matter submitted to the Committee or under consideration by it shall be disqualified to participate in consideration of or vote with respect to the matter, and it shall be the duty of the presiding officer to appoint a disinterested representative to act in place of the party disqualified.

**5.2.2 Nature of Meetings of the Executive Committee.** Open meetings of the Executive Committee may be held with the approval of a majority of the members of the Executive Committee, but all business of the Executive Committee shall be transacted in executive session.

**5.2.3 Quorum.** A quorum of the Executive Committee shall consist of not less than four members, provided that one of the members must be a Chief Executive Officer. Each member of the Committee shall be entitled to one vote. The Executive Committee shall act in accordance with votes of a majority of its members unless a greater vote is otherwise required by the Constitution or Bylaws.

**5.2.4 Notice of Meetings of the Executive Committee.** The President or Commissioner, as the case may be, shall provide notice of each Executive Committee meeting that is reasonable under the circumstances giving rise to the meeting. The notice shall, to the extent practicable, specify the nature of the matters to be considered at the meeting.

## 5.3 AMENDMENT AND SUSPENSION [*Clarified/Conformed/Renumbered/Revised: 6/1/11*]

**5.3.1 Amendment Process.**

***5.3.1.1 Amendment.** The provisions of the Constitution and Bylaws may be amended only at a meeting of the Conference. All proposed amendments to the Constitution or Bylaws must be submitted to all members in writing by the Commissioner not less than 21 calendar days prior to the meeting.

***5.3.1.2 Amendment to Amendment.** A proposed amendment to a provision of the Constitution or Bylaws may be amended at any meeting.

***5.3.1.3 Voting Requirements.** An amendment (or amendment to amendment) of a dominant provision (denoted by an asterisk in the margin of the provision) requires a two-thirds vote of all of the members of the Conference in good standing, whether all of the members of the Conference are present at or participating in the meeting or not. All other amendments require a vote of a majority of all the members of the Conference in good standing, whether all the members of the Conference are present at or participating in the meeting or not.

***5.3.1.4 Effective Date.** All amendments shall become effective immediately unless a different date is specified.

CONSTITUTION, ARTICLE 6

# Institutional Control and Responsibility

6.1 Institutional Responsibility .......... 10

## *6.1 INSTITUTIONAL RESPONSIBILITY

The Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution.

BYLAW, ARTICLE 10

# Ethical Conduct


| | | |
|---|---|---|
| 10.1 | Statement of Purpose | 11 |
| 10.2 | Recruiting | 11 |
| 10.3 | Academic Integrity | 11 |
| 10.4 | Game Management | 12 |
| 10.5 | Sportsmanship | 12 |


The Southeastern Conference embraces the principles of ethical conduct stated in the NCAA Manual.

## 10.1 STATEMENT OF PURPOSE

The members of the Southeastern Conference subscribe to the principle that intercollegiate athletics is a legitimate and important part of higher education, is regarded as a significant part of the university culture, and shall be administered and conducted in a manner consistent with the institution's educational policies. It is the function of the Conference to encourage intercollegiate athletics on an amateur basis with effective institutional control and to establish and promote standards of personal conduct for all those who administer and participate in Conference events.

Therefore, the Conference sets forth this code to maintain intercollegiate athletics in harmony with the essential educational purposes of the institution. A spirit of mutual trust and cooperation is fundamental to the successful application of the rules of the Conference and this code of ethical behavior.

## 10.2 RECRUITING

**10.2.1** Coaches shall comply with and promote compliance with all rules and regulations of the Conference and the NCAA and are accountable for the highest standards of honesty and integrity in order to provide a fair and equitable opportunity for each prospective student-athlete to make an informed and properly-considered commitment to the university of his/her choice. [*Clarified/Conformed 6/1/11*]

**10.2.2** The right of a prospective student-athlete to obtain accurate information to aid in the decision process must be respected. Thus, no coach shall provide false or misleading information, or offer inducements that are violations of the rules or regulations of their member institution, the Conference, or the NCAA. [*Clarified/Conformed 6/1/11*]

**10.2.3** Coaches and other member personnel shall advocate the positive advantages and attributes of their university and its intercollegiate athletics program and shall avoid making any derogatory statements concerning another member institution's athletics program, facilities or educational opportunities.

**10.2.4** Coaches shall strictly adhere to all applicable rules related to the involvement of alumni and boosters in the recruiting of prospective student-athletes.

**10.2.5** A request by a prospective student-athlete to be subjected to no further recruitment shall be respected.

## 10.3 ACADEMIC INTEGRITY

**10.3.1** Coaches shall only recruit prospective student-athletes who have the necessary academic background to succeed as students at his/her member institution. [*Clarified/Conformed 6/1/11*]

**10.3.2** In determining a prospective student-athlete's initial eligibility status, each member institution shall be responsible for making every effort to assure that credentials utilized to determine eligibility are accurate and authentic. [*Clarified/Conformed 6/1/11*]

**10.3.3** Each member institution shall provide student-athletes access to sufficient academic support services and counseling to meet their academic needs. [*Clarified/Conformed 6/1/11*]

**10.3.4** Each member institution shall ensure that its coaches provide student-athletes the necessary time and resources to succeed academically in a meaningful degree program. [*Clarified/Conformed 6/1/11*]

**10.3.5** Each coach, in conjunction with the appropriate academic authorities, shall monitor each student-athlete's academic performance to ensure satisfactory progress and timely graduation with a meaningful college degree. [*Clarified/Conformed 6/1/11*]

## 10.4 GAME MANAGEMENT

**10.4.1** Each contest shall be played and administered according to the prescribed rules set forth by the Conference and the NCAA.

**10.4.2** The host member institution shall ensure that the visiting team has an equal opportunity to compete successfully. The host member institution is solely responsible for providing adequate and appropriate crowd control, bench safety, access for communication and locker room security. [*Clarified/Conformed 6/1/11*]

## 10.5 SPORTSMANSHIP

**10.5.1** All institutional staff members and student-athletes of a member institution, shall conduct themselves with honesty and good sportsmanship. Their behavior shall at all times reflect the standards of honor and dignity that characterize participation in the collegiate setting. For intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society, coaches, student-athletes and all others associated with these athletics programs and events should adhere to such fundamental values as honor, respect, fairness, civility, honesty and responsibility. These values should be manifest not only in athletics participation but also in the broad spectrum of activities affecting the athletics program.

It is the responsibility of each member institution to establish policies for sportsmanship and ethical conduct in intercollegiate athletics consistent with the educational mission and goals of the institution. Furthermore, member institutions are responsible for educating all constituencies about these policies on a continuing basis. [*Adopted: 6/4/0; effective 8/1/04, Revised: 6/1/18*]

**10.5.2** Coaches and administrators shall refrain from public criticism of other member institutions, their staffs or players. Coaches and administrators shall also refrain from making public statements and accusations with regard to infractions concerning member institutions and their personnel. In response to questions by the media, it is appropriate to state that infractions are reported, investigated and addressed in accordance with established Conference and NCAA procedures. [*Clarified/Conformed 6/1/11*]

**10.5.3** Coaches, players and support personnel shall refrain from all public criticism of officials, which shall include making public any specific communications with the Conference office and/or officiating coordinators related to officiating. [*Revised: 6/1/07*]

**10.5.4** Coaches and support personnel shall provide favorable examples in appearance, conduct, language, and sportsmanship and shall refrain from personal conduct that may incite spectators. [*Revised: 6/2/94*]

BYLAW, ARTICLE 12

# Amateurism

12.3 Interaction with Sports Agents ........................................................ 13

## 12.3 INTERACTION WITH SPORTS AGENTS

**12.3.1 Limitation on Access**. A member institution shall not issue to a sports agent regular season or postseason game credentials in any sport that provide the individual with access to the sideline, locker rooms, or any area where contact with student-athletes may be possible. [*Adopted: 6/4/04; effective 8/1/04*]

BYLAW, ARTICLE 13

# Recruiting


| | | |
|---|---|---|
| 13.6 | Official Visits | 14 |
| 13.7 | Unofficial Visits | 14 |
| 13.9 | Letter of Intent Programs, Financial Aid Agreements | 14 |
| 13.11 | Tryouts | 14 |


In general, the Conference rules and regulations governing recruiting shall be the rules and regulations of the NCAA as set forth in the NCAA Manual and official interpretations thereof.

## 13.01 ETHICAL CONDUCT IN RECRUITING [See SEC Bylaw 10.2]

## 13.1 REQUIREMENTS TO RECRUIT

**13.1 Requirements to Recruit – Rules Education.** An institutional staff member shall not engage in on or off-campus recruiting activities until the staff member has received rules education covering applicable NCAA and SEC legislation relating to the recruitment and eligibility of prospective student-athletes. Continuing rules education must occur on an annual basis. [*Adopted: 6/3/22]*

## 13.6 OFFICIAL VISITS

**13.6.7.5 Student Host.** An individual used to host a prospective student-athlete during an official visit must be a full-time institutional staff member, a graduate assistant coach, or a current student-athlete in the prospective student-athlete's sport. [*Adopted: 10/8/18; effective 8/1/19*]

**13.6.7.5.1 Exception – Football.** A student designated in a manner consistent with the institution's policy for providing campus visits or tours to prospective students in general may be used to host a football prospective student-athlete at an institution's football stadium immediately prior to, during, and immediately following an institution's football contest. [*Adopted: 5/31/19; effective 8/1/19*]

## 13.7 UNOFFICIAL VISITS

**13.7.3.1.8 Student Host.** An individual used to host a prospective student-athlete during an unofficial visit arranged by or involving the athletics department (e.g., contact with athletics department staff, athletics-specific tour, complimentary admission) must be a full-time institutional staff member, a graduate assistant coach, or a current student-athlete in the prospective student-athlete's sport. [*Adopted: 10/8/18; effective 8/1/19*]

**13.7.3.1.8.1 Exception – Football.** A student designated in a manner consistent with the institution's policy for providing campus visits or tours to prospective students in general may be used to host a football prospective student-athlete at an institution's football stadium immediately prior to, during, and immediately following an institution's football contest. [*Adopted: 5/31/19; effective 8/1/19*]

## 13.11 TRYOUTS

**13.11.1.8 Non-Scholastic Football Events.** A member institution may not host, sponsor, or conduct non-scholastic football events (e.g., 7-on-7 football events) at any location, on or off campus. [*Adopted: 6/3/11; effective 8/1/11*]

BYLAW, ARTICLE 14

# Eligibility: Academic and General Requirements


| | | |
|---|---|---|
| 14.01 | General Principles | 15 |
| 14.1 | General Eligibility Requirements | 15 |
| 14.2 | Seasons of Competition: Five-Year Rule | 17 |
| 14.3 | Freshman Academic Requirements | 17 |
| 14.5 | Transfer Regulations | 17 |


## 14.01 GENERAL PRINCIPLES

**14.01.1 Compliance With Other NCAA and Conference Legislation.** Each student-athlete of each member institution who competes in, or is on the roster of a team that competes in, intercollegiate varsity or junior varsity athletic competition must comply with the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA applicable to his/her sport in order to be eligible for athletically-related aid, practice, or competition. [*Renumbered/Clarified/Conformed 6/1/11*]

## 14.1 GENERAL ELIGIBILITY REQUIREMENTS

**14.1.1 Regular-Season and Postseason Competition.** Unless otherwise specified in these Bylaws, regular-season and postseason eligibility rules for the Southeastern Conference are the same as the eligibility rules for NCAA championships.

**14.1.2.2 Validity of Academic Credentials.** Each member institution bears primary responsibility for reviewing and ensuring the validity of the NCAA Eligibility Center certification of initial eligibility and the institution's certification of transfer eligibility for each prospective student-athlete ("PSA") who will participate in intercollegiate competition at the institution. [*Revised: 6/5/99; Revised: 6/2/06*; *Revised 6/1/2007; Revised 5/31/2013; effective August 1, 2013; for student-athletes initially enrolling full-time at a collegiate institution on or after August 1, 2013; Revised 6/3/16; Revised 6/2/17; effective 8/1/17; Revised: 6/2/23]*

(a) Each member institution must review and ensure that all academic credentials (herein the "Credentials") supplied by a PSA to the NCAA Eligibility Center for initial eligibility certification, or to the institution for transfer eligibility certification are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA, whether the NCAA Eligibility Center challenges or specially reviews those Credentials or not. [*Revised: 6/1/11; Revised: 6/2/17 effective 8/1/17*]

(b) Each member institution shall establish and maintain its own written policies for the review of Credentials required by subsection (a) of this Bylaw 14.1.2.2.

(c) For PSAs who enroll at a member institution as an entering freshman with no previous full-time collegiate enrollment, even if a member institution has admitted a PSA and determined in accordance with its own process that the NCAA Eligibility Center certification of eligibility is based upon valid and accurate Credentials that fairly reflect the academic abilities and qualifications of the PSA, the member institution shall develop a special written report (the "Special Report") in accordance with subsections (d) and (e), if: [*Revised: 6/2/17 effective 8/1/17, Revised: 6/1/18]*

(1) The PSA transfers or withdraws from high school in his or her senior year;

(2) Core courses have been taken out of sequence by the PSA;

(3) Revisions (other than to correct clerical errors) are made to the PSA's transcript that raise the PSA's grade in one or more core courses; or

(4) The PSA has completed more than one core course through nontraditional means (e.g., virtual high school or a correspondence course) after his or her junior year of high school. [*Revised: 6/1/18*]

(i) An institution is not required to develop a Special Report due to Bylaw 14.1.2.2 (c)(4) if the PSA is an Early Academic Qualifier, pursuant to NCAA legislation or NCAA Eligibility Center policies.

(d) Each Special Report shall:

(1) Specify which of the numbered subparagraphs of subsection (c) of this Bylaw 14.1.2.2 triggered the requirement for a Special Report;

(2) Attach complete and correct copies of all of the PSA's Credentials supplied to the NCAA Eligibility Center and to the SEC member institution;

(3) Set forth in detail the review made by the member institution to determine whether the Credentials are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA;

(4) Include such supporting material as is reasonably necessary and appropriate under the circumstances to establish that the PSA's Credentials are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA;

(5) Be created and maintained on file by the certifying institution prior to the PSA's initial participation in intercollegiate competition.

(e) The supporting material required by subparagraph (4) of subsection (d) of this Bylaw 14.1.2.2 shall include the following, to the extent applicable:

(1) If the requirement for a Special Report is triggered by subparagraph 14.1.2.2(c)(1), the Special Report shall include a complete explanation of the circumstances and cause for the withdrawal or transfer, and verification that the transfer was not for the purpose of avoiding inadequate grades in core course(s) or for the purpose of securing adequate grades in core course(s) without actually meeting the academic requirements of such course(s); and

(2) If the requirement for a Special Report is triggered by subparagraphs 14.1.2.2(c)(2)-(4), the Special Report shall include verification that the PSA in fact properly completed and satisfied the academic requirements of all core courses and that the PSA's grades in those courses are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA.

**14.1.16 Class Attendance Policies.** Conference athletics departments shall establish class attendance policies for student-athletes. Each athletics department has discretion as to the nature and scope of the policy. Each athletics department shall be responsible for the supervision and enforcement of its policy, including any sanctions when the policy is violated. [*Adopted: 6/1/2007 effective 8/1/2007, Revised: 5/30/24*]

**14.1.17 Disciplinary Standards.** Each member institution bears primary responsibility for monitoring the behavior of its current and prospective student-athletes and for establishing appropriate disciplinary standards in accordance with this bylaw. [*Adopted: 5/29/2015*]

(a) Each member institution shall establish and maintain policies and procedures for monitoring student conduct issues.

(b) Each member institution shall establish and maintain appropriate disciplinary standards for current student-athletes involved in student conduct issues.

**14.1.18 Serious Misconduct**. A prospective student-athlete, including a transfer, who has been convicted of or pled guilty or no contest to a felony involving serious misconduct, or has been subject to official school disciplinary action at any time during enrollment at any previous educational institution (excluding limited discipline applied by a sports team or temporary disciplinary action during an investigation) due to serious misconduct (as defined herein) shall not be eligible for athletically-related financial aid, practice or competition at a member institution. An institution shall conduct an appropriate inquiry into a prospective student-athlete's background that at least satisfies the Conference's minimum due diligence expectations (see Appendix B) prior to providing the prospective student-athlete athletically-related financial aid or allowing him/her to participate or compete. Incidents of serious misconduct involving an enrolled student-athlete shall not be subject to these provisions. For purposes of this provision, "serious misconduct" is defined as sexual assault, domestic violence, other forms of sexual violence, dating violence or stalking; or conduct of a nature that creates serious concerns about the safety of others. [*Adopted: 5/29/2015, Revised: 6/3/16, Revised: 6/1/18 effective 10/15/18*]

**14.1.18.1 Exception – Reinstatement at Previous Institution.** A transfer student-athlete who has been subject to official school disciplinary action for serious misconduct at a previous collegiate institution may be eligible for athletically-related financial aid, practice and competition at a member institution provided the individual has been reinstated without condition and has completed a minimum of one academic year since reinstatement at the previous institution. [*Adopted: 6/2/23*]

## 14.2 SEASONS OF COMPETITION: FIVE-YEAR RULE

**14.2.4 Hardship Waiver**. In accordance with NCAA Bylaw 12.8.4, upon application to the Commissioner by a member institution, a student-athlete may be granted an additional year of varsity competition in accordance with the NCAA hardship rule. An application for hardship must be endorsed by the team physician, trainer and the Director of Athletics (or by a person acting for the Director of Athletics as his or her designee).

## 14.3 FRESHMAN ACADEMIC REQUIREMENTS

**14.3.2 Eligibility for Financial Aid, Practice and Competition.**

**14.3.2.1 Non-Qualifiers** [*Revised: 6/1/96 effective June 1, 1997 for those student-athletes first entering a member institution on or after Fall semester/quarter, 1997; Revised: 6/1/08; effective 8/1/2008; Revised: 6/1/95; Revised: 6/1/2008; effective 8/1/2008; Revised: 6/2/23, Revised: 5/29/25*]

(a) A limited number (see limits in subsection 14.3.2.1(b) below) of student-athletes who enroll at a member institution as freshmen as a non-qualifier (as defined by NCAA Bylaw 14.3.2.1) may become eligible for athletically-related financial aid, practice, and competition after their freshman year, provided the student-athlete presents an average high school GPA of at least 2.0 (as confirmed and certified by the NCAA Eligibility Center) in at least twelve core courses.

(c) There shall be an annual limit on the number of student-athletes who are non-qualifiers and who may become eligible after their freshman year for athletically-related financial aid, practice, and competition at a member institution. The limits, which are applied on an annual basis with no carry-over of unused numbers to following years, are set forth as follows: [*Adopted: 6/5/99; Revised: 5/30/03; Revised: 6/1/08; effective 8/1/2008*]

1. For men's sports a total of four non-qualifiers enrolled in a particular academic year may become eligible to receive athletically-related financial aid, or for practice or competition. Of these four, no more than two are permitted to become eligible in football, and no more than one may become eligible in any other sport.
2. For women's sports, a total of four non-qualifiers enrolled in a particular academic year may become eligible to receive athletically-related financial aid, or for practice or competition. Of these four, no more than one may become eligible in any one sport. [*Revised: 5/30/03 effective 8/1/2003*]

## 14.5 TRANSFER REGULATIONS

**14.5.4 Two-Year College Transfers.**

**14.5.4.2 Non-qualifiers.** A non-qualifier, who initially enrolls at a two-year college and transfers to a member institution, shall not be eligible for competition during the individual's initial academic year in residence unless each of the following requirements have been met: [*Revised: 6/3/93; Revised: 6/1/08*; *Revised: 6/1/12, Revised: 6/3/21*]

(a) Attended the two-year college that granted the Associate or equivalent degree as a full-time student for the last three semesters or four quarters immediately prior to graduation from the institution granting the two-year degree (excluding summer terms); [*Revised: 6/1/02*]

(b) Correspondence, extension and distance learning courses used to fulfill the transferable English, Math and/or Science (when applicable) requirements of NCAA Bylaw 14.5.4.2, may only be completed at a two-year college where the individual is enrolled as a full-time student in pursuit of an Associate or equivalent degree.

**14.5.5 Four-Year College Transfers.**

**14.5.5.1 Transferring within the Southeastern Conference**. A transfer student, including a graduate transfer, from a member institution may be eligible for intercollegiate competition during the individual's initial academic year in residence at another member institution provided the student provides written notification of transfer to the institution within their sport's regular NCAA transfer window immediately following the sport's championship segment (see, NCAA Bylaw 13.1.1.3.1) [*Revised: 6/2/00; effective 8/1/2001; Revised: 6/1/08; Revised 6/3/21, effective 10/1/21, Revised: 6/2/23, effective 10/1/23*]

**14.5.5.1.1 Exception - Head Coach Departure.** A student-athlete may initiate notification of transfer during a 30 consecutive-day period beginning the day after the head coach of the student-athlete's team departs or announces departure from the institution. [*Adopted: 6/2/23, effective 10/1/23*]

**14.5.7 Waivers.** Prospective student-athletes with education impacting disabilities are subject to and must satisfy the eligibility standards set forth in this Bylaw 14.5; provided, however, that (i) in satisfying such standards, such students may take advantage of any applicable NCAA or SEC Bylaws that have the purpose or effect of providing reasonable accommodation to individuals with education impacting disabilities, and (ii) the Commissioner may waive or modify the standards in this Bylaw 14.5, in his or her sole discretion, if and as necessary or appropriate to comply with applicable laws or regulations. [*Adopted: 6/1/08; effective 8/1/2008*] [*Renumbered 6/1/11*]

BYLAW, ARTICLE 15

# Financial Aid

15.01 General Principles........................................................................................................................................ 19

## 15.01 GENERAL PRINCIPLES

**15.01.1 Institutional Financial Aid Permitted.** Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations. Full records detailing the source and distribution of all financial aid awarded to student-athletes participating in intercollegiate athletics shall be kept for a minimum of seven years.

**15.01.2 Eligibility of Student-Athletes for Institutional Financial Aid.** Each member institution must have student-athletes receiving athletic aid execute either the official Conference Financial Aid Agreement, as provided by the Conference office, or an institutional financial aid form that provides full and complete disclosure of the terms pursuant to which the aid shall be awarded to ensure each student-athlete is fully and properly informed of the terms of the grant-in-aid. A student-athlete who has signed an SEC Financial Aid Agreement with a member institution and is eligible to receive the athletic scholarship on the institution's first day of classes of the academic year specified on the financial aid agreement, but who does not enter that institution or who does enter and withdraws from that institution before fully completing-his/her first semester or quarter (except when the recipient of an athletic scholarship award enters military service before enrolling in the awarding institution and remains in military service for a period of eighteen months or more), shall not be eligible to receive an athletics grant-in-aid during the student-athlete's first two years in residence at the second Conference institution. [*Revised: 6/2/06; effective 8/1/2006*]

**15.01.2.1 Release from SEC Financial Aid Agreement.** An individual who has requested and received a release from a signed SEC Financial Aid Agreement as approved by the Director of Athletics at the signing Conference institution shall no longer be subject to the terms of Bylaw 15.01.2 or the SEC Financial Aid Agreement. [*Adopted: 6/1/18*]

BYLAW, ARTICLE 16

# Awards, Benefits, and Expenses for Enrolled Student-Athletes

16.2 Complimentary Admissions and Ticket Benefits ........ 20

## 16.2 COMPLIMENTARY ADMISSIONS AND TICKET BENEFITS

### 16.2.1 Permissible Procedures.

#### 16.2.1.1 Institutional Events in the Student-Athlete's Sport.

**16.2.1.1.2 Exceptions – SEC Championships, NCAA Championships and Bowl Games.** Complimentary admissions for an SEC Championship, NCAA Championship or Bowl Game shall be provided only through a pass list for individuals designated by the student-athlete. Member institutions may provide six complimentary admissions to each individual listed as a member of the official traveling squad for an SEC Championship, NCAA Championship or Bowl Game. No more than two admissions may be provided to non-traveling members of the squad. [*Revised: 5/30/03; effective August 1, 2003; Revised: 6/4/2010; effective 8/1/2010*]

BYLAW, ARTICLE 17

# Playing and Practice Seasons

17.1 General Playing-Season Regulations ........ 21
17.2 Roster Limits ........ 21

## 17.1 GENERAL PLAYING-SEASON REGULATIONS

**17.1.9 Southeastern Conference Limitation on Practice, Playing Season, Number of Contests and Squad Sizes.** Practice, playing seasons, number of contests and squad sizes are governed by the following: [*Revised: 5/31/2013; effective 8/1/2013*]

(a) In sports regulated by the Conference, limitations on practice, playing seasons, maximum contests, championships and tournaments, and squad sizes (home and travel) shall be governed by the Commissioner's Regulations and any modifications to such limitations shall be reported at the next regular meeting of the Chief Executive Officers; [*Revised: 5/29/15*]

(b) An institution shall not schedule contests of any kind during a period beginning with the first scheduled final exam through the last scheduled final exam. This bylaw does not apply to games scheduled by the Conference; [*Adopted: 6/4/04*]

(c) In the sport of football, all practices, including intra-squad games, must be held on campus, or in the immediate campus community, except that this restriction does not apply to: (1) practices held in conjunction with postseason games or regular in-season games to be played away from home; or (2) spring practices and spring games held in a facility used at least twice during the applicable academic year for regular season home competition.

## 17.2 ROSTER LIMITS

**17.2.1 Roster Limits.** An institution shall annually be limited to a total roster number in each sport as prescribed below. Any sport not referenced shall be subject to the established national roster limit: [*Adopted: 7/17/25*]

| | | |
|---|---|---|
| (a) | Men's Cross Country | 10 |
| (b) | Men's Golf | 8 |
| (c) | Men's Gymnastics | 17 |
| (d) | Men's Soccer | 26 |
| (e) | Men's Swimming | 22 |
| (f) | Men's Tennis | 9 |
| (g) | Men's Track & Field (Indoor) | 35 |
| (h) | Men's Track & Field (Outdoor) | 35 |

**17.2.1.1 Application and Exceptions.** Unless expressly stated otherwise, Conference roster limits shall be applied in accordance with corresponding NCAA rules on roster limits (see NCAA Bylaw 17.2)

**17.2.1.2 Roster Changes.** An institution may not add an athlete to its designated roster (including by replacement) from the team's first contest or date of competition of the championship segment through the end of the team's championship season. [*Adopted: 4/2/26*]

**17.2.1.2.1 Exception – Previously Enrolled Student.** An institution may add an athlete to its roster during an ongoing playing season provided the institution has not reached the roster limit in the applicable sport and the athlete was enrolled in a minimum full-time program of studies at the certifying institution as of the team's first contest date. [*Adopted: 4/2/26*]

BYLAW, ARTICLE 18

# Championships and Tournaments

18.8 Southeastern Conference Championships and Tournaments ........ 22

## 18.8 SOUTHEASTERN CONFERENCE CHAMPIONSHIPS AND TOURNAMENTS

**18.8.1 General Regulations.** Conference championships and tournaments are subject to the following:

(a) Unless otherwise specified in the sections dealing with individual sports, Conference championships and tournaments shall be held in accordance with the Commissioner's Regulations for each sport;

(b) Institutions participating shall assume full financial responsibilities;

(c) It shall be the duty of the Conference member or members to which championships or tournaments are awarded to make all local arrangements for conducting the championships or tournaments. The host institution shall keep a complete record of the contest and report to the Conference office;

(d) All Conference championships and tournaments shall be open to only Conference teams;

(e) In the sports of football, baseball, men's and women's basketball, gymnastics and soccer, a detailed financial report shall be made to the Conference office. In all other championships and tournaments that are administered by a member institution, the host institution will assume full financial responsibilities and file a financial report with the Conference office; [*Revised: 6/3/93*]

(f) The Conference office will provide trophies and awards for all sports in accordance with the Commissioner's Regulations governing each sport;

(g) All Conference championships shall be scheduled during a time period that does not conflict with the final examination periods of any member institution. A waiver of this bylaw shall be granted only upon the majority approval of the Executive Committee; and [*Revised: 6/1/96*]

(h) All rules regarding selection of participants and seeding for the Conference championships shall be included in the Commissioner's Regulations for each sport. [*Adopted: 6/1/02*] [*Clarified 6/1/11*]

BYLAW, ARTICLE 19

# Compliance and Enforcement

19.8 Southeastern Conference Compliance Program ........ 23

## 19.8 SOUTHEASTERN CONFERENCE COMPLIANCE PROGRAM

### 19.8.1 General Provisions

**19.8.1.1 General Principles.** The primary objective of the Conference compliance program is to help member institutions achieve compliance with the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA (referred to collectively in this Article 19 as the "Rules") primarily through the exercise of educational programs and monitoring procedures. Although a compliance program provides no guarantees of avoiding violations, it can help to ensure that problems that arise remain limited in scope and place the member institution in a better position to take appropriate self-corrective measures.

It is the goal of the Conference compliance program to eradicate willful violations of the Rules and to reduce, as much as possible, inadvertent violations of the Rules. To achieve that end, the Conference will provide support services as appropriate to assist institutional staff members at member institutions in achieving a working knowledge of the Rules. The Conference will also define standards of expected conduct and consequences for failure to comply with the Rules. It should be emphasized that the provision of technical support and other resources by the Conference office does not relieve the member institutions from responsibility for Rules enforcement and compliance. It is the obligation of each member institution to enforce and comply with the Rules.

Absent Conference approval to make a submission directly to the NCAA, member institutions shall submit all requests for interpretations of NCAA rules and regulations to the NCAA through the Commissioner's office.

**19.8.1.2 Hiring Practices.** Member institutions shall exercise best efforts to hire individuals committed to rules compliance. In connection with this requirement, member institutions shall thoroughly evaluate an individual's record of rules compliance prior to employing an individual in any coaching or noncoaching position with sport-specific responsibilities. Where a member institution considers hiring an individual who has engaged in unethical conduct as defined under NCAA Bylaws or who has participated in activity that resulted, or may result, in a Level I, Level II or major infraction, the President or Chancellor of that member institution shall be notified by the athletics department prior to the individual being employed by the institution.

Each member institution must include in each contract with every athletic director, coach, senior woman administrator, and other employee of its athletic department a specific provision obligating the employee to comply with the Rules and specifying that the employee agrees to be bound by and will comply with the enforcement, penalty, and other disciplinary provisions and procedures of the NCAA and of the Conference, including but not limited to the provisions of Article 4 of the Constitution and of this Bylaw 19.8. [*Revised: 6/2/17, Revised 5/30/24*]

### 19.8.2 Enforcement and Compliance Procedures

#### 19.8.2.1 Reports of Alleged Violations.

(a) Each member institution, and all employees of the member institution, shall comply with procedures developed and published by the Commissioner, with approval of the Chief Executive Officers, as such procedures shall be revised from time to time, concerning reporting violations and alleged violations of the Rules to the Conference. In compliance with and if required to do so by such procedures, a member institution associated with any violation or alleged violation of the Rules must furnish report(s), including a full and complete final report, concerning such violation or alleged violation (and of any required investigation relating thereto) to the Commissioner.

(b) Each member institution shall comply with procedures developed and published by the Commissioner, with approval of the Chief Executive Officers, as such procedures shall be revised from time to time, concerning reporting violations and alleged violations of the Rules to the NCAA.

(c) The Conference office shall not conduct its own investigations but may recommend, among other options, outside resources to work with a member institution in developing necessary information.

#### 19.8.2.2 Action by the Commissioner.

(a) Upon receipt of the final report required by Bylaw 19.8.2.1(a), the Commissioner shall determine:

(1) If the member institution conducted a thorough investigation;

(2) If the determination made by the member institution is consistent with the information developed in its review of the allegations;

(3) If the information substantiates that a violation of the Rules has occurred; and,

(4) What, if any, penalties or sanctions should be imposed by the Conference, and whether any student-athlete should be suspended or ruled ineligible.

(b) If the Commissioner determines that penalties or sanctions should be imposed or that a student-athlete should be suspended or ruled ineligible, the Commissioner shall proceed to impose the penalties or sanctions, or issue notice that the student-athlete is suspended or ineligible, as authorized by and provided in Article 4 of the Constitution.

(c) The Commissioner, in his or her discretion, may postpone or decline to take action pending or subsequent to completion of an NCAA investigation and/or pending a decision by the NCAA concerning imposition of penalties or sanctions or determination of eligibility.

**19.8.2.3 Reinstatement of Eligibility.**

(a) A student-athlete, or the member at which a student-athlete is enrolled, may petition the Commissioner to reinstate the student-athlete's eligibility.

(b) The Commissioner may, in his or her discretion, restore a student-athlete's eligibility if, under all the facts and circumstances, the Commissioner concludes that reinstatement is appropriate.

**19.8.2.4 Appeals.**

**19.8.2.4.1** Unless the Commissioner in his or her discretion stays or delays the effective date, all penalties, sanctions, eligibility determinations, and other enforcement or eligibility decisions or actions of the Commissioner shall become effective immediately upon notification to (i) the Athletic Director and the Chief Executive Officer of the member institution involved, and (ii) any student-athlete, coach, or other athletic department representative or employee affected thereby.

**19.8.2.4.2** A member institution and any student-athlete, coach, or other athletic department representative or employee affected by a penalty, sanction, adverse eligibility determination, reinstatement determination, or other adverse enforcement or eligibility decision or action (all referred to collectively in the Constitution and Bylaws as an "Adverse Action") has the right to appeal the decision of the Commissioner to the Executive Committee and to further appeal any decision of the Executive Committee to the Conference (*i.e.*, to the Chief Executive Officers).

**19.8.2.4.3** To appeal from an Adverse Action of the Commissioner as provided in Bylaw 19.8.2.4.2, the member institution or individual pursuing the appeal must:

(a) Submit a written notice of intent to appeal to the Commissioner within five calendar days after the date on which the Commissioner notifies the appellant of the Adverse Action; and

(b) Submit to the Commissioner (for distribution to the Executive Committee), within ten calendar days after submission of the written notice of intent to appeal, any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

Unless good cause exists for denying or limiting an extension, the Commissioner, upon request, may extend, for no more than twenty calendar days, the time for submission of any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

**19.8.2.4.4** To appeal from a decision of the Executive Committee as provided in Bylaw 19.8.2.4.2, the member institution or individual pursuing the appeal must:

(a) Submit a written notice of intent to appeal to the Commissioner within five calendar days after the date on which the appellant receives the decision of the Executive Committee; and

(b) Submit to the Commissioner (for distribution to the Chief Executive Officers), within ten calendar days after submission of the written notice of intent to appeal the decision of the Executive Committee, any written statements, documents, or other evidence or materials that the appellant wants the Chief Executive Officers to consider.

Unless good cause exists for denying or limiting an extension, the Commissioner, upon request, may extend, for no more than twenty calendar days, the time for submission of any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

**19.8.2.4.5** The Executive Committee and the Chief Executive Officers shall resolve appeals after considering the submissions of the appellant and after considering any submissions or information provided by the Commissioner, either upon his or her own initiative or upon request.

**19.8.2.4.6** Unless the Commissioner in his or her discretion stays or delays the effective date after receiving notice of an appeal, any penalty, sanction, adverse eligibility determination, or other adverse enforcement or eligibility decision or action shall continue in effect pending appeals.

**19.8.2.5 Compliance Reviews and Legislative Services.**

(a) The Conference office may conduct compliance reviews of member institutions. Each member institution must file a written response with the Conference office following receipt and review of a compliance review report. This written response shall address the issues identified in the report and will be required for submission to the Commissioner within 90 calendar days of receiving the report.

(b) The Conference office will provide legislative services, including but not limited to:

(1) Rules interpretations;

(2) Distribution of written legislative interpretation updates as well as other rules education materials;

(3) On-campus educational presentations to coaches and administrators; and

(4) Education seminars and programs, as necessary.

Member institutions should be aware that Conference office interpretations of the NCAA's Bylaws, and other rules, regulations, and legislation of the NCAA, are not binding upon the NCAA.

[*Article 19 was substantially revised on 6/1/11 to conform to practices and procedures previously adopted by the Conference*.]

BYLAW, ARTICLE 21

# Committees, Meetings, Events


21.8 Coaches' Meetings and Other Events ........ 26
21.9 Sports Committees ........ 26


## 21.8 COACHES' MEETINGS AND OTHER EVENTS

**21.8.1 Attendance.** Each head coach in the Southeastern Conference is required to attend the following to the extent applicable to their sport:

(a) Annual Coaches' Meeting;

(b) Winter Meeting of Head Football Coaches;

(c) Press Conferences at Conference Championships;

(d) Coaches Luncheon at SEC Football Championship; and

(e) Conference Media Day Event.

**21.8.2 Penalty.** Should a coach not attend any of the events listed above, without the prior approval of the Commissioner, his or her member institution shall pay a $10,000 fine to the Conference. [*Adopted: 6/4/04; Revised: 5/29/09; effective 8/1/2009; Renumbered, Relocated and Clarified 6/1/11*]

## 21.9 SPORTS COMMITTEES

**21.9.20 Southeastern Conference Sports Committees.** Men's and women's sports committees are subject to the following:

(a) There shall be a sports committee for each men's and each women's sport sponsored by the Conference. The committee shall be composed of the head coaches of each institution sponsoring the sport. The chair of the committee will be selected pursuant to the policies outlined in the Commissioner's Regulations for each sport. [*Revised: 6/1/95*]

(b) The sports committees make recommendations to the Athletic Directors and/or Senior Woman Administrators on all aspects of their sport; and

(c) The format and site of all coaches' meetings are to be determined by the Conference office, and each institution shall be represented by only the head coach. No alternative representation shall be permitted absent prior approval of the Commissioner. In track where there are two coaches, one representing men's teams and one representing women's teams, each institution shall be represented by at least one head coach. Additionally, in swimming, the diving coach of the host institution for the subsequent year's championship may attend the meeting. [*Revised: 6/5/99*]

BYLAW, ARTICLE 22

# Media and Related Agreements

22.1 Media and Related Agreements ........ 27

## 22.1 MEDIA AND RELATED AGREEMENTS

***22.1.1 Conference Agreements Govern**. Each member shall include provisions in each of its television, media, internet and digital rights agreements specifying that the member's agreements are subject and subordinate to all past, present, and future television, media, internet and digital rights agreements to which the Conference is or becomes a party, and further specifying that if any provision in the member's agreement is inconsistent or conflicts with any Conference agreement, the Conference agreement shall supersede the provision in the member's agreement, such that the superseded provision shall be of no effect to the extent of any such inconsistency or conflict. [*Clarified 6/1/11, Revised; 1/14/21*]

***22.1.2 Games and Telecasts.** Each member must fully conform to and comply with all current broadcast guidelines and broadcast agreements of the Conference. [*Moved and Clarified 6/1/11, Revised; 1/14/21*]

***22.1.3 Football Video.** No member of the Conference shall make video recordings of football teams of other members except in games in which the member's team is participating. [*Moved and Clarified 6/1/11, Revised; 1/14/21*]

BYLAW, ARTICLE 23

# People, Culture, and Community Initiatives

23.1 People, Culture, and Community Initiatives ........................................................ 28

## 23.1 PEOPLE, CULTURE, AND COMMUNITY INITIATIVES

**23.1.1 Athletics Leadership Roles at Member Institutions.** It is the expectation of the Conference that its member institutions shall work proactively to support initiatives, practices, and training that enhance individual campus environments and the Conference as a whole and employ thoughtful hiring practices for leadership positions within their athletics departments. Member institutions must employ intentional efforts to identify and consider the most qualified individuals for leadership roles to recruit and retain the best candidates for such roles. Such candidates may be from historically underrepresented groups who may be outside the professional, social, and societal networks of those frequently making hiring decisions on behalf of member institutions. [*Adopted: 6/3/21; Revised: 3/13/25*]

**23.1.2 Consultation with Commissioner.** Although employment decisions for member institutions will not be and should not be made by the Conference office, in order to further and ensure appropriate attention to the policies and goals set forth explicitly and implicitly in this Bylaw Article 23, prior to commencing a search for the positions of athletics director, head coach, and SWA, each member institution shall contact the Commissioner (or, if the Commissioner so directs, a specified Associate Commissioner with respect to head coach positions) to discuss and address the efforts employed to identify the best talent for the position. [*Adopted: 6/3/21; Revised: 3/13/25*]

**23.1.3 Annual Training and Education.** The Commissioner shall develop and implement an annual training and education program for the athletics directors and senior staff of member institutions concerning and addressing people, culture, and community in athletics, such as best practices for improving hiring and retention of talent. The Commissioner shall, as appropriate, identify and retain consultants to provide guidance concerning such program and to provide training and education and shall provide updates to the Chief Executive Officers concerning the consultants retained and the implementation of the training and education program. [*Adopted: 6/3/21; Revised: 3/13/25*]

**23.1.4 Leadership Development Program.** The Commissioner shall develop and implement a leadership development program specifically focused on providing participants with networking and mentoring opportunities, and other developmental opportunities to facilitate the creation of a larger pool of candidates to strengthen the pipeline for future leadership roles in the athletics department at member institutions. [*Adopted: 6/3/21; Revised: 3/13/25*]

**23.1.5 Other Initiatives.** The Commissioner may implement other initiatives and measures to promote people, culture, and community in athletics and across all sports at Conference member institutions under the direction of the Chief Executive Officers. [*Adopted: 6/3/21*]

ADMINISTRATIVE BYLAW, ARTICLE 30

# Administrative Regulations

30.20 Officiating ........ 29
30.22 Provisions and Standards for Conference Sports ........ 29

## 30.20 OFFICIATING

**30.20.1 Baseball, Basketball, Football, Soccer, Softball and Volleyball Officiating.**

**30.20.1.1 Compensation of Officials for Baseball, Basketball, Football, Soccer, Softball and Volleyball.** The Athletic Directors will set the travel expenses and the maximum fees for officials for Conference varsity baseball, basketball, soccer, and softball and volleyball games and for regular-season football games. [*Revised: 6/1/01*]

**30.20.1.2 Approval, Evaluation and Assignment of Officials.** The retention and assignment of baseball, basketball, football, soccer, softball and volleyball officials shall be under the control of the Commissioner. The official records, assignments, and all reports on officiating and officials shall be kept in the Conference office. The coordinators of baseball, basketball, football, soccer, softball and volleyball officials shall be appointed by and under the direction of the Commissioner. The coordinators shall provide information concerning rule interpretations and mechanics of officiating; and approve, assign and evaluate officials for these sports. [*Revised: 6/1/01*]

**30.20.1.3 Commissioner's Regulations for Baseball, Basketball, Football, Soccer, Softball and Volleyball Officiating.** The Commissioner shall publish and keep current the Commissioner's Regulations for baseball, men's and women's basketball, football, soccer, softball and volleyball officiating in the Southeastern Conference. After approval by the Athletic Directors, these regulations shall establish the procedures for officiating the aforementioned sports. Recommendations for revisions shall be received by the Commissioner from the officials, the coaches and other institutional representatives. No substantive revisions, however, shall become effective until approved by the Athletic Directors. [*Revised: 6/1/01*]

**30.20.2 Officiating for Sports Other than Baseball, Basketball, Football, Soccer, Softball and Volleyball.**

**30.20.2.1 Regular-Season Competition.** The approval and assignment of officials for regular-season competition of all sports, other than baseball, basketball, football, soccer, softball and volleyball shall be the responsibility of the host institution. [*Revised: 6/1/01*]

**30.20.2.2 Conference Championships.** The approval and assignment of officials for Conference championships and tournaments shall be coordinated between the responsible coaches' committee and the host institution. Final approval for the assignment and selection of the officials for these championships and tournaments must be received from the Commissioner's office.

## 30.22 PROVISIONS AND STANDARDS FOR CONFERENCE SPORTS

**30.22.1 General Information.**

**30.22.1.1 Regulated Sports.** At least one-fourth (25%) of the member institutions of the Conference must sponsor teams in a sport for that sport to be regulated by the Conference and for a Conference champion to be declared. The sports currently regulated by the Conference are: Men's sports--baseball, basketball, cross country, football, golf, indoor track, outdoor track, swimming and tennis; Women's sports--basketball, cross country, equestrian, golf, gymnastics, rowing, soccer, softball, swimming, tennis, indoor track, outdoor track, and volleyball. [*Revised: 6/1/12*]

**30.22.1.2 Varsity and Junior-Varsity Sports.** Varsity and junior-varsity sports must satisfy the following:

(a) Varsity and junior-varsity teams in all sports may be composed of freshmen and/or upper-classmen;

(b) A student-athlete who participates on a team of one classification may not participate on a team of a different classification on the same day; and

(c) An institution shall organize no more than one freshman or junior varsity team in any given sport.

**30.22.1.3 Conference Championships.** Conference championships are subject to the following:

(a) A Conference champion shall be determined annually in each of the sports listed in Bylaw 30.22.1.1. The method of determining the Conference champion for each of these sports shall be provided for in the Commissioner's Regulations of

each sport. When two institutions tie for a championship and no championship play-off is held, these institutions shall be declared co-champions; and

(b) A member institution's team or teams, prohibited by the Conference or the NCAA from participating in postseason competition in a given sport, shall not be eligible for a Conference championship and participation in a Conference season-ending event (e.g., game, tournament, meet) in that sport for the duration of this prohibition. [*Revised: 6/1/12*]

**30.22.1.4 Athletes-of-the-Year, Scholar-Athletes-of-the-Year and Community Service Leaders of the Year.**

(a) **Male and Female, Roy F. Kramer Athlete-of-the-Year Awards**. There shall be an award for the SEC Male and Female Athlete-of-the-Year. Each institution's Athletic Director will submit one nomination for each award. Each Athletic Director will receive one ballot for the male and one ballot for the female athlete-of-the-year. Each institution will cast one ballot for the male and one ballot for the female and will not be allowed to vote for its own nominee. The Conference shall pay travel expenses for each Roy F. Kramer Athlete-of-the-Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the SEC Football Championship. [*Revised: 6/3/05*]

(b) **Male and Female, H. Boyd McWhorter Scholar Athlete-of-the-Year**. There shall be a postgraduate scholarship award for the SEC Male and Female Scholar-Athlete-of-the-Year. Each institution shall nominate one male and one female student-athlete for the award, with the ultimate selection of the two winners being made by the Faculty Athletics Representative Selection Committee. Thirty additional awards, entitled SEC Postgraduate Scholarship Awards, shall be given each academic year to the institutional nominees not selected as the SEC Male and Female Scholar-Athlete-of-the-Year. The SEC Male and Female Scholar-Athlete-of-the-Year shall each be awarded a $20,000 scholarship. The SEC Postgraduate Scholarship Award recipients shall each receive a $10,000 scholarship. The Conference shall pay travel expenses for each H. Boyd McWhorter Scholar Athlete-of-the-Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the Conference annual meetings. [*Revised: 6/3/05; Revised: 5/29/98 effective June 1, 1998; Revised 6/2/17*]

(c) **Male and Female, Brad Davis Community Service Leaders of the Year**. There shall be a postgraduate scholarship award for the SEC Male and Female Community Service Leaders of the Year who demonstrate the most outstanding and meritorious community service achievements during their entire college careers. Each institution shall nominate one male and one female student-athlete for the award, with the ultimate selection of the two winners being made by the Faculty Athletics Representatives Selection Committee. Thirty additional awards shall be given each academic year to the institutional nominees not selected as the SEC Brad Davis Community Service Leaders of the Year. The Male and Female SEC Brad Davis Community Service Leaders of the Year shall each receive a $15,000 scholarship. The Community Service Scholarship recipients shall each receive a $7,500 scholarship. The Conference shall pay travel expenses for each Brad Davis Community Service Leader of the Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the Conference annual meetings. [*Revised: 6/1/01; Revised: 6/3/05; Revised: 6/3/11; effective 8/1/11; Revised: 6/3/22*]

(d) **Michael L. Slive Distinguished Service Award.** Awarded on special occasions when an outstanding candidate(s) emerges, the Michael L. Slive Distinguished Service Award will be recognized as one of the Conference's most prestigious honors. The recipient, a former student-athlete, coach, graduate or administrator of a member institution or the Conference office, must be a person of exemplary character and outstanding accomplishment who has maintained a lifetime of interest in college athletics and who, over a significant period of time, has exhibited superior leadership qualities and made a significant impact to the betterment of the mission of the Southeastern Conference. Administrative groups associated with the Conference, such as Presidents and Chancellors, Faculty Athletics Representatives, Athletics Directors, and Senior Woman Administrators, as well as individuals, such as former recipients, coaches, administrators, and other campus leaders may provide nominations to the Commissioner. Selection of the recipient shall be made by unanimous approval of a special five-member committee appointed by the Commissioner. The award shall be presented to deserving candidates at the Conference annual meetings. [*Revised: 12/13/16*]

**30.22.1.5 Playing Conditions.** Playing conditions at Conference contests are governed by the SEC Game Management Manual and by the following:

(a) The host institution is charged with the responsibility of providing satisfactory playing conditions, providing the best possible protection for the public and officials, and using its facilities for producing an atmosphere of good sportsmanship. The Commissioner will periodically distribute information regarding crowd-control procedures;

(b) Contests televised under Conference television contracts shall have game times established in accordance with those contracts. For all other contests, except as noted in the Commissioner's Regulations, the host institution shall set the starting times of contests and so notify the visiting team well in advance;

(c) At football games, artificial noise makers shall not be brought into or used in any sports venue during games between member institutions, other than contests played on the campus of an institution with a traditional institutional noise maker. Each institution should have statements printed on tickets and notices to the effect that such noisemakers will not be permitted inside its competition areas. Penalties for violations of this provision are set forth in the Commissioner's Regulations; [*Revised: 6/1/02; Revised: 6/4/2010; Effective 6/4/2010; Revised: 6/1/12; Revised: 5/29/15*]

(d) At football games the use of amplifiers, microphones, and megaphones shall be restricted to the cheerleaders of the institutions participating, directed only toward the stands and shall not be used from the time the offensive center puts a hand on the football until the football has been snapped. Additionally, the use of institutionally controlled computerized sound systems (including music), institutionally controlled artificial noisemakers and any traditional institutional noise maker shall not play from the time the offensive center puts a hand on the football until the officials whistle the play dead. Bands shall not play from the time the offensive center puts a hand on the football until the football has been snapped. In no case may music be played which may be construed to be derogatory toward the visiting team or the game officials. Physical distractions (e.g., artificial noisemakers, portable amplifiers or the main stadium public address) shall not be used by cheerleaders while either team is on the field (warm-ups or competition). An institution shall submit to the Commissioner an annual use plan explaining how traditional institutional noise makers shall be governed to ensure compliance with SEC Bylaw 30.22.1.5 (d). Penalties for use of traditional institutional noise makers in violation of this provision or failure to adhere to the institution's management plan for traditional institutional noise makers shall be set forth in the Commissioner's Regulations governing the sport of football; and [*Revised: 6/4/2010 effective 6/4/2010, Revised: 6/1/12, Revised: 5/30/14 effective 8/1/14, Revised: 6/1/18*]

(e) In sports other than football, the use of artificial noisemakers shall be governed by the Commissioner's Regulations for each sport. Penalties for violations of this provision are also set forth in the Commissioner's Regulations for each sport. [*Revised: 5/29/15*]

ADMINISTRATIVE BYLAW, ARTICLE 31

# Executive Regulations


| | | |
|---|---|---|
| 31.10 | Payment of Debt Service | 32 |
| 31.20 | Revenue Distribution - Basketball | 32 |
| 31.21 | Revenue Distribution - Football | 32 |
| 31.22 | Revenue Distribution - Baseball | 34 |
| 31.23 | Revenue Distribution - All Other Sports | 34 |
| 31.24 | Distribution of NCAA Sport Sponsorship and Grants-in-Aid Funds | 34 |
| 31.25 | Distribution of NCAA Academic Values-Based Revenue Funds | 34 |
| 31.26 | Automatic Restriction against Participation in Distribution of Conference Funds | 35 |
| 31.3 | Distribution of Funds | 35 |


The Southeastern Conference Executive Committee has issued the following policy statement relative to these revenues: All basketball and football revenues received by the member institutions which are to be sent to the Conference office for further distribution should be received in the Conference office within 40 calendar days of receipt by the institution or by April 1 whichever is earlier. Any such revenue received after April 1 shall be remitted within 10 calendar days after receipt by the institution.

## *31.10 PAYMENT OF DEBT SERVICE

**31.10.1 Payment of Debt Service.** Before any revenues of the Conference are allocated and distributed as otherwise provided in this Bylaw, the Commissioner shall make provision for payment of principal, interest, fees and any other amounts payable with respect to any outstanding indebtedness of the Conference when and as such amounts become due. The Conference shall make provision for such debt service amounts first from the revenues received by the Conference under its media agreements (allocated among the media agreements and sports as determined by the Commissioner), and if the revenues from the media agreements are not sufficient, from other revenues of the Conference as determined by the Commissioner. [*Adopted: 1/14/21*]

## 31.20 REVENUE DISTRIBUTION - BASKETBALL

**31.20.1 Distribution of Revenue Generated by Basketball.** The following basketball revenue received by the Conference office for distribution each year shall be divided into equal shares with one share being retained by the Conference office and one share being distributed to each member institution.

(a) Basketball Television - All revenue derived from national network and national cable basketball telecasts shall be divided into equal shares, with one share being distributed to each member institution and one share being distributed to the Conference. [*Revised: 6/1/995*; *Revised: 5/29/09; effective 8/1/2009]*

(b) NCAA Basketball Tournament (Men's and Women's) - Each member institution shall receive $45 per mile one-way from its campus to the competition site for each round of the tournament in which they travel and participate. In addition, each member institution shall receive one payment of $100,000 for appearing in the Preliminary, First, and/or Second Round, an additional one payment of $125,000 for appearing in the Regional Semifinals and/or Regional Finals, and an additional one payment of $300,000 for appearing in the Final Four. Funds from the participation pool of the NCAA Basketball Tournament shall be used to provide these payments. All remaining revenue from the NCAA Basketball Tournament from the participation pool, shall be divided into equal shares with one share to each member institution and one share to the Conference office. [*Revised: 5/29/98 effective June 1, 1998; Revised 6/2/00, 5/30/03, 6/1/11, 10/3/14, 6/3/16, 6/2/17, 5/29/25*]

(c) Southeastern Conference Basketball Tournament (Men's and Women's). Revenues received by the Conference office each year from the Tournament shall, following remittance of expenses as outlined in the Commissioner's Regulations, be divided into equal shares, with one share to each member institution and one share to the Conference. [*Revised: 5/29/98; effective 6/1/1998; Revised: 5/29/25*]

## 31.21 REVENUE DISTRIBUTION - FOOTBALL

**31.21.1 Distribution of Post Season Game Receipts.** Distribution of revenue (after allowable deductions) generated from member institutions participating in bowl games shall be reviewed on an annual basis and determined as follows: [*Revised: 6/1/95*; *Revised: 6/2/06*; *effective 8/1/2006; Revised: 5/31/2013; effective 8/1/2013; Revised: 6/2/17, Revised: 5/30/24]*]

(a) For bowl games providing receipts which result in a balance of less than $2,000,000, the participating institution shall retain $1,100,000, plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into equal shares with one share to the Conference and one share to each member institution. [*Revised: 6/1/02; Revised: 6/2/06*; *effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/14; effective 8/1/2014*; *Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18, Revised: 5/30/24*]

(b) For bowl games providing receipts which result in a balance between $2,000,000 and $3,999,999, the participating institution shall retain $2,100,000, plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into equal shares, with one share to the Conference and one share to each member institution. [*Revised: 6/1/02; Revised: 6/2/06*; *effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18, Revised: 5/30/24*]

(c) For bowl games providing receipts which result in a balance between $4,000,000 and $5,999,999, the participating institution shall retain $2,400,000, plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into equal shares, with one share to the Conference and one share to each member institution. [*Revised: 6/1/02; Revised: 6/2/06*; *effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18, Revised: 5/30/24*]

(d) For bowl games providing receipts which result in a balance of $6,000,000 or more, the participating institution shall receive $3,000,000 plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into equal shares, with one share to the Conference and one share to each member institution. [*Revised: 6/1/02; Revised: 6/2/06*; *effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18, Revised: 5/30/24*]

(e) For College Football Playoff ("CFP") first round games, a participating team (home or away) shall each receive $3,000,000. A participating visiting team shall also receive a travel allowance as determined by the SEC Executive Committee. For CFP second round games (quarterfinals), a participating team shall receive $3,500,000, plus a travel allowance as determined by the SEC Executive Committee. For CFP third round games (semifinals), a participating team shall receive $3,750,000, plus a travel allowance as determined by the SEC Executive Committee. For the CFP National Championship, a participating team shall receive $4,000,000, plus a travel allowance as determined by the SEC Executive Committee. Institutions participating in a College Football Playoff game may also request additional travel expenses, which may be granted at the Commissioner's discretion. The remainder of all CFP proceeds shall be remitted to the Commissioner and shall be divided into equal shares, with one share to the Conference and one share to each member institution. [*Adopted: 5/30/24*]

(f) Bowl Revenue Protection Insurance shall be deducted prior to Conference distribution. [*Adopted: 6/1/02; Revised: and Effective 6/4/2010; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016*]

(g) The cost of unused tickets up to the contractually guaranteed ticket purchase number shall be deducted prior to Conference distribution for all bowl games providing receipts of $6 million or more. For bowl games providing receipts of less than $6 million, the participating institution shall be fully responsible for the contractually guaranteed ticket purchase number. [*Adopted: 6/2/17; Revised: 5/28/20*]

(h) For bowl games in which a member institution participates as an "alternate" (*e.g*., 5-7 team) under NCAA Postseason Bowl Game requirements, the participating institution shall retain all revenue distributed by the bowl. The participating institution shall not receive a base retainage or travel allowance as set forth in subsections (a) through (d) above. The participating institution shall also be fully responsible for the contractually guaranteed ticket purchase number and any other expenses associated with participation in the bowl. [*Adopted: 6/2/17]*

**31.21.2 Distribution of Football Television Receipts**. Distribution of revenue generated from football television shall be as follows: [*Revised: 6/1/96*]

(a) A member institution appearing in a non-conference home game or a conference vs. conference game played on a non-traditional playing date to meet contractual commitments or to accommodate a request by the Conference office shall receive an appearance fee of $300,000 as the home team; and [*Revised: 6/4/04; Revised: 6/1/2007; Revised: 5/29/09; effective 8/1/2009; Revised: 6/3/11; effective 8/1/11*]

(b) All remaining revenue shall be divided into equal shares with one share being distributed to each member institution and one share being distributed to the Conference.

**31.21.3 Football Championship Game Revenue.** All revenue remaining from the championship game after expenses of planning and conducting the event have been deducted shall be divided as follows: [*Revised: 6/3/93*]

(a) Each participating institution shall be reimbursed for the actual cost of transporting an official party of 150 (including student-athletes, coaches, administrators, cheerleaders, bands, etc.) to the site (air or bus travel from campus to the site; local transportation is not included). This amount shall be approved in advance by the Conference office and must be supported by actual invoices. In addition, each participating institution shall receive $275,000 to cover all costs associated with institutional lodging, meals, local transportation and all other expenses related to the championship. Each participating institution will be financially responsible for payment for 150 rooms for two nights at the designated team headquarters hotel; *[Revised: 6/1/95; Revised: 6/1/96; Revised: 6/3/05; Revised: 6/1/12*]

(b) Each participating institution shall receive a band/cheerleader travel allowance of $50 per mile, one-way from its campus to the site (according to Rand-McNally Mileage Chart). Each institution shall be financially responsible for 100 rooms for two nights at its designated band hotel; [*Revised: 6/1/95; Revised: 6/1/96; Revised: 6/1/07*]

(c) Each participating institution shall be reimbursed for the actual cost of all player/guest admissions actually used by student-athletes (up to six per student-athlete) listed on the institution's official Championship traveling squad; [*Adopted: 6/3/16; effective 8/1/16*]

(d) All remaining revenue shall be divided into equal shares, with one share distributed to each member institution and one share to the Conference office; and

(e) Institutions may petition to the Executive Committee prior to the game for an increase in the travel allowance only in the event actual expenses exceed the designated amount.

## 31.22 REVENUE DISTRIBUTION - BASEBALL

**31.22.1 Distribution of Revenue Generated by Baseball.** Revenues received by the Conference office each year for baseball shall be divided as follows:

SEC Baseball Tournament - All guaranteed revenues shall be divided as follows:

(a) Each participating institution will be provided a per diem of $75 per day for up to 30 individuals for each day the institution plays a game. The per diem revenue will be paid on a percentage basis of available funds;

(b) Each participating institution shall receive a travel allowance of $30 per mile one-way. The travel allowance will be paid on a percentage basis of available funds; and

(c) Any revenue above full expenses of the participating teams shall be divided into equal shares, with one share to each member institution and one share to the Conference.

## 31.23 REVENUE DISTRIBUTION - ALL OTHER SPORTS

**31.23.1 Distribution of Revenue Generated by Other Sports.** Revenues received by the Conference office each year for all other sports shall be divided as follows: Net Revenues from SEC championships (other than football, men's and women's basketball, and baseball) either bid, or held at a neutral or off-campus site, shall be divided as follows: one share to the Conference office, remaining revenue shall be divided evenly among institutions which sponsor teams in that particular sport.

## 31.24 DISTRIBUTION OF NCAA SPORT SPONSORSHIP AND GRANTS-IN-AID FUNDS

**31.24.1 Distribution of NCAA Sport Sponsorship and Grants-in-Aid Funds.** NCAA Sports Sponsorship and Grants-in-Aid funds shall be sent by the NCAA to the Conference office. The funds shall then be divided into equal shares with one share to each member institution and one share to the Conference office. [*Adopted: 6/3/16; effective 8/1/16*]

## 31.25 DISTRIBUTION OF NCAA ACADEMIC VALUES-BASED REVENUE FUNDS

**31.25.1 Distribution of NCAA Academic Values-Based Revenue Funds.** NCAA Academic-Values Based Revenue funds shall be sent by the NCAA to the Conference office. The funds shall then be divided into equal shares with one share to each member institution and one share to the Conference office. [*Adopted: 5/31/19*]

## 31.26 AUTOMATIC RESTRICTION AGAINST PARTICIPATION IN DISTRIBUTION OF CONFERENCE FUNDS

**31.26.1 Restriction Against Participating in Distribution of Conference Funds due to Postseason Ban.** If, in football or men's basketball, a member institution is prohibited by the NCAA or Conference from participating in postseason games and events that generate revenues for the Conference (a "Postseason Ban"), the institution's share of revenue from the Conference derived from such sources shall be reduced as follows:

**31.26.1.1 Postseason Ban.** For each fiscal year in which an institution is subject to a Postseason Ban in football or men's basketball, the institution's distribution shall be reduced by an amount equal to 50% of the postseason media and competition/events revenues generated by the Conference in the fiscal year attributable to the respective sport. The withheld 50% of revenues that would have otherwise been distributable to the institution shall be distributed equally to all other member institutions in the Conference that are not subject to a Postseason Ban in football or men's basketball. [*6/1/96; Revised: 6/3/05, 6/3/21*]

**31.26.2 Repeat Violations.** If a member institution receives another Postseason Ban from the NCAA or Conference in either football or men's basketball during the five fiscal years immediately following the fiscal year in which the institution's revenue was first reduced by application of Bylaw 31.26.1, the institution's distributions attributable to postseason revenues in the respective sport shall be reduced as set forth in Bylaw 31.26.1, but the percentage of withholding shall be 100% instead of 50%. [*6/1/96; Revised: 6/3/05, 6/3/21*]

**31.26.3 Determination of Postseason Revenues.** Postseason revenues generated in a fiscal year by the Conference attributable to football and men's basketball shall be determined by the Commissioner based on the consistent application of the accounting and revenue recognition practices generally followed by the Conference for purposes of reporting and distributing revenues to its member institutions, subject to adjustments in such practices from year-to-year unrelated and not attributable to the application of this Bylaw 31.26 and to any amendments to this Article 31; provided that (i) the amount by which any revenue distribution is reduced shall be calculated after allocation of gross Conference revenues to any payment of debt service pursuant to Bylaw 31.10 (and after allocation of gross Conference revenues to any other extraordinary payments by the Conference) and (ii) a member institution's surplus distribution (from the Conference's share of various revenues as provided in this Article 31) shall not be reduced by application of this Bylaw 31.26. The Commissioner's determination of Postseason revenues generated in a fiscal year by the Conference shall be final and dispositive. [*Revised: 6/3/21*]

## 31.3 DISTRIBUTION OF FUNDS

**31.3.1 Distribution to Institution's Designated Agent.** A member institution may request that a portion of the revenues owed to the institution under Article 31 be distributed from the Conference to a designated third-party agent. The amount of such separate allocation shall be limited to the value of the House v. NCAA settlement benefits pool in that year. An institution electing to exercise this option shall notify the Conference and provide all necessary information to complete the transaction at least seven business days prior to the scheduled distribution. The requesting institution and the designated third-party agent shall be liable for any misconduct or inappropriate use of the funds, and the third-party agent shall fully comply with all pertinent policies and any enforcement and accountability measures established by the Conference or respective national governing body (e.g. College Sports Commission). The requesting institution shall also be responsible for any tax (federal or state) penalties or liabilities that may arise from the distribution of such funds to the third-party. [*Adopted: 8/12/25*]

ADMINISTRATIVE BYLAW, ARTICLE 32

# Enforcement Policies and Procedures

The Southeastern Conference adheres to the enforcement policies and procedures specified in this bylaw of the NCAA Manual.

# EXHIBIT B

EAST BATON ROUGE PARISH C-783299
Filed Aug 19, 2026 3:05 PM CIV.D
Deputy Clerk of Court

**JACK PYBURN, JAZMIN FERGUSON, JAMIL MUTTILIB, AMIYA JOYNER, RASHAD KING, MICHAEL ELEY, ANDREW BURNETTE, WYDETT WILLIAMS, KEENAN LANDRY, THOMAS MARSALA, PERCY DANIELS, JOSHUA "GREEDY" WILLIAMS, DAE'QUAN WRIGHT, DERRIAN FORD, ASIA NICHOLSON, ZXAVIAN HARRIS, CHANDLER JACKSON, PEITOK MACHAR, TJ HARDEN, BLAKE COTTON, ETHAN JOHNSON, ANTHONY TARJAE HANKERSON, JASMINE JONES, WEYLIN LAPUAHO, EMILEE BOYER, LUKE DRZEWIECKI, TRENT HENDRICK, BRYLAN GREEN, AVERY STRICKLAND HURST, SAM PISSIS, JUNIOR TUIHALAMAKA, AND DQ SMITH.**

**VERSUS**

**NATIONAL COLLEGIATE ATHLETIC ASSOCATION**

**FILED________________________**

**NO. C-783299; DIV. D**

**19TH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

______________________________

**DEPUTY CLERK OF COURT**

## ORDER

On this day, the Court considered Plaintiffs' Verified Petition for Temporary Restraining Order and Preliminary Injunction, with Request for Declaratory Relief and Permanent Injunction. The Court, having reviewed the verified petition, finds that the requirements of La. C. Civ. Pro. Art. 3603 for the issuance of a temporary restraining order [without notice] have been met; and, accordingly, this **TEMPORARY RESTRAINING ORDER** is hereby issued, as follows:

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Verified Petition for a Temporary Restraining Order is **GRANTED**.
2. Defendant National Collegiate Athletic Association ("NCAA") and its officers, agents, employees, representatives, successors, assigns, and all persons acting in concert or participation with it, are hereby temporarily restrained and enjoined from enforcing NCAA Bylaw 12.6, or any other NCAA bylaw, to preclude Plaintiffs from competing in NCAA Division I athletics during the 2026–2027 season on the basis that Plaintiffs have already competed in four seasons of competition

prior to starting their NCAA careers and counting their first season of junior college competition against their years of NCAA eligibility and start of their eligibility clock;

5. Defendant NCAA, and its officers, agents, employees, representatives, successors, assigns, and all persons acting in concert or participation with it, are hereby temporarily restrained and enjoined from prohibiting Plaintiffs from competing in NCAA Division I athletics during the 2026–2027 season on the basis that Plaintiffs have signed a professional contract, or agent contract, or played in a professional sporting event, so long as they terminate any such contract and repay any money they have received prior to playing in a collegiate game.

6. Defendant NCAA is further temporarily restrained and enjoined from enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution) and the ghost transfer rule against:

   a. Plaintiffs;

   b. Any NCAA member institution or coach for which Plaintiffs choose to compete during the 2026–2027 season; and

   c. Any NCAA member institution or coach that competes against Plaintiffs.

7. The NCAA is ordered to open the transfer portal for all Plaintiffs for one week from entry of this Order and, upon request of any Plaintiff, his/her NCAA member institutions shall immediately place such Plaintiff in the national transfer database without any other requirements or delay;

8. To the extent the NCAA believes it has another basis to declare a Plaintiff ineligible to compete in the 2026-27 season, the NCAA shall come before this Court and explain such reason through a motion seeking leave of this Court to declare any Plaintiff ineligible to play a collegiate sport in 2026-27

9. This Temporary Restraining Order shall remain in effect for ten days of the date of this order, unless extended by the Court in the manner provided for in La. Civ. Pro. Art. 3604.

10. The Court orders that Plaintiffs shall post a nominal bond in the amount of $ Ø , pursuant to applicable law.

**IT IS FURTHER ORDERED** that Defendant NCAA appear and show cause on the ~~X~~ 31 day of ~~Sept~~ August, 2026, at 1:30 o'clock a.m./p.m., at the 19TH Judicial District Courthouse, 300 North Blvd., Baton Rouge, Louisiana 70802, Courtroom ________,why a Preliminary Injunction should not issue on the same terms set forth above.

THUS DONE AND SIGNED, this 19 day of Aug, 2026, at Baton Rouge, Louisiana.

[signature]

JUDGE, 19TH JUDICIAL DISTRICT COURT

# EXHIBIT C

FOLLOWING MEETINGS WITH THE PRESIDENTS, CHANCELLORS, AND ATHLETICS DIRECTORS OF THE SOUTHEASTERN CONFERENCE, THE SEC WILL ENFORCE THE FOLLOWING POLICY:

AN SEC INSTITUTION IS NOT PERMITTED TO HAVE AN ATHLETE ON ITS ROSTER WHO HAS:

1. PREVIOUSLY DECLARED FOR THE NFL, NBA, OR WNBA DRAFT, AND DID NOT APPROPRIATELY WITHDRAW,

2. SIGNED A CONTRACT WITH AN NFL (OR OTHER PROFESSIONAL FOOTBALL LEAGUE), NBA/G-LEAGUE, OR WNBA (OR AFFILIATE) TEAM, OR

3. BEEN LISTED ON AN NFL (OR OTHER PROFESSIONAL FOOTBALL LEAGUE), NBA/G-LEAGUE, OR WNBA (OR AFFILIATE) ROSTER.

THE COMMISSIONER IS AUTHORIZED TO ENFORCE THIS EXPECTATION WITH PENALTIES AGAINST MEMBER INSTITUTIONS.

# EXHIBIT D

# MEMORANDUM

August 26, 2026

TO: SEC Presidents & Chancellors

FR: Greg Sankey, Commissioner

Re: Application of Existing SEC Bylaws to Athletes who Have Professionalized

On August 24, 2026, SEC Presidents & Chancellors affirmed that individuals who choose to leave college athletics, sign professional playing contracts, and compete professionally should not subsequently be permitted to return to college competition. Allowing such individuals to return to college competition will blur the line between college and professional sports, create significant competitive equity concerns, and reduce opportunities for high school and current college athletes.

Permitting professional athletes to return to college sports would also be contrary to the Conference's mission and purpose which is to sponsor intercollegiate athletics with competition by student-athletes who are not professionals. Each member institution has an affirmative obligation under the Conference Constitution and Bylaws to comply with Conference rules, establish and maintain effective institutional control, conduct its athletics program in harmony with the essential educational purposes of the Conference's member institutions, and foster strong but fair competition among the teams of the Conference's member institutions in a broad spectrum of sports and championships for the benefits of student-athletes.

Institutions and coaching staff members who promote, pursue, or engage in the recruitment or rostering of former professional athletes on a college team engage in conduct that is detrimental to the Southeastern Conference and contrary to the Conference's core purpose and mission.

In recognition of that fact, an institution that includes an athlete on its roster who has taken steps to become a professional athlete in a manner inconsistent with existing SEC Bylaws (see, SEC Bylaw 14.01.1), shall be subject to penalties as determined by the Commissioner as

established under SEC Bylaw 4.4.3.

Consistent with existing Conference eligibility standards, an individual is considered to have become a professional, and thereby may not be included on a member institution's roster, if the individual:

1. Previously declared for the NFL, NBA, or WNBA Draft and did not appropriately withdraw;
2. Signed a contract with an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) team; or,
3. Has been listed on an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) roster.

The Commissioner, consistent with his role and obligation to interpret the SEC Bylaws, will provide guidance concerning professionalization standards as applied to other sports and leagues in the near future. In the meantime, member institutions are expected to promptly notify the Conference office of any specific circumstances in which the institution seeks to recruit or roster an individual whose status as a professional athlete may be in question.

Consistent with SEC Bylaw 4.4.3(a), the Commissioner is authorized to impose appropriate penalties on a member institution that violates SEC Bylaws or other rules and regulations. Accordingly, if a member institution violates SEC rules by adding an individual who has become professional to its designated roster, the Commissioner shall impose the following penalties:

- The head coach in the sport in which the violation occurred shall be suspended from all coaching, recruiting, and administrative duties for 50% of the respective sport's playing season (e.g. six games/weeks of a 12-game season in football);
- A fine of equal to 50% of the respective sport's annual budget;
- Removal of voting privileges on items of Conference business for the member institution; and,
- Any other penalty as deemed appropriate under the circumstances by the Commissioner or the SEC Presidents & Chancellors.

Please feel free to reach out directly to Conference staff or me with questions.

GS/mb

# EXHIBIT E

EAST BATON ROUGE PARISH C-783299
Filed Aug 27, 2026 3:25 PM CIV.D
Deputy Clerk of Court

JACK PYBURN, JAZMIN FERGUSON, JAMIL MUTTILIB, AMIYA JOYNER, RASHAD KING, MICHAEL ELEY, ANDREW BURNETTE, WYDETT WILLIAMS, KEENAN LANDRY, THOMAS MARSALA, PERCY DANIELS, JOSHUA "GREEDY" WILLIAMS, DAE'QUAN WRIGHT, DERRIAN FORD, ASIA NICHOLSON, ZXAVIAN HARRIS, CHANDLER JACKSON, PEITOK MACHAR, TJ HARDEN, BLAKE COTTON, ETHAN JOHNSON, ANTHONY TARJAE HANKERSON, JASMINE JONES, WEYLIN LAPUAHO, EMILEE BOYER, LUKE DRZEWIECKI, TRENT HENDRICK, BRYLAN GREEN, AVERY STRICKLAND HURST, SAM PISSIS, JUNIOR TUIHALAMAKA, DQ SMITH, DAN ROUZAN, JALIA LASSITER, PAYTN MONTICELLI, TRAE TOMLINSON, JOCELYN OLLIVIERRE, RYAN STARR, TREY THOMAS, CKELBY PHILIP GIVENS, KENNEDY BUNKER, AND PAUL MANNING.

**NO. C-783299, DIV. D**

**19TH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

______________________________
**DEPUTY CLERK OF COURT**

**VERSUS**

**NATIONAL COLLEGIATE ATHLETIC ASSOCATION, SOUTHEASTERN CONFERENCE, AND GREG SANKEY, SOLEY IN HIS ROLE AS COMMISSIONER OF THE SEC**

**FILED**______________________

**ORDER**

On this day, the Court considered Plaintiffs' First Amended Verified Petition for Temporary Restraining Order and Preliminary Injunction, with Request for Declaratory Relief and Permanent Injunction. The Court, having reviewed the verified petition, finds that the requirements of La. C. Civ. Pro. Art. 3603 for the issuance of a temporary restraining order [without notice] have been met; and, accordingly, this **TEMPORARY RESTRAINING ORDER** is hereby issued, as follows:

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' First Amended Verified Petition for a Temporary Restraining Order is **GRANTED.**

2. Defendants National Collegiate Athletic Association ("NCAA"), Southeastern Conference ("SEC"), Greg Sankey, in his capacity as Commissioner of the Southeastern Conference (collectively, "Defendants"), and their officers, agents, employees, representatives,

successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from enforcing NCAA Bylaw 12.6, or any other NCAA or SEC bylaw or rule, to preclude Plaintiffs from competing in NCAA Division I athletics during the 2026–2027 season on the basis that Plaintiffs have already competed in four seasons of competition.

3. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that the Plaintiff did not enter the NCAA transfer portal or violated any SEC transfer rule.

4. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that they played at a junior college prior to starting their NCAA careers and counting their first season of junior college competition against their years of NCAA eligibility and start of their eligibility clock;

5. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting Plaintiffs from competing in SEC or NCAA Division I athletics during the 2026–2027 season based on any actions Plaintiffs took after the conclusion of their 2025-26 season, such as signing a professional contract, agent contract, or playing in a professional sporting event, so long as they terminate any such contract and repay any money they have received prior to playing in a collegiate game. **To be clear, it is the Court's intention to place Plaintiffs in the position they were in at the end of their last college sports season. As long as they would have been eligible to continue playing college sports in the following semester if they had a fifth year of eligibility, they are eligible today.**

6. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with are further temporarily restrained and enjoined from enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, and/or any SEC rule or proposed penalty against:

   a. Plaintiffs;

   b. Any NCAA member institution or coach for which Plaintiffs choose to compete during the 2026–2027 season; and

   c. Any NCAA member institution or coach that competes against Plaintiffs.

7. The NCAA is ordered to open the transfer portal for all Plaintiffs for one week from entry of this Order and, upon request of any Plaintiff, his/her NCAA member institutions shall immediately place such Plaintiff in the national transfer database without any other requirements or delay;

8. To the extent the NCAA and/or SEC believes it has another basis to declare a Plaintiff ineligible to compete in the 2026-27 season, the NCAA and/or SEC shall come before this Court and explain such reason through a motion seeking leave of this Court to declare any Plaintiff ineligible to play a collegiate sport in 2026-27

9. This Temporary Restraining Order shall remain in effect for ten days of the date of this order, unless extended by the Court in the manner provided for in La. Civ. Pro. Art. 3604.

10. The Court orders that Plaintiffs shall post a nominal bond in the amount of $________, pursuant to applicable law.

**IT IS FURTHER ORDERED** that Defendants appear and show cause on the 3rd day of September, 2026, at 11:00am o'clock a.m./p.m., at the 19TH Judicial District Courthouse, 300 North Blvd., Baton Rouge, Louisiana 70802, Courtroom 10C, why a Preliminary Injunction should not issue on the same terms set forth above.

THUS DONE AND SIGNED, this 28 day of August, 2026, at Baton Rouge, Louisiana.

JUDGE, 19TH JUDICIAL DISTRICT COURT

**PLEASE SERVE:**

**SOUTHEASTERN CONFERENCE**
2201 Richard Arrington Jr.
Blvd. N.
Birmingham, AL 35203

**GREG SANKEY**
Commissioner of the SEC
2201 Richard Arrington Jr.
Blvd. N.
Birmingham, AL 35203

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**
**to be served via Article 1313 of the Louisiana Civil Code**

# EXHIBIT F

EAST BATON ROUGE PARISH C-783299
Filed Aug 27, 2026 3:25 PM CIV.D
Deputy Clerk of Court

JACK PYBURN, JAZMIN FERGUSON, JAMIL MUTTILIB, AMIYA JOYNER, RASHAD KING, MICHAEL ELEY, ANDREW BURNETTE, WYDETT WILLIAMS, KEENAN LANDRY, THOMAS MARSALA, PERCY DANIELS, JOSHUA "GREEDY" WILLIAMS, DAE'QUAN WRIGHT, DERRIAN FORD, ASIA NICHOLSON, ZXAVIAN HARRIS, CHANDLER JACKSON, PEITOK MACHAR, TJ HARDEN, BLAKE COTTON, ETHAN JOHNSON, ANTHONY TARJAE HANKERSON, JASMINE JONES, WEYLIN LAPUAHO, EMILEE BOYER, LUKE DRZEWIECKI, TRENT HENDRICK, BRYLAN GREEN, AVERY STRICKLAND HURST, SAM PISSIS, JUNIOR TUIHALAMAKA, DQ SMITH, DAN ROUZAN, JALIA LASSITER, PAYTN MONTICELLI, TRAE TOMLINSON, JOCELYN OLLIVIERRE, RYAN STARR, TREY THOMAS, CKELBY PHILIP GIVENS, KENNEDY BUNKER, AND PAUL MANNING.

**NO. C-783299, DIV. D**

**19TH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

______________________________
**DEPUTY CLERK OF COURT**

**VERSUS**

**NATIONAL COLLEGIATE ATHLETIC ASSOCATION, SOUTHEASTERN CONFERENCE, AND GREG SANKEY, SOLEY IN HIS ROLE AS COMMISSIONER OF THE SEC**

**FILED**______________________

## REQUEST FOR ORDER TO SHOW CAUSE

On August 19, 2026, this court entered an order (the "TRO") enjoining, amongst other things:

> 5. Defendant NCAA, and its officers, agents, employees, representatives, successors, assigns, and all persons acting in concert or participation with it, are hereby temporarily restrained and enjoined from prohibiting Plaintiffs from competing in NCAA Division I athletics during the 2026-2027 season on the basis that Plaintiffs have signed a professional contract, or agent contract, or played in ~ professional sporting event, so long as they terminate any such contract and repay any money they have received prior to playing in a collegiate game.

In short, this Court entered an injunction against the NCAA placing athletes back in the position they were in when their eligibility expired under the old rules and forbidding the NCAA from excluding those athletes from competition based on any actions they took to move on with their lives given their lack of NCAA eligibility.

On August 24, 2026, the Southeastern Conference put out a statement saying, "Individuals who choose to leave college athletics, sign professional playing contracts, and compete

professionally should not then be permitted to return to college competition."[1] None of the Plaintiffs in this case "cho[]se to leave college athletics." Rather: (1) the NCAA told them they were out of eligibility; then (2) then on April 15, 2026, the NCAA announced it was reversing its rules in a way that would give them an additional year of eligibility; then (3) on or around April 27, 2026, the NCAA reversed itself again to exclude Plaintiffs from competition. The NCAA passed its final rule unfairly excluding Plaintiffs in late June 2026. Unsurprisingly, Plaintiffs moved on with their lives given their exclusion from the NCAA.

Then, last month, courts around the country began entering orders prohibiting the NCAA from excluding members of the Class of 2022 (like these Plaintiffs) from participation in a fifth year of college sports in 2026-27. Plaintiffs here also retained counsel came to this Court, which also entered an order enjoining the NCAA from utilizing its rules to prevent players from playing in 2026-27.

On August 25, 2026, the SEC changed its position on athletes who signed professional contracts. Rather than focusing on players who "***chose***" to leave college athletics, the SEC issued a statement attempting to stop **<u>all</u>** players who signed professional football or basketball contracts—including Plaintiffs—from playing college sports:


SEC

FOLLOWING MEETINGS WITH THE PRESIDENTS, CHANCELLORS, AND ATHLETICS DIRECTORS OF THE SOUTHEASTERN CONFERENCE, THE SEC WILL ENFORCE THE FOLLOWING POLICY:

AN SEC INSTITUTION IS NOT PERMITTED TO HAVE AN ATHLETE ON ITS ROSTER WHO HAS:

1. PREVIOUSLY DECLARED FOR THE NFL, NBA, OR WNBA DRAFT, AND DID NOT APPROPRIATELY WITHDRAW,

2. SIGNED A CONTRACT WITH AN NFL (OR OTHER PROFESSIONAL FOOTBALL LEAGUE), NBA/G-LEAGUE, OR WNBA (OR AFFILIATE) TEAM, OR

3. BEEN LISTED ON AN NFL (OR OTHER PROFESSIONAL FOOTBALL LEAGUE), NBA/G-LEAGUE, OR WNBA (OR AFFILIATE) ROSTER.

THE COMMISSIONER IS AUTHORIZED TO ENFORCE THIS EXPECTATION WITH PENALTIES AGAINST MEMBER INSTITUTIONS.

[1] https://www.espn.com/college-football/story/_/id/49716985/pro-athletes-not-return-college-competition.

Point 2 from the SEC is directly in violation of this Court's temporary restraining order. And the SEC is a "person[] acting in concert or participation with" the NCAA on eligibility issues as referenced in this Court's Order. Specifically, in approximately half a dozen filing around the country opposing athletes' requests for injunctive relief, the NCAA filed a "Declaration of Conference Commissioners," which included among its signatories Greg Sankey, Commissioner of the SEC. Ex. 1, Declaration of Conference Commissioners (the "Declaration"). At the NCAA's request, Mr. Sankey and the SEC stated, in pertinent part:

> "We submit this declaration in support of the NCAA's Opposition to Plaintiffs' Motion for Preliminary Injunction and in support of the NCAA's recent change to its eligibility rules on June 23, 2026." (Ex. 1 at 1)
>
> "Representatives from our Conferences were heavily involved in the DI Cabinet's extensive process for developing and thinking through the age-based Model." (Ex. 1 at 3).

The Declaration provides definitive proof that the SEC is a person "acting in concert or participation with" the NCAA on eligibility issues and participated in nationwide litigation on this topic on behalf of the NCAA.

Then, a few hours later, the SEC announced an intention to enforce its interconference transfer rule – a rule purely derivation of the NCAA's transfer portal rules, which had already been enjoined this Court. Specifically, the SEC rule requires players to enter the transfer portal "during their sport's regular transfer window" as set by NCAA rules. Of course, this Courts in enjoining the NCAA transfer rules for the Class of 2022, there would be no reason for a player to enter the transfer poral during the "regular transfer portal window" when the NCAA had declared them ineligible at that time.

Rather than telling the SEC, you must obey the Court order enjoining the unfair NCAA rules that you "were heavily involved in" creating, the NCAA allowed the SEC to continue its attempt to improperly circumvent this Court's order on August 26, 2026, when the SEC announced the following penalties for schools and coaches that allow certain Plaintiffs to play in the 2026-27 season based on order of this Court:

- Half-season suspension for head coaches;
- SEC voting privileges revoked on business matters for the school in violation of the rule;
- A fine of 50% of the school sport's annual budget;

- The right to levy other penalties by Greg Sankey and/or other SEC presidents/chancellors if necessary.[2]

Theses draconian penalties have the effect of making it impossible for Plaintiffs to play for any SEC school in the 2026-27 year despite this Court's order based on new rules the SEC created – as mirrors of the NCAA rules this Court enjoined last week. They also violate the Louisiana Constitution by effectively denying Plaintiffs access to the courts.

As a result, Plaintiffs ask this Court to enter an order to show cause as to why the NCAA should not be held in contempt for the SEC's attempt to institute its own rules mirroring NCAA rules enjoined by this Court to prevent certain Plaintiffs in this lawsuit from playing college sports in 2026-27.

Wherefore, Plaintiffs ask the Court to enter an Order requiring the NCAA to appear before this Court on Thursday, September 3, 2026 at 11:00am o'clock, ___m. and show cause why it should not be held in contempt of Court for the violation of this Court's Order by the SEC, a person acting in concert and/or participation with the NCAA.[3]

THUS DONE AND SIGNED, this 28 day of August, 2026, at Baton Rouge, Louisiana.

JUDGE, 19TH JUDICIAL DISTRICT COURT

**PLEASE SERVE:**

**SOUTHEASTERN CONFERENCE**
2201 Richard Arrington Jr.
Blvd. N.
Birmingham, AL 35203

**GREG SANKEY**
Commissioner of the SEC
2201 Richard Arrington Jr.
Blvd. N.
Birmingham, AL 35203

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

**to be served via Article 1313 of the Louisiana Civil Code**

---

[2] https://www.on3.com/teams/kentucky-wildcats/news/sec-finalizes-harsh-penalties-for-rostering-former-pros/.

[3] Because the SEC was not a party to the TRO, Plaintiffs do not seek to hold the SEC in contempt at this time. However, Plaintiffs have added both the SEC and its Commissioner as Defendants to the lawsuit today and seek injunctive relief against them via a separate motion.

Respectfully submitted this 27th day of August, 2026.

Respectfully submitted,

/s/ A.M. "Tony" Clayton
A.M. "Tony" Clayton (#21191)
Michael P. Frugé (#26287)
Richard J. Ward, III (#32267)
Michael C. Hendry (#35819)
Brillian P. Clayton (#36829)
Keondra K. Riley (#38386)
Chandler C. Agee (#39779) and

and

Ryan Downton (*Pro Hac* Forthcoming)
Texas Bar No. 24036500
The Texas Trial Group
500 PR-693, Ste. 30
Dorado, PR 00646*
Phone: 512-680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

and

THE PEPER LAW FIRM, P.A.
Mark A. Peper, Esq. (*Pro Hac* Forthcoming)
548 Savannah Highway
Charleston, South Carolian 29407
Phone: (843) 225-2520
Fax: (843) 225-2554
mark@peperlawfirm.com

***Attorneys for Plaintiffs***

# EXHIBIT G

**JAZMIN FERGUSON, JAMIL MUTTILIB, AMIYA JOYNER, RASHAD KING, MICHAEL ELEY, ANDREW BURNETTE, WYDETT WILLIAMS, KEENAN LANDRY, THOMAS MARSALA, PERCY DANIELS, JOSHUA "GREEDY" WILLIAMS, DAE'QUAN WRIGHT, DERRIAN FORD, ASIA NICHOLSON, ZXAVIAN HARRIS, CHANDLER JACKSON, PEITOK MACHAR, TJ HARDEN, BLAKE COTTON, ETHAN JOHNSON, ANTHONY TARJAE HANKERSON, JASMINE JONES, WEYLIN LAPUAHO, EMILEE BOYER, LUKE DRZEWIECKI, TRENT HENDRICK, BRYLAN GREEN, AVERY STRICKLAND HURST, SAM PISSIS, JUNIOR TUIHALAMAKA, DQ SMITH, DAN ROUZAN, JALIA LASSITER, PAYTN MONTICELLI, TRAE TOMLINSON, JOCELYN OLLIVIERRE, RYAN STARR, TREY THOMAS, CKELBY PHILIP GIVENS, KENNEDY BUNKER, PAUL MANNING. AMANI GIVENS, CARMELIA MUCCILLI, QUINTRAVEOUS "TREY TAYLOR, MELVIN PRIESTLY, LEE AMEDEE IV, AMAREE ABRAM, AND RYLEY BOYNE**

**VERSUS**

**NATIONAL COLLEGIATE ATHLETIC ASSOCATION, SOUTHEASTERN CONFERENCE, AND GREG SANKEY, SOLEY IN HIS ROLE AS COMMISSIONER OF THE SEC**

**FILED________________________**

**NO. C-783299, DIV. D**

**19TH JUDICIAL DISTRICT COURT**

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

**________________________________**

**DEPUTY CLERK OF COURT**

**ORDER**

On this day, the Court considered Plaintiffs' Second Amended Verified Petition for Temporary Restraining Order and Preliminary Injunction, with Request for Declaratory Relief and

Permanent Injunction. The Court, having reviewed the verified petition, finds that the requirements of La. C. Civ. Pro. Art. 3601 and 3602 for the issuance of a preliminary injunction have been met; and, accordingly, this **PRELMINARY INJUNCTION** is hereby issued, as follows:

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Second Amended Verified Petition for a Preliminary Injunction is **GRANTED**.

2. The following orders apply to the Defendants National Collegiate Athletic Association ("NCAA") for all Plaintiffs. The following orders apply to the Southeastern Conference ("SEC") and Greg Sankey, in his capacity as Commissioner of the SEC ("Sankey"), as to all Plaintiffs other than Jamil Muttilib, Michael Eley, Andrew Burnette, Thomas Marsala, Asia Nicholson, Peitok Machar, Jasmine Jones, Sam Pissis, DQ Smith, Dan Rouzan, Trae Tomlinson, Carmelia Muccilli, Lee Amedee, IV, Ryley Boyne, and Ckelby Philip Givens.

3. Defendants NCAA, SEC, and Sankey (collectively, "Defendants"), and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from enforcing NCAA Bylaw 12.6, or any other NCAA or SEC bylaw or rule, to preclude Plaintiffs from competing in NCAA Division I athletics during the 2026–2027 season on the basis that Plaintiffs have already competed in four seasons of competition.

4. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that the Plaintiff did not enter the NCAA transfer portal or violated any SEC transfer rule.

5. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that they played at a junior college prior to starting their NCAA careers and counting their first season of junior college competition against their years of NCAA eligibility and start of their eligibility clock;

6. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting Plaintiffs from competing in SEC or NCAA Division I athletics during the 2026–2027 season based on any actions Plaintiffs took to participate in or market themselves for participation in professional athletics after the conclusion of their 2025-26 season, such as signing a professional contract, agent contract, or playing in a professional sporting event, so long as they terminate any such contract and repay any compensation they have received prior to playing in a collegiate game. **To be clear, it is the Court's intention to place Plaintiffs in the position they**

**were in at the end of their last college sports season. As long as they would have been eligible, academically and otherwise, to continue playing college sports in the following semester if they had a fifth year of eligibility, they are eligible today.**

7. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with are further temporarily restrained and enjoined from enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, and/or any SEC rule or proposed penalty against:

    a. Plaintiffs;

    b. Any NCAA member institution or coach for which Plaintiffs choose to compete during the 2026–2027 season; and

    c. Any NCAA member institution or coach that competes against Plaintiffs.

8. The NCAA is ordered to open the transfer portal for all Plaintiffs for one week from entry of this Order and, upon request of any Plaintiff, his/her NCAA member institutions shall immediately place such Plaintiff in the national transfer database without any other requirements or delay;

9. Further, as a person in concert with the NCAA and SEC, Louisiana State University ("LSU") is restrained and enjoined from take any action adverse to ____list all LSU athletes___, or any other Plaintiff in this case who enrolls as a student at LSU.

10. This Preliminary Injunction shall remain in effect until trial of this case.

11. The Court orders that Plaintiffs shall post a nominal bond in the amount of $________, pursuant to applicable law.

The Court will issue a written opinion explaining its ruling within 10 days.

THUS DONE AND SIGNED, this _____ day of September, 2026, at Baton Rouge, Louisiana.

____________________________________

JUDGE, 19[TH] JUDICIAL DISTRICT COURT

# EXHIBIT H

19th Judicial District Court for the Parish of East Baton Rouge

State of Louisiana

No. 783299 Div. D

Jack Pyburn, et al.,

v.

National Collegiate Athletic Association, et al.

# MOTION FOR LEAVE TO FILE AMICUS BRIEF ON BEHALF OF THE STATE OF LOUISIANA

**Respectfully Submitted:**
**ELIZABETH B. MURRILL**
**Attorney General**

Zachary Faircloth (LSBA #39875)
*Principal Deputy Solicitor General*
Caitlin Huettemann (LSBA #40402)
*Assistant Solicitor General*
1885 N. 3rd Street
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
HuettemannC@ag.louisiana.gov

*Counsel for State of Louisiana*

**NOW INTO COURT,** through undersigned counsel, comes the Attorney General of the State of Louisiana, Elizabeth Murrill, in her capacity as Attorney General, who respectfully moves this Honorable Court to allow her to file an amicus brief in the above captioned matter on behalf of the State of Louisiana.

The Attorney General as the "chief legal officer of the state" has a significant interest in the issues presented in this case. La. Const. art. IV, § 8. In particular, the Attorney General has an interest in the fair and consistent application of rules and regulations to every citizen—and every player—in the State. The State also has an interest in the operation of its public universities and the allocation and preservation of their funding amidst an unstable regulatory system. Moreover, the outcome of this case will impact not only the parties involved but also the broader statewide public, due to the unfair positions many individuals find themselves in as a result of the challenged and ever-changing NCAA rules.

The State has read the Court's Temporary Restraining Order and its Request for Order to Show Cause, as well as Plaintiffs' Petition, and believes that this amicus brief will provide additional context regarding the state-wide implications of this matter.

**WHEREFORE**, the Attorney General prays that this Honorable Court grant this motion and allow the State to file the attached amicus brief.

**Respectfully submitted,**

**ELIZABETH B. MURRILL**
**ATTORNEY GENERAL**

BY /s/ *Caitlin Huettemann*
Zachary Faircloth (LSBA #39875)
*Principal Deputy Solicitor General*
Caitlin Huettemann (LSBA #40402)
*Assistant Solicitor General*
1885 N. 3rd Street
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
FairclothZ@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for State of Louisiana*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has this date been served upon all parties to this proceeding by email or by mailing same to each by First Class United States mail, properly addressed and postage paid on this 2nd day of September, 2026.

*/s/ Caitlin Huettemann*
Caitlin Huettemann (LSBA #40402)

19th Judicial District Court for the Parish of East Baton Rouge

State of Louisiana

No. 783299 Div. D

Jack Pyburn, et al.,

v.

National Collegiate Athletic Association, et al.

## [PROPOSED] ORDER

Based on the above and foregoing *Motion for Leave to File Amicus Brief on Behalf of the State of Louisiana,* **IT IS HEREBY ORDERED AND DECREED** that said motion is **GRANTED.** The Attorney General of the State of Louisiana is hereby granted leave to file the proposed brief.

**SIGNED** this ________ day of _____, 2026 in Baton Rouge, Louisiana.

______________________________

19th Judicial District Court for the Parish of East Baton Rouge

State of Louisiana

---

No. 783299 Div. D

---

Jack Pyburn, et al.,

v.

National Collegiate Athletic Association, et al.

---

# AMICUS BRIEF OF THE STATE OF LOUISIANA

---

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
P: (225) 421-4088
F: (225) 326-6494

ZACHARY FAIRCLOTH (LSBA #39875)
Principal Deputy Solicitor General

CAITLIN HUETTEMANN (LSBA #40402)
Assistant Solicitor General

*Counsel for State of Louisiana*

## CONCISE STATEMENT OF THE CASE

This case is a classic bait-and-switch. The NCAA told Plaintiffs—members of the Class of 2022 who want to play college football—that they were no longer eligible for play after the typical timeline for collegiate competition had run its course. Then, shortly thereafter, the NCAA rescinded that decision and promised instead that these individuals could receive an additional year of eligibility to play the sport they love. But, around April 27, 2026, the NCAA changed course *again* and once more stripped Plaintiffs of their ability to return to the field. Many of those players then took the NCAA at its word and moved on from college football.

But the story didn't end there. Following developments across the country, Plaintiffs followed the growing trend and filed their Petition in this Court, seeking relief under Louisiana law from the NCAA's eligibility determination. On August 28, 2026, this Court entered a temporary restraining order allowing Plaintiffs to pursue the opportunity they had been denied, including by requiring that they be allowed to enter the transfer portal. The NCAA and its conferences, however, have their own rules governing the consequences for institutions that allow athletes to compete contrary to those rules. The result is a struggle that reaches past the Plaintiffs themselves: Louisiana's public universities now face the prospect of having to comply with this Court's order while risking serious penalties from the governing body of the sport.

The NCAA's ever-changing rules have consequences beyond these individual athletes. They affect the universities that recruit them, the other student-athletes with whom they compete, and the coaches and administrators responsible for complying with an increasingly complicated set of rules. And those rules can

arrangement, and have struggled under the "broken" system for years now.[1] And they have operated thereunder often without access to a fair and unbiased decisionmaker. The Louisiana Constitution protects all Louisiana citizens' access to open courts and likewise promises them that they may rely on the resulting court decisions. La. Const. art. 1, § 22. It is imperative to players and institutions across the State, then, that they can (and should) listen to court orders, and do so without fear of later punishment. If reprisal outside the court system cuts against those individuals who exercised and protected their rights within it, there is, in fact, no meaningful remedy from our courts.

Ultimately, the State has an interest in college sports rules that are fair, consistent, and predictable—ones capable of being followed by athletes, coaches, and institutions who don't have to choose between contempt charges or conference sanctions.

## ARGUMENT

### I. THE NCAA'S CHANGING RULES HAVE LEFT STUDENT-ATHLETES TO MAKE IRREVERSIBLE DECISIONS AGAINST A MOVING TARGET.

Plaintiffs entered college in 2022 expecting to be treated fairly as compared to all other athletes they competed against. They subsequently confronted changes to the rules governing their fifth season of competition while their eligibility was ongoing. The NCAA first treated these athletes as ineligible, later provided a pathway for an additional year of eligibility, and then again changed course. That incessant back-and-forth made compliance with, and reliance on, NCAA rules near impossible.

By the time the rules changed again, some Plaintiffs had already graduated, pursued professional opportunities, entered into professional contracts, or otherwise

under the rules set by the NCAA as written, because "[t]he NCAA ... controls the market for college athletes." *NCAA v. Alston*, 594 U.S. 69, 109 (2021) (Kavanaugh, J., concurring). NCAA often exerts that control, too, without any opportunity for players to obtain relief from an unbiased decisionmaker.

There is a basic unfairness in requiring an individual to make a consequential (and often life-changing) decision based upon one set of mandatory rules, only to change those rules after the decision has been made. Of course, not every rule change is impermissible, nor is every athlete affected by a rule change necessarily entitled to the relief he seeks. But fair administration of a regulatory system requires *some* consideration of reliance, and a streamlined access to a just and open court system in cases where that reliance is taken advantage of. *See* La. Const. art. 1, § 22.

A student-athlete cannot go back in time and decline a professional opportunity because the NCAA or a court later decided that he could have another season of college eligibility. A graduate cannot simply "undo" the decision to enter the workforce. And an athlete who reasonably understood that he was finished with college football cannot recreate the recruiting, transfer, or roster opportunities that existed months earlier. Those are the significant, real-world stakes behind what might otherwise look like a basic dispute about eligibility rules.

## II. THIS UNCERTAINTY PUTS LOUISIANA'S PUBLIC UNIVERSITIES IN AN UNFAIR POSITION.

The predicament described above is not limited to the athletes alone. Louisiana's public universities operate within the same NCAA-"control[led] market," *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring), and thus must make decisions against that ever-moving target of NCAA rules. They recruit players, allocate

This Court's August 28 temporary restraining order directs Defendants to refrain from enforcing certain eligibility restrictions against Plaintiffs during the 2026–27 season and requires that the transfer portal be opened to Plaintiffs for a specified period. The NCAA and SEC, meanwhile, have taken positions that expose member institutions to substantial consequences if they permit athletes to compete in circumstances the governing organizations have deemed impermissible. The SEC has announced severe penalties, including suspension of a head coach, loss of conference voting privileges, and a fine equal to 50% of a school's annual sports budget. That leaves a public university in an extraordinary predicament.

"By joining the NCAA, each member agrees to abide by and to enforce [its] rules." *NCAA v. Tarkanian*, 488 U.S. 179, 183 (1988). But the NCAA's "ability to accomplish its goals" and the benefit member-schools derive from the relationship "depend[] to a substantial degree on the creation of nationally uniform rules under which teams can compete on an equal basis." *NCAA v. Miller*, 795 F. Supp. 1476, 1484 (D. Nev. 1992), *aff'd*, 10 F.3d 633 (9th Cir. 1993). Recognizing the importance of uniformity from the NCAA perspective, courts in this State typically do not interfere in NCAA rule determinations "except in cases when the affairs and proceedings have not been conducted fairly and honestly, ... or when the action complained of is capricious, arbitrary, or unjustly discriminatory." *Jones v. NCAA*, 96-2205 (La. 9/12/96), 679 So. 2d 381, 382. That unfairness is present in spades here.

A school should not have to ask whether complying with a court order will cause it to violate the rules of its athletic conference. A coach should not have to decide whether putting an eligible athlete on the field could jeopardize his career. And a public institution should not have to choose between obeying the judicial process and

## III. CLEAR AND CONSISTENT RULES SERVE EVERYONE INVOLVED.

The State's interest ultimately comes down to a simple proposition: The rules of the game should not change in ways that leave the players unable to know what game they are playing. The NCAA's regulatory structure necessarily requires institutions and athletes to rely upon eligibility determinations. Without that reliance, recruiting becomes uncertain, roster construction becomes unstable, scholarships become difficult to administer, and student-athletes cannot make informed decisions about their education and careers.

The problem, of course, is not limited to Louisiana and its own athletes: "This is a national crisis, not a local one."[2] There are athletes on all sides of this dispute who have made decisions based upon the ever-changing rules they were given. There are athletes seeking another opportunity to play. There are athletes who have occupied roster spots based upon the rules in place when they were recruited. There are schools that have filled their rosters and allocated scholarships. There are coaches who have made employment and recruiting decisions based upon eligibility determinations. There are universities that must somehow prepare to compete under whatever rules ultimately govern them. And, if that were not enough, some of these athletes have already or will take the field in just a few short days, creating an urgency that consistent rule application could have avoided.

The State does not suggest that the rules governing collegiate athletics can never change. But those rules are promulgated and enforced against young people and schools making decisions about real life that have real, irreparable consequences. The conference's reliance-be-damned response is not a lawful answer. Plaintiffs here, like others similarly situated, often need access to and relief via the court system to

These principles are particularly important for public universities. Louisiana's public institutions are responsible for stewarding public resources while complying with the rules imposed upon them. They should be able to know what conduct is permitted and what conduct will expose them to institutional or individual penalties. And they should be able to rely upon judicial orders without simultaneously being placed at risk by another authority. Otherwise, our schools risk "spending themselves into insolvency."[3] The State therefore has a substantial interest in ensuring that the ultimate resolution of this dispute—via a fair and unbiased decisionmaker—produces a system that is not only legally sound, but equitable, administrable, and consistent for the people and institutions required to operate within it.

The Court's task here therefore implicates more than the question of whether a particular eligibility rule should exist. It implicates how justice is administered when the rules governing a person's eligibility have flip-flopped-and-flipped-again after that person has already ordered his life around them. The best course is one that considers the circumstances of all those who must live under the rules—including the athletes who seek relief, the athletes who relied on the prior rules, and the public institutions that must implement whatever rules result.

## CONCLUSION

The State respectfully requests the Court grant its motion for leave to file this amicus brief, and consider these broader interests in determining the appropriate relief in this matter.

Dated: September 2, 2026

Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General

1885 N. 3rd Street
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
FaircothZ@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for State of Louisiana*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing has this date been served upon all parties to this proceeding by email or by mailing same to each by First Class United States mail, properly addressed and postage paid, on this 2nd day of September, 2026.

*/s/ Caitlin Huettemann*
CAITLIN HUETTEMANN (LSBA #40402)

# EXHIBIT I



**Attorney General Liz Murrill**
@AGLizMurrill

The conference's reliance-be-damned response is not a lawful answer.

These changing rules are promulgated and enforced against young people and schools making decisions about real life that have real, irreparable consequences. Plaintiffs need to be able to rely on a court's decision on these issues without fear of reprisal in the future.

1:49 PM · Sep 3, 2026 · **13.8K** Views

**Attorney General Liz Murrill** @AGLizMurrill

garbage & frivolous

> **104.5 ESPN** @1045espn · Sep 3
>
> EXCLUSIVE INTERVIEW 🎙️ 🚨
>
> Louisiana Attorney General @LizMurrillforLA joins @MattMoscona on AFR to break down the SEC's federal lawsuit against LSU and the escalating legal battle over player eligibility. ⚖️ 🐯 ...




6:12 PM · Sep 3, 2026 · **27.1K** Views

**Attorney General Liz Murrill**
@AGLizMurrill

Dae'Quan Wright, who played for Ole Miss, says he lost out on seven-figure NIL money in a fifth year. Mississippi didn't fight for him, but Louisiana will.

6:38 PM · Sep 3, 2026 · **177.2K** Views

**Attorney General Liz Murrill**
@AGLizMurrill

These athletes were seeking a fair forum and a neutral decision-maker, and I'm very pleased that they obtained that, as well as relief.

The NCAA did not send anyone to the hearing other than lawyers. And the SEC Commissioner astonishingly said he had never read the relevant rules until today.

The judge heard all the testimony, but I believe he was most moved by the rule itself: it does not prohibit these students from playing. I believe the judge ruled correctly by protecting their eligibility.




10:35 PM · Sep 3, 2026 · **268K** Views