FILED
2026 Nov-23 PM 05:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

**SOUTHEASTERN CONFERENCE**, an Alabama unincorporated association,

Plaintiff,

v.

**WADE ROUSSE**, in his official capacity as President of Louisiana State University; **VERGE AUSBERRY**, in his official capacity as Vice President and Director of Athletics of Louisiana State University; **LANE KIFFIN**, in his official capacity as Head Football Coach of Louisiana State University; **LEE MALLETT**, in his official capacity as Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **JOHN H. CARMOUCHE**, in his official capacity as Vice Chair and Member of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **RODERICK ALVENDIA, JOHN BALLARD, BEN BAROUSSE, REBECCA F. BONIOL, JOHN R. CONDOS, VALENCIA SARPY JONES, CHARLES A. MOODY III, ESPERANZA E. MORAN, RAYMOND R. MORRIS, JENNIFER B. SETTOON, REMY VOISIN STARNS, COLLIS B. TEMPLE JR., JAMES M. WILLIAMS**, and **JOSEPH BLAISE ZUSCHLAG**, in their official

**Case No.: 2:26-cv-01586-ACA**

**OPPOSED**

capacities as Members of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; **ELIZABETH B. MURRILL**, in her official capacity as Attorney General of the State of Louisiana; and **WILL WADE**, in his official capacity as Head Men's Basketball Coach of Louisiana State University, ) ) ) ) ) ) ) ) ) ) )

Defendants.

**PLAINTIFF SOUTHEASTERN CONFERENCE'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Since its inception in 1933, Plaintiff Southeastern Conference (the "SEC" or the "Conference") has stood for competitive integrity, fair competition, and the healthy integration of athletics and academics. Among the most fundamental of the shared rules that govern its member institutions are the longstanding provisions that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics (the "Professionalism Rules") and the corresponding responsibility of each member institution's President or Chancellor to ensure that the institution and its athletics personnel comply with those Rules. The Professionalism Rules are built upon an essential principle: college athletics is

reserved for students who are actively pursuing an education while competing for their universities. The Professionalism Rules preserve competitive fairness, protect opportunities for high school students and current college athletes, and maintain the distinction between college and professional sports. That distinction is critical to the SEC's member institutions, their Presidents and Chancellors, and their fans. Its destruction, threatened by the actions of Defendants, will irreparably harm the Conference.

Article 6 of the SEC Constitution requires the CEO of each member institution to maintain institutional control, *i.e.*, to ensure that all athletics personnel at the institution respect and comply with all NCAA and SEC Bylaws and rules (the "Institutional Control Rules"). The expectations and requirements set forth in that Article are foundational principles of fundamental importance to the fulfillment by the Conference of its purpose and mission as set forth in the Constitution and Bylaws. This expectation is reinforced by Bylaw 19.8.1.1, which provides that "[i]t is the obligation of each member institution to enforce and comply with the Rules."

Now faced with Defendants' brazen violation of the Professionalism Rules—alongside their disregard and derogation of the Institutional Control Rules—the SEC brings this Renewed Motion and its Supplemental Amended Complaint.[1] This action

[1] The SEC cites to its proposed Supplemental Amended Complaint due to the exigencies of its need for injunctive relief. It recognizes that the Court has not yet granted its Motion for Leave to

originated with Defendants' actions related to LSU's football program, but Defendants have since tripled down. After providing assurances to the SEC and disclaiming any intention to let former professional athletes take the field or court, Defendants reversed course, rostering and playing a former NBA player (RJ Luis, Jr.) in a collegiate basketball game. Defendants' actions illustrate and evidence deficient institutional control over the LSU athletics program and a lack of respect for and blatant disregard for the core tenets and principles of the SEC.

The Presidents and Chancellors of the other fifteen members of the SEC deferred addressing and making a decision about LSU's membership in light of LSU's assurances that the SEC's rules, policies, and principles would be respected, and in order to proceed judiciously and with discretion. For the reasons explained below, it has become apparent that these assurances were hollow promises. The Defendants have caused and are causing irreparable harm to the SEC because, and as long as, the SEC is forced to remain publicly associated with Louisiana State University ("LSU"), Defendants, and their actions. Defendants' course of action has left the SEC with no choice but to seek further relief from this Court.

To vindicate its First Amendment right not to associate with LSU or Defendants in light of their violation of the Professionalism Rules and disregard for

file the Supplemental Amended Complaint, which is being filed contemporaneously with this Motion.

the Institutional Control Rules, the Conference seeks a TRO and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys from taking any action—including filing, prosecuting, or participating in lawsuits—to deter, coerce, prevent, or punish the Conference for exercising its First Amendment right of free association, including considering the termination of LSU as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws at a properly scheduled and noticed December 3, 2026, Special Meeting of the Conference, and from blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the CEOs to terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action.

The ability to determine its own membership is fundamental to the SEC's right of free association under the First Amendment. Absent a TRO and injunction, the SEC and its member institutions will suffer irreparable harm from forced association of its competitions, brand, championships, and media properties with conduct it has expressly, unanimously, and publicly rejected for decades. The balance of equities and the public interest unquestionably favor vindication of the Conference's First Amendment rights over Defendants' efforts to compel the SEC to associate with

conduct that is antithetical to its mission and values. The Conference is accordingly entitled to a TRO and preliminary injunction.

## II. FACTUAL BACKGROUND

### A. The SEC's Mission and Governance

The Southeastern Conference is the nation's premier intercollegiate athletic conference. At present, it has sixteen member institutions, fifteen of which are state universities: the University of Alabama, Auburn University, the University of Arkansas, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri, the University of Oklahoma, the University of South Carolina, the University of Tennessee, Texas A&M University, the University of Texas, and Vanderbilt University (the only private institution). ECF No. 6-1 at ¶ 4. The Presidents and Chancellors of the SEC's member institutions have governed together across generations, operating under a set of shared rules that have shaped the athletic and educational paths of thousands of student-athletes and provided the competitive integrity and fair competition necessary for the SEC to thrive. The SEC has endured for nearly a century because its members have adhered to that common set of rules, which each member institution, and every coach at those institutions, has agreed to follow—until now.

The SEC is an Alabama unincorporated association. *Id.* at ¶ 3. It operates under the direction and control of the President or Chancellor of each of its member universities, who serve as the "Chief Executive Officers" or "CEOs" of the Conference. *Id.* at ¶ 5. The Conference and its members are also members of the NCAA, but the NCAA does not control the Conference or *vice-versa*; instead, the Conference and the NCAA are separate and independent entities. *Id.* at ¶ 9.

**B. The SEC's Professionalism Rules**

Both the NCAA and the SEC have long maintained rules that prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from competing in college athletics. Among those rules is NCAA Bylaw 12.2.4, which provides that a student-athlete "shall not enter into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement." This NCAA Bylaw is incorporated by reference and is effective as an SEC Bylaw pursuant to SEC Bylaw 14.01.1. *See* ECF No. 6-2.

The principles reflected in the SEC's Professionalism Rules have been a cornerstone of the college athletics model since its inception, are fundamental to the SEC's mission and organizational identity, and reflect the core expressive message of the Conference: that collegiate athletics serve an educational mission and are distinct from professional sports. The rules are grounded in the principle that college

athletics are reserved for current college athletes who are actively pursuing a degree while also participating in college sports and for future college athletes who seek to benefit from the unique educational, athletic, and leadership opportunities provided through college sports. ECF No. 6-1 at ¶ 16.

The importance of the Professionalism Rules to the SEC's mission and identity flows from their promotion of several foundational goals. The Professionalism Rules foster competitive fairness in the context of college athletics by recognizing that an athlete who has pursued a professional career, with the benefit of professional-level training, resources, and competition, occupies a fundamentally different position than a student-athlete who has remained within the collegiate model. *Id.* Thus, a central goal of the Professionalism Rules is avoiding competitive disadvantage and fundamental unfairness for current student-athletes who have not pursued a professional sports career and had access to professional sports opportunities and benefits but instead have maintained their commitment to the collegiate athletics model by fulfilling academic standards and participating actively in an educational community while participating in college sports. They also prevent similar unfairness to college sports programs that have operated within the existing framework for college athletics and thus have not sought to add former professional athletes to their rosters. *Id.* at ¶ 17. In addition, the Professionalism Rules promote fairness among the SEC's member schools, ensuring that each member institution is

engaged in competition with other institutions governed by, subject to, and compliant with the same foundational set of rules and requirements.

The Professionalism Rules also create and preserve opportunities for high school student-athletes and current college athletes. *Id.* at ¶ 18. Each roster spot filled by a former professional athlete (or left open for such an athlete) is one that becomes unavailable to a high school student-athlete or another less-developed athlete who would benefit from the educational and athletic growth opportunities uniquely available through collegiate athletics. *Id.* Further, without consistent application of these rules, college athletes cannot have confidence in the rules of the competition in which they are engaged or the real-world effects of their decision to pursue a professional sports career; college coaches do not receive clear guidance on actions they can and cannot take to build their rosters for effective and compliant competition; and entering college freshmen face uncertainty about their opportunities to join a roster and benefit from the experience of participating in college athletics.

### C. Defendants' Recruitment and Rostering of Professional Athletes

In June 2026, the NCAA adopted a new age-based eligibility model, commonly referred to as the "5-for-5" rule, that allows student-athletes up to five seasons of competition within a five-year period beginning when they enroll in college. Beginning in the summer of 2026, certain student-athletes who first enrolled

in college in 2022 and had exhausted their eligibility by spring of 2026 (the "2022 Class") began filing lawsuits across the country challenging the NCAA's decision to implement the 5-for-5 rule and not to grant an additional year of eligibility to the 2022 Class. Among those athletes were several former college football players who had signed professional contracts with NFL teams during the 2026 NFL Draft and undrafted free agency period.

Despite the SEC's longstanding rules—and the express language of the Professionalism Rules—prohibiting professional athletes from returning to college athletics, Defendants saw this as an opportunity to be exploited. They began an orchestrated campaign to recruit professional athletes to join LSU's sports teams for the 2026-27 season.

***Football*** **–** LSU's efforts included (1) recruiting players who had signed NFL contracts, appeared on NFL rosters, or were actively participating in NFL training camps and then (2) actively working with those players to undermine the SEC's ability to enforce the Professionalism Rules.

On August 19, 2026, a group of athletes filed a lawsuit in Louisiana state court, seeking a fifth year of eligibility to participate in college athletics. *See Pyburn v. Nat'l Collegiate Athletic Ass'n*, No. C-783299, Div. D (19th Judicial District Court, Parish of East Baton Rouge, Louisiana) ("*Pyburn*"). Three of those professional athletes had signed contracts with NFL teams but nevertheless sought

the ability to return to college competition if they did not ultimately make a final professional roster. In the days that followed, public reporting[2] indicated that Defendant Kiffin and others associated with LSU recruited the three professional athletes to play football at LSU even though they would not be eligible to participate in college athletics pursuant to longstanding NCAA and SEC rules, including the Professionalism Rules. Defendant Kiffin also publicly confirmed that professional players were practicing with LSU's football team and that he intended to play them during the upcoming season.[3]

Defendants acted in concert with the *Pyburn* plaintiffs in an attempt to subvert the Conference's authority and violate the Professionalism Rules. Although Defendants eventually chose not to include professional players on LSU's football

[2] *See* LSU SPORTS, *Lane Kiffin Press Conference* (YouTube, Aug. 24, 2026), https://www.youtube.com/watch?v=e0V4ZUVdGps&t=14s; THE PAT MCAFEE SHOW, *Lane Kiffin Responds To Critics Of NFL Players Returning To Play At LSU* (YouTube, Aug. 25, 2026), https://www.youtube.com/watch?v=YXL-8iDvIsY; John Talty and Chris Hummer, *How Lane Kiffin and LSU triggered a national showdown over NFL-to-college transfer*, CBS SPORTS (Aug. 25, 2026, 10:59 AM), https://www.cbssports.com/college-football/news/lane-kiffin-lsu-nfl-players-college-football-eligibility-loophole/; LSU SPORTS, *The Lane Kiffin Press Conference* (YouTube, Aug. 31, 2026), https://www.youtube.com/watch?v=IHGfBUnAXEk.

[3] *See, e.g.*, Heather Dinich, *LSU's Lane Kiffin says his players pursuing ex-NFLers*, ESPN (Aug. 31, 2026, 3:00 PM), https://www.espn.com/college-football/story/_/id/49785035/lsu-lane-kiffin-says-players-endorse-pursing-ex-nflers (Defendant Kiffin confirms that at least one former player is practicing with LSU's football team); Seth Emerson, *Lane Kiffin met with LSU's player leadership before adding returning pro players, he said*, N.Y. Times (Aug. 31, 2026), https://www.nytimes.com/athletic/7553369/2026/08/31/lane-kiffin-eligibility-lsu-college-football/ (quoting Defendant Kiffin stating, with regard to adding former professional players to LSU's team, "this is how the real world works. They can bring employees into certain jobs to help the company.").

roster, intervening events solidified and validated the SEC's concerns that (1) Defendants lack institutional control over the LSU athletics program and (2) Defendants have no respect for, will continue to derogate, and intend to continue breaching the Conference's Constitution, Bylaws, and rules.

***Basketball*** – LSU's misconduct did not end with its football roster decisions. It also recruited a former professional basketball player to its men's basketball roster for the 2026-2027 season, RJ Luis, Jr. Mr. Luis is a former professional player who entered the 2025 NBA Draft and did not withdraw; signed a "two-way" contract with the Utah Jazz in July 2025; participated in the Boston Celtics' training camp in October 2025; and participated in three NBA preseason games. **Ex. A** ¶ 7.

Defendants made numerous representations prior to November 17, 2026, that LSU would not include Mr. Luis on its men's basketball roster. *Id.* ¶ 21. They even told this Court that it was "demonstrably false" that LSU was violating the Professionalism Rules with respect to Mr. Luis and assured the Court that LSU's basketball program would follow the SEC's rules and not roster Mr. Luis. ECF No. 32 at 5; *see also id.* at 4-6. On numerous occasions prior to November 17, LSU represented to the SEC that this lawsuit is unnecessary and should be dismissed by the SEC, without revealing LSU's ultimate intentions with respect to Mr. Luis. But on November 17, 2026, Defendants revealed their true intent.

That day, LSU sent a letter to the SEC stating that they *would* include Mr. Luis on LSU's basketball roster. *See* **Ex. A** at ¶ 22. A copy of that letter is attached as Exhibit 10 to the Second Sankey Declaration. *Id.* at 340–42. That same day, Defendants added Mr. Luis to the LSU men's basketball team roster. *Id.* at ¶ 22. And when the SEC expressed public concern over the decision, *see id.* at ¶ 24, Mr. Luis moved to hold the SEC in contempt of the *Luis* injunction**,** *id.* at ¶ 26. Copies of the SEC statement and Mr. Luis' Motion are attached as Exhibits 11 and 12, respectively, to the Second Sankey Declaration. *Id.* at 344, 346–76.

The SEC has already contended that Defendants' recruitment of Mr. Luis violated its Professionalism Rules and feared that such recruitment would lead to more egregious violations. *See* ECF No. 29 at 2, 7, 9. Those fears were realized when Defendant Wade actually rostered and played Mr. Luis in a collegiate basketball game on November 18, 2026. Counsel for Mr. Luis and the Defendants proceeded in a choreographed fashion, with Defendants first publicly professing support for the SEC's Rules and Mr. Luis remaining silent. When Mr. Luis brought his motion for Preliminary Injunction, Defendant Wade testified that but for the SEC Rules, Mr. Luis would take the court. **Ex. A** at ¶ 17. And even though the Louisiana court declined to order LSU to play Mr. Luis and expressly denied Mr. Luis' request for a Preliminary Injunction against LSU, Mr. Luis was permitted by LSU to take the court for the LSU basketball team days after the court enjoined the SEC. *Id.* at ¶ 27.

After committing a clear violation of SEC rules, Defendants again turned about-face. In statements on November 19, 2026, Defendant Rousse directed Defendant Wade not to play Mr. Luis in upcoming collegiate basketball games and Mr. Luis's counsel stated that he planned to withdraw Mr. Luis' motion for a contempt finding. *See id.* at ¶¶ 28–29; *id.* at 378, 380. Those statements give the SEC no comfort. They merely offer further evidence that (1) Defendants are actively collaborating with third party professional athletes to defy SEC rules, (2) Defendants have no real intention of following SEC rules unless it suits their objectives, and (3) Defendants will continue reversing course if it allows them to evade judicial oversight. The SEC simply cannot be certain that Defendants won't change their minds and violate longstanding Conference rules again.

Currently, the SEC has no avenue to penalize LSU for Defendants' conduct. But the SEC cannot be forced to associate with LSU while Defendants commit actions that are irreconcilable with the Conference's goals and views and that make a mockery of the Conference's institutional control requirements. Defendants' actions with respect to Mr. Luis violate the SEC's Professionalism Rules and confirm the lack of institutional control over the athletics program at LSU that is required by the SEC Constitution and Bylaws.

### D. The SEC's Efforts to Protect its Expressive Identity

On August 24, 2026, in response to the lawsuits filed by professional athletes, the SEC's Presidents and Chancellors unanimously affirmed the Conference's longstanding position that individuals who choose to leave college athletics, sign professional contracts, and compete professionally should not subsequently be permitted to return to college competition. ECF No. 6-1 at ¶ 27; *see also* ECF No. 6-3. The Presidents and Chancellors explained that, consistent with their and the Conference's long-held beliefs, allowing professional athletes to compete in college sports would "blur the line between college and professional sports, create significant competitive equity concerns, and reduce opportunities for high school and current college athletes." ECF No. 6-3 at 1.

Recognizing the importance of the Professionalism Rules, the SEC Presidents and Chancellors conducted a regularly scheduled, in-person meeting on August 25, 2026, addressed recent litigation challenges to the validity of the Rules, and unanimously instructed the Conference office to issue a public policy statement that same day. ECF No. 6-1 at ¶¶ 28–29; ECF No. 6-4. Every one of the sixteen CEOs voted for the public statement, including Defendant Rousse on behalf of LSU. ECF No. 6-1 at ¶ 30. The policy statement clarified that the SEC's longstanding Professionalism Rules prohibit an SEC institution from having an athlete on its roster who has: "1. Previously declared for the NFL, NBA, or WNBA draft, and did not

appropriately withdraw, 2. Signed a contract with an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) team, or 3. Been listed on an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) roster." ECF No. 6-4.

The SEC Presidents and Chancellors also instructed the Commissioner to provide interpretive guidance concerning the Conference's longstanding Professionalism Rules. On August 26, 2026, consistent with the Presidents and Chancellors' direction, Commissioner Sankey issued a memorandum to all SEC member institutions providing guidance concerning the enforcement of the SEC's Professionalism Rules and available sanctions against SEC member institutions, CEOs, coaches, and other SEC athletics personnel for violations of those Rules. *See* ECF No. 6-3. This memorandum noted that "[p]ermitting professional athletes to return to college sports would also be contrary to the Conference's mission and purpose which is to sponsor intercollegiate athletics with competition by student-athletes who are not professionals." *Id.* at 1. It stressed that "[i]nstitutions and coaching staff members who promote, pursue, or engage in the recruitment or rostering of former professional athletes on a college team engage in conduct that is detrimental to the Southeastern Conference and contrary to the Conference's core purpose and mission." *Id.* In recognition that promoting, pursuing, and engaging in the recruitment or rostering of professional athletes on a college team is detrimental

to the Conference and contrary to its purpose and mission, the memorandum stated that "an institution that includes an athlete on its roster who has taken steps to become a professional athlete in a manner inconsistent with existing SEC Bylaws . . . shall be subject to penalties as determined by the Commissioner as established under SEC Bylaw 4.4.3." *Id*. at 1–2.

The memorandum further explained that "if a member institution violates SEC rules by adding an individual who has become professional to its designated roster, the Commissioner shall impose the following penalties: [t]he head coach in the sport in which the violation occurred shall be suspended from all coaching, recruiting, and administrative duties for 50% of the respective sport's playing season (*e.g.*, six games/weeks of a 12-game season in football); [a] fine of equal to 50% of the respective sport's annual budget; [r]emoval of voting privileges on items of Conference business for the member institution; and, [a]ny other penalty as deemed appropriate under the circumstances by the Commissioner or the SEC Presidents & Chancellors." *Id*. at 2. All of these penalties were already authorized pursuant to SEC Bylaws 4.4.3 (providing the Commissioner with powers and authority to impose penalties and sanctions) and 4.1.2 (setting forth the plenary power and authority of the Conference CEOs, including as they relate to penalties against member institutions). *See* ECF No. 6-2. The SEC CEOs expressly directed Commissioner

Sankey to impose these penalties upon a violation of the Professionalism Rules. ECF No. 6-1 at ¶¶ 32, 34.

Although LSU, through Defendant Rousse, voted in favor of the Conference's statement that professional athletes should not be permitted to participate in college sports, it abstained from the vote authorizing the specific penalties set forth in the memorandum, forecasting the now-clear intent of its agents to flout the Professionalism Rules. ECF No. 6-1 at ¶ 34. The viewpoints expressed in this memorandum and other statements by the SEC as described above reflect a core tenet of the Conference's institutional identity (and a core requisite for membership). The SEC holds itself out to its student-athletes, its fans, its media partners, and the public as an organization committed to competitive integrity, educational values, and the principle that collegiate athletics is distinct from professional sports—a tenet to which LSU has made clear it no longer holds.

**E. The SEC's Institutional Control Rules**

Article 6 of the Constitution requires each CEO to enforce the Conference Bylaws at his or her member institution. *See* ECF No. 6-2. In addition, SEC Bylaw 19.8.1.2 provides that each member institution must include in each contract with every athletic department employee an agreement to be bound by and comply with the enforcement, penalty, and other disciplinary provisions and procedures of the NCAA and of the Conference. *See id.* at Bylaw 19.8.1.2. The SEC Bylaws further

provide that all coaches "shall comply with and promote compliance with all rules and regulations of the Conference and the NCAA." *Id*. at Bylaw 10.2.1.

These provisions reflect the expectation and requirement that each member institution maintain institutional control, *i.e*., that it ensure all athletics personnel at the respective member institution respect and comply with all NCAA and SEC Bylaws and rules. That is a foundational principle of fundamental importance to the fulfillment by the Conference of its purpose and mission as set forth in the Constitution and Bylaws and is reinforced by Bylaw 19.8.1.1, which provides that "It is the obligation of each member institution to enforce and comply with the Rules." *See* ECF No. 6-2 at Bylaw 19.8.1.1.

**F. The SEC's First Amendment Rights**

The First Amendment protects not only the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), but also the corresponding right not to associate. *Id*. at 623; *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all"). Where, as here, a group is forced to continue association with certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Boy Scouts of Am. v.*

*Dale*, 530 U.S. 640, 648 (2000). Being forced to retain as a member an institution that no longer aligns with the SEC's values expressed in the Professionalism Rules—given the institution's recruitment of professional athletes and other public statements and actions in opposition to those rules—"significantly affect[s]" the SEC's ability to express its longstanding values. *Id*. at 650.

As state officials acting in their official capacities, Defendants are all state actors whose official actions are taken under color of state law. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988) (holding that a state employee acts under color of state law when exercising responsibilities pursuant to state employment). The SEC has clearly and consistently expressed its view that professionals should not be permitted to return to college competition. When an SEC member publicly rejects this stance, the Conference is forced to associate its institutional identity with the very conduct it has openly condemned. That forced association impairs the SEC's message and undermines the expressive identity it has built over more than ninety years. Moreover, the forced association and resulting harm would be furthered and amplified if the SEC cannot enforce the Professionalism Rules by disassociating itself from members that undermine its core values and identity.

### G. The Louisiana Preliminary Injunctions

The *Pyburn* and *Luis* injunctions currently prevent the SEC from imposing penalties on LSU for the Defendants' misconduct. As discussed in the Supplemental Amended Complaint, Defendants have acted in conjunction with the *Pyburn* and *Luis* plaintiffs by, among other things, (1) filing an amicus brief in the *Pyburn* action and advocating on behalf of the *Pyburn* plaintiffs, (2) actively "support[ing]" Mr. Luis' effort to enjoin the SEC and its Commissioner from enforcing the Conference's Professionalism Rules, **Ex. A** ¶ 14, and (3) working with both the *Pyburn* and *Luis* plaintiffs to stifle the SEC's ability to enforce its rules or terminate LSU's membership in the Conference.

In August 2026, numerous athletes seeking eligibility brought the *Pyburn* lawsuit against the NCAA and the SEC in Louisiana state court seeking declaratory and injunctive relief making them eligible to compete in the 2026-2027 season. The *Pyburn* plaintiffs filed an Amended Petition adding the Conference and the SEC's Commissioner as Defendants on August 27, 2026. ECF No. 6-1 at ¶ 35. Shortly after the Petition was filed, the Louisiana Court entered an Amended Temporary Restraining Order ("Amended TRO") and a Show Cause Order. *Id.*; *see also* ECF Nos. 6-5, 6-6. At a September 3, 2026, hearing on the *Pyburn* plaintiffs' Motion for a Preliminary Injunction and the related motions of the *Pyburn* defendants to set aside the Amended TRO, the Louisiana Court orally granted the *Pyburn* plaintiffs'

Motion for Preliminary Injunction and instructed the *Pyburn* plaintiffs to prepare a formal order. ECF No. 6-1 at ¶ 36. The *Pyburn* court then entered a Preliminary Injunction Order on September 9, 2026, which is attached as Exhibit 2 to the Second Sankey Declaration. **Ex. A** at ¶ 4; *id.* at 301–03.

Both the *Pyburn* Amended TRO and the Preliminary Injunction Order prohibit the defendants in that case, including the Conference and Commissioner Sankey, from "enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, ***and/or any SEC rule or proposed penalty***" not only against the plaintiffs in that case but against "[a]ny NCAA member institution or coach for which Plaintiffs choose to compete during the 2026-2027 season." ECF No. 6-5 at ¶ 6; **Ex. A** at 303 (emphasis added); *see also* ECF No. 6-1 ¶ 36.

In late October 2026, Mr. Luis sought to expand his existing preliminary injunction to include the SEC. He added the SEC and LSU as defendants in his existing Louisiana lawsuit and moved for a temporary restraining order and a preliminary injunction against the SEC and LSU. In support of his motion, Mr. Luis filed an affidavit admitting that Defendants had "supported" him in his lawsuit against the NCAA. **Ex. A** at ¶ 14; *id.* at 324–26. The court imposed a temporary restraining order in late October and subsequently granted Mr. Luis' motion for a preliminary injunction against the SEC on November 13, 2026. A copy of the preliminary injunction "Judgment" is attached as Exhibit 8 to the Second Sankey

Declaration. *See* **Ex. A** at ¶ 18; *id.* at 334–35. The court did not enjoin LSU and the Judgment does not require LSU to roster Mr. Luis.

The preliminary injunction prohibits the SEC from (a) "declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC," (b) "acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA," and (c) "on any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr. to be a member of the LSU men's basketball team and to practice, participate, and compete with the team throughout the 2026-27 season." **Ex. A** at 334–35. The preliminary injunction against the SEC effectively prohibits the SEC and its member institutions from imposing penalties on LSU, but it does not, and cannot, impose prior restraints on speech in violation of the First Amendment. Although Defendants claim that the *Luis* preliminary injunction required LSU to roster Mr. Luis, *see* **Ex. A** at 340–42, it does not require LSU to do so. The Louisiana court expressly denied the preliminary injunction that Mr. Luis sought against LSU.

On November 18, 2026, Mr. Luis' counsel emailed SEC counsel, implying that the *Luis* injunction prevents the SEC from considering whether to expel LSU from the Conference. *See* **Ex. A** at 337. Later that same day, Mr. Luis moved to hold the SEC in contempt of the *Luis* injunction for making a public statement expressing

concern about LSU's decision to place Mr. Luis on its roster. *See* **Ex. A** at 346–76. As in the *Pyburn* case, this series of events in the *Luis* case illustrates how Defendants have acted in concert with Mr. Luis and his counsel. On information and belief, these actions reveal that Defendants planned to roster Mr. Luis all along and that they have been working with Mr. Luis and his counsel to delay and ultimately block consideration by the SEC CEOs of LSU's potential expulsion.

Both the *Pyburn* and *Luis* Preliminary Injunction Orders, as well as Mr. Luis' motion to hold the SEC and Commissioner Sankey in contempt, remain in place as of this filing. As such, the SEC is enjoined from imposing penalties on LSU for its conduct and has no avenue by which to exercise its First Amendment Rights other than by terminating LSU's membership in the Conference. Importantly, as discussed at p. 27, *infra*, the SEC's exercise of its plenary power to terminate LSU's membership is not a punishment, nor is it an action to enforce a rule.

### H. The SEC's Intent to Consider Removal of LSU

In September 2026, the CEOs of the SEC's member institutions other than LSU met both informally and at a formal meeting to discuss Defendants' conduct, the *Pyburn* Preliminary Injunction, and LSU's continued membership in the Conference. ECF No. 6-1 at ¶¶ 41–42. At the September 4, 2026 meeting, the other 15 SEC CEOs expressed great concern about those issues, including that (1) the *Pyburn* Amended TRO and Preliminary Injunction were preventing the SEC from

imposing penalties if Defendants violated the Professionalism Rules, (2) Defendant Kiffin was working in concert with counsel for the *Pyburn* plaintiffs, with the support and involvement of Defendant Attorney General Murrill, and (3) Defendants Rousse and Ausberry have no meaningful control over Defendant Kiffin or the football program at LSU, even though Section 6.1 of the SEC Constitution specifies that the "Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution." ECF No. 6-1 at ¶ 42; *see also* ECF No. 6-2.

In light of LSU's renunciation of its intention to roster professional players, *see* ECF No. 32, **Ex. A** at ¶ 5, the SEC CEOs did not hold a vote on whether to terminate LSU's membership in the Conference during the September 10, 2026, meeting, **Ex. A** at ¶ 6. Instead, the remaining members of the Conference attempted to reach a resolution with LSU. That effort came to an abrupt halt, however, as a result of the actions and public statements of LSU and Defendants on and after November 13, 2026. After informal discussions, the remaining fifteen members of the SEC voiced serious concerns about LSU's institutional control, or lack thereof, and the pattern of conduct by LSU summarized above.

In light of Defendants' recalcitrance, lack of institutional control, and the serious harm caused by their actions and in consultation with and at the direction of

the SEC's President, Commissioner Sankey has given formal notice of another Special Meeting to consider the termination of LSU's membership in the SEC, pursuant to Section 3.1.5 of the SEC Constitution. *Id.* at ¶¶ 31–32. That meeting is currently set for December 3, 2026. *Id.* at ¶ 31. And, by making a public announcement that LSU will no longer be a member of the Conference, the SEC and its remaining members will effectively disassociate themselves with LSU's conduct and statements.

Throughout this litigation, officials speaking on behalf of LSU have publicly criticized the Professionalism Rules and the positions and actions taken by the SEC CEOs. For example, after the Clemson game, Defendant Kiffin reiterated his disagreement with and objections to the Professionalism Rules and the SEC's position in a press conference reported on X (formerly known as Twitter). ECF No. 6-1 ¶ 51. Further, Defendant Kiffin has repeatedly and publicly declared that he "fought" for the *Pyburn* plaintiffs, including on September 5, 2026, on ESPN's College GameDay program and on the Marty & McGee show that same day.

Defendant Kiffin's statements and position and Defendant Wade's decision to roster and play Mr. Luis, along with the numerous other statements and actions by Defendants described herein, are directly contradictory to Defendant Rousse's support for the Policy Statement on August 25, 2026. Taken together, they confirm the lack of institutional control over LSU's athletics program that is required by

Article 6 of the SEC Constitution and by the remaining provisions of the Constitution and Bylaws referenced above. *Id*. at ¶ 52.

Pursuant to Section 4.1.2 of the SEC Constitution, the CEOs are vested with "plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever," including the power to "[t]ake all actions specified and contemplated in Article 3 [of the SEC Constitution] in their sole discretion." ECF No. 6-2. Under Section 3.1.5 of the SEC Constitution, "[m]embership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers," with a two-thirds vote required to terminate membership. *Id.* Any action taken by the SEC's CEOs under Section 3.1.5 is pursuant to the CEOs' plenary power and authority to regulate the SEC as a voluntary membership association. It does not enforce an SEC rule and is not a penalty. Pursuant to notice properly given under Section 5.1 contemporaneously with the filing of the Supplemental Amended Complaint, the meeting scheduled for December 3, 2026, will be a Special Meeting of the Conference to decide whether to terminate LSU as an SEC member institution pursuant to Section 3.1.5 of the SEC Constitution and Bylaws. *See* **Ex. A** at ¶¶ 31–32.

**I. Harm to the SEC**

Defendants' conduct has caused and continues to cause significant harm to the Conference. Defendants' conduct has infringed the SEC's First Amendment

right of expressive association by forcing the Conference, through and in concert with the *Pyburn* and *Luis* plaintiffs, to associate itself and its competitions with conduct that it has expressly repudiated. *See* ECF No. 6-1 at ¶¶ 54–58. The Conference's only recourse is to remove LSU to preserve its expressive identity, a step it will consider at the upcoming December 3 meeting. Based on their conduct to date, including actions inconsistent with representations made to the SEC and to this Court, there is a clear, present, and irreparable threat that Defendants or persons who are in active concert or participation with them, such as the *Pyburn* and *Luis* plaintiffs, will try to enjoin, block, delay, or interfere with the December 3 meeting.

If the meeting is enjoined or if any other action is taken by Defendants or other persons who are in active concert or participation with them, such as the *Pyburn* plaintiffs or Mr. Luis, to block, delay, enjoin, or otherwise prevent consideration by the CEOs of the SEC whether to terminate the membership of LSU, both the Conference and its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights. Likewise, if those actors take any action to undermine any decision by the CEOs to terminate LSU's membership in the Conference, other than any challenge or counterclaim brought solely in this action, both the Conference and its member institutions will be irreparably harmed and injured by deprivation of their First Amendment rights.

## III. ARGUMENT

"A TRO or preliminary injunction is appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001) (citation omitted). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (citation omitted; emphasis in original). The relief requested by the Conference satisfies each of the required elements here.

### A. The Conference is likely to prevail on the merits.

Because Defendants' actions violate the long-established right of expressive association under the First Amendment, the Conference has a substantial likelihood of success on the merits. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. The First Amendment is applicable to the States through the Due Process Clause

of the Fourteenth Amendment. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976).

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" As set out below, Defendants here are state actors who are acting to deprive the Conference of its First Amendment rights and therefore should be enjoined as authorized by § 1983.

**1. Defendants are state actors.**

The threshold requirement of state action is easily satisfied here. All Defendants are sued in their official capacities as officials of Louisiana State University or the State of Louisiana and are accordingly state actors. "State employment is generally sufficient to render the defendant a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation omitted, alteration adopted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity" as Defendants are here. *Id.* at 50. Any action Defendants might take to prevent the

SEC from exercising its First Amendment rights by terminating LSU's SEC membership would necessarily be undertaken in their capacities as state officials.

**2. The First Amendment protects the right of non-association.**

The Conference's right not to associate with those who express viewpoints and engage in conduct contrary to its core values is protected by the First Amendment. The United States Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. As the Court has explained, that "[f]reedom of association . . . plainly presupposes a freedom *not* to associate." *Id*. at 623 (emphasis added); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all").

In the same vein, the United States Supreme Court has held that the First Amendment prevents a state actor from infringing an organization's right to express only the views that it intends to express. *Dale*, 530 U.S. at 648. As the Court explained in *Dale*, the right of association "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Id*. at 647–48. "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to

express." *Id.* at 648. Under these precedents, the SEC must be free from state action that prevents it from removing members whose actions are contrary to its mission, values, and expressive identity.

**3. Forcing the SEC to associate with members whose conduct is antithetical to its mission violates the Conference's First Amendment rights.**

The SEC is an expressive association. Since its founding in 1933 by university presidents committed to the principle that athletics should promote and serve educational values, the Conference has organized collegiate athletic competition around a core set of shared principles. Its CEOs have collectively and repeatedly expressed the Conference's institutional position that college sports must be reserved for college athletes. The SEC's expressive character is not incidental to its operations. It is integral to the Conference's organizational purpose and identity.

The Conference's Professionalism Rules, which prohibit individuals who have entered a professional draft, signed professional contracts, or been rostered on a professional athletics team from returning to compete in college athletics, embody the SEC's core expressive message: that collegiate athletics serve an educational mission and are fundamentally distinct from professional sports. The Institutional Control Rules requiring members to ensure compliance with the Professionalism Rules further reflect the SEC's commitment to that message. The SEC has repeatedly expressed its view on this important issue. The Conference's values are embodied

and expressed in its Constitution and Bylaws, in formal governance actions of its Presidents and Chancellors, in public statements by the SEC's Commissioner, and in the Conference's communications with its member institutions, student-athletes, fans, and media partners. In *Dale*, the Supreme Court held that the Boy Scouts had engaged in protected expression regarding its values through the Boy Scouts' mission statement, the Scout Oath, the Scout Law, and the activities in which scouts participate. 530 U.S. at 649-50. The Professionalism Rules and the SEC's repeated statements of its commitment to reserving college athletics for non-professionals are likewise protected expression core to the SEC's institutional identity.

The Conference's ability to maintain its expressive identity depends on compliance with the Conference's rules by its members and on each member institution maintaining institutional control. The Conference's power to determine its own membership, including the power to remove members, is likewise essential to its control over its message, mission, and identity.

But Defendants' recent conduct demonstrates that, absent an injunction from this Court, there is a grave and imminent threat that when the Conference gives notice of its intent to exercise its right of non-association by meeting on December 3 to consider removal of LSU from the Conference, Defendants, in concert with others, including Mr. Luis and his legal team, will attempt to prevent it from doing so. Those efforts would be direct state action seeking to prevent the Conference from

exercising its right of non-association by compelling it to continue associating with a member engaged in conduct it has long condemned and which is antithetical to its mission.

The forced association that would result from interference with the SEC's ability to terminate LSU's membership is precisely the type of governmental compulsion the Supreme Court held unconstitutional in *Dale*. There, the Court held that New Jersey's public accommodations law could not be applied to force the Boy Scouts to accept a member whose presence would "significantly affect" the organization's ability to express its views. 530 U.S. at 650, 656–59. The Court emphasized that "[t]he ***forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association*** if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id*. at 648 (emphasis added; citation omitted). Thus, where a group is forced to accept certain members whose conduct is antithetical to the group's viewpoint, that compulsion "may impair the ability of the group to express those views, and only those views, that it intends to express." *Id*. Preventing the SEC from removing a member whose views and conduct no longer align with the Conference's mission "significantly affect[s]" the SEC's ability to express its longstanding values.

The Supreme Court's decision in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), is also instructive. In *Hurley*, the

Court unanimously held that a state could not require parade organizers to include a group whose message the organizers did not wish to convey. *Id.* at 573. "[T]his use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* In the same way, preventing the SEC from removing a member that acts in contradiction to its long-held core beliefs forces it to associate its competitions—one of its primary expressive platforms—with conduct that directly contradicts the Conference's message that college athletics are reserved for college athletes. That forced association destroys the SEC's autonomy to choose the content of its message, and injunctive relief is necessary to preserve the Conference's ability to protect its expressive identity without reprisal by state actors.

#### 4. The threat that Defendants will interfere with a termination meeting is clearer than ever.

Recent events have further crystallized the threat of interference from Defendants, which has been real and imminent since the Conference first brought this action. That Defendants are closely collaborating with Mr. Luis, including in his legal proceedings, is now evident from his sworn affidavit stating that LSU and Defendant Wade "supported" him in his lawsuit—a suit he recently expanded to name the SEC as a Defendant and through which he secured an injunction prohibiting the SEC from penalizing LSU for rostering Mr. Luis or playing him in games. Supp. Am. Compl. ¶¶ 110–121. Defendants' determination to collaborate

with Mr. Luis to ensure that LSU can roster and play him without consequence is further demonstrated by Defendant Wade's testimony that the SEC's Professionalism Rules were the sole reason LSU had not rostered and played Mr. Luis prior to November 13. *See id*. at ¶ 117. And Mr. Luis's attempt to hold the SEC in contempt of the Louisiana court's injunction merely for expressing its disappointment in LSU's actions is further evidence that Mr. Luis and Defendants are working together to advance not only his interests but LSU's. *See id*. at ¶¶ 129–31.

Put simply, Defendants already have, including through Mr. Luis's lawsuit, prevented the SEC from employing one means of disassociating from LSU, namely, imposing penalties on LSU for violating the Professionalism Rules. In light of that, the Conference has every reason to expect Defendants to likewise interfere with the SEC's consideration of an alternative means of disassociation: termination of LSU from the conference at the upcoming December 3 meeting.

LSU's reversal of course regarding Mr. Luis and its pretextual explanations for that change of course likewise demonstrate an ongoing lack of institutional control. After voting for the SEC's policy statement regarding its Professionalism Rules, repeatedly assuring the Conference that it would not roster or play Mr. Luis, and filing a brief with this Court on October 20 arguing that it was "demonstrably false" that LSU's men's basketball team was violating the SEC's rules, Defendants nevertheless rostered Mr. Luis and played him in a game on November 18. *See id.*

at ¶¶ 64–65, 109, 124, 132; ECF No. 32 at 5. LSU's excuses for its about-face could not disguise Defendants' failure to control LSU's athletics programs. LSU's November 17 letter to the SEC stating that it would roster Mr. Luis despite its prior assurances called the SEC's August 25, 2026 Policy Statement "new," "never-before-presented," and "aggressive" even though LSU (through Defendant Rousse) voted *for* that statement, and the letter claimed that the Louisiana court's injunction in *Luis* required LSU to roster Mr. Luis even though the court expressly denied Mr. Luis's request to enjoin LSU. Supp. Am. Compl. at ¶¶ 125–27.

The foregoing course of conduct demonstrates an absence of institutional control that further foreshadows Defendants' willingness to take any and all steps to protect LSU's flouting of the SEC's rules, including interfering with the upcoming meeting. Nor does LSU's additional flip-flop on November 19 reduce the threat of interference. To the contrary, the choreographed nature of Defendant Rousse's announcement and the subsequent announcement by Mr. Luis's counsel only further confirms that Defendants and Mr. Luis are working together toward joint objectives and that LSU's position on whether it will comply with the SEC's Professionalism Rules is subject to change at any time based on where its interests lie at the moment. Nothing about LSU's decision not to play Mr. Luis (for now) reduces the risk that Defendants will interfere with consideration of terminating LSU's membership in the SEC.

### 5. The Anti-Injunction Act and the doctrine of *Younger* abstention are not implicated here.

The Anti-Injunction Act ("AIA"), 28 U.S.C. § 2283, presents no bar to the TRO and preliminary injunction that the Conference seeks, including enjoining Defendants from initiating lawsuits or engaging in further conduct aimed at preventing the Conference from exercising its First Amendment right of disassociation. The AIA prohibits federal courts from issuing "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The U.S. Supreme Court, however, has recognized that 42 U.S.C. § 1983, under which the Conference seeks relief here, is an "expressly authorized" exception to the AIA. *Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972) ("[W]e conclude that, under the criteria established in our previous decisions construing the anti-injunction statute, [§] 1983 is an Act of Congress that falls within the 'expressly authorized' exception of that law.").

Moreover, *Pyburn* and *Luis*—suits by private plaintiffs against private defendants—do not fall within the narrow, "exceptional" circumstances that trigger *Younger* abstention: "state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (internal quotation marks and citation omitted). Accordingly,

this case is no exception to the Court's "virtually unflagging" obligation to hear cases over which it has jurisdiction. *Id.* at 77 (quotation omitted).

**B. The Conference will suffer irreparable harm without injunctive relief.**

Absent injunctive relief, the Conference will continue to suffer irreparable harm. The infringement of the SEC's First Amendment right of expressive association constitutes irreparable harm *per se*. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("There can be no question that the challenged restrictions [on First Amendment rights], if enforced, will cause irreparable harm."); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) ("We have expressly held that an ongoing violation of the First Amendment constitutes an irreparable injury.") (quotation marks and citation omitted). As the Eleventh Circuit has explained, violations of First Amendment rights, "because of their intangible nature, could not be compensated for by monetary damages" and thus necessarily constitute irreparable injury. *Ne. Fla. Chapter of Ass'n of General Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1239 (M.D. Ala. 2000) ("In short, irreparable harm is not

difficult to establish when the impairment of First Amendment rights is at issue.") (footnote omitted).

The harms the SEC will suffer if it is prevented from determining its own membership fit squarely within the rationale articulated by the Eleventh Circuit in *City of Jacksonville*. If the Conference cannot remove a member whose conduct it condemns, the harm from forced association with that unwanted member cannot be undone after the fact or compensated by monetary damages. And the damage to the confidence of the public in the SEC's member institutions and in the integrity of SEC competition, once inflicted, is difficult if not impossible to repair. Each game in which professional athletes participate under the SEC's banner without the Conference being able to remove the member engaging in such direct violations of its Professionalism Rules compounds the Conference's constitutional injury by forcing it to associate its competitions and brand with conduct it has expressly rejected. This is not harm that can be undone after the fact or for which monetary relief could make the Conference whole. *City of Jacksonville*, 896 F.2d at 1285 (noting that First Amendment violations, "because of their intangible nature, could not be compensated for by money damages"). The harm the SEC would suffer is therefore irreparable and warrants a preliminary injunction.

### C. The balance of equities favors a preliminary injunction.

When a plaintiff has shown likelihood of success on the merits of a claim that the defendant is violating its First Amendment rights, as the SEC has done above, the injury to the plaintiff "is not outweighed by any threatened harm to [the defendants] because [they] ha[ve] 'no legitimate interest' in" violating the Constitution. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). Moreover, the Conference's freedom of expressive association is a core American constitutional right. The equities clearly favor an injunction protecting that right.

### D. The public interest favors a preliminary injunction.

The public has a strong interest in ensuring that fundamental First Amendment protections are upheld against state encroachment. *Honeyfund.com*, 94 F.4th at 1283 ("[A] preliminary injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights."); *see also Butler*, 111 F. Supp. 2d at 1240 ("[the] public interest is well served when the application of potentially unconstitutional laws is enjoined"). By contrast, the public has no interest in Defendants compelling the Conference to associate with LSU or with Defendants. The rights vindicated in this action include those held sacrosanct by the American system of jurisprudence. Failure to protect those rights here would permit state actors to override the expressive choices of a private association. This precedent would chill the exercise of expressive association rights far beyond the SEC, reaching any

private organization whose membership or eligibility standards a state actor might wish to override. Accordingly, granting the requested relief strongly serves public interests in protecting foundational constitutional rights.

**E. The Court should waive the bond requirement.**

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction or TRO "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (alterations in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)); *L.W. ex rel. Ward v. Comm'r of Ga. Dep't of Cmty. Health*, 176 F.4th 635, 646 (11th Cir. 2026) ("Our caselaw establishes that the district court may properly determine that no bond is required and set the security amount at $0."); *Leeds v. Bd. of Dental Examiners of Ala.*, 2018 WL 10593812, at *2 (N.D. Ala. Oct. 16, 2018) (declining to require bond).

"Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Complete Angler,*

*LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) (citations omitted); *see also Honeyfund.com Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) (indirectly quoting *Complete Angler* and waiving bond); *Johnston v. Tampa Sports Auth.*, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006) ("[I]n a case where, as here, Plaintiff's fundamental constitutional rights are at issue, imposing a financial burden on a plaintiff as a condition to protecting fundamental constitutional rights would create an unfair hardship on that plaintiff."). Because the Conference has demonstrated a strong likelihood of success on the merits and seeks to vindicate its fundamental First Amendment rights, the Court should exercise its discretion to waive the bond requirement.

**CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant this motion and enter a temporary restraining order and preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendants or their officers, agents, servants, employees, and attorneys—including, for example, Mr. Luis—from doing any of the following: (1) violating the Conference's First Amendment rights by compelling the Conference to associate with conduct that is contrary to the Conference's purpose and mission; (2) seeking to deter, coerce,

prevent, or punish the Conference for exercising its First Amendment rights; (3) blocking, delaying, enjoining or otherwise preventing, including through court action or proceedings, consideration by the CEOs of the SEC whether to terminate the membership of LSU at their December 3 meeting, any adjournment thereof, or otherwise; or (4) blocking, delaying, enjoining, reversing, or otherwise undermining any decision by the CEOs to terminate LSU's membership in the Conference, except for any challenge or counterclaim brought solely in this action.

Respectfully submitted this 23rd day of November, 2026.

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: */s/ Robert W. Fuller*
Robert W. Fuller*
N.C. Bar No. 10887
Amanda P. Nitto*
N.C. Bar No. 45158
Travis S. Hinman*
N.C. Bar No. 50779
600 S. Tryon Street, Ste. 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@rbh.com
anitto@rbh.com
thinman@rbh.com

Erik R. Zimmerman*
N.C. Bar No. 50247
1450 Raleigh Road, Suite 100
Chapel Hill, North Carolina 27516
Telephone: (919) 328-8800
Facsimile: (919) 328-8791
ezimmerman@rbh.com

* *Admitted pro hac vice*

**BRADLEY ARANT BOULT CUMMINGS LLP**

By: */s/ R. Thomas Warburton*
R. Thomas Warburton
T. Brooks Proctor
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
twarburton@bradley.com
bproctor@bradley.com

*Attorneys for Plaintiff Southeastern Conference*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and will serve the filing via FedEx and private process server on the following Defendant:

> **Will Wade**, in his official capacity as Head Men's Basketball Coach of Louisiana State University

*/s/ R. Thomas Warburton*
OF COUNSEL