FILED
2026 Nov-25 PM 01:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SOUTHEASTERN CONFERENCE,<br><br>Plaintiff,<br><br>v.<br><br>WADE ROUSSE, in his official capacity as President of Louisiana State University, *et al*.,<br><br>Defendants. | ) | Case No.: 2:26-cv-01586-ACA |

**<u>Second Declaration of Greg Sankey</u>**

1. I am the Commissioner of the Southeastern Conference (the "SEC" or the "Conference"). I have personal knowledge of the facts set forth below and, if called on to do so, would testify competently to the facts stated herein under oath.

2. On September 8, 2026, I submitted a Declaration in connection with the SEC's First Amended Complaint and its Motion for Temporary Restraining Order and Preliminary Injunction. *See* ECF No. 5-1. I submit this Second Declaration in connection with the SEC's Supplemental Amended Complaint and its Renewed Motion for Temporary Restraining Order and Preliminary Injunction.

3. My September 8, 2026 Declaration discussed the *Pyburn* litigation. *See* ECF No. 5-1 at ¶¶ 25–40. A copy of the transcript from the September 3, 2026 hearing referenced in paragraph 38 of that Declaration is attached as Exhibit 1.

4. On September 9, 2026, the Louisiana court entered a Preliminary Injunction Order in the *Pyburn* litigation. That Order is attached as Exhibit 2.

5. My September 8, 2026 Declaration also discussed Defendants' earlier conduct and statements that implied an intent to include professional players on LSU's football roster and allow them to play. *See* ECF No. 5-1 at ¶¶ 49–52. After the SEC filed its First Amended Complaint in this action, Defendants chose not to include professional players on LSU's football roster.

6. My September 8, 2026 Declaration also discussed a Special Meeting of the Conference's CEOs that was scheduled for September 10, 2026. *See id.* at ¶¶ 48, 53, 65. In the hope that the decision not to include professional players on LSU's roster reflected institutional control and was an indication that Defendants intended to comply with the Conference's Professionalism Rules, the Conference's CEOs did not take a vote on whether to terminate LSU's membership in the Conference.

7. LSU's men's basketball program recruited RJ Luis, Jr. to its basketball team for the 2026-27 season. Before that recruitment, Mr. Luis had entered the 2025 NBA Draft; did not withdraw from that draft; signed a "two-way" contract with the Utah Jazz in July 2025; participated in the Boston Celtics' training camp in October 2025; and participated in three NBA preseason games. Mr. Luis was not affected by implementation of the 5-for-5 rule; he chose to leave college early and enter the 2025 NBA Draft.

8. On August 3, 2026, Mr. Luis sued the NCAA in the 19th Judicial District Court for the Parish of East Baton Rouge. That lawsuit is captioned *Luis v. National Collegiate Athletic Association*, Case No. C-782241.

9. Mr. Luis moved for a preliminary injunction against the NCAA. On August 24, 2026 (in an oral order reflected in a formal written order signed on August 27, 2026), the Louisiana trial court issued a preliminary injunction against the NCAA. The court's formal written order on preliminary injunction against the NCAA is attached as Exhibit 3.

10. When the Louisiana court granted that preliminary injunction against the NCAA, the SEC was not a defendant in Mr. Luis's lawsuit.

11. At SEC media days on October 13, 2026, Defendant Wade stated, with respect to Mr. Luis: "We're going to follow all the SEC protocols with him. I think it's been pretty clear what the SEC protocols are on all that. He didn't travel with us to McNeese, and he hasn't been rostered." As late as October 29, 2026, Defendant Wade continued to state publicly that Mr. Luis would not play basketball for LSU. The above statements were reported in a Tiger Rag article attached as Exhibit 4.

12. On October 27, 2026, Mr. Luis moved to amend his lawsuit to add the SEC and LSU as defendants. He simultaneously moved for a temporary restraining order and a preliminary injunction against the SEC and LSU.

13. On October 28, 2026, the Louisiana court granted Mr. Luis's motions to amend his lawsuit to add the SEC and LSU as defendants and for a temporary restraining order against the SEC and LSU. On November 5, 2026, Mr. Luis moved to extend the temporary restraining order, which motion was granted. A copy of the court's temporary restraining order is attached as Exhibit 5.

14. On November 12, 2026, Mr. Luis filed an affidavit in support of his motion for a preliminary injunction. That affidavit is attached as Exhibit 6. The affidavit stated that LSU and Defendant Wade "supported" Mr. Luis in his lawsuit against the NCAA. *See* Ex. 6 at 2.

15. Also on November 12, 2026, Mr. Luis filed a proposed order granting a preliminary injunction against the SEC and LSU. A copy of that proposed preliminary injunction is attached as Exhibit 7.

16. On November 13, 2026, the Louisiana court held a hearing on Mr. Luis's motion for a preliminary injunction against the SEC and LSU. At that hearing, Mr. Luis's counsel argued, among other things, that the Louisiana court should require LSU to include Mr. Luis on its basketball roster for the 2026-27 season. The court stated at the hearing that it would grant a preliminary injunction against the SEC but would not grant a preliminary injunction against LSU.

17. At the preliminary injunction hearing, Defendant Wade testified by videoconference. He stated that the SEC's rules were the only impediment to LSU rostering and playing Mr. Luis.

18. On or around November 13, 2026, the Louisiana court issued a written "Judgment" on Mr. Luis's motion for a preliminary injunction. Consistent with the court's statements at the hearing, that Judgment grants a preliminary injunction against the SEC and denies a preliminary injunction against LSU. The court's Judgment is attached as Exhibit 8.

19. On November 16, 2026, in response to an inquiry from Mr. Luis's counsel, the SEC's counsel sent an email to Mr. Luis's counsel stating: "The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if [it] places Mr. Luis on its men's basketball roster." A copy of that email is attached as part of Exhibit 9.

20. The above response to Mr. Luis's counsel is substantively the same response that the SEC's counsel gave on September 14, 2026 to an inquiry about the *Pyburn* Preliminary Injunction from counsel for Jazzmin Ferguson, one of the *Pyburn* plaintiffs. In that earlier response, the SEC's counsel stated that "the SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if Ms. Ferguson plays."

21. Before Defendants rostered Mr. Luis on November 17, 2026 as discussed below, LSU officials indicated to me on multiple occasions—including a text message from Defendant Ausberry to me on September 5, 2026 and a phone call between Defendant Wade and me on October 14, 2026—that Mr. Luis would not play for LSU's basketball team.

22. On November 17, 2026, LSU sent a letter to the SEC. That letter is attached as Exhibit 10. In that letter, Defendants stated that they would include Mr. Luis on LSU's basketball roster as an active and eligible player.

23. That same day, LSU officially added Mr. Luis to LSU's men's basketball roster, with LSU designating him as an active and eligible athlete.

24. Also on November 17, 2026, after learning of LSU's decision to roster Mr. Luis, the SEC issued a statement expressing its concern about that decision: "LSU's decision today to rely on its own interpretation of the Court's order to justify its actions is inconsistent with the expectations and responsibilities of [SEC membership]. This is a deeply concerning and disappointing development." A copy of that statement is attached as Exhibit 11.

25. On November 18, 2026, Mr. Luis's counsel sent the SEC's counsel an email attached as part of Exhibit 9. In that message, Mr. Luis's counsel implied that the Louisiana court's preliminary injunction prevents the SEC from considering whether to expel LSU from the Conference.

26. On November 18, 2026, Mr. Luis moved to hold the SEC in contempt of the preliminary injunction. A copy of that motion is attached as Exhibit 12.

27. On the evening of November 18, 2026, LSU's men's basketball team played a game against the University of Louisiana Monroe. Mr. Luis participated in that game, scoring 11 points and securing 9 rebounds.

28. On the evening of November 19, 2026, LSU issued the statement from Defendant Rousse attached as Exhibit 13. Defendant Rousse stated: "In my role as President of the LSU system, after further review, I have instructed LSU Men's Basketball Coach Will Wade not to play RJ Luis."

29. A few hours later, lead counsel for Mr. Luis, Tony Clayton, announced a corresponding reversal of course by Mr. Luis. A Baton Rouge television station reported:

> Tony Clayton told The Advocate on Thursday night that Luis decided to step aside to protect his teammates, coach Will Wade and the school after LSU President Wade Rousse ordered Wade not to play the former St. John's guard. "In essence, he told me that the juice is just not worth the squeeze," Clayton told The Advocate, calling Luis an "honorable kid to fall on the sword" for the program.
>
> The move follows direct talks Thursday between Rousse and SEC Commissioner Greg Sankey, with Yahoo Sports reporting that some conference presidents were prepared to consider voting to expel LSU or boycott its basketball team over rostering the former NBA signee.
>
> Clayton told The Advocate his team will drop its motion to hold the SEC in contempt of court—though Luis still reserves the right to sue for damages. While praising Wade and Rousse as honorable men for

> backing Luis, Clayton aimed sharp criticism at Sankey: "We are a nation of laws and not of men, and he's not an honorable man."

This report is attached as Exhibit 14.

30. As of the filing of this Declaration, Mr. Luis has not dismissed his lawsuit against the SEC.

31. In consultation with and at the direction of the SEC's President and based on informal feedback from other Conference CEOs, I have given formal notice of a Special Meeting of the Conference, to be conducted on December 3, 2026, to consider the termination of LSU's membership in the SEC.

32. The President and the other Conference CEOs have voiced serious concerns about LSU's institutional control, or lack thereof, and the pattern of conduct by LSU summarized above. It is my understanding and the direction from the President of the Conference that the Special Meeting will remain on the schedule and that termination of LSU's membership will be considered whether or not LSU continues to exclude Mr. Luis from participating in basketball games as a player on the LSU team.

Executed under penalty of perjury, this 23rd day of November, 2026.

Greg Sankey
Southeastern Conference, Commissioner

# Exhibit 1

NINETEENTH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DIVISION D

COPY ORIGINAL

JACK PYBURN, ET AL

VERSUS NO. 783299

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL

EXCEPTIONS AND PRELIMINARY INJUNCTION

BEFORE HONORABLE WILLIAM M. JORDEN, DISTRICT JUDGE

ON SEPTEMBER 3, 2026

AT EAST BATON ROUGE PARISH COURTHOUSE

BATON ROUGE, LOUISIANA

KIMBERLE' F. COBB, CVR-M, CCR

OFFICIAL COURT REPORTER

CERTIFICATE NO. 24003

# A P P E A R A N C E S

Representing: PLAINTIFF, JOCELYN OLLIVIERRE

MR. TONY M. CLAYTON
CLAYTON & FRUGE
3741 HIGHWAY 1 S
PORT ALLEN, LOUISIANA 70767

Representing: PLAINTIFFS, JACK PYBURN, ET AL

MR. RYAN DOWNTON
THE TEXAS TRIAL GROUP
500 PR-693, SUITE 30
DORADO, PR 00646

MR. MARK A. PEPER
THE PEPER LAW FIRM, P.A.
548 SAVANNAH HIGHWAY
CHARLESTON, SOUTH CAROLINA 29407

Representing: INTERVENOR, NATHAN COX

MR. DERRICK D. KEE
COX, COX, FILO, CAMEL, WILSON & BROWN LLC
723 BROAD STREET
LAKE CHARLES, LOUISIANA 70601

Representing: STATE OF LOUISIANA, OFFICE OF ATTORNEY GENERAL

MS. ELIZABETH B. MURRILL
OFFICE OF ATTORNEY GENERAL
1885 N. 3RD STREET
BATON ROUGE, LOUISIANA 70802

Representing: DEFENDANT, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

MR. RICHARD F. ZIMMERMAN, JR.
BUTLER SNOW LLP
445 NORTH BOULEVARD, SUITE 300
BATON ROUGE, LOUISIANA 70802

MR. TAYLOR ASKEW
HOLLAND & KNIGHT
511 UNION STREET, SUITE 2700
NASHVILLE, TENNESSEE 37219

MR. DAVID J. ZEITLIN
HOLLAND & KNIGHT
511 UNION STREET, SUITE 2700
NASHVILLE, TENNESSEE 37219

MS. JULIE M. MCCALL
BUTLER SNOW LLP
445 NORTH BOULEVARD, SUITE 300
BATON ROUGE, LOUISIANA 70802

Representing: DEFENDANTS, SOUTHEASTERN CONFERENCE AND GREG SANKEY

MR. JASON ROGERS WILLIAMS
JASON ROGERS WILLIAMS & ASSOCIATES, LLC
607 ST. CHARLES AVENUE, SUITE 300
NEW ORLEANS, LOUISIANA 70130

MR. MICHAEL Q. WALSHE, JR.
STONE PIGMAN WALTHER WITTMANN L.L.C.
909 POYDRAS STREET, SUITE 3150
NEW ORLEANS, LOUISIANA 70112

MR. DONALD W. PRICE
STONE PIGMAN WALTHER WITTMANN L.L.C.
909 POYDRAS STREET, SUITE 3150
NEW ORLEANS, LOUISIANA 70112

# INDEX


EXCEPTIONS

| | |
|---|---|
| MR. WILLIAMS | 10 |
| MR. DOWNTON | 17 |
| MR. KEE | 18 |

OPENING STATEMENTS

| | |
|---|---|
| MR. DOWNTON | 20 |
| MR. ASKEW | 20 |
| MR. WILLIAMS | 25 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GREG SANKEY | | | | |
| BY MR. CLAYTON | | 31 | | |
| BY MR. DOWNTON | | 53 | | |
| BY MR. KEE | | 91 | | |
| BY MR. WILLIAMS | 98 | | | |
| BY MR. CLAYTON | | | | 115 |
| BY MR. DOWNTON | | | | 128 |
| BY MR. KEE | | | | 136 |
| JAZMIN FERGUSON | 140 | 143 | | |
| GREG SANKEY | 149 | | | |
| JOCELYN OLLIVIERRE | 152 | | | |
| THOMAS MARSALA | 155 | 157 | | |
| CKELBY GIVENS | 158 | | | |
| DAE'QUAN WRIGHT | 161 | | 170 | |
| BY MR. ASKEW | | 167 | | |
| BY MR. WALSHE | | 168 | | |
| ZXAVIAN HARRIS | 171 | 174 | 176 | |
| CARMELIA MUCCILLI | 176 | | | |
| KEENAN LANDRY | 179 | 185 | | |
| PAYTN MONTICELLI | 187 | 189 | 191 | 192 |
| LEE AMEDEE | 193 | 195 | | |
| NATHAN COX | 197 | 200 | | |
| JALIA LASSITER | 201 | 203 | 204 | |
| MARK PEPER | 209 | | | |
| BY MR. ASKEW | | 217 | | |
| BY MR. WILLIAMS | | 220 | | |

SUMMATIONS


| | |
|---|---|
| MR. DOWNTON | 229 |
| MR. CLAYTON | 241 |
| MR. KEE | 243 |
| MR. ASKEW | 245 |
| MR. WILLIAMS | 255 |
| MR. DOWNTON | 268 |
| RULING | 274 |


********

**E X H I B I T S**

**FOR THE PLAINTIFFS:**

**FOR THE DEFENDANT:**

COURT HAVING BEEN CALLED TO ORDER ON SEPTEMBER 3, 2026, BEFORE THE HONORABLE WILLIAM M. JORDEN, AND THIS MATTER CALLED TO BAR, WITH THE PLAINTIFFS, JACK PYBURN, ET AL REPRESENTED BY COUNSEL, MR. CLAYTON, MR. DOWNTON, MR. KEE AND MR. PEPER; THE DEFENDANT, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION AND REPRESENTED BY COUNSEL, MR. ZIMMERMAN, MR. ASKEW, MR. ZEITLIN AND MS. MCCALL; AND THE DEFENDANTS, SOUTHEASTERN CONFERENCE AND GREG SANKEY PRESENT AND REPRESENTED BY COUNSEL, MR. WILLIAMS, MR. WALSHE AND MR. PRICE:

**THE COURT:** You all may be seated. Apologies that we're not on the 11th floor. I know there's a trial that's been going on for about a week or so that's still going so we would have had more room, but here we are. Cozy and comfortable.

All right. Before we get started, this is Jack Pyburn, et al versus National Collegiate Athletic Association, et al. Let's make our appearances for the record, please.

**MR. CLAYTON:** Good morning, your Honor. Tony Clayton on behalf of Jocelyn Ollivierre and remember for the record, because I'm the Chairman of the Board, I cannot represent Mr. Givens, but I'll be representing this female athlete and I'll just be cocounsel with Mr. Downton.

But, for the record, Judge, we plan on not being duplicitous but I will ask questions on behalf of my female client and I would also assure my out-of-town colleague here that he would be able to pursue the questions for all the other players so that we won't be just tag teaming, but we will do one opening, we will do one closing but we will cross-examine or question witnesses as we choose but we will not be --

**THE COURT:** That makes sense. I appreciate that.

**MR. PEPER:** Good morning, your Honor. Attorney Mark Peper, Pro Hac in from South Carolina, cocounsel for the remaining plaintiffs.

**THE COURT:** I got his waiver in, right, didn't I get that earlier?

**MR. PEPER:** Came in yesterday, your Honor.

**THE COURT:** Appreciate it.

**MR. DOWNTON:** Your Honor, Ryan Downton for the plaintiffs. I believe you have my Pro Hac paperwork as well.

**MR. KEE:** Your Honor, Derrick Kee on behalf of intervenor, Nathan Cox.

**THE COURT:** As soon as we're done with the introductions, I want to, I think it's already been indicated I want to take care of the intervention first as long as there is no objection, we'll get through that hopefully quickly.

**MR. CLAYTON:** Judge, one more point. We have the Attorney General for the State of Louisiana with your permission she going to assist us at this table. She's filed an amicus brief.

**THE COURT:** I actually had a question about that and I recognize you, Attorney General Murrill. I didn't see that the brief was actually filed but I have it here asking for a waiver to allow you to and I just wasn't, I just wasn't sure how you guys were expecting me to proceed. Y'all tell me.

**MS. MURRILL:** Your Honor, my counsel who filed is here, I think that we filed a motion and the brief together which is typically what we would do when we

file an amicus brief. We file a motion for leave to file the brief and attach the brief.

**THE COURT:** All right. What's that?

**STAFF ATTORNEY:** The clerk hasn't processed it. So we don't see it here.

**THE COURT:** Either way, understandably. Unless there's an objection, I'll allow that as well.

**MR. CLAYTON:** Thank you, your Honor.

**MR. KEE:** Judge, I didn't announce, Paul Cox is also my cocounsel.

**THE COURT:** All right.

**MS. MURRILL:** Your Honor, do you want a copy of the brief? We do have a copy.

**THE COURT:** A clean copy, I would appreciate that.

**MS. MURRILL:** You guys got copies? Thank you, your Honor.

**THE COURT:** To the defense.

**MR. ASKEW:** Good morning, your Honor. Taylor Askew along with Richard Zimmerman, David Zeitlin, and Julie McCall for the NCAA.

**THE COURT:** All right.

**MR. WILLIAMS:** Your Honor, Jason Williams and Michael Walshe on behalf of the SEC and Commissioner Sankey.

**THE COURT:** Is that everybody else over there? All right. You took care of it, good deal.

So first, procedurally, let's take care of this intervention. Mr. Kee.

**MR. KEE:** Yes, your Honor. May it please the Court, Derrick Kee on behalf of Nathan Cox who is present in court. Mr. Cox, raise your hand.

Judge, as indicated, I believe the Court has already granted the intervention. I would indicate that there is no opposition from any of the plaintiffs as well as I'm unaware of any opposition and certainly none was filed by any of the defendants.

As such, I think everyone can sense there's no prejudice to any party. Obviously, this is an interest of judicial economy, we're about a day late in filing this after everyone else so I wanted to make sure we're in proper posture. Also, the case in controversy arises out of a common nucleus of operative facts. Nathan Cox is from the Class of 2022. He's 22 years old. He grew up in Lake Charles, Louisiana, so he's a Louisiana resident. He played tennis at Vanderbilt University, he played two games here against LSU as well as played in the SEC tournament.

As mentioned before, there's no opposition. he's mentioned in the opposition of the NCAA as well as the SEC but not as to his intervention. Also, all parties have been made aware of Nathan's entry into the suit and this case is in proper posture to move forward.

**THE COURT:** All right. Again, hearing no objection, seeing no opposition from any side, I'm going to allow the intervention, again, for the record, of Mr. Nathan Cox.

**MR. KEE:** Thank you, Judge.

**THE COURT:** Now let's now move, we had a number of exceptions I believe that were filed. We will begin with the exceptions.

**MR. WILLIAMS:** Thank you, Judge. Judge, I believe we're beginning with SEC's exception of improper cumulation.

May it please the Court. Your Honor, when you strip away everything surrounding this case, the headlines, the big personalities, the broader debate about college athletics, this particular exception presents a pretty straightforward question. Why are 43 of these plaintiffs in one lawsuit against the SEC because they are not similarly situated, they're not even challenging the same rules, they don't have the same eligibility histories. They do not seek to attend the same institution. But most importantly, Judge, the overwhelming majority of them have not alleged that the SEC has done or threatened to do anything at all to them and that matters, Judge.

Louisiana law requires a community of interest before materially different plaintiffs can cumulate their claims into one proceeding. The test our courts use is a practical one, Judge. Do the claims share enough of the same factual and legal issues that it is simply commonsensical to litigate them together? Here, Judge, that answer is clearly no. I think the numbers make that abundantly clear. There are 43, I guess now 44, named plaintiffs in this case but they are not one group.

At a minimum, they fall into basically three different buckets. You have athletes who graduated high school in 2022, competed for four years in Division I and now seek a fifth year under the NCAA's new eligibility model. You have another group who competed at junior college or non-NCAA institutions.

Now, their arguments involve an entirely different set of rules and a different question, whether those years should count against their NCAA eligibility. And then you have this third bucket and it's a very, very different category, players who signed professional contracts. Those players implicate another set of rules entirely including the rules governing professional athletes returning back to college rosters.

Those are very different facts, different rules, different legal theories and ultimately, Judge, potentially different outcomes. But, your Honor, the problem becomes even more clear when we stop talking about the NCAA generally and focus on my client, the SEC and Commissioner Sankey. Because out of the 43 plaintiffs, only seven affirmatively allege in their pleadings that they intend to attend an SEC institution during the 2026-2027 season. Seven out of 43. Six of those seven say they intend to remain at the exact same SEC institution they attended last year, that's LSU or Ole Miss. Meaning the SEC's interconference transfer rule isn't even applicable as to that group. So then we narrow this yet again and then we get to the professional athletes issue that has received probably the lion's share of the attention of this litigation.

According to the pleadings before the Court, only one plaintiff, Jack Pyburn, actually alleges both that he signed an NFL contract and that he intends to enroll at an SEC institution. One. One out of all 43 that are before you today.

I understand that there may be facts outside the

four corners of these pleadings, the brief acknowledges that Dae'Quan Wright and Zxavian Harris are known to have signed NFL contracts and committed to LSU if eligible. But that actually proves our point rather than defeats it because this exception asks the Court to look at these plaintiffs, these allegations, and these claims against the defendants and when you do that with a sober eye, there simply isn't one common controversy involving 43 plaintiffs and the SEC. There are very different controversies that have been just bundled together and that bundling matters because plaintiffs are asking this Court for extraordinarily broad relief against the SEC. They want an injunction that would prohibit the conference from enforcing rules that might prevent plaintiffs from transferring or competing during a 2026-2027 season without first obtaining permission from this Court.

But you see, Judge, for the vast majority of these plaintiffs, an injunction against the SEC would not change a single thing. They haven't alleged that they're going to an SEC school. They haven't allege the SEC rule is preventing them from playing and they haven't alleged an SEC specific injury. So why should the Southeastern Conference be required to litigate against dozens of plaintiffs who cannot identify what the conference has allegedly done to them? And why should an injunction against the SEC potentially extend to people whom the injunction would provide absolutely no meaningful relief?

So that's not just a technical problem, that's exactly why the cumulation rules exist. They require

us to identify who actually has a controversy and with whom. Your Honor, I don't think this requires the Court today to decide the larger philosophical question surrounding college athletics, doesn't require the Court to decide whether a fifth year is even a good policy.

**THE COURT:** Let me ask you this, Mr. Williams. Didn't SEC put themselves in there when they made the rule after I signed, let me not say this, not made the rule. When, I think it was after I signed the TRO, there was a rule that was, I guess, circulated about any institution that has these pro players, signs these players, these are the punishments, you're going to lose 25, all this whatever that is. Isn't the SEC now putting themselves in the same position as the NCAA when they do that?

**MR. WILLIAMS:** Absolutely not, Judge. The rule, the rules of the SEC that are in question predated this litigation. They predated these athletes from even being in the college arena. What we're talking about is enforcement of long-standing rules. Example, if I got a rule in my house that none of my kids are supposed to drink my expensive scotch, I don't have to enforce that rule when they're eight or nine. But when they come home from college that might be a little different. The rule was always there but nobody had tested it.

**THE COURT:** Sure.

**MR. WILLIAMS:** So that's the difference, Judge.

It certainly doesn't require this Court on this particular exception to decide the ultimate merits of every plaintiff's NCAA eligibility. You don't even

have to require the Court to decide whether a former athlete should ever be permitted to return. Those fights may come; I'm certain they will. But before we have those fights, Judge, Louisiana procedure requires us to determine who actually is entitled to have that fight together in one case. And that's where the plaintiffs' claims and case breaks down. They have 43 individuals with materially different histories, governed by materially different rules, seeking materially different relief, but they put them together all under one caption. Then they've added the SEC and Commissioner Sankey as defendants even though the overwhelming majority of those plaintiffs do not allege a concrete controversy involving Commissioner Sankey or the SEC.

The law does not permit that merely because all 43 plaintiffs share a general desire to play one more year of college sports. If that were enough to establish a community of interest, Judge, the requirement would almost really just have no meaning at all. The question isn't whether the plaintiffs have something in common, they certainly do. The question is whether their claims present the same factual or legal issues such that it makes common sense to litigate them together.

**THE COURT**: Let me ask you this then. What you would pose to me then is if the Court were to sustain your exception, the improper cumulation, and I would say or take your word for it that it's about seven of them that have either played in the SEC school, have intended to continue to play at SEC school, we've got the Ole Miss school, we've got the LSU school, and of

course, I believe there's Vanderbilt. So those three, you would suggest then that we would need to start this over and split out the seven and then come on back to deal with everybody else, is that what you would posit to the Court?

**MR. WILLIAMS:** Judge, I would suggest that we would proceed with the plaintiffs that have established a genuine controversy that includes SEC and Commissioner Sankey and you have to make that determination but based upon --

**THE COURT:** And then you would then have me then here, again, so I would say, all right, I'm only here about the seven for the SEC and then I let y'all sit down and I say, all right, let me take the other 30-some-odd, 35 and now we're going to talk about NCAA, is that what you're --

**MR. WILLIAMS:** Judge, I think if somebody slipped and fell in Wal-Mart, you couldn't bring suit against Costco just because they sell the same stuff.

**THE COURT:** You're in New Orleans and you know one of the things that we used to do, I know in the Code it says if there's a different way that you can try a case; one with a jury and one with a bench trial, simple enough. All you got to do is waive and then the jury is hearing the felony and the judge is hearing the misdemeanor and then we still move on.

**MR. WILLIAMS:** That's true, Judge. But if you play this thing out, you would put the SEC and Commissioner Sankey in the position of defending claims that have not even actually been brought against them. These are not cosmetic differences. And neither one is -- players seeking a fifth year

under NCAA's new age-based model is not presenting the same case as a player arguing that his junior college participation should not count. Two very different things. And neither one is presenting the same case as a player who signed an NFL contract and now wants to come back to an SEC roster. These aren't cosmetic differences.

The differences determine which rules apply, which defenses apply, which facts matter and ultimately whether each athlete is eligible at all. So we're not asking the Court to prejudge anybody's case. We're asking the Court to require the plaintiffs to litigate the cases they actually have against the proper defendants. If someone has a concrete controversy against the NCAA, then that claim can be litigated against the NCAA. If someone has a real controversy against Commissioner Sankey and the SEC, that claim should be litigated against just Commissioner Sankey and the SEC.

But 43 plaintiffs cannot use a handful of SEC related claims as a vehicle to obtain the sweeping relief against the conference on behalf of everybody else. And Article 464 gives this Court the mechanism to correct that very clear problem that is here before we really even get into the merits. Your Honor, there's a temptation in a case like this particularly because these are athletes and eligibility, of course, has a clock attached to it to say let's just throw everybody together and we'll figure it out. I understand that instinct. But speed cannot replace precision and fairness is not going to be accomplished by putting everybody into

the same lawsuit regardless of whether they actually belong there. Fairness is identifying the actual dispute. Who's been injured? By whom? Under what rule? And what relief would remedy that injure? And when those plaintiffs ask that question here, the supposed community of interest among the 43 just falls apart.

So I would respectfully ask this Court to sustain the SEC's dilatory exception of improper cumulation and order that any claims against the SEC or Commissioner Sankey proceed if at all only as to the plaintiffs who can actually allege a concrete SEC specific controversy. And that's not denying anybody their day in court. It's just requiring the plaintiffs bring the right dispute against the right defendant and respectfully, your Honor, that's not only what Louisiana law requires but that's just common sense. Thank you, Judge.

**THE COURT:** Thank you, Mr. Williams.

**MR. DOWNTON:** Good morning, your Honor. I don't think we have a huge dispute actually on this issue. I think counsel is missing some of the SEC-related players. Just looking quickly I saw plaintiffs King, Harris, Wright, Williams, Smith, Boyer, Lassiter, Monticelli, Ollivierre, Starr, Bunker and Abram all went to SEC schools last year. Plaintiffs intend and will stipulate to dismiss all claims against the SEC for all plaintiffs other than those currently attending SEC schools or expressing intention to go to an SEC school next year with a belief, a genuinely-held belief, that the SEC is not going to allow that. And I'm not sure we have any of those.

I'd like until lunch to be able to give you that list.

**THE COURT:** I appreciate that. Okay.

**MR. KEE:** Judge, very briefly. As you astutely pointed out, Mr. Cox is an SEC player from Vanderbilt. One of the decisions he has to make is whether or not he intends to, if your injunction is granted, whether he intends to go back to Vanderbilt or possibly go to LSU or somewhere else. So he immediately fits into the folks that are in dispute today.

And, Judge, I just want to craft it like this. What if this was a civil rights injunction against a multiagency organization which includes state police and city police and various police and they were all named in a suit and we're asking for injunctive relief. Clearly, the actions and the laws pertaining to each and each conduct would be separate and distinct. However, the Court is well able, and I could tell from the way you asked the questions, to parse the issues and order in a way that only affects those who are going to have applicability's to each particular request for relief. So I think this should be denied.

**THE COURT:** I think that's it on the responses. Rebuttal, Mr. Williams, if anything. Again, I know there was a consent to some part and then there was a question by the intervenor on the others. So go ahead, Mr. Williams.

**MR. WILLIAMS:** Judge, based upon the, I'm not sure if it was a proposed stipulation or consent, I think we're okay moving forward. There was a

suggestion that there are other SEC athletes but we can only rely on what's in the pleadings. The pleadings don't say they're going to an SEC school.

**MR. DOWNTON:** I read you names of athletes listed in the pleadings as having attended an SEC school at their last place. So I believe they all have a relationship to the SEC such that they can proceed at this time.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** It's interesting enough because you almost have to put the cart before the horse. You do. Because, again, there's so many mirrored rules from the SEC and the NCAA, et cetera, that actually apply, make this applicable.

Tell you what I'm going to do. As it relates for the parsing out, I'm going to allow the parsing out of the SEC as it relates to the defense of these specific allegations but I will give, I do believe that there was enough notice provided as it relates to who these individuals are. So what that means is, as we're going to move forward, the SEC is only going to be asked to defend themselves against those individuals that either had prior relations to SEC schools, have indicated their intention to potentially go into SEC schools. As it relates for the remaining plaintiffs, obviously the SEC you won't have to question or defend yourselves against the allegations of those individuals. That's the ruling of the Court.

**MR. WILLIAMS:** Thank you, your Honor.

**THE COURT:** Any other outstanding exceptions at this time? Hearing none, let's move forward to the

petitioners.

**MR. DOWNTON:** Your Honor, we have a lot of the plaintiffs who are with us today. We would like them to have a chance to speak to you and tell their stories.

**THE COURT:** Absolutely, I will permit that.

**MR. DOWNTON:** Given that, I don't want to spend a lot of time on opening statement. We'll come back at the end of the day and sum up.

So the very short version is these are all athletes that we believe are similarly situated. They're all athletes who have not gotten a chance for a fifth year of NCAA sports and they desire that. The athletes that came before them all got a fifth year due to the COVID waiver, the Pavia waiver or other NCAA rulings. Everyone going forward is getting a fifth year, they desire to be treated equitably and fairly under the NCAA Manual that the NCAA promulgates and the athletes are all required to sign each year before they can play.

We will spend the day showing you how the NCAA has operated arbitrary and unfairly in applying that waiver, in applying the Manual and the various waivers to athletes while these players have been in school and we will hear their each individual story. And then we also have concerns about how the SEC and the NCAA have interacted over the course of the last year and to the extent we do believe that they've been acting in concert and we've got concerns about their compliance with the orders. Thank you.

**THE COURT:** Thank you.

**MR. ASKEW:** Briefly, your Honor. Good morning.

My name is Taylor Askew. I'm from Nashville, Tennessee. Thank you so much for allowing me to appear before you.

A lot of plaintiffs here today, a lot of people, a lot of interested parties, I get it. I think there are a couple of things we need to remain cognizant of as we move throughout the day today because regardless of the allegations and things like this, this remains a court of law, the law applies to it, that's what we're going to apply.

So what is the NCAA? What is it? It's not this monolithic entity in Indianapolis that just promulgates rules on its own and tells the schools this is the rules of the road, this is what you got to do. It's just the schools. It is the schools. That's what a private voluntary association is. It's just the collective Division I members who have gotten together, decided, deliberated, debated and created for themselves a body of rules on how they are going to regulate and govern sports, interscholastically at the collegiate level. That's what they've done.

What are the rules that are at issue here? You've heard about the JUCO rules, the pro rules but really this comes down to two rules. The first rule is under the 2005-2006 (sic) NCAA Bylaws, what were the eligibility rules at that time because all of the plaintiffs that were before you, all of them, that was the last time they took the field or the court and competed in Division I sports. What were those rules? Those rules said within a five-year time period starting upon your matriculation into an

intercollegiate institution, you have up to four seasons of competition. That's what you can play. That had been the rule before and that was the rule all the way up until June of this year.

What did the players get under that rule? They got four seasons of competition within five years. What does that mean? They got all of it. They got everything that the 2005-2006 (sic) and its predecessors ever said they would get.

The second rule is the new age-based eligibility model that is present in the 2006 or 2026-27 Manual. That rule was passed in June of this year. It was effective August 1 of this year. It is prospective reaching. It does not say it's retroactive. The law presumes that rules are prospective unless they specifically say they are not. Those are the two rules that are at issue here.

What -- what is the import of that? The import of that is under Louisiana law, the Court can't, it just can't step in and say, well, the rules can be different. It can't supplant its thoughts for that of the NCAA. It can't say, well, you know, I think you all could have done it this way, but you did it that way. That's just not how it works.

The Court's evaluation would be limited to have the rules been, have the rules been applied consistently. Has each person situated under either framework gotten the same shake? And this is a series of dozens of lawsuits across the country. And you'll hear from plaintiffs that they want to turn it on its head and say look how much the NCAA is getting sued over this. That's not proof that the NCAA is

liable. That's proof that it's consistently applied the rule because there are so many student athletes who are getting treated exactly the same. And they're getting treated exactly the same because they all exhausted their eligibility under the 25-26 rule book. And that is where we're going with this.

We have to -- to succeed on a claim for a preliminary injunction, you have to have a likelihood of success on the merits of a claim. As you move through the day, your Honor, I want you to be cognizant of how you would write an order, how would you write an order granting this? The foundational claim here is that the NCAA has breached a contract. What's the contract? Which contract? Is it the 25-26 Manual? It couldn't be that. It couldn't be because that says you get four and five and they got four and five. If it's the 26-27 Manual, how do they have standing? They never played under that. Those rules didn't come into effect until after they were gone, after all of their eligibility had been exhausted. That's just the first element of a breach of contract claim.

The second claim is the breach. It's the same argument. What did the NCAA not give them? What was taken away from them? This is not a case where the NCAA said you get five and five and now we're switching to four and five so we're pulling that rule away from you. It's the exact opposite. It's you matriculated to school with the expectation that you would get four seasons in five years. You got every single one of those. And nobody is saying the NCAA can't change their rules. Nobody's saying that.

Nobody is saying the NCAA didn't follow its process to change those rules. Nobody's attacking the procedure by which we got here. They're just say there's a new rule; I wish it applied to me. That's not a claim; which leads us to the third element of a breach of contract, which what's the damage? The damage is I'm losing out on a season of competition that was never promised to me, that I could never have reasonably expected to participate in. That's not a contract damage. That's like saying I bought a car for $10,000 and turns around and sees my neighbor bought the same car for $9,000, you've breached my contract because I wish I got that deal. But that's now how that works. It's not how it works. You got the car for $10,000 and you got the car and that's how it was applied consistently.

So, finally, your Honor, how are you going to craft injunctive relief here? Ask yourself what is it that you are enjoining? Are you enjoining the implementation of the new rule? Are you saying this new rule is unfair, the 26-27 age-based rule, I'm enjoining that rule? Okay, now you're stuck with the old rule and they're ineligible because it just goes back to the way it was. If you're enjoining the four and five rule from 25-26, well, that rule's no longer in effect anymore so there's nothing to enjoin.

So what you're doing is you're actually stepping in and saying I'm going to make up a new rule for all of college sports and I am going to rewrite this provision of the NCAA's rule book. So the overarching question beyond that, your Honor, we are all sitting here today discussing who is best

situated, who is best situated to legislate, administer, and govern the complex ecosystem of interscholastic sports? Is it the schools that participate in them and live and breathe them every day and have collectively decided that this is the way things should go or is it individual courts on truncated records, on expedited timelines, with minimal proof, with busy dockets, who's better suited to do that?

Louisiana law says private voluntary associations get to make their rules. What they don't get to do is selectively apply them. Look today for any instance, a single instance, of this new age-based rule being applied anything but uniformly. If you completed your four seasons of competition during the 25-26 year you do not have eligibility. It was never represented anything other than that.

So as we remain cognizant and move forward throughout the day, I respectfully ask your Honor to deny this injunction and allow the NCAA to govern itself. Thank you.

**THE COURT:** Thank you.

**MR. WILLIAMS:** Judge, in our brief there's a chart. I'll give another copy to plaintiff. It's in our brief and I have one for the Court just so you can have this throughout the day just to remind you although we are at the same table, we're two different organizations.

**THE COURT:** Sure.

**MR. WILLIAMS:** And you can see there, Judge, NCAA is on one side with one logo and the SEC is on

the other side with a very different logo and a very different structure. Your Honor, the SEC's issue is narrow. This case involves though NCAA eligibility waivers, individual athletes, and decisions by different organizations. But the SEC is not the NCAA.

The question concerning the SEC is may 16 universities voluntarily establish rules governing their athletic competition? That's it. And may their conference enforce those rules equally against its 16 members. We submit the law says they can.

Three points, I believe, Judge, will guide the Court's consideration of the evidence throughout the day. First, this rule regardless of what's on Twitter, regardless of what plaintiffs say, this rule predates this dispute. The SEC did not create this rule because one school recruited these plaintiffs or for these plaintiffs or anticipation of this litigation. The SEC has long maintained a bright line between collegiate competition and professional sports. This controversy did not create that line.

**THE COURT:** Hold on, hold on, Jason. What is amateurism?

**MR. WILLIAMS:** Judge, if you're trying to walk me down a path I'm not trying to go to.

**THE COURT:** I know you wasn't ready yet but, look, I figure I'm going to be asking that question maybe 15, 20 times before it's all over with and you just went there. The SEC has a bright line between collegiate and professional sports, I get that, but there have been some arguments that have been made. You don't have to answer it right now just be

prepared.

**MR. WILLIAMS:** Judge, I am prepared and I knew it was coming because you played college football, I played college football.

**THE COURT:** You did too.

**MR. WILLIAMS:** And it was a very different time.

**THE COURT:** It absolutely was.

**MR. WILLIAMS:** There was no NIL. You did it for purely the opportunity to get some snaps and some reps. But, Judge, the rule has existed for a very, very long time. And we did not make it up. It just was tested. This controversy did not create that line, it tested it. The evidence will show the SEC members adopted this rule, all 16, governing their competition and the rules that would apply equally across the conference. Not a single school is being singled out. The rules apply to all 16.

Secondly, Judge, the SEC and the NCAA, we have to stay on this point, are distinct organizations. The SEC is a separate organization with its own constitution, its own Bylaws, governance structure, its own Commissioner and the rules for the institutions that voluntarily compete in that particular conference. Now the SEC participates in NCAA governance, but the NCAA does not govern the SEC.

The NCAA's determination concerning an athlete's eligibility therefore does not answer the separate question before the Court. What rules may 16 SEC members establish for competition among themselves? That's the question. The SEC is not asking the Court to decide whether these athletes may ever play

football again or to punish them. It is defending its authority to enforce its agreed-upon rules against its voluntary members.

Third, Judge, common rules are necessary for competition. College football, as you know, is intensely competitive. Every coach, every athletic department, every university wants to win. That's why we're here. That's why it's such a big deal. But competition also creates powerful incentives.

If one institution gains an advantage prohibited by a common conference rule, the answer cannot be that every institution must violate the same rule just to keep up, just to compete. That's why conference -- that's why this conference established common rules. Sixteen competitors agree in advance, we will play by these same rules and when one of those rules is tested, the conference has to be able to enforce it. Otherwise, it's not a rule.

What the evidence will show? The evidence, today, Judge, I believe will establish that the SEC's members adopted a rule governing when professional participation ends for SEC competition. That rule existed before this controversy. It applies equally to all 16 and SEC may enforce it. The plaintiffs will understandably focus on the immediate consequences for the athletes in this court and that, of course, deserves your attention.

But the Court needs to also ask who else is affected by the relief that is being requested by you? The consequences extend beyond these plaintiffs to other teams, coaches, college athletes and a whole bunch of young athletes who have not yet even had

their first opportunity to compete on the college level. Just a bunch of 17-year-old and 18-year-olds with a dollar and a dream of waking up early, working out as much as they can just to get a shot. Not to get NIL money, just to get a shot.

This case does not require the Court to resolve every issue that modern college athletics will need to figure out. This Court doesn't need to decide every NCAA eligibility question or determine what college sports should look like 10 years from now. It requires the Court to answer one narrower question. Can 16 universities voluntarily establish a reasonable line between collegiate and professional competition and enforce that line equally just among its members? The evidence will show, Judge, that this rule was not written for these plaintiffs, enforced against one university alone or created for this particular litigation. It is a common rule that was adopted in advance by 16 voluntary members and applied accordingly as the same standard across the conference.

So the answer should be clear, Judge, the SEC may draw that line. It should draw that line because there's a bunch of folks in high schools right now who don't have lawyers, who don't get press conferences fighting for them to have an opportunity on college rosters. College rosters are finite, Judge. If people can come back into it, they're taking somebody's spot. Thank you, Judge.

**THE COURT:** Thank you. All right. I believe that's it on the openings. You may begin.

**MR. DOWNTON:** Your Honor, one logistical

question before we begin. Does the Court typically take a lunch break and, if so, what time?

**THE COURT:** No. I don't. Honestly, normally what I do is if it looks like we've been going, I'm like the dad on vacation. I'm trying to get to where we're going by a certain time. But if we need to obviously take compassion breaks, nature breaks, I'll break, you know, because so many people, I'll take 15-minute breaks throughout the day.

**MR. DOWNTON:** Thank you, your Honor.

**MR. CLAYTON:** Judge, can we call our first witness?

**THE COURT:** You may. Go ahead.

**MR. CLAYTON:** We call Commissioner Greg Sankey to the stand.

**THE COURT:** Mr. Sankey, please come forward. When you make your way up to the ramp, please watch your step. I don't want you to fall here. I've seen lawyers actually get tripped up on this one and we're going to swear you in right here.

(The witness was duly sworn.)

**THE COURT:** Come on up, please, sir. Have a seat. Let me ask you, Commissioner, hopefully this doesn't bother you. If it does, let me know and I'll cut it off.

**THE WITNESS:** I noticed in the back.

**MR. WILLIAMS:** Judge, before we begin I just want to make sure does Mr. Clayton represent an SEC athlete?

**MR. CLAYTON:** I represent -- yes. And the second question is I don't have to answer that from him, I'm calling him under 611 and I'm here. I'm

lawfully in this case and I would ask counsel to keep his little comments like that while I do my job.

**MR. WILLIAMS:** Judge, I'm speaking to the Court about it.

**THE COURT:** You got a question as to who is he representing and what is he going to be asking questions about. I think it may be germane if they do come up as it relates to the SEC, you'll be prepared accordingly. But pursuant to the Court's previous ruling, if you find that there was nothing about the SEC as it relates to any of the clients that are not then there you go. You got that answer too.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** Go ahead, Mr. Clayton.

**MR. CLAYTON:** Thank you, Judge. May I proceed?

**THE COURT:** You may.

**G R E G S A N K E Y,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**CROSS-EXAMINATION**

**BY MR. CLAYTON:**

**Q** Give us your name and occupation for the record.

**A** Gregory Sankey and I'm Commissioner of the Southeastern Conference.

**Q** What does Commissioner of the Southeastern Conference do, what do you do?

**A** A lot right now. It's laid out within our Bylaws. We're responsible and I'm at the head of the conference office for scheduling, for example, for communications, academic eligibility, oversight of eligibility. We have championships we conduct. We oversee regular-season competition. Overseeing

programs. I work with our presidents and chancellors and athletic directors on the policies and Bylaws of the conference. So that's an overview. Also in the environment I'm in, I spend a lot of time on government relations and, today, I'm here representing the conference in a court of law.

**Q** Do y'all have the power to adopt rules?

**A** We do.

**Q** I'm going to draw your attention to August 26 of this year. Did you and your member schools get together and adopt a particular rule that restricted these players from playing football or any sports?

**A** We did not on that day, no.

**Q** What date was it?

**A** It predates my joining the SEC. There's been a --

**Q** Mr. Sankey, let me go back to my question if you --

**MR. WILLIAMS:** Judge, he can't cut him off.

**THE COURT:** I'm going to sustain the objection. Mr. Clayton, please if you don't like his answer I'll allow you to reask the question. That's sustained, you can ask a different -- go ahead.

**BY MR. CLAYTON:**

**Q** After the injunction --

**MR. WILLIAMS:** Judge, can the witness finish his answer?

**THE COURT:** I'm going to let him reask the question.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** And then Mr. Sankey can. Go ahead, Mr. Clayton.

**MR. CLAYTON:** Let the record reflect I'm calling this witness under 611 which I get to lead this witness.

**BY MR. CLAYTON:**

**Q** Mr. Sankey, again, did you and your organization and the members of the SEC meet subsequent to an injunction that was granted on August 19, 2026, in this court for and in favor of RJ Luis?

**A** We met on August 25 and 26th.

**Q** Let's talk about August 25 and 26th. What, if anything, did you do on that day?

**A** We gathered to evaluate a strategic framework as we go through changes in college sports. One of the emerging issues is decisions in courts, expectations among our members for compliance with our rules. That strategic framework included how we look at our competition, competitive structures, how we look at the media in the future, how we govern ourselves, how we deal with the organization of the SEC office.

**Q** Mr. Sankey, you said that y'all deal with decisions of the court. And you're under oath, and I need you to tell this judge, did y'all deal with, talk about, ascertain any issue pertaining to an injunction issued by this Court as it relates to the NCAA? That's yes or no and then you can explain.

**MR. WILLIAMS:** Objection, Judge, it's a compound question, it's yes or no for three different questions.

**THE COURT:** Overruled.

**MR. CLAYTON:** Thank you, Judge.

**BY MR. CLAYTON:**

**Q** Answer the question.

**A** Could I ask you to repeat the question just to make sure I'm focused on the proper issue?

**Q** Yes. On August 25 and on the 26th you made the statement that y'all talked about decisions of court. Did you and your organization and the folks, SEC presidents, did y'all talk

about any issues pertaining to an injunction issued by this Court?

A I don't think it was specific to that injunction. I think there were, as I recall, a number of issues happening in courts and we talked about our rules and our expectations common among our membership.

Q What, if anything, did y'all do as a result of that conversation?

A We reaffirmed that we expect our members to comply with the conference Bylaws as they are established and the presidents directed an accountability and oversight policy that would be attached to that.

Q You're finished? So that was August 25?

A 25th and 26th. There were two components. One --

Q Right. So that was after the injunction from Baton Rouge; correct?

A I believe that's correct. Yeah, I'm not familiar with exactly with the date.

Q Let me read this to you and tell me if this is accurate. On August 26, the SEC approved severe sweeping punishment designed to completely deter universities from bypassing pro athletics ban. If a member school rosters a player who signed a professional contract or declared for a pro draft without properly withdrawing, they may face three immediate SEC sanctions: coach suspension, the team head coach is automatically suspended for 50 percent of the season; massive financial fines, the university is stripped of 50 percent of that specific sport's annual operating budget; and third, loss of powers, the school's voting privileges or conference business matters are fully revoked. Was that talked about and acted upon at that meeting?

A That oversight was, yes.

Q And as a result, that oversight was effective because of the Court's ruling; correct?
A No. We, I think the day before, established thresholds for professionalism that have always been part of the rules.
Q But you had a rule, an injunction, from a Baton Rouge judge that said the NCAA could not discriminate and treat these kids arbitrary and capriciously and you and your folks had a meeting subsequent to that injunction, August 19, and you're telling this judge today that y'all only reinforced the rules?
**MR. WILLIAMS:** Objection to the form, Judge.
**THE COURT:** Overruled.
**MR. CLAYTON:** Thank you, Judge. It's going to be hard but I got a long time to go.
**BY MR. CLAYTON:**
Q You and your folks at your discretion had a meeting after the judge issued an injunction to the NCAA not to arbitrarily and be capricious and discriminate against these young athletes, y'all convened a meeting to address that issue; correct?
A We addressed our Bylaw and our commitment among our 16 members.
Q But if the court in Louisiana, a Louisiana judge tells the NCAA not to do it, who are you to call your folks together and say we're reinforcing our rules, which is more powerful? You or the court of law?
**MR. WILLIAMS:** Objection to the form.
**THE COURT:** There's an objection.
**MR. CLAYTON:** I'll rephrase that.
**THE COURT:** All right. Rephrase that. That was sustained.
**BY MR. CLAYTON:**
Q Do you respect Louisiana courts?

**MR. WILLIAMS:** Objection, Judge.

**THE COURT:** Same objection, noted. That will be sustained as well.

**BY MR. CLAYTON:**

Q Why did you think you had to create or adopt this new rule?

**MR. WILLIAMS:** Objection to asking why to the question that you just sustained, Judge, he's going down the same path.

**THE COURT:** I think the form is different --

**MR. CLAYTON:** Judge --

**THE COURT:** Hold on, hold on, let me answer the objection, Mr. Clayton. The form, that's a different one. I'll allow him to be able to ask that question.

**MR. WILLIAMS:** Thank you, Judge.

**BY MR. CLAYTON:**

Q Do you remember that question because I don't, Commissioner?

A I don't.

Q He stopped me.

A I'm trying to track --

**THE COURT:** That's why he's doing it.

**MR. CLAYTON:** That's exactly why he's doing it. And he's not going to stop me.

**BY MR. CLAYTON:**

Q My whole issue with the SEC is when NCAA was prohibited from doing anything to prevent these athletes from exercising their Five-for-Five rule, what did you and your folks get together and say we need to reaffirm our stance, why?

A Because as a conference of 16 member universities, our presidents and chancellors believed it was important to be clear about the expectations of our members to establish fair

competition.
Q Let me show you something. Louisiana has a law. Let me ask you this first. Does the NCAA promulgate rules that you, the SEC, that y'all have to follow?
A It does.
Q When this lawyer stood up before this Court and said that these rules that you guys had predated this Court's injunction; is that accurate?
A Yes.
Q Why did you have to go and reestablish this rule again subsequent to the judge's injunction?
A That was not reestablishing a rule.
Q What was the rule?
A The rule was the same rule before and after. The rule was there when I arrived in 2002.
Q What's the rule?
A That we have a bright line between collegiate participation and participation in professional sports. What was issued in the memo is consistent with the clarity that we understood applies to our 16 universities and a statement that if you have an individual on a roster under that policy, here's the accountability to be applied.
Q What year -- subject to the rules that the NCAA passed in June that students are eligible for their Five-for-Five, they can get a fifth year?
A Are we subject to that rule?
Q Yes. You have to adhere to that NCAA rule.
A Yes, as it moves forward. We voted no on the rule but a majority of the Division I membership adopted the rule.
Q And that changed the whole complexion of this college, this 2022 high school graduates entering freshman, it changed the rules as it applies to those folks; right?

A No, it did not as I understand. It was effective from that point forward for those currently enrolled or enrolling for 26-27.

Q So you're saying the kids that enrolled in 2022, they could come back and play their fifth year; is that what you're saying?

A No. You're asking me about specific dates. I'm not looking for the rule. I understand that part of the contention is the time of enrollment, when does the rule apply. So the rule applied as was adopted on a moving forward basis.

Q So a simple question to you today that when the memo says you adopted a policy to suspend a coach for half a season, to exact severe fines, that was not a rule adopted by your organization on August 25 or 26th?

A That was the direction from presidents to me to exercise my authority as Commissioner to establish fair competition among our 16 member universities.

Q And that happened after August 19; right?

A It did.

Q So if a court has ordered, signed an order that the NCAA cannot effectuate a rule that would prohibit these folks from taking any punitive damage or punitive actions against these kids, why didn't you and the SEC come in and say if they did so, we're going to exact severe punishment, why did you do that when a court prohibited the NCAA from doing it?

A At the beginning of your question, I think two questions ago, you were asking about the five, excuse me, that age-based eligibility model and its effective date. Our statement was about those who've crossed the line to be professional athletes returning to college and seeking roster opportunities and that related to providing fair competition among our 16 member universities and recognizing there are a limited number of

roster spots and those young people not in that category deserve that college opportunity themselves.

Q You familiar with Chambliss, an athlete named Chambliss?

A Not particularly.

Q He may be quarterback for Ole Miss. I'm sure you know who the quarterbacks of the football --

A Chambliss, I'm sorry. I heard you say Chambers.

Q I'm from the south -- you say tomato, I say tomatah. Chambliss.

A I got you.

Q You familiar with him?

A Yes.

Q How many years has he been involved in college sports?

A He secured an additional year of eligibility through the NCAA waiver process.

Q How many years was the question, sir. How many years?

A I don't know off the top of my head.

Q Six. What if I tell you six?

A Okay.

Q Is that fundamentally fair that these kids want a fifth and y'all let him have six?

A As I recall his circumstance, he had a medical condition that prevented him --

Q He had strep throat.

A Let me back up. He had a medical condition that was part of a process that resulted in that year being granted. That's very different --

Q I got an ingrown toenail --

**MR. WILLIAMS:** Objection to him cutting him off, Judge, you got to let him finish.

**THE COURT:** That's sustained. Mr. Clayton, go ahead on, please allow him to finish. Then you can

tell him about the ingrown toenail.

BY MR. CLAYTON:

Q Did you finish?

A I lost track at the ingrown toenail piece.

Q I was trying to make the equivalent to Chambliss. He had strep throat or something like that. He has a sixth year and these kids are trying to get their education, support their families, start their lives and you're saying they can't get a fifth year and Chambliss has six or whatever strep throat or whatever again?

A I can't comment on his medical condition. I'm not certain that's precise.

Q The point I want to make is the discriminatory deal that some kids are treated differently. Let me ask you this. Are you paid?

A I am.

Q How much you get paid?

A I think in the last probably tax return, about $4.8 million a year.

Q 4.8 million. Did you fly here on a private jet to get here?

A I did. I did.

Q You flew on a private jet and you make 4.8 million and you don't want these kids -- that's too harsh --

**MR. WILLIAMS:** Objection, Judge.

**THE COURT:** That's sustained.

**MR. WILLIAMS:** Objection.

**THE COURT:** That's sustained.

**MR. CLAYTON:** Let me back off.

BY MR. CLAYTON:

Q You make 4.8 million, you flew here on a private jet --

**MR. WILLIAMS:** Judge, we lodged an objection.

Nobody needs to go into how much people are making to do what they're doing here today, Judge. I don't think anybody wants that.

**THE COURT:** I don't think a lot of people want to do that either. Look, move on, Mr. Clayton. I'm going to give you one more question.

**MR. CLAYTON:** I want -- the argument, Judge, is kind of hypocritical that he's making 5 million and that these kids want to get paid --

**MR. WILLIAMS:** Judge, this not -- this is not closing arguments.

**THE COURT:** No, but he's laying the foundation to be able to argue it later. This is the thing, I understand, I think I basically understand the argument and the principle where we're going. NIL has changed a lot of things and the opportunity for individuals to be able to make money that has been well pled in the arguments, I believe, that have been put out there. So, again, the point as far as Mr. Sankey being able to make money and all these other folks that are making money and these college athletes who have, at least up until this point, been able to make some money participating, that point is well taken and noted.

**MR. CLAYTON:** Judge, that's my foundation. You sit here and you talk about -- I'm going to get to that. They make a lot of money off the back of these kids but as long as he's making money, they can't make it? I'm going to go back to my question.

**THE COURT:** I'm going to let you ask your question. Go ahead.

**BY MR. CLAYTON:**

Q 4.8 million, how much money -- strike that. Does the NCAA make a lot of money off of these member schools athletics?

**MR. WILLIAMS:** Judge, that is irrelevant to the reason we are here today.

**THE COURT:** And I think he's not the one to answer the question about NCAA, so I'm going to sustain the objection.

**MR. WILLIAMS:** Thank you, Judge.

**BY MR. CLAYTON:**

Q Does the SEC pay NCAA money for being a member of the NCAA?

**MR. WILLIAMS:** Judge, again, that is irrelevant to the purposes of this TRO. We are here for a very specific purpose today.

**THE COURT:** I understand that. That's a different question. I'm going to allow him to be able to answer that one.

**MR. WILLIAMS:** Yes, sir.

A You'll forgive me that somebody does this. There was a time when the dues, I think, paid by a member were $900. That's the last frame of reference I have.

**BY MR. CLAYTON:**

Q Your credibility, you're saying to this Court that y'all get $900 from LSU?

A You asked me for the dues that the Southeast Conference pays to the NCAA.

Q I did not ask dues. Let me rephrase.

A That's what I understood.

Q Let me rephrase it. How much money do y'all make off LSU? How much y'all pay the NCAA?

**MR. WILLIAMS:** Judge, the question how much do y'all make off -- that's completely improper, Judge,

and not relevant.

**THE COURT:** This is what I'm going to do. I'm going to sustain the question because I did hear two different ways, Mr. Clayton. I'm going to give you a second to go ahead and get that question out how you want it, rephrase the question.

**BY MR. CLAYTON:**

Q Does LSU pay money to the NCAA?

A Simply for dues would be my understanding which is that $900 number or something quite nominal.

Q If LSU is on TV, media, does y'all pay the NCAA any money you make off the media?

**MR. WILLIAMS:** Judge, where we going -- objection. This is completely improper for the TRO.

**THE COURT:** Overruled.

**MR. CLAYTON:** Judge, it's hard for you to get in his head. I see I'm renting space in yours.

**BY MR. CLAYTON:**

Q Listen, my question, how much money does LSU pay the NCAA? It's a simple question.

A I provided what I understand is a simple answer.

Q $900.

A There's a dues assessment. That's it to pay. You're asking me what is paid from a campus to the NCAA.

Q There's a young fellow by the name of I think his name is Hudson, are you familiar with this athlete named Hudson?

A Not right now, no.

Q When the NCAA -- when the NCAA is prohibited from doing an act that tells them they cannot discriminate against an athlete because he or she played pro, are you familiar with RJ Luis who plays basketball for LSU?

A I have become, yes.

Q And your order is that players who have dipped their toes in the professional league cannot come back and play college sports, you familiar with that?
A Under specific descriptions, yes.
Q Why don't you juxtapose that to this, 91 this year, 91 professional athletes who played football in Europe are now playing in United States colleges?
A The European definition and being in clubs and what's actually been received has been one of those issues that goes through an evaluation process. As we define in our statement, signing a contract with the NBA or G-League are very specific activities and I don't know the circumstances of each of those, I think you said 91 individuals.
Q Are you telling this Court with a straight face that those folks in Europe that, by the way they've beaten us a couple times in the Olympics, that they're different -- strike that. You can discriminate against a United States citizen and let the pros from England and Africa and India and Ukraine, whatever, come over here and play?

**THE COURT:** Before you answer, there's an objection?

**MR. WILLIAMS:** Yes, Judge, we object to Mr. Clayton's to the form of Mr. Clayton's question with regards to the Commissioner discriminating because these individuals have played in different countries. Object to the form, it is irrelevant to the purposes of this TRO. Maybe a time when this question is relevant, but right now it's not.

**THE COURT:** Sustain the objection --

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** -- as it relates to the form of the question.

**BY MR. CLAYTON:**

**Q** Let's go back to the simple question. You and the rest of you SEC and ACC and Pac-10 and Big 12 whatever, 91 pro players from overseas are playing on our college campuses.

**THE COURT:** There's an objection.

**MR. WILLIAMS:** Objection, Judge, it is interesting but it is improper to ask the Commissioner of the SEC to speak for all of the other commissions, Judge.

**THE COURT:** I appreciate it. That's going to be overruled. I think he can answer that. That question doesn't ask for any analysis or anybody allowed.

**A** I don't know the basis of the definition that they're pro players, those 91. I don't know the circumstances.

**BY MR. CLAYTON:**

**Q** They played pro ball overseas and now and they got paid lots of money and now they're playing in colleges over here, and you nor anyone else prohibited them from playing on the collegiate level?

**MR. WILLIAMS:** Judge, object. Asked and answered, he just didn't like the answer. He answered it, he just doesn't like it.

**MR. CLAYTON:** Judge, can you stop him from talking?

**THE COURT:** Mr. Clayton, Mr. Clayton, please address all your comments to me.

**MR. CLAYTON:** Can he stop the talking objections?

**THE COURT:** I get what you're saying. There's no jury in front of us. It is what it is.

**MR. CLAYTON:** Tell him to stop.

THE COURT: Come on, Mr. Clayton. Stay focused.

MR. CLAYTON: Judge, he's talking and you know what he's doing? He's coaching him to the answer.

THE COURT: Stay focused.

MR. WILLIAMS: Now Mr. Clayton's, bullying me, Judge.

THE COURT: Gentlemen, gentlemen.

MR. CLAYTON: He's coaching.

THE COURT: Gentlemen.

MR. CLAYTON: All right. I'll keep going.

THE COURT: Let's move on.

**BY MR. CLAYTON:**

Q You got to answer the question, the judge said.

THE COURT: I did say he has to answer that question. If you know the answer.

A I don't know the circumstances of those 91 individuals.

**BY MR. CLAYTON:**

Q Let me tell you as an officer of the court, they're playing college ball and that falls in the face of your rule that you adopted on August 25 or 26th that says anyone having any involvement with pro sports cannot play at an SEC school.

A Our statement was more specific than what you're describing.

Q Explain it to me.

A It talked about -- you're asking about basketball, NBA, G-League contracts, roster participation, entering a draft and not withdrawing, those certain circumstances were defined.

Q My point is why do you have 91 pro players playing on the college level, some in your schools, why can they do it and you don't block them?

MR. WILLIAMS: Objection, this is the fifth time around.

**THE COURT:** Overruled. Go ahead before you forget the question, before you forget the answer, go ahead.

A I don't know the circumstances of those 91 players.

**BY MR. CLAYTON:**

Q I'm telling you they played pro ball overseas, trust me with that.

A I -- you're asking me to speak to something that I don't have knowledge of.

Q Let me ask you this. So you don't know the circumstances of that but do you know the circumstances of these kids who did not play in one pro game, trying to come back and get their fifth year that the NCAA said they were entitled to, can you explain that?

A I don't know all of their circumstances.

Q Shouldn't you listen to them before you just arbitrarily say that you're going to punish the coach, punish the school, lose 50 percent of your revenue, shouldn't you at least evaluate and allow these kids an opportunity?

**THE COURT:** There's an objection.

**MR. WILLIAMS:** Objection, Judge, Mr. Clayton has misstated the words of the Commissioner.

**THE COURT:** That's overruled. He's allowed -- he's allowed to treat him somewhat hostile. Overruled. Go ahead.

**BY MR. CLAYTON:**

Q I bet you forget that again.

A I'm not a hostile person but I understand. You asked me about that group of individuals and their circumstance.

Q Yes.

A What our statement spoke to was professionals. I don't know that all of those individuals have that issue present in

their experience.

Q Let me ask this. Assume that I didn't play ball like Jason and the judge but assume I was a ballplayer and I was told in January that my four years are up and I tried for the draft and I didn't make it and then you and the NCAA said, you know what, guys, you can go back and you've got a fifth year, should I be allowed to come back because I didn't know that?

A I certainly did not say that and I don't think that's what the NCAA policy said.

Q You need to explain it to me because I missed the bus on that one. That's what these kids are asking. They were like y'all subsequent to them getting out of college, they passed the rule that allowed folks to get five years. So if they would have stayed, they would've been allowed to play their fifth year, that's why we're here?

A Not necessarily.

Q Tell me why we're here today.

A I'm sorry, that was not about why we're here. That was about your question of had they stayed, they could've played. They would not have had that fifth year as I understand the way the rule is presented. So we're walking into two different issues. Not every issue is about a professional athlete. But we also have the five-year issue and people made decisions, went to pursue their professional career and that becomes one of those dividing lines.

Q And I think the judge gets it. But after that, you created a rule, the NCAA and you followed it that says that you can have your fifth year that now players can five years, no more of that redshirt and all that, you get five years, that's from this point forward; correct?

A Specific to the five-year age-based model from the point it was adopted forward.

Q And then during COVID, you went back four years to allow those players to have an extra year. I did have a son that played ball, so he got a fifth year. That was COVID, right?
A Excuse me, I'm sorry. It was decided during COVID that the unknowns really at this time of year and a worldwide pandemic justified saying if you want to play, we'll respect that opportunity and not deduct a season of eligibility. If you don't, we had, I think, over 400 young people who retained their scholarships but didn't play.
Q Let's go back to when you said that y'all reaffirmed or adopted this rule on August 25 and 26th. Before you did that, did you call the Commissioner of the ACC to ask him what he thought about it?
A I did not.
Q Did you call the Commissioner of the Pac-10 or Big-10?
A Not before, no.
Q Did you call the Commissioner of the Big 12?
A No.
Q So it was just the SEC and you didn't speak with anyone else?
A No, we had a conversation on I think it's Monday, August 24, which produced a statement from our presidents and chancellors unanimously to say that college sports is not the place for returning professional athletes. I think that's included as one of the exhibits and we did that and then some others followed with different policies.
Q And all that was done after this judge issued an injunction against the NCAA prohibiting them from doing so; correct?
A Based on the date you provided, yes, the 24th was after for purposes of the conference rule.
Q One minute. Did you authorize the SEC to sue LSU and

Coach Lane Kiffin?
A That's part of the process with our presidents and chancellors.
Q You get money from these schools to help pay that 4.8 million that you ride around these private jets, don't you?
**MR. WILLIAMS:** Objection to the form, Judge.
**MR. CLAYTON:** I'll move on.
**BY MR. CLAYTON:**
Q You sued folks that paid --
**THE COURT:** Sustained for the record.
**MR. CLAYTON:** I'll move on.
**BY MR. CLAYTON:**
Q You sued LSU, why?
A We established our First Amendment right for freedom of association so that our conference can make decisions and our members can make decisions about membership.
Q They have a First Amendment right of association to finish playing out their college career, talking about my client. You sued your own member schools?
**THE COURT:** There's an objection. Mr. Williams.
**MR. WILLIAMS:** Objection, Judge, asked and answered third time around.
**MR. CLAYTON:** I don't get it. It's not clear to me. I need to ask it again.
**THE COURT:** Overruled for one last time.
**BY MR. CLAYTON:**
Q You sued LSU and one of your coaches?
A I answered that previously.
Q Do you not like LSU?
**MR. WILLIAMS:** Objection, Judge.
**THE COURT:** That' sustained.
**MR. CLAYTON:** No further questions.

**THE COURT:** Thank you, Mr. Clayton. Hold on, Mr. Williams.

**MR. WILLIAMS:** I thought Mr. Clayton covered it all, Judge. I didn't realize it.

**THE COURT:** There's something still there, I suppose.

**MR. DOWNTON:** Your Honor, I'm not familiar with your courtroom. Can I connect to HDMI here or only at the table?

**THE COURT:** So you can connect to HDMI here or you can connect there. Bria, can you assist, please?

**MR. CLAYTON:** Can we take a five-minute break to set up?

**THE COURT:** Hold on one second. The witness is asking for a bottle of water. I'm going to let him go ahead on and get a bottle of water if one of y'all have a bottle of water for him.

What were you asking for, Mr. Clayton?

**MR. CLAYTON:** I was asking for a five-minute break but I wanted to instruct Mr. Williams that his client is under cross, he cannot talk to him.

**THE COURT:** That is correct. What I am going to do is I will go ahead and take that five-minute break.

Commissioner Sankey, you are still under oath. You are not to discuss your testimony with any of the other witnesses, lawyers, et cetera. We will resume back in about five minutes or so after we are connected.

(A recess was taken.)

**THE COURT:** You all may be seated. That's right, I got to wait on my minute clerk. Give me a

second. When she comes back we'll get started. Y'all can have a seat. Once second, guys, again, while I'm still waiting.

**MR. CLAYTON:** We're waiting on some documents about two minutes to bring them up.

**THE COURT:** That's fine. No rush for me.

**MR. CLAYTON:** Judge, can I put something -- well, it'll have to be on the record. While I was cross-examining the Commissioner, I got notice that he just filed suit against LSU with a federal judge to block what you're doing. So he's sitting here under oath --

**MR. WILLIAMS:** Judge, what are we doing right now?

**THE COURT:** He's putting something on the record.

**MR. WILLIAMS:** Judge, it's completely improper and impermissible.

**THE COURT:** I got you. I don't even know what he's asking for yet.

**MR. WILLIAMS:** He's not asking for anything, Judge. He's just trying to control the courtroom and tell the Court what to do. That's improper.

**THE COURT:** Nobody can tell me what to do and you know that, Mr. Williams.

**MR. WILLIAMS:** I know that, Judge. I just don't like him trying.

**THE COURT:** I got you. I appreciate that.

**MR. CLAYTON:** Judge, as I was cross-examining this gentleman, I got notice that they are now suing LSU to prevent, assuming you rule in our face, our favor, to prevent what he's up here --

**THE COURT:** Thank you for letting me know, Mr. Clayton. You said we were still waiting on a couple pieces of paper to be brought up.

**MR. PEPER:** Your Honor, couple of minutes.

**THE COURT:** Okay. No worries, we'll wait.

**MR. DOWNTON:** If your Honor is ready, we can go and then when the paper gets here, I can get there.

**THE COURT:** Whatever is your pleasure. With that being said, we're back on the record, let's go ahead and continue.

**CROSS-EXAMINATION**

**BY MR. DOWNTON:**

**Q** Good morning, Mr. Sankey.

**A** Good morning. Afternoon now actually.

**Q** You filed an affidavit in connection with this proceeding; correct?

**A** I did, yes.

**Q** And I've got it up on the screen, we're working on getting paper copies. I do have one copy, would you like to have the one paper copy I have?

**A** If I could, yes, please.

**MR. DOWNTON:** May I approach, your Honor?

**THE COURT:** You may.

**BY MR. DOWNTON:**

**Q** What's displayed on the screen and what you have is a copy of the affidavit you filed yesterday in this case; correct?

**A** Correct. I'm not certain of the date. I think that's correct.

**Q** I'm not certain either if it was the day before.

**A** I know it was this week.

**Q** These are your words and you declared them under oath; correct?

A Yes.
Q In paragraph 3a, you say that the SEC has not adopted any new bylaws or rules that affect any of the student athletes at issue in this proceeding; correct?
A Correct.
Q And that's accurate?
A Yes.
Q You also say the SEC and NCAA bylaws and rules referenced in paragraph 16 of that affidavit that prohibit professional athletes from returning to college to play sports the, quote, professionalism rules have been in effect for decades; correct?
A Correct.
Q And you've not adopted -- and I'm sorry, I'll back up. If I say you, I'm not talking about you individually as Mr. Greg Sankey unless I specify that. If I say you, I'm talking about the SEC, okay?
A Thank you.
Q The SEC has not adopted any new professionalism rules this year; correct?
A Correct.
Q Let's go down to paragraph 16 and see what rules you reference there. In paragraph 16, you say to maintain eligibility to participate in college athletics, NCAA bylaw 12.2.4, and then you talk about that bylaw. That's not an SEC bylaw, correct, that's an NCAA bylaw?
A As presented there it is then referenced as being incorporated into our bylaws as a conference.
Q We will get to the incorporation. But the words of the bylaw itself are in an NCAA bylaw?
A Correct.
Q And it's an NCAA bylaw governing contracts and compensation; correct?

A Well it's labeled that way, yeah, I'm sorry. The parenthetical reference, correct.
Q It states that a student athlete, quote, shall not enter into any kind of agreement to compete in professional athletics either orally or in writing regardless of the legal enforceability of that agreement; correct?
A Correct.
Q That's the NCAA's Bylaw?
A It is.
Q And you're aware that's one of the Bylaws that this Court enjoined the NCAA from enforcing as to plaintiffs in this case; correct?
A That's my understanding.
Q That is one of the Bylaws that the SEC, after the Court enjoined the NCAA from enforcing, the SEC put out a statement that it intended to enforce that Bylaw because it was incorporated into SEC rules?
A I'm not looking at that statement so I think there's a memo that speaks to that as I described earlier descriptions of what crosses the threshold into professional athletics.
Q We're going to get that memo. But does that memo correctly reflect the NCAA's policy position? Strike that, I'm sorry. Does that memo correctly reflect the SEC's policy position on this matter?
A That memo talked about expectations among our member institutions, all 16, to which they've agreed for the conduct of their athletic competition and I believe it referenced elements of what I just described within that memo from a professional sports standpoint.
Q Let's take a look at your SEC Bylaws. You've also attached them -- or strike that. The SEC attached those Bylaws to its filings with this court; correct?

A Yes, that's correct.

MR. DOWNTON: My hard copies here yet?

MR. PEPER: They are not, Ryan. They are not.

BY MR. DOWNTON:

Q Attached to your declaration, you've got the SEC Bylaws; correct?

A Correct.

Q You can see them on the screen here?

A I do see them.

MR. PEPER: They are, Ryan.

BY MR. DOWNTON:

Q All right. I'll have a hard copy for you in a second. Until then, we're going to have to just rely on the screen.

MR. DOWNTON: Permission to approach, your Honor?

THE COURT: You may.

BY MR. DOWNTON:

Q I'm going to put everything on the screen but if it's easier to read, feel free to turn within the packet. I've handed you what the SEC has filed in this matter that has your, your affidavit attached along with the exhibits including the SEC bylaws. We're going to turn down to Bylaw 14. Bylaw 14.01 is entitled General Principles, you can see on the screen?

A Yes.

Q 14.01.1 says Compliance With Other NCAA and Conference Legislation. Each student athlete of each member institution who competes, or is on the roster of a team that competes in, intercollegiate varsity or junior varsity athletic competition must comply with the Constitution, Bylaws, and other rules, regulations, and legislation in the conference and the NCAA applicable to his or her sport in order to be eligible for athletically related aid, practice, or competition. Did I read

that correctly?
A You did.
Q It's in the SEC Bylaws; correct?
A It is, yes, correct.
Q And all SEC member institutions are required to comply with those Bylaws; correct?
A Correct.
Q If we go down to 14.1, it has General Eligibility Requirements. You can see that?
A Yes.
Q 14.1.1, Regular-season and Postseason Competition. Unless otherwise specified in these Bylaws, regular-season and post season eligibility rules for the Southeastern Conference are the same as the eligibility rules for NCAA championships. Did I read that correctly?
A You did.
Q Is that accurate?
A It is.
Q So unless there's something different in your Bylaws, if an athlete, if one of these plaintiffs is eligible under NCAA rules, they are also eligible to compete in the SEC; correct?
A That is correct.
Q So unless we're dealing with something specific in your Bylaws that is different from the NCAA Manual, if this Court enjoins NCAA from enforcing an NCAA rule, as long as there's not something else in your Bylaws that's different, they are eligible to compete in the SEC; correct?
A I think I understand your question. That's correct, yes.
Q Let's look at the transfer rule. Let's get down to 14.5.5. Section 14.5 on page 17 of the Bylaws concerns transfer regulations; correct?
A Yes.

Q And then 14.5.5 concerns four-year college transfers; right?
A That's correct.
Q And then 14.5.5.1 has to do with transfers within the Southeastern Conference; correct?
A Yes.
Q It says a transfer student including a graduate transfer from a member institution may be eligible for intercollegiate competition during the individual's initial academic year -- I guess I'll read all of it -- in residence or at another member institution provided the student provides written notification of transfer to the institution, and here's the important part, within their sport's regular NCAA transfer window immediately following the sport's championship segment, see NCAA Bylaw 13.1.1.3.1. You can see that?
A Yes.
Q So is it fair to say that the SEC has determined that for a player to transfer from one SEC school to another they must do so within a window prescribed by the NCAA?
A I think more precisely as written here, the transfer window that immediately follows that championship season, that specific window. That's the one the conference has designated for interconference transfer.
Q And they did that based on NCAA Bylaw 13.1.1.3.1; correct?
A It is a different application, that rule is referenced, there have been times when there are multiple transfer windows. So the conference has said specifically with intent that the one that follows or is associated with the end of your championship season is the one that applies for transfers within the conference.
Q There used to be two transfer windows in football; right?
A Fall sports, generally, football being one, correct.

Q Football no longer has two transfer windows; correct?
A Yes, that's right.
Q There was a concern with tampering that if you didn't transfer in the first window, there can be tampering and so the SEC said we're not having a second window?
A The reasons for it are beyond tampering. There was setting roster, preparing one's team, representing to young people early in the year that they're going to be part of a team and have that opportunity, focusing at the end of the academic year was cited rather than being out recruiting in the transfer space, being involved in recruiting during the spring period for high school and incoming student athletes who would be freshman. It was seen as appropriate for the conference and its membership to manage transfers in that manner.
Q And the SEC raised all those issues to the NCAA and the NCAA removed the second transfer portal window for football; correct?
A I'd have to check the legislative history. We operated --
Q Let me do it this way. Yes or no, the second transfer portal window has been removed?
A Has been removed but it was well after we instituted a rule. So we said we're not going to use the second transfer portal for several years while it still existed.
Q But at this time and under these Bylaws, there is one transfer portal window and it is set by the NCAA and the SEC has adopted it?
A I think that's true. It has for football. You asked me about football. I'm familiar with basketball, baseball windows that follow after the regular season. My recollection is there aren't split windows any longer but I haven't gone back and studied each sport.
Q You also know that this Court enjoined the NCAA from

enforcing the transfer portal restriction in its rules as to these plaintiffs; right?
A That's my understanding.
Q And then after this Court enjoined the NCAA from doing that, the SEC put out a statement that its rule, which is entirely derivative of the enjoined NCAA transfer portal rule, was still in effect?
A Well, a student athlete could transfer and play but there's an oversight process that's been established that an institution makes that decision.
Q Right. And if the institution makes that decision to take a player when the Court's enjoined the NCAA from stopping them, the SEC may suspend the coach for half the season or fine the school 50 percent of the school's operating budget for that sport; right?
A I believe that's the statement.
Q When the SEC put out that statement, it was aware of this Court's order prohibiting the NCAA from enforcing that rule; correct?
A That would be yes.
Q When we were looking back at the SEC rules, and you got the paper copy now, the SEC rule on professionalism said it incorporated the NCAA rule through Bylaw 14.01.1; is that correct?
A It doesn't use the word incorporate but it identifies the rules that apply.
Q Let's get the exact words. In paragraph 16 of your declaration, you cite NCAA Bylaw 12.2.4, Contracts and Compensation, and you say in your words, quote, this Bylaw is incorporated by reference and is also effective as an SEC Bylaw pursuant to SEC Bylaw 14.0.1?
A That's correct in that document. Earlier I was looking at

the Bylaw.
Q But you've told this Court that the NCAA Bylaw is incorporated into the SEC Bylaws and is effective pursuant to SEC Bylaw 14.01.1; correct?
A Yes.
Q And we've got Bylaw 14.01.1 on the screen and it says student athletes are going to comply with the rules; right?
A In 1401.1?
Q Yes.
A That would be a shortened version but they must meet those standards as part of our conference expectation among our 16 universities.
Q All of the standards in the 500 pages of the NCAA Manual; correct?
A This one's specific to eligibility and then, as you note, right below that we have more specific and our own specific policies as well as in Bylaw 14, excuse me, 14-1.
Q And 14.01.1 doesn't say anything about professionalism, does it?
A It reflects on the Bylaw, but does not there.
Q Doesn't say anything about signing contracts with professional teams?
A Not in that paragraph.
Q Doesn't say anything about NCAA Bylaw 12.2.4?
A Not in Bylaw 1401.
Q But Bylaw 14.01 is what the conference is using to say we are not bound by this Court's ruling enjoining NCAA Bylaw 12.2.4 concerning professionalism; correct?
A The conference is saying among our 16 member institutions, they've agreed to the standards. They've agreed to those standards.
Q You said you didn't create any new rules; correct?

A Correct.
Q So the only rule you have to enforce is not an SEC rule, it's an NCAA rule, isn't it?
A Student athlete could be eligible to play. What we have said is we have expectations among our member universities and it was not a new rule, it was a direction on how accountability would be applied because we have agreed to that common template for competition among our 16.
Q But you don't have separate rules on competition, do you? Outside of the Bylaws.
A We have the separate rules that are presented here. We have this rule specifically.
Q You have the SEC Bylaws and if something is not, if something is in the SEC Bylaws different from the NCAA, you go to your Bylaw; correct?
A We go together.
Q If your Bylaw is silent on an issue, we looked at earlier, the default is whatever the NCAA says; correct?
A Among our universities as specified.
Q Right, that's what 14.1.1 says. Unless otherwise specified in these Bylaws, eligibility for the SEC is the same as eligibility for the NCAA; correct?
A That's what our members have said among the 16, that is the standard.
Q And the SEC has no separate Bylaw governing professionalism; correct?
A That's correct.
Q So when the SEC found out that the NCAA's Bylaw on professionalism had been enjoined, it put out a statement that it was going to enforce long-standing rules about professionalism; correct?
A There's a lot in the memo. It identified the common

expectations among our member universities.
Q But as far as the actual black and white text of any rule, it's the NCAA's rules?
A We've restated those for our purposes to make clear the definitions that apply.
Q You restated them after this Court enjoined the NCAA from enforcing them?
A It was the dates I referenced earlier.
Q Your Bylaws don't contain any specified punishments, the information you put out regarding punishments you said you did in your discretion as Commissioner; correct?
A That was direction from our presidents and chancellors under my authority as Commissioner.
Q It's not something that's in the Bylaws, those punishments of a 50 percent fine or a 50 percent suspension, those were determined in your discretion or were those directed from the presidents and chancellors?
A We communicated those were directed from the presidents and chancellors.
Q Do they vote on this?
A Yes.
Q You said the vote was 15 to 0 with one abstention?
A On that oversight process, yes.
Q Including the penalties?
A There's a vote on the standard of professionalism that was 16-0. The accountability measure is built in with the 15-0-1 vote.
Q I think you said earlier the SEC voted no on the rule change to Five-for-Five?
A That's correct. Our representatives did.
Q Are you aware the NCAA's been representing that was a unanimous vote?

A I have because on the rule after the emergency piece was voted upon, that's where we said no from a timing standpoint. That vote then became yes on the overall principle because that's what was left. And the direction on the age-based eligibility model was the view that things are changing around us, how does NCAA adapt. The emergency effective date was where the no vote was applied to be clear.
Q Even though the SEC voted no, once it passed, the SEC was still bound by the rule as written by the NCAA; correct?
A We've not altered anything from that rule.
Q As of today, the NCAA is -- strike that. As of today, the SEC is bound by the rule as written in the NCAA Manual?
A We've not provided any different rule, we've not considered that, no.
Q I understand you haven't looked at anything different. I'm just trying to make sure that at this point the SEC's position is it is bound by the NCAA Five-for-Five rule as written in the Manual?
A That's the rule that would apply. You asked about bound which, just to be clear, my perspective is could our membership come back and say something different? They could. So right now, I would suggest that applies in response to your question. I'm trying to be helpful in that but maybe too helpful.
Q I understand what you're saying. Let me see if I understand. You're saying right now our Bylaws say, unless we say otherwise, we follow NCAA rules; correct?
A In some certain particular circumstances, yeah.
Q With respect to eligibility?
A You can see how that plays out. Let me go back to your question about the age-based, yeah, that's the rule that applies. We haven't changed anything. My attempt to be helpful failed miserably there, did it not?

Q I think I get it. You're saying you're following those rules now, but you're reserving the right to change your Bylaws and go a different direction?
A You used the word bound. Could we make a different decision some day? Sure. Am I predicting one for you? No. I don't know if that brings to conclusion my attempt to be helpful in the answer.
Q You are a lawyer by training?
A No, I'm not.
Q But you do recognize how words have meaning either on a paper or in a court and you want to be precise with your words as much as possible?
A I was trying to be helpful as I confessed.
Q I think earlier you said I think this was you that private associations do not get to selectively apply their rules. Was that something you said or was that something your lawyer said?
A I think that was in the presentation from counsel.
Q Okay. I won't ask you about your counsel's comments. The SEC voted against Five-for-Five originally. How long has the SEC been aware that the NCAA was thinking about moving to a Five-for-Five platform?
A That's a good question. It would be several years based on comments made by the NCAA president. If you look back in time though, the five-year eligibility model has been considered several times in the '90s. I think once about 2006, 2007 and it did not advance at that time.
Q Was the SEC involved in discussions this spring around the Five-for-Five model?
A We did not spend a great deal of time in conference meetings if that's the question. Our representatives to NCAA committees would have been, no doubt, involved in those conversations.

Q Do you have an understanding as to what the current rule is with respect to Five-for-Five?
A I don't know the technical aspect. It's been a while since I read it. It relates to an effective date and it's, I think, described as age-based, age-based eligibility model.
Q Effective date of August 1, 2026?
A I'm not looking at it. So you're going to have to forgive me. I'm not disputing that. You can certainly determine that from the documents.
Q We'll pull it up in a couple minutes so we can be looking at it together. Let's finish a little on the professionalism rules and where the SEC is or is not on that issue. Are you a girl dad? You are, right?
A I'm sorry, what?
Q A girl dad. Have you ever heard that term?
A I have two daughters.
Q You're a girl dad.
A I will accept the label then. I didn't see that one coming.
Q I'm a girl dad too.
A I have to be honest with you.
Q Any of your daughters play sports?
A At the high school level.
Q They enjoyed that experience?
A I think most of the time.
Q I noticed when you guys put out your memo it's not really a memo, you put out a one-page statement on professionalism. Do you recall that?
A The 25th-26th timeframe?
Q Yeah.
A Yeah, I think it was front and back. And there was a statement on the 24th, couple statements.

Q Let's look at this paper copy, page 8 of the document that the SEC filed.
A That's the legal-size paper?
Q Yes. I've got it up on the screen too, are you able to see it either on paper or on the screen?
A Yes.
Q I think this was August 25. The SEC said following meetings with presidents, chancellors, and athletic directors of the Southeastern Conference, the SEC will enforce the following policy. You can see that?
A I do, yes.
Q This policy is not in the SEC Bylaws, is it?
A It is not. Those words are not, no.
Q The only basis for saying this is not a new policy is the SEC's position that SEC Bylaw 14 point something point something incorporates the NCAA's rules and the NCAA has rules against professionalism; correct?
A The long-standing line between professional sports and college sports participation is the basis for that.
Q So you stated on August 25, an SEC institution is not permitted to have an athlete on its roster who is, one, previously declared for the NFL, NBA, or WNBA draft and did not appropriately withdraw; correct?
A Yes.
Q So you're not talking about people whose eligibility expired and so the leagues automatically consider them draftable. Here, you're talking about underclassmen who leave early; right?
A Yeah, that's correct.
Q None of the plaintiffs in this case left early so we're going to keep going past that one. Number two, signed a contract with an NFL or other professional football league,

NBA, G-League, or WNBA, or affiliate team. Do you see that?
A I do.
Q So and again this is not in an SEC Bylaw; correct?
A That presentation, no. Again, we talked about the incorporation piece.
Q So does that mean the SEC has no issue with someone who has signed a women's soccer contract?
A In the memo issued the next day because all of this is new, the notion that we're talking about professional athletes returning to college requires a level of research and understanding that we've not been asked before. So the next day, the memo assigned the task of digging in in other sports to understand where that similar professionalism line would be crossed.
Q Has the SEC reached a conclusion?
A Not at this time. We obviously have some legal issues for which we've been attentive.
Q You know there are plaintiffs in this case who signed contracts in sports other than football or men's basketball or women's basketball?
A I'm learning that, yes.
Q So as of today, are you telling me the SEC has no position as to whether it is going to try to stop them from playing if this Court enjoins the NCAA's professionalism rules?
A I'll go back to say we've been assigned the task to research and understand what leagues would cross the professionalism threshold because I did not start my year thinking I would be dealing with what is and what is not a professional athlete in a soccer league in particular. And, again, on the day following this statement, the assignment was made to do the work to determine where that threshold may be crossed.

Q Right. I understand that. But what I'm concerned about is what we're asking the Court to order or not order here and it sounds like the SEC is still trying to reserve the right to prevent professional women's soccer players, softball players, lacrosse players, you're reserving the right to decide whether they can play or not if they previously signed a professional contract in any of those sports; correct?
A The Southeastern Conference is trying to recognize that there's a historical difference between playing in a professional league in a professional sport and being a college athlete on a continuing basis. That's the assignment. I say that respectfully, this is new. These are about roster opportunities that are limited and I'm equally concerned about young people having the opportunity to enter and participate on our teams or not lose roster spots late in the process that they thought would be available.
Q Sounds like you're saying at this point you don't know.
A We're certainly learning.
Q But sitting here today, you cannot answer the question as to whether the SEC will object to any of these athletes from playing in the SEC because they signed a contract in a sport other than football or men's basketball?
A I'm telling you we've been assigned that task.
Q Is there a monetary threshold?
A That's work.
Q You've added G-League guys in here. Up until this year -- well, strike that. You're aware last year the NCAA let a lot of former G-League players in?
A I'm aware of some.
Q Are you aware the NCAA has testified that its Bylaws surrounding formal professionals have not changed in half a dozen years?

A I don't know what they've testified to.
Q We'll put the transcripts in -- I understand that no one from the NCAA is here to talk to the Court today.
A I appreciate that. I think part of my presence here is these are times of change. And as I said before, I think the line between professionalism and being part of a college program remains important and certainly our member universities feel that way.
Q Would it surprise you if the NCAA has previously testified the rules surrounding professionalism have not changed, just how they're interpreted and applied has had to change with the times. Is that consistent with what you're saying?
A I don't know what they've said, but there have been changes over time.
Q So for instance, I think it was last year the NCAA allowed a former G-League player who had gotten a $1.1 million contract for two years of professional basketball in the G-League, they let him come back to college after that. You're aware of that?
A I don't know who that is. I know that they've had some G-League waivers that I consider highly disappointing but I don't know the specific monetary reality or the nature of the agreement.
Q And the SEC has not refused to play against or allow to play in conference any of those former G-League players; correct?
A They refuse to play against, I don't know if we've played against anyone. I just don't know the individuals of which you speak. There was an order involving a former G-League player relating to our league. As quickly as I possibly could, I submitted an affidavit objecting to that and ultimately that order was concluded.
Q I'm not talking about legal proceedings. I'm just talking

about when the NCAA voluntarily let former G-League players in.

A I'm not an expert on everything the NCAA has done. I know there are some of those out there and I know how I've reacted.

Q Is it fair to say that the SEC has never excluded a former G-League player that the NCAA allowed in?

A Again I speak to circumstance last year that was the first one I encountered with a former G-League player seeking to return and objected and submitted an affidavit to that point and eventually that order stopped and the young man did not play any longer.

Q You're talking about is this Mr. Bediako?

A Yes.

Q You're talking about a player the NCAA said he could not come back and then he went to court and got an order and then that was reversed?

A Correct. Correct.

Q I'm not talking about him. I'm talking about all of the players that the NCAA voluntarily let in.

A I've had concerns about those. I don't know specifically those of whom you speak. There was an issue with a Baylor player and the NCAA has to speak to their determination of that individual's eligibility since I did not make that decision.

Q You're talking about Mr. Nnaji who played four years professionally including in leagues in Turkey and Spain, was in the NBA draft and then the NCAA decided he got four years of college eligibility starting this last year even though he had played four years professionally, that's who -- the Baylor player?

A I'm not an expert on the circumstance. I know the generalities.

Q Let's look at another one. London Johnson.

**MR. DOWNTON:** Your Honor, I'm not sure what's

happened to our overhead screen. We were trying to switch to the Elmo since it wasn't working here. I'm happy to stay with the computer. It went dark.

**BY MR. DOWNTON:**

Q I understand this is not an SEC player but you've heard about Mr. Johnson?

A I don't know the specifics.

**MR. WILLIAMS:** Judge, given the foundation that it's not an SEC school, we would object to questioning the SEC Commissioner about this player and whatever the fallout was from there.

**THE COURT:** Overruled. And the only reason why I'm overruling it is because of Commissioner Sankey's previous answer in acknowledging that nobody is here from the NCAA and he did acknowledge that he could potentially answer some of those questions. To the extent of what he knows, I'll allow him to answer. But your objection is noted but overruled.

**MR. WILLIAMS:** Thank you, Judge.

**BY MR. DOWNTON:**

Q Louisville plays Kentucky every year in basketball; right?

A Yeah, they do, yes.

Q This guy went to Louisville, so he played an SEC school; correct?

A I don't know that he did. The article, again, I don't know the circumstances, it's dated January 10. That game is typically in December, November or December.

Q That's fair. Can you see there were it says Mr. Johnson signed a two-year G-League contract out of high school, 1.1 million?

A I do see that presented there.

Q In another one of these hearings --

**MR. WILLIAMS:** Judge, I'm just going to lodge an objection as to impermissible and unnecessary hearsay as it does not relate to the SEC.

**THE COURT:** Overruled. I think there was a question about does the SEC refusing to play against those schools that are allowing people, so again, I caught that earlier. Overruled.

**MR. WILLIAMS:** Yes, your Honor.

**THE COURT:** Go ahead.

**BY MR. DOWNTON:**

**Q** The SEC has not told any schools not to play against schools playing Mr. Johnson; correct?

**A** I don't know about Mr. Johnson in January and February. I don't think we would've been playing them.

**Q** Let me ask it a lot more broadly. Has the SEC ever directed any of its schools not to play a school that has a former G-League player on it?

**A** Schools can make those decisions, the Conference has not directed the group approach outside the league.

**Q** The conference, up until this summer, the conference had never told its schools you cannot roster a former G-League player; correct?

**A** No, that's incorrect actually. When the Bediako situation arose, I was very clear about the problems introduced and, again, objected to that and told the school that I was adverse to the position being advocated in that case.

**Q** Sorry. Before Bediako. When the NCAA began allowing G-League players to play in the NCAA, the SEC did not change its Bylaws to say we're following NCAA Bylaws and eligibility except no G-League players for us?

**A** I objected directly when I learned of the circumstance that seemed problematic, but did I submit some rule change

nationally? Did the conference do that?
Q I'm not asking nationally. I'm asking about the SEC Bylaws, you didn't amend them, did you?
A No.
Q Do you know Mr. Vaughn for the NCAA, I'm going to represent to you what he testified in a previous hearing and get your thoughts on it. He said that some of our schools now pay players over $1 million a year. So how can we hold it against another player that he was paid $1 million before he wanted to come to school. Would that surprise you if Mr. Vaughn of the NCAA testified to that when he was explaining how the professionalism rules have not changed but the interpretation and application of them have changed?

**MR. WILLIAMS:** Judge, I would lodge an objection. It's improper to ask his opinion of that statement.

**THE COURT:** If he knows.

**MR. WILLIAMS:** What weight does it have with regards to the TRO, Judge?

**THE COURT:** I'll give it the weight that I think it deserves. Thank you, Mr. Williams.

**MR. WILLIAMS:** Thank you, Judge.

**MR. ASKEW:** Your Honor, just from the NCAA's perspective to put that quote into context that was discussing professional participation prior to enrollment.

**THE COURT:** I appreciate it. What I'll do is I'll allow you to be able to clean it up as much as you see necessary on your direct examination.

**BY MR. DOWNTON:**
Q Is it your understanding that the NCAA has adjusted its interpretation of the professionalism rules due to the fact

that schools can now pay players directly such that it a $1.1 million contract in the G-League someone can still come back to school?
A I don't know the basis for the quote from Mr. Vaughn and what that relates to. I've expressed concern when I learned of waivers with which I disagree.
Q You've expressed concern but have not actually changed SEC rules?
A We engaged and had something within our league as I described before.
Q Is it fair to say that the SEC rules are as set forth in the SEC Bylaws?
A Yes.
Q And athletes can rely on the text of the SEC Bylaws?
A Yes.
Q Same true for the NCAA and your understanding as SEC Commissioner, is it true that NCAA rules are set forth in NCAA Division I Manual?
A Yes.
Q And the SEC incorporates that Manual into its own policies except where the SEC says we're doing something different?
A It does as designated through our Manual.
Q So both the SEC and the athlete should be able to rely on the actual written words in the NCAA Manual?
A Yes.
Q You believe those words should be applied equitably to all athletes; correct?
A To the extent possible recognizing there are interpretations and applications that take place in waivers.
Q With the new five-year rule, you understand there are to be no more waivers; correct?
A That was one of the talking points communicated to support

the change.
Q Are you familiar with the Protect College Sports Act?
A I am.
Q SEC's supporting that; correct?
A We have. It's not a unanimous vote but the majority of our membership has indicated support for that legislation.
Q I'm sorry, I'm going to back up and get one thing I missed before we get to that. Did you previously sign a letter on behalf of NCAA along with the commissioners of the ACC, Big 12, Big Ten, PAC-12 and Big East to be filed in eligibility proceedings?
A Yes, I think, I'd have to see it to make sure. I'm assuming you're looking at my signature. Thank you.
**MR. DOWNTON:** Your Honor, we haven't even talked about exhibits today. In other cases with the NCAA in these matters, we've generally stipulated that if something, that as this is a preliminary injunction, you can consider hearsay and we've just generally said it all comes in. You guys up for that today too or something different?
**MR. ASKEW:** I'm sorry, what's the question?
**THE COURT:** The request was as it relates to the exhibits. Are they going to be any general objections being that hearsay is allowed, et cetera, you tell me as far as these exhibits because there's a lot of documents that we're talking about going back and forth.
**MR. ASKEW:** Not from the NCAA, your Honor. We just ask that your Honor recognize they're hearsay and ascribe whatever weight you want to.
**THE COURT:** You already know my answer to that.
**MR. WILLIAMS:** We agree, Judge.

THE COURT: All right. Sounds nice and easy.

MR. DOWNTON: And, so, your Honor, give that we're going electronic and paper, I'd ask if I can submit all at the end?

THE COURT: Just supplement. You can all do that. Just supplement and make sure we get them all at the end for whatever reviewing body after this is done.

BY MR. DOWNTON:

Q Mr. Sankey, did you get to look at the letter in front of you?

A I started through the first two pages quickly but I've not reviewed it.

Q Is it your signature on the last page?

A That is.

Q Page 3, paragraph 6, it says representatives from our conference were heavily involved in the D-1 Cabinet's extensive process for developing and thinking through the age-based model. So was a representative from the SEC heavily involved in the D-1 Cabinet's process for developing the age-based model?

A Certainly involved.

Q At this point, the SEC is following the NCAA's age-based model in all respects; correct?

A Correct. In respect to that specific rule.

Q So if this Court entered an injunction against the NCAA in connection with any part of that rule, an additional injunction against the SEC would not be necessary because you're following whatever the NCAA does there; correct?

A On that specific issue.

Q With professionalism, you would say even though there's not a rule in your Bylaws about professionalism, you think if

the Court wanted to stop you from enforcing a professionalism rule, it can't just enjoin the NCAA, it needs to enjoin the SEC as well?

A I'm not a legal expert but we made clear the expectation among our 16 universities in that regard.

Q And have you communicated to the 16 universities an expectation that they will comply with court orders?

A I think they understand that reality.

Q Are you aware that a few days ago the University of Georgia told an athlete they would not put his name in the transfer portal when a court order had enjoined both the NCAA and SEC from transfer portal rules and ordered the portal opened for that player?

A I haven't heard from Georgia about that. I'd heard some conversation, I can't tell you the specifics.

Q I don't want you to tell me about your conversations with your lawyers but you know your lawyers are aware of that situation; correct?

A I had a conversation about a Georgia athlete. I don't know how much detail you provided that syncs up with that conversation.

Q Have you done anything to -- so you're aware Georgia said we don't have to follow that order?

A I'm not aware of that specifically.

Q I don't know why I can't get it on the screen so I'm not going to show it to you. Is it the SEC's position that if the SEC is enjoined, that its schools have to follow the court orders against the SEC?

A We stated back that we will follow court orders. I think you may have reached out -- I'm sorry, we were asked that in two circumstances Friday. I got a lot of publicity. But our schools also want to be able to exercise their rights and so I

can't speak for all of them but certainly will follow the court order as issued appropriately where it applies.
Q So your schools believe they can ignore court orders if they're not a named defendant in the case?
A I'm not the attorney to evaluate that. I have legal counsel to advise on that but I'm not going to speak particularly for the schools in that regard.
Q I'd like your understanding as an SEC Commissioner as to whether you believe your schools have to follow court orders against the SEC?
A Very much we will work with our attorneys to make sure that we're not out of sync.
Q So when a court ordered the transfer portal opened for seven days for an athlete -- strike that. Do SEC football rosters lock the day before the first game?
A Yes.
Q Is that for the season?
A Yes, as I understand. I think that's national, I'm sorry. I apologize.
Q So can you see a problem when a court enjoins the SEC and the NCAA from enforcing transfer rules and orders the portal opened and the University of Georgia takes it upon themself to say that court order doesn't apply to us we refuse to put your name in the portal and rosters locked in two days?
A I can't speak to the basis for what Georgia has said.
Q And you can't tell me if the SEC has taken any steps to require Georgia to comply with that court order?
A Not that I'm aware of. I think that's being done, those conversations would be on a campus. We've made clear our intent to follow the court orders as they apply to our universities or our conference.
Q That player's name is Jacori Thomas.

A Okay.
Q So I'd ask you to please look at that if you have not. Let's go back to the College Sports Act. College Sports Act is really long. High level, can you tell the Court what's going on? Or if that's too broad a question let me know, I'll try to --
A I think it's a hundred, well, at one time it was 111 pages. I'm not sure the court wants me to describe all of those. There's three pieces to it. One on administrative issues, it covers eligibility, transfers, student athlete support. Second that covers media rights, conference memberships. Third, it's about funding for HBCU infrastructure as I recall. That was newly added in, I think, August.
Q And the SEC has been working with the other conferences, the NCAA, Congress, other constituencies for some time to try to find something that everyone can agree on and can pass and become law; --
A That's --
Q -- is that fair?
A I'm sorry. That's fair.
Q With this particular bill, the SEC was not originally on board but as of -- when did you guys first publicly support this?
A Friday, July 31, I think was the date.
Q Do you know why on that particular day you came out in favor of it?
A A lot of videoconferences, phone calls back and forth, some adjustments made to the legislation in the Title 1 and Title 2 areas specifically. Ultimately, our presidents and chancellors voted by majority to support the legislation as it was written at that time.
Q Did they vote that evening by teleconference?

A We were on a video conference that evening.
Q Earlier that day, a court in Tennessee had entered an eligibility injunction against the NCAA and a court in Colorado had issued a nationwide injunction against the NCAA on eligibility; correct?
A I'm not as familiar with the Tennessee circumstance. I know there was a decision out of a Colorado court, correct.
Q I don't want to go through the whole bill for you. But I do want to look at Section 113 which is on eligibility to participate in intercollegiate sports. Section B states Years of Eligibility. In general, subject to paragraph 2, a student athlete is eligible to compete in intercollegiate competition for Division 1 or Division II institution as defined by the NCAA, or its successor, for a maximum of five calendar years beginning on whichever occurs first, and I'm going to pause there.
This is the provision, this is the provision that the SEC supports to become law that would give athletes five years of eligibility as long as they fall under these circumstances; correct?
A I think it's important to be clear the scope of the bill is what was supported. And this is in the bill, to respond to your question.
Q Do you oppose this provision?
A Do I?
Q Does the SEC?
A We have not.
Q So the provision says you get five years beginning on which occurs first, either the academic year following your 19th birthday. Basically when you turn 19. Or the date the athlete enrolls full-time at a school; correct?
A Yes.

Q So as long as an athlete is within five years of turning 19 or five years of enrolling in school, if this bill becomes law, they are eligible; correct?
A If, yes, correct.
Q If the bill becomes law.
A Under that, yeah.
Q And if the bill became law with immediate effectiveness, all of these athletes who are within five calendar, five years of their 19th birthday and five years of starting school, they would be immediately eligible; correct?
A I think the if at the beginning respectfully is a big if because who knows whether it will advance or not and then the House and back and forth. So there's plenty of work to be done.
Q Certainly a big if. But under this language, if that happens, those athletes would become eligible as of the effective date of the bill?
A Again, this is going to be too helpful. We've tried to understand effective dates and application and when it comes on and there's a lot in the bill as I said, 111 pages. So I would expect there's some answers that need to be given on when the effective date and the legislation becoming applicable. I've asked but I don't have that expertise. I can't tell you that answer.
Q At this point, it doesn't -- you just don't know if this bill is going to pass and you don't know if it does, when it would be effective?
A Correct.
Q But if it passed and if it was effective, all of the athletes within five years of their 19th birthday and five years enrolling in school would be eligible?
A Two big ifs, but as presented.

Q All of these plaintiffs here today, all of these athletes, you understand they're still all within five years of their 19th birthday and five years of enrolling in school; correct?
A I don't know them all.
Q You understand that's the theory of their claim?
A I do understand that reality.
Q Earlier I think you referenced something about a rule applying at the time of enrollment. If you change your SEC Bylaws while an athlete is enrolled, do the new Bylaws apply to that athlete for the next year?
A It's typically defined within the Bylaw change itself, a phrase like enrolling on or after a particular date.
Q So if you have that phrase there's a limitation as to who the Bylaw applies to and if you don't have that limitation, the Bylaw applies to everybody?
A I'd have to see the effective date but that phrasing I've seen before. You asked me about how things would apply. It would depend on how the rule or the Bylaw was actually structured. But that's one way it's dealt with.
Q And if a Bylaw doesn't -- well, Bylaws are effective as of their effective date, that's kind of a tautology; right?
A Yes. Can I just ask, are we talking about the Protect College Sports Act or something?
Q Sorry, I moved off the Protect College Sports Act. Now I'm just in the SEC Bylaws and the NCAA Bylaws to the extent you've got an understanding of them as you Commissioner of the SEC.
A Okay.
Q So both your Bylaws and the NCAA Bylaws generally have effective dates for each Bylaw; correct?
A Yes.
Q And as a general rule a Bylaw is effective for everyone as

of the effective date unless there is a limitation. For instance, you said they might say it only applies to athletes enrolling after a certain date?

A Or within the body. It could be if my recollection, I'm not studying Bylaws every day in my current role like I might have 20 years ago, but in the Bylaw and the effective date explanation itself.

Q If there is nothing in the Bylaw itself and there is no limitation based on enrollment as you described, then the presumption is the Bylaw applies to everyone?

**MR. ASKEW:** Your Honor, I might object to this one. I think we're talking about contract interpretation. He's already testified he's not an attorney and how Bylaws work.

**THE COURT:** I understand. Objection calls for legal conclusion. However, I will allow it giving it the weight that I think the Commissioner is allowed to be able to say to what his understanding is.

**MR. ASKEW:** I appreciate that, your Honor.

**MR. CLAYTON:** Judge, they get two bites, that's Mr. -- whatever his name -- Williams' client, and then he gets up for the NCAA and objects.

**THE COURT:** You're right. You're right. I actually forgot about that. I got so many lawyers in here.

**MR. CLAYTON:** I'm going to remind you.

**THE COURT:** I appreciate the reminder. Gentlemen, let's try to stick to the rules. I know that was a big question as it related to because we've been going back and forth how the SEC applies NCAA eligibility rules. So as we move forward, guys, let's see if we can remind ourselves of that.

**MR. ASKEW:** Your Honor, just so I don't step on any toes, would you like me to just remain seated for the remainder of this witness and leave the objections.

**MR. CLAYTON:** I would.

**MR. ASKEW:** Just so we know who's talking.

**THE COURT:** That's fine.

**BY MR. DOWNTON:**

Q I'm trying to remember where we were. I think I was asking about don't give me a legal conclusion because that's not what you're here for. You're just here in your role as SEC Commissioner. Is it your understanding as SEC Commissioner that if a Bylaw does not contain any limitation as to a class of persons that it applies to everyone?

A It would be helpful to see the Bylaw because I don't, a moment ago I was thinking about the Protect College Sports Act effective date, you'll just have to forgive me.

Q Sure. I'm going to put a page of the NCAA Manual up on the screen. I pretty much picked this at random. It says, Determination of Freshman Eligibility. And then it's got a section, Participation Prior to Certification. I don't know what this section's about, it doesn't really matter. What I picked it is because down below it's got dates. It says when it was revised, you can see those dates?

A Yes. There's kind of a partial -- part of the screen, so I'm not able to see the full page.

Q Do we have a way to just make --

**THE COURT:** Thanks, Bria. I know we don't usually use Elmos anymore.

**BY MR. DOWNTON:**

Q So we're just looking at 14.3.4.1 and at the end it's got dates it was revised, you can see that?

A Yes, I'm sorry.
Q So it was revised in January 2000 -- January 1989, and again in October 2005, May 2007, September 2007, you can see those dates; correct?
A Yes.
Q Then it was amended January 15, 2011, but that change wasn't effective until August 2011. You can see that?
A I see those grouped together. Having done this stuff, things get written in rationale and respectfully, I see that. I don't want to say that that's absolutely correct because I'm not looking at what was presented to the group that decided.
Q And I'm not using this for any purpose other than just getting an understanding of how the Bylaws are presented. You've got a Bylaw that's presented and then it gives you the dates it was revised and if a Bylaw was not going to be effective on the date it was revised, it gives you the effective date; right?
A I would believe so. Again, the actual legislative proposal would be helpful. But let's just say it's in there. I get what you're saying.
Q What counts is what actually makes it into the Manual; right?
A Not generally but -- again, there's a lot of legislative text in a proposal. I'm actually -- I'll stop being helpful, how's that. This would appear to have been voted on January 15, 2011. I may have been in the room. And it says it went into effect August 1, 2011.
Q I have a feeling that that comment is going to be on social media today.
A As you can imagine, there's a bit on social media in my world. Turn all your filters on.
Q The set of the Bylaws, they're generally effective on the

revision date. If they're going to be effective later, it tells us when they'll be effective in the Bylaw; correct?
A Yeah. I'm trying to figure out why it's presented that way, but I'm not disagreeing.
Q You may have another limitation I'd like you mention. So up at that top one, 14.3.3, the last line it says effective 8-1-16 for student athletes initially enrolling on or after 8-1-16.
A Right.
Q So it does not apply to people who enrolled before that date, only people enrolled after 8-1-16?
A That would be my understanding of that presentation.
Q That's something you see throughout the NCAA's Bylaws, it's not just this one place, right?
A Yeah. There are different words but a lot of dates.
Q You said there's a lot in legislative proposals but eventually the legislative proposals need to get down to actual language of Bylaw text that is voted on, approved and binding on the NCAA; correct?
A Yes.
Q That language is expressed in what they call the Division I Manual; correct?
A Yes.
Q A new one comes out every year?
A Yes, I think that's right. With technology, it's updated more frequently.
Q For an athlete to compete in the SEC and the NCAA, they have to sign off on the Manual; correct?
A The athlete, I don't think they sign off. The rules, whether it's those from our Manual that our conference has adopted or the NCAA, would apply.
Q To be clear, the athletes don't get a choice, they just

acknowledge these are the rules?
A I think the answer is yes. You're asking me is there some formal process. There's the rules that apply to establish eligibility.
Q And you don't know if the NCAA requires athletes to sign a statement each year --
A Yeah, there's a student athlete statement that's signed. It's not the Manual though.
Q Is it fair for athletes to rely on the words printed in the Manual?
A Yes.
Q The new Manual went into effect August 1, 2026; correct?
A Just like these Bylaws, I'm not looking at NCAA Manual, so there's usually every August in my experience. It doesn't necessarily come to me that much. There's an NCAA Manual produced. I don't think I have a new one yet, so we're September.
Q We've got the new one. We just got it and that's what I want to show you. You understand that the Five-for-Five proposal that was approved in June is now part of the new Manual; correct?
A I've not seen it. I presume I'm about to see it.
Q You can see on the screen the 2026-27 Manual?
A Yeah.
Q We'll put the whole one into evidence electronically for the judge, it's 500-something pages, we will not print it.
**THE COURT:** I've got 25-26 Manual.
**BY MR. DOWNTON:**
Q Let's take a look at Bylaw 12.6. We can sort of see it. I'm going to read it for everybody. 12.6, Five-year Period of Eligibility. An individual's period of eligibility for practice and competition shall be limited to five years. An

individual's five-year eligibility period begins with the earlier of the following, and we'll get to what those are. And it's got a revision date of July 31, 2014; June 6, 2025, which became effective August 1; and then the important one for this dispute June 24, 2026, which became effective as of August 1, 2026. So you would agree with me that this Bylaw is currently in effect for this year?
A I think there's more to that as I was indicating in our back-and-forth about dates. But I see what's presented there.
Q What's presented in the actual text of the Bylaw is that it is effective and in effect for this school year and became effective August 1; correct?
A Well, there's a colon, so there's more to the Bylaw and that I don't know what documents were voted on and acted upon that established different expectations. What's there is there. I think the NCAA would be better speaking to that than I would.
Q And they're not here are they?
A I'm here.
Q And you said you don't know what else was voted on and neither do these athletes. They know what is actually in print from NCAA as their Bylaws governing this year; correct?
A The school would understand because those documents are printed and provided and, again, I have not seen this document but there's a lot to the legislative process.
Q You haven't seen the 2026-27 NCAA Manual?
A Until right now.
Q Let's look at the rest of it. So we left off from the previous page, you have five years and it begins with the earlier of, one, the regular academic term of an academic year in which the individual enrolls in a collegiate institution in a full-time program and attends a class; or, two, the academic

year immediately after the individual's 19th birthday; correct?
A I see that.
Q That is the rule currently in effect?
A Subject to what I've been trying to explain.
Q Nothing you are trying to explain is actually in the NCAA Manual, is it?
A I don't know, this is the first time I've seen this.
Q There's nothing in here about limiting this to athletes who enroll after a certain date, is there?
A I don't know. I've seen this part.
Q This is the part where it tells you if there is a limitation that the Bylaw only applies to athletes that enroll after a certain date. We saw that in the examples we looked at; right?
A For those specific Bylaws in the past, yes.
Q If the NCAA wanted to say we're not including the people who finished their fourth year in 2026 who enrolled in 2022, the NCAA knew how to say this Bylaw is only effective for athletes who enroll after August 1, 2023?

**THE COURT:** Objection, what is it?

**MR. WILLIAMS:** Judge, I lodged an objection earlier with regards to requiring this Commissioner to answer questions for the NCAA. You said you allowed for a brief period, we've now spent about 7 to 10 minutes.

**THE COURT:** He made his point though now, Mr. Williams. So I'm going to have to begrudgingly overrule your objection. You may continue.

**BY MR. DOWNTON:**

Q We've seen that if the NCAA desired to say that this Bylaw only applies to athletes who enrolled after August 1, 2023, and exclude this group of people, they knew exactly how to do it

because they do it throughout all their other Bylaws, but it's not here, is it?

**MR. WILLIAMS:** Objection. That's an improper question for this witness.

**THE COURT:** Overruled. I'll give his answer whatever weight that I see.

**A** I don't know why the NCAA presented it this way. I know what was understood leading up to the decision.

**BY MR. DOWNTON:**

**Q** The decision as expressed in the Bylaws is what it is?

**A** You've presented that printing to me.

**Q** The SEC's going to follow the NCAA Bylaws as written; correct?

**A** On this five-year period.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Thank you. Mr. Kee. I'm sorry, that was the actual intervenor as well, Mr. Williams. You'll have a second.

**MR. KEE:** Judge, I won't be long. I have some very pointed questions for Mr. Sankey.

**CROSS-EXAMINATION**

**BY MR. KEE:**

**Q** Thank you for coming, Mr. Sankey.

**A** Sure.

**Q** Mr. Sankey, just want to see how you see court orders and when I say you I mean the SEC, like in 30(B)(6) deposition. When I say the SEC, does the SEC intend to follow court orders across the country?

**A** We've communicated about that, we do.

**Q** Okay. Does the SEC intend to follow court orders from this Court, the 19th JDC?

**A** It does, where they apply.

Q So when an institution or member institution calls you and says can Nathan Cox be in the portal today based on the orders of this Court, you're going to tell them yes?
A I've not had that call.
Q If you have that call?
A I would be in conversation with legal counsel to ask what applies and what doesn't apply.
Q Is there anything you think your lawyer would tell you that would say disobey this Court's order?
**MR. WILLIAMS:** Objection, Judge. Improper question.
**THE COURT:** That is improper. I'll sustain that objection.
**BY MR. KEE:**
Q Is there any reason you would not obey this Court's order?
**MR. WILLIAMS:** Asked and answered, Judge.
**THE COURT:** Rephrase, overruled.
A No.
**BY MR. KEE:**
Q Have you seen the petition for intervention or the amended petition of Nathan Cox?
A I have not.
Q Has the SEC been made aware of it?
A I was aware of Nathan potentially being involved as we walked in, but I don't recall seeing the petition.
Q Are you aware that Nathan is a part of the Court's order as it relates to this proceeding?
A Not being a lawyer, I'm not completely certain what happened this morning with intersection or involvement and how that applies.
Q Fair enough. Are you aware that the SEC has not filed any opposition to Nathan's participation in this proceeding?

A I don't know that off the top of my head because I wasn't tracking on that particular circumstance.
Q Are you aware that Nathan attended Vanderbilt University?
A I am.
Q Is Vanderbilt University a SEC institution?
A It is.
Q Are you aware of any reason why Nathan cannot attend Vanderbilt today, in his fifth year?
A To attend, I wouldn't know that, but, no, I don't have any particular reason. I don't know the background. I've not met Nathan.
Q He's a great guy, you should before you leave.
A Yeah, I know. I'm proud of the young people that participate in college sports.
Q I'm glad you said that. Would you be proud to tell Vanderbilt that he is now eligible under this Court's order to come and play for them today?
**MR. WILLIAMS**: Objection, improper question.
**THE COURT**: It is improper question. I'm going to sustain that objection.
**BY MR. KEE:**
Q Is there any reason you are aware of that Nathan is not able to play today for an SEC institution?
A Is that not part of why we're here in the conversation?
Q That is. And I want you to tell the Court why he can't come and play at Vanderbilt, an SEC school, if you know today.
**MR. WILLIAMS**: Objection, Judge, improper question. And the Court has not ruled on the exception that was before it earlier today.
**MR. KEE**: Judge, if he doesn't know.
**THE COURT**: I haven't, but I understand the question. Again, we're talking about this window.

We're talking about this window. Mr. Kee, if you could please, I guess, maybe rephrase it as a relates to this window that we're in right now.

**BY MR. KEE:**

Q In the window that we're in today, can Nathan play at Vanderbilt based on what you know about these proceedings?

A What's the window?

Q You didn't talk about that with your lawyer?

**MR. WILLIAMS:** Objection to the form, Judge.

**THE COURT:** He can rephrase that as well. It wasn't really a question.

**MR. KEE:** I understand, Judge. I just want to know because Mr. Sankey seems to talk about the member institution quite often and that they contact him and I want to make sure I'm aware, I want the Court to know what he's going to tell them when they call him.

**BY MR. KEE:**

Q When they call you, if the Court grants the injunction today and they call you as it relates to Nathan Cox, are you going to instruct the member institution that he can attend Vanderbilt University?

**MR. WILLIAMS:** Judge, I'm going to lodge an objection to the question of what the Commissioner's going to do based upon this Court not having decided the matters before today. A hypothetical about what he does later on today or what he does tomorrow, this Court has not ruled. It's an appropriate question for the TRO, Judge.

**THE COURT:** Your response?

**MR. KEE:** In response to that, he's already communicated a couple of things. Number one, he's

communicated that they intend to follow the rulings but he also said they reserved the right and SEC has said they reserve the right to do something different up the road and I'm trying to see what they're going to do.

**THE COURT:** Ergo the objection because he doesn't want to lock him into something he's going to say here today in front of me. I'm going to sustain it. I think I got the answer already. He did indicate earlier we're following court orders, we're following court orders. They're basing all their rules off of NCAA guidelines, their Bylaws, it's clear up until a point. So I got it.

**BY MR. KEE:**

Q Mr. Clayton asked you earlier about threats to the member institutions. The fact that SEC is kind of teetering on the line of what they may do in the future, that's not a threat to the expectations of the member institutions if they later decide that they're going to penalize schools that allow students like Nathan in?

**MR. WILLIAMS:** Compound question, Judge, and the same objection to form. This Court has not decided this matter. Asking the witness what he will do based upon a decision that has not been rendered on the matter.

**THE COURT:** No, I'm going to allow this and I'm going to tell you why I'm going to allow this question. The difference is it's already been testified to that there was no punishment that was codified prior to the TRO being put in place. For the punishment to subsequently be codified, I'm going to let him to go ahead on and explore that a little

bit more.

**MR. WILLIAMS:** Yes, sir.

**A** Can you help me with the question again?

**BY MR. KEE:**

**Q** Yes. Is the SEC reserving rights to punish folks for doing exactly what this Court rules if he rules in our favor?

**MR. WILLIAMS:** Punish folks, Judge, I got to object to.

**BY MR. KEE:**

**Q** Or to lodge --

**MR. WILLIAMS:** Lacks specificity.

**THE COURT:** Again, I think we all know what we're talking about, Mr. Williams. Mr. Kee, you can ask that question and we're talking specifically I think it was what Mr. Clayton --

**MR. KEE:** What Mr. Clayton talked about, Judge.

**THE COURT:** -- 50 percent of fees and suspending the coach.

**MR. KEE:** We're talking about punishing the coach and we're talking about punishing the member institutions.

**THE COURT:** I think we all know what we're talking about.

**BY MR. KEE:**

**Q** Is the SEC reserving rights to punish the coach and the SEC institution based on what this Court decides?

**A** As I understand, if the individual involved returns to Vanderbilt University, this is a fifth-year issue is the basis of the question. I don't know at this moment where either of those memorandum would apply.

**Q** Can I summarize that you guys don't intend to punish anyone for accepting this Court's ruling and operating in

accordance therewith?
A I need to see the Court's ruling.
Q The Court has already ruled for the seven days that he can be in the portal. Can he do that and not have a school believe that there's a threat that they may be punished?
A You're asking me about him returning to Vanderbilt? Is what I understood.
Q I'm talking about -- I'm talking about consequences of even transferring to LSU or any other institution.
A Well, our 16 member universities that have said we're going to follow the interconference transfer policy that the conference has adopting, that common expectation.
Q You're telling me that if the Court says something different, you guys are going to accept the Court's ruling and allow them to transfer?
A I think we would all want to see the Court's ruling.
Q And you will confidently tell any of the member institutions who contact you that that is the Court's position, and it's our conference position to follow that?

**MR. WILLIAMS:** Objection, Judge. Improper question for this TRO. What will you tell them based upon what the judge does? We are here to find out what you're going to do, Judge.

**MR. KEE:** Judge, we're really trying to find out what the intention is because they left a lot of gray area by saying what they didn't put in the rule.

**THE COURT:** They have. And, Mr. Kee, at this point, I'm going to ask you to move on because I think Commissioner Sankey is pretty dug in, he's not going to answer that. I'm not going to force him to answer that. I think I already know the answer and that's in that we're going to follow the NCAA until

we don't want to follow the NCAA. So be that more legislation or lawsuits and all that other stuff that might be where they're talking about. So go ahead, Mr. Kee.

**MR. KEE:** Understood, Judge.

**BY MR. KEE:**

Q You said you don't have any specific information about Nathan Cox, you haven't reviewed his eligibility?

A I have not.

Q And you don't have any information as it relates to any opposition or you don't deny any of the claims he's made in his petition?

A He was identified to me as possibly being involved today. I don't know the specifics. There's a lot going on.

**MR. KEE:** Nothing further.

**THE COURT:** Thank you. I think that's it over here. Mr. Williams.

**MR. WILLIAMS:** Thank you, Judge.

**DIRECT EXAMINATION**

**BY MR. WILLIAMS:**

Q Commissioner Sankey, there was a number of questions, there were a number of questions about the August vote on the professionalism standard. Was that a unanimous vote?

A The professional standard was.

Q Did that unanimous vote include leadership from LSU?

A Yes.

Q They agreed to the standard?

A The standard on the 25th.

Q When SEC was named in, was SEC named in any court order when its members, when its member presidents met on August 28 to your knowledge?

A 25th and six.

Q 25th and sixth, yes.
A Not to my knowledge.
Q I believe that there are a few questions about NCAA Exhibit 12, the declaration of conference commissioners in support of the defendant's opposition. You remember those questions?
A Yeah, I do, yes.
Q Did you sign -- you have it up there?
A I do. I have a lot of papers but I think I have the correct document.
Q Did you sign that declaration on behalf of the SEC?
A I did.
Q It was also signed by James Phillips of Atlantic Coast Conference?
A Correct.
Q And the Big Ten Conference as well?
A Correct
Q The Pac-12 Conference?
A Yes.
Q The Big 12 Conference?
A Yes.
Q And the Big East Conference?
A Yes.
Q With regards to this document and just generally your opinion on this, is there a difference regarding professionalism as it relates to precollege enrollment and postcollege enrollment?
A That has been part of the conversation and there have been distinctions made by the NCAA.
Q Mr. Clayton asked you about what he perceived as inconsistencies related to basketball and I want to ask you about the action that the SEC took in Alabama regarding, is it

Bediako, am I pronouncing that name right?

A Correct.

Q He tried to come back from the NBA?

A I think he had played in the G-League by memory. I don't know what that means from an NBA time standpoint or training camp.

Q What action did you take in this instance?

A I filed an affidavit opposing the order and communicating why I thought permitting eligibility was improper. That the line between professional sports and college sports needed to be maintained.

Q And in terms of -- and your decisions, those things are directives or at the direction of your membership; correct?

A Yes. I communicated with membership that affidavit was being submitted.

Q Counsel opposite brought up a Georgia player, Mr. Cory Thomas, you remember those questions?

A I don't. You're going to have to help me.

Q I'll try -- it would have been the second presentation from plaintiffs regarding a Cory Thomas and his decision or not to enter into the portal.

A Jacori.

Q Okay. Jacori Thomas. Okay. And are you aware that Georgia counsel offered to enter the player into the portal if plaintiff counsel dismissed the suit?

**MR. CLAYTON:** Judge, --

**THE COURT:** There's an objection, Mr. Clayton?

**MR. CLAYTON:** Leading, it's his witness.

**THE COURT:** To the leading, I'm going to sustain that. Again, I know it was taken out of order, out of turn but you are on direct examination, Mr. Williams.

BY MR. WILLIAMS:

Q Do you recall the circumstances with regards to plaintiffs' lawsuit with regards to the decision of this Mr. Thomas not entering the portal?

A There were conversations about his involvement in the lawsuit and discussions between lawyers.

Q Did those discussions have anything to do with his decision to enter the portal or not to your recollection?

A I remember about involvement in the lawsuit and I'm sure the transfer portal was part of it. That would be -- you have to understand there's a lot coming at me right now.

Q Yes, sir. Now, the Protect College Sports Act that was discussed, is there any expectation that the Protect College Sports Act would ever apply to student athletes similarly situated to these plaintiffs?

A I don't know all the situations, not to my knowledge. As we discussed, the five-year eligibility model if that legislation advances.

Q Now, counsel opposite also although they talked about the contents the PCSA, they did not ask you at all about what is says regarding professional athletes. What does it say with regards to professional athletes entering back into the college arena?

A I don't know where the copy is but it references that professional athletes are not eligible. There's a line about that. I think it was on that same page.

Q Not eligible. You have to answer for the court reporter, yes or no.

A Yes, I'm sorry. Nodding does not help the transcript.

Q Now, some of this stuff was skipped over during plaintiff's cross-examination of you. Please tell the Court how long you've served as Commissioner of the SEC.

A Since June of 2015.
Q When you arrived in June of 2015, did the professional rule exist when you took on that role?
A It did.
Q Before becoming Commissioner, what other roles had you held in college athletics?
A I was the director -- I was an intern and then director of compliance at Northwestern State University in Natchitoches, Louisiana. Then I was assistant Commissioner, Associate Commissioner and Commissioner of the Southland Conference and then moved to the SEC in 2002 as an associate Commissioner and was promoted to Executive Associate Commissioner, I think that was 2012.
Q Now, you've been asked a whole lot of questions that are in the bailiwick of the NCAA although you were just the Commissioner for the SEC. Such that we don't get that confused, in broad terms, can you describe your responsibilities as Commissioner of the SEC?
A Certainly. Those are defined in our Bylaws, those responsibilities and it relates to the conduct of our competitions be they regular season or conference championships, presentation and promotion of the conference itself. The standards and upholding the standards that we have, that exist in our Bylaws. We work -- we have communications role, we have a ticketing role. We have financial management role, controversial from time to time, we have officiating oversight. That's not exhaustive. So obviously I've referenced before dealing with government relations issues and obviously spending more time on legal issues of late.
Q Certainly that role includes administrating, administering and enforcing the rules adopted by your members?

A Correct.
Q How many university members of the SEC?
A Sixteen.
Q All 16 members, are they part of -- is it a voluntary organization?
A It is, yes.
Q When one of these members or institutions joins the SEC, does it agree to comply with the SEC Constitution, Bylaws and governing rules?
A Yes.
Q Who ultimately possesses the governing authority within the conference?
A The presidents and chancellors group.
Q Commissioner, the Southeastern Conference, that's not the NCAA?
A It is not.
Q Is the SEC a completely separate organization from NCAA?
A It is.
Q Is the SEC itself a member of the NCAA?
A Yes.
Q Do SEC institutions also participate in NCAA athletics?
A In the postseason, yes. In the tournaments, specifically, I think would be the reference point there.
Q Does SEC participate in NCAA governance?
A Yes.
Q Does the NCAA participate in --
**MR. CLAYTON:** Judge, I'm patient with him. He has to ask direct questions, it's his witness.
**BY MR. WILLIAMS:**
Q What is the role --
**THE COURT:** That's sustained, go ahead, rephrase.

BY MR. WILLIAMS:
Q What is the role of the SEC with regards to NCAA governance?
A We have representatives that serve on various committees, cabinets, or boards. Those would be representatives from our campuses, sometimes from our conference office.
Q When the presidents and chancellors of SEC institutions meet to decide the rules that will govern them, does NCAA participate in that?
A No.
Q I want to turn now to the SEC rule concerning participation in professional sports. Based upon your knowledge and research and experience, how long have you personally understood the SEC to maintain a distinction between college, collegiate competition and professional participation?
A We went back in our documents into the '80s and stopped there. We did find a newspaper article from 1911 but that was under the Southern Intercollegiate Athletic Association where university had been prevented from playing games because of the involvement of professional athletes. That the SIAA was a precursor to the SEC. So I think, literally, it's been a consistent application, consistent standard.
Q What was that year again you went back to?
A The last one?
Q Yeah.
A 1911.
Q Based on your experience in college athletics and as a Commissioner, how is that distinction traditionally understood?
A In many ways like it is now. Entry into a draft and going through that draft being selected, signing professional contract, playing on a professional team, being on a roster.
Q Commissioner, did the SEC create any new professional

rules in response to one single member of your membership?

A It did not.

Q Did any of the SEC's existing professional rules change in response to a single member?

A No.

Q Then what then -- please explain to the judge what then did the presidents and chancellors address specifically recently.

A Making clear that the membership of our league expects the standard that you asked me about to be applied on our campuses, that's an agreement among our 16 universities. There is concern that what had been rather limited by number returnable professional athletes would expand and then young people currently on rosters would lose opportunities. Those who have, you know, the 18- and 19-year-olds not here that haven't had the opportunity to be a college athlete might lose that opportunity. There's also a concern that coaches were going to quickly go spend another recruiting session at NFL training camps waiting for waivers or cuts to happen, same in other professional sports. And promote the disruption of the continuity of a college education, jump in and out, just not an orderly way to conduct competition.

Q And are you familiar with this document?

A Yes.

Q I think all the lawyers on the plaintiffs' side that asked you questions about that statement following the meetings with the presidents and chancellors, they said that you did something. But what you did was issue a statement.

**MR. CLAYTON:** Objection, leading.

**THE COURT:** Sustained for the leading. Rephrase it. Go ahead.

**MR. WILLIAMS:** I'll withdraw and rephrase.

**BY MR. WILLIAMS:**

**Q** What did this statement actually do?

**A** There was a view and it notes the presidents, chancellors, and athletics directors because they were in a meeting together wanted to make sure it was clear the expectation of our membership as related to former professional athletes returning to college.

**Q** And you shared that information broadly?

**A** Yes.

**Q** Was any school sanctioned?

**A** No.

**Q** Was any coach sanctioned?

**A** No.

**Q** Was any player penalized or sanctioned?

**A** No.

**Q** Do these rules apply to only one single institution in Louisiana or do they apply to everybody?

**A** They apply to the 16 in our conference.

**Q** So the rule would be applied the same way for Alabama?

**A** That's the expectation, yes.

**Q** Georgia?

**A** Yes.

**Q** Texas?

**A** Yes.

**Q** Why, Commissioner, if you can explain to the judge, is uniform application important in a conference made up of extremely highly competitive institutions?

**A** It is highly competitive and the rosters were formed based on understanding of the rules that applied at the time. The expectation that's been established is there is a difference between those who've departed and entered the professional sports world versus those who've maintained continuity of

education and participation in college sports. As I noted before, there is also concern for student athletes being displaced by all of a sudden an influx of those who've gone through four years returning. But the specific conversation that day was about, within our league, the equitable competition, the integrity of the competition for the 16 universities being the primary focus.

**Q** Was it thinking that it would prevent an arms race for college coaches?

**A** Not particularly an arms race for coaches, but the motivation that everyone go out at the last moment and recruit former professional athletes as it relates to this statement. Populate your rosters and if some people have been doing that and others hadn't because they understood there was this clear boundary line, that would present a very different competitive balance reality.

**Q** Speaking of a balance reality, counsel opposite have talked about the plaintiffs in this room, what does it mean to college freshman and college sophomores in terms of this finite number of roster spaces?

**A** Well, experience --

**MR. CLAYTON:** Objection, Judge, he has no way of knowing the mindset of --

**THE COURT:** Sustained. Give me some foundation, please.

**MR. WILLIAMS:** Yes, I sure will.

**BY MR. WILLIAMS:**

**Q** Are there a limited number of college rosters spots at the 16 universities?

**A** There are.

**Q** And if cut down day at the NFL --

**THE COURT:** And please don't lead.

**MR. WILLIAMS:** Okay.

**MR. CLAYTON:** He can't help it.

**BY MR. WILLIAMS:**

Q If coaches want to win games and universities want to win games and the NFL releases some exceptional athletes who would like to continue to play, if college coaches recruit them and put them on their rosters, what does it mean to the folks that were already on that roster and already on that depth chart?

**MR. CLAYTON:** That was nine questions and I don't know which one to object to, all of them.

**THE COURT:** I got it. I'm going to sustain the objection. I think there's a -- it's a longer more protracted way to ask that.

**MR. WILLIAMS:** I'll withdraw it. I'll withdraw it. I see Mr. Clayton is getting hungry, Judge, let me switch it around.

**BY MR. WILLIAMS:**

Q Commissioner, was is a college football coaches job when it comes to building a roster?

A They have a number of roster spots. They're going to evaluate talent. They're going to evaluate current members of the team. They're going to evaluate perspective athletes who are out there that are interested in playing college football and they're going to form that roster and they're going to teach them technique. They're going to be part of overseeing the development of their strength, their conditioning and preparation for the season. I could probably go on like I could have with my job description, but that's probably sufficient.

Q Got it. Thank you. Is there anything improper about a coach trying to obtain the best lawful competitive advantage available to his institution?

A I think within the defined parameters because having equitable competition needs to remain a priority.
Q Then what happens if one SEC institution is permitted to recruit recently released professional football players while the other institutions are competing under the same conditions?
**THE COURT:** Hold on, there's an objection.
**MR. WILLIAMS:** That's open-ended, Judge. I'm not sure what he's -- I know you like to talk.
**THE COURT:** That's why I'm waiting on it too.
**MR. CLAYTON:** I kind of think I like that question. I'm going to sit down.
**THE COURT:** He got what he wanted just by standing up. Go ahead.
**MR. WILLIAMS:** I'll repeat it.
A Thank you.
**BY MR. WILLIAMS:**
Q What happens if one SEC institution is permitted to recruit recently released professional players while the other member institutions are competing under the same conditions that were agreed upon?
A In other words, not recruiting?
Q Yes, sir. Not recruiting professionals.
**MR. CLAYTON:** That's the objection. Because either they all. The other day, Southern had a game, they said it was hot Givens. It was hot for everybody. So here it's open for everybody. So when Mr. Sankey tried to qualify it, you mean other than, that's the problem with that question.
**THE COURT:** Overruled. I guess I interpreted the question a little differently. One is working under this and the other one is working under what they perceive to be -- that's how I interpreted it.

MR. CLAYTON: I'll sit down then, Judge.
THE COURT: But go ahead, Mr. Williams.
MR. WILLIAMS: Thank you, Judge.
BY MR. WILLIAMS:
Q You understand the question, Commissioner?
A The addition of someone with a great deal of experience, has gone through NFL training camp, for example, would be viewed as advantageous. Others haven't had that same opportunity because they've abided by what they understood to be the common agreement, the common expectations among our universities.
Q If one SEC institution is, in fact, recruiting from the NFL cut down list, would you expect the other SEC coaches to simply ignore that potential source of talent or start doing the same thing?
A First of all, I never imagined having to answer that kind of question. That's not been a part of how college football functions. The NFL is not a recruiting ground for college football. It has not been. If behavior in one place continues, I would expect it to drive behavior in another and I don't think the behaviors are fully understood. Because then our coaches are spending another recruiting window at NFL training camp. It's not about high school prospects. It's not about ordering your roster around the transfer portal. Those young man on a football team who go through off-season spring practice, summer conditioning, preseason, they don't know if they have a roster spot until after NFL cut day which is the first week in the season. And if coaches are looking to add experience quickly, I think that's an incredibly important threat to consider to college football and the educational opportunities and the progression from freshman to sophomore on to life.

Q Is that the kind of collective competitive problem one of the reasons the conference adopted these common rules in the first place?
A It is.
Q Let me talk to you a little bit about the current college athletes who were playing by the rules that we've all lived by for so many years in college athletics. When the SEC's presidents and chancellors considered this issue, were they concerned only with the interest of former players who wanted to return or anybody else?
A No, they were concerned about current members of their team. I think as I described they're also concerned about the continuity of education that's been historically present in college athletics. They were concerned about the behaviors that may develop among their coaching staff as I describe would have a different emphasis in recruiting that we've never experienced before. It just hasn't been part of the equation.
Q Would that also include incoming athletes like 17-, 18-year-olds who have graduated from high school?
A Yes. Part of the conversation included those entry points for college athletes or aspiring college athletes. The concept of a college going culture which I think college sports helps incentivize at the high school and youth sports level. The aspirational opportunity is meaningful. The progression from adolescence to adulthood through the continual educational experience. And that if it's go out in the draft after your third year, go out in the draft after your fourth year under this new paradigm and just come back, how would you ever have roster stability in a team culture from January through kickoff of the season?
Q Are roster positions or roster opportunities unlimited in college football?

A They are not.
Q If a roster position is occupied by one athlete, can another athlete simultaneously occupy that same position?
A Not once a team's roster is set and ours are generally at their limit so they have to make decisions who can fill those spots.
Q I know Mr. Clayton made a lot about your method of travel and how much you get paid, but I want to talk about the mission of the SEC and your role. Are the interests of those younger and current SEC athletes part of your responsibility as Commissioner too?
A It is.
Q Why?
A The college sports ecosystem is much as I just described. We want young people to be aspiring to access college opportunities and in my role college athletics opportunities across the board in sports. If there are more and more and this has been one of the concerns over years older students who come back and decide to participate in college athletes, or excuse me, in college athletics that limits those entry points. That's an important concern as we talked about desire and aspiration and the next generation having opportunities like this generation has had.
Q As Mr. Clayton has argued for why not simply allow each individual SEC institution to decide for itself whether or not it wants to use professional players?
A The conference comes together for the common good, if you will, the common experience, the common commitment to a set of standards and a set of competition. The Southeastern Conference, I think, is unique. The passion that's here for LSU, when I lived in this state having experienced it, is real. What happens on Saturdays is important across our footprint.

The ability to have competitive balance and competitive equity. We're certainly going to have programs that excel for a period of time. But historically in football, in particular, the level of competitive distance between our programs is enormously small and I think that's part of what creates the excitement and the interest. That's part of what represents and presents college football.

Q Everybody looking for every competitive edge every day?

A And we have to manage those in different ways. It's not simply this conversation. When I walked into the Southeastern Conference in 2002 I was told everything's about recruiting. So how you do that on an equitable basis has meaning.

Q Would asking every coach to simply exercise voluntary restraint solve this problem?

A Not in my opinion. I think you have to have a commitment to a common set of standards to have the reality that I described that constitutes college football in college sports.

Q Commissioner, did the SEC determine whether these plaintiffs satisfy NCAA requirements; was that the question?

A No.

Q Is SEC asking this Court to decide whether the NCAA correctly applied its eligibility rule to athletes?

A The five year rule is not.

Q Just a couple questions on your role as it relates to what you talked about a couple minutes ago, the stability of conference competition. The thing that everybody loves on Saturday, college football, public interest. Why is stability and conference rules important to institutions and to athletes?

A That stability in policy allows each program to make decisions though have unique aspects on their campuses but they can come together and play from this common basis and have the kind of high-level competition with proximity of scores leading

to championships, building interest, building I think the aspiration to access the opportunities in the Southeastern Conference.

Q From the conference's perspective, is predictable application of common rules important where an individual athlete understandably wants a different rule?

A It is. I think that's the expectation that our universities have established.

Q You certainly understand and you get why these athletes want to continue to play sports and continue to play football; correct?

A I do. I respect their role as participants. It's not easy to accept the challenge, the responsibility and the burden. The reality for all of us is there's a conclusion to times. And we have this confusion created by the change in the rules but I think we should be concerned about those not here as well and the opportunities for them and I respect the difficulty of that balance. My desire is that they've all had a rewarding experience when they walked in to understand the time of participation that they had.

Q Just to be clear, the SEC's position with regards to these athletes is not meant to disrespect their prowess, their ability, or their accomplishments?

A Not at all. Not at all. In fact, I hope that the experiences prepare them for what comes next in life. And done it well.

Q The SEC did not invent this professional rule because of the plaintiffs in this litigation?

A No, it did not.

Q You said the rule's been in place, I think you said, since 1911?

A That line of demarcation between professional sports and

returning to college, yes.

Q Commissioner, in your judgment how important is the enforcement of this rule to the Southeastern Conference?

A Our campuses communicated it is a primary importance that we not be out recruiting professional athletes back into college sports. They've communicated the importance of a balanced approach to transfers within our conference because it does relate to relations of the member universities. And on their behalf, I would put the importance at among the highest level that we have common expectations and common standards and the 16 participate under those standards in the manner to which they voted and agreed.

**MR. WILLIAMS:** Thank you, Commissioner. No further questions.

**MR. CLAYTON:** Judge, I have about 12 points that he directed on that went outside the scope of my cross and I would ask permission that I get to cross on those doors that he opened.

**THE COURT:** When we get there, I'll make that determination. I'll hear what it is, it was a while ago. Been about four or five of y'all. I'll let you know. Go ahead, Mr. Clayton. If there's an objection, I'm saying, I'll make that understanding.

**RECROSS-EXAMINATION**

**BY MR. CLAYTON:**

Q He ended with you saying about you made a statement about the confusion from the change in these rules has created this chaos, you agree with that?

A The change has created a level of confusion.

Q Should these children be punished because you and the NCAA changing the rules?

**MR. WILLIAMS:** Objection, Judge, it's been made

very clear that none of the sanctions described will apply to a single athlete, nothing has been done. The question should they be punished is completely inappropriate with regards to this TRO motion.

**THE COURT:** I disagree.

**MR. CLAYTON:** I'm robbing this train, Jessie James. Thanks, Judge. I'm sorry.

**THE COURT:** Yeah, go ahead.

**MR. CLAYTON:** Let me ask my questions.

**BY MR. CLAYTON:**

**Q** So these kids should be punished because you and the NCAA and the SEC and you changed the rule, Five-for-Five?

**A** I've not suggested that these individuals be punished.

**Q** That's why we're here today giving them the opportunity and you keep saying they played pro sports. Can you tell me any one of these kids played for the Miami Dolphins, the New Orleans Saints, played on Sunday in any professional sport, the soccer, anything, can you name one of them?

**THE COURT:** Is there an objection?

**MR. WILLIAMS:** Objection, Judge, and this is exactly why took up that exception first. We're now defending different issues, different arguments, different positions and different histories and Mr. Clayton is taking advantage of the fact that the SEC is standing in defense of claims that do not belong to the SEC.

**THE COURT:** I'll give it the weight that it deserves. Overruled.

**BY MR. CLAYTON:**

**Q** The question is you keep talking about they're recruiting professionals as if these kids are Drew Brees assuming like that, that's not fair, Mr. Sankey is it? That's not fair,

because they're not -- not knocking these kids -- they're not the kind of folks that been out there and made billions of dollars like you, they're not the kids that made that kind of money and want to come back and play college ball; isn't that correct?

**THE COURT:** That part of the question, I'm going to sustain the objection.

**MR. CLAYTON:** I'll take the part about what he makes but he does make a lot.

**MR. WILLIAMS:** Judge, can we at least get an objection on this compound question. Just take them one at a time. I know he's got a lot. And he thinks fast, Judge. Watching Mr. Clayton is like watching the sunset, Judge, you can't even look away. But can we at least get one question at a time?

**THE COURT:** Go ahead sustain the objection, compound question. Go ahead, Mr. Clayton.

**BY MR. CLAYTON:**

**Q** Real deal. Can you cite any one of them that made millions of dollars?

**A** I don't know their circumstance.

**Q** Can you cite any one of them that played a professional game?

**A** I don't know their circumstance sitting here.

**Q** Can you tell me or tell this Court cite any instance other than these children that may have gone out for a draft and weren't selected and then found out, you had another fifth year that they could have made a lot of money on NIL? That was kind of compounded, but --

**A** I'm trying to determine which question.

**Q** Let me slow down. Let me slow it down.

**A** I'd appreciate that.

Q Can you cite any one of these kids that went to the NBA draft or NFL draft and getting selected, do you call those folks pros? Is that a professional athlete if he didn't make it in the draft?
A It depends on what happened after that draft.
Q He wasn't good enough to make it.
A They may have signed a contract.
Q Add this to that.
A They may have made roster. I don't know sitting here individually each of their circumstances.
Q Add this to that. Add this to that. The NCAA comes up with a rule saying you know what, you get a fifth year and nobody told them that when they tried to better themselves in the pros; is that fair to these kids?
A There's realities for all of us. There are decisions that are made. But there are other young people entering the system and there are limited opportunities and we have to respect those as well.
Q Let's talk about that. Mr. Williams brought up the roster and you made the statement that some poor kid may not make that roster. Do you remember saying that?
A Maybe not those words, but close.
Q We talk different, I'm from here.
A I appreciate that.
Q Me too. That person who you said may not make the roster, he's given an extra year, five years, he can probably make it the next year can't he?
A It depends, he may lose an opportunity. There's no certainty -- there's no certainty --

**MR. WILLIAMS:** Judge, the witness has to have the opportunity --

**THE COURT:** You got to let him finish. Let him

finish --

**MR. WILLIAMS:** -- to respond.

**THE COURT:** -- Mr. Clayton, sustained.

**MR. CLAYTON:** I got your question, I heard your answer.

**MR. WILLIAMS:** He's got to hear all of it, Judge, not just the piece -- he cut him off. He's got to give him an opportunity.

**THE COURT:** I understand. Thank you, gentlemen. You can reask your question if you need, Mr. Clayton, reask the question of Mr. Sankey or if you remember where you were, you can finish your answer.

A There's no certainty in the reality you're suggesting. The person who loses an opportunity at that time may not be back.

**BY MR. CLAYTON:**

Q That's exactly what I'm saying, there's no certainty. And who created this uncertainty? You and the NCAA; correct?

A No, not the professional piece. That's not been modified.

Q You made a statement when you were being questioned that the first time you saw the Five-for-Five deal wash today, did you say that?

A No. I said the first time I've seen the 26-27 Manual was today and I was presented parts of that Manual that relate to the new rules. I don't know that I saw all of those. That is what I was referring to at that time.

Q You made the statement that it's not fair for coaches to be out there recruiting experienced professional athletes, you remember saying that earlier?

A Something close to that.

Q Do you find a student athlete that never played a day or minute of pro sports an experienced professional athlete?

A Going through depending on the league and the competition and the preparation, those are opportunities that are very different from a college athlete who's going to class and on campus. So there can be realities that are very different.
Q If I went to try out for the Saints to be a kicker and I got cut then you tell me you got a fifth year, Tony, would I be considered a pro athlete and I never kicked a football in a pro game in my life?
A I don't know what the tryout was. There are try outs that have always been allowed.
Q Mr. William asked you about the application of the law. The law should be followed by everyone, you agree you should not break the rules; right?
A I agree you should follow the rules.
Q The punishment should be the same for everybody, isn't that correct, Mr. Commissioner? Because LSU shouldn't be punished harder than anyone else; right?
A Our presidents and chancellors set a standard to an advance communique the expectations of our membership as a conference of 16 universities.
Q And you treat all 16 of them like your children, you treat them all the same?
A I have a responsibility to do my best.
Q And you got to be fair to all of them; right?
A I work at that daily.
Q So you decided to sue LSU and you agree that you could have sued any of all your member institutions in any state that they're in; right?

**MR. WILLIAMS:** Judge, that is outside the scope. Mr. Clayton said he can go to areas I went to. I didn't bring that up once.

**THE COURT:** I remember you did not.

**MR. WILLIAMS:** Thank you, Judge.

**MR. CLAYTON:** But he did bring it up, he, my good friend over here, probably maybe kind of some games now, but my friend here says he's equitable and everyone to all his 16 institutions. He loudly just delivered here with that, Judge.

**MR. WILLIAMS:** Judge, that's not an open door or open window.

**THE COURT:** That's not. That's overruled. You're not going to talk to him about that, Mr. Clayton. I note your objection.

**MR. CLAYTON:** I'll move on to something else, Judge. You know where I was going?

**THE COURT:** I do.

**BY MR. CLAYTON:**

Q Mr. Sankey, you said you never expected that you would be you to answer questions pertaining to issues about whether or not a pro athlete can play college sports; correct?

**A** I think that was specific to football in that conversation.

Q You said something earlier about a young person signing a contract, does the SEC, is there anyone in your office that sits down with a student athlete and say, hey, if you get into this NBA draft or this NFL draft or any other draft and you sign this contract you can't ever come back, did y'all explain that to them?

**A** That would be done on campuses. Our office is not next to the student athletes, we're not interacting with student athletes on a daily basis like happens on our campuses.

Q You know Mr. Vaughn who's over your compliance?

**A** Mr. who?

Q Vaughn. V-A-U-G -- what's his name, Vaughn?

MR. ASKEW: His name is Jerry, he doesn't work for the SEC.

MR. CLAYTON: What's his name?

MR. ASKEW: Jerry Vaughn.

**BY MR. CLAYTON:**

Q You know Mr. Vaughn, Jerry Vaughn with NCAA?

A I've met him. I've not interacting with him in a number of years.

Q You met him?

A Yeah.

Q He knows him.

A I met him. I think there's a difference between meeting someone and knowing them.

Q You know what his job title is?

A I do not.

Q So if he testified in here that when asked questions by us about professional athletes and the whole nine yards when the rule changed that he really couldn't answer the question why there were pros from overseas coming to play in colleges over here.

THE COURT: Objection, Mr. Williams?

MR. CLAYTON: I'll move on to another question.

THE COURT: Thank you.

MR. WILLIAMS: Thank you, Judge.

**BY MR. CLAYTON:**

Q Do you know any pros from Europe that are playing college ball for any one of your SEC schools?

A I haven't gone back to look right now. They would be eligible if the NCAA has established their eligibility but I don't know the basis for that right now.

Q But if there any, would that be fair to these kids?

A It could be. I don't know their circumstance.

Q I guess -- you're never going to admit --

**MR. WILLIAMS:** Judge, there's a lack of foundation, objection. You got to lay the foundation that he knows the thing that he's asking him about first.

**THE COURT:** Again, I disagree. He started talking about opportunities from high school kids, they got D-3, they got D-2, they got all these other NCAA schools, they got all this other stuff and now he's going to posit that it could hurt their ability to play. Bringing in professional kids, again, he's opened it. He's already started talking about that.

**MR. WILLIAMS:** Just note my objection for the record, Judge.

**THE COURT:** It is noted. If you can answer it to the extent that you think you can, go ahead, Mr. Sankey.

**MR. CLAYTON:** My grandmother used to say ain't no fun when the rabbit has the gun. Back to you.

**THE COURT:** You can strike that comment, please.

**MR. CLAYTON:** I will admit that I get to do the questioning, not him. This witness belongs to me now. He can have him afterwards.

**BY MR. CLAYTON:**

Q All I'm looking for you talked about equity. I'm looking for LSU student athletes and I don't care where they're from, just to treat them equitably, apply the law the same. You admitted yourself that, you said Chambliss, I said Chambliss, he's been around six years. You with me?

A I remember that conversation. I'm not sure that's a parallel but go ahead.

Q Is it fair?

**A** It could be, yeah. He lost an opportunity for a period of time.

**Q** You said it could be, it could be. You -- when you were talking to Mr. Williams, you talked about that you've been a commissioner since 2015?

**A** That's correct.

**Q** Tell this judge you can't cite one instance where the SEC punished any school for playing a pro athlete, can you?

**A** I don't think there's been an athlete who's bumped up against what we've understood to apply as a professional.

**Q** You got to answer my question. You got to tell the judge here's my question, I'll make it simple. I'm from Louisiana. Since 2015, you don't know of any instance where any SEC school by you or anyone else has been punished for having a pro player?

**MR. WILLIAMS:** Judge, he answered the question. He just didn't like the answer.

**THE COURT:** I guess for clarification, I'll let him ask that. You can answer it if you can because I want to be clear on the answer too.

**A** As I said earlier --

**BY MR. CLAYTON:**

**Q** It's a yes or no and then you explain. I'll repeat it to you. Do you know of any instance since 2015 of any SEC schools that's been sanctioned or punished by you or anyone else for playing a professional player?

**A** I objected to the return --

**Q** It's a yes or no.

**A** I'm explaining.

**Q** You got to answer it. You can explain all you want. Yes or no?

**A** Yes. I acted when a G-League player came back.

Q Let me stop. I'm going to ask my question. I'm sorry, Judge. I didn't ask you to tell me how to build a clock. I'm just asking you what time it is. Now, watch this. Do you know of any school in the SEC that's been punished or sanctioned by you or anyone for playing a pro athlete?
A No.
Q You can explain.
A We had a G-League return. I reacted because that's a whole new experience as I explained earlier with an affidavit saying that's not appropriate for college sports. That's a reflection of how I feel. Are there other circumstances where questions were asked about a professional athlete entering and our schools going, no, that's not appropriate, certainly. But you asked specifically about sanctions and I answered that question. But there's a lot that takes place in conversation before we move to a sanctions piece.
Q But your answer is no, right?
A With your knowledge I could have a qualifier, an explanation behind it.
Q But it's no; correct?
A As I shared.
Q You told Mr. Williams that at this meeting August 24/25 all the chancellors and presidents of the SEC schools had a little pow wow and had discussions about this ruling that emanated from the courts of Baton Rouge; you remember saying that?
A I think it was about awareness.
Q What about it, what did y'all discuss?
A I don't recall specifically.
Q It conflicts with my question earlier when I asked you and you made a statement, well, this rule has always been in place. And I'm, like, so you guys didn't do anything after their

August 19th injunction and then I kind of said on the 26th, you said, no, the 25th. They met with you to discuss what? The injunction from Baton Rouge?

**A** No. We had a planned meeting. The conversation that I indicated earlier was a big picture strategic framework. Because of the timing of court decisions, we had discussions about what are our expectations of our member institutions.

**Q** So you had a meeting to talk about the timing of court decisions -- let me ask you this. Did the injunction that emanated from this city, this Court, was that ever brought up in your presence?

**MR. WILLIAMS:** Judge, I've got to object to him cutting him off in the middle of his answer to ask another question. He has to have a right to complete his answer.

**THE COURT:** Overruled. He was finished with his question. You probably cut him off on the last question.

**MR. CLAYTON:** Not that one.

**THE COURT:** Not that one, go ahead.

**MR. CLAYTON:** It was a pretty good question.

**BY MR. CLAYTON:**

**Q** Did the conversation come up about the injunction from Baton Rouge?

**A** There were a lot of court issues.

**Q** Listen, you've got to answer questions.

**A** I am answering the questions.

**Q** What SEC schools --

**THE COURT:** Mr. Clayton, hold on, Mr. Clayton.

**MR. CLAYTON:** He's got to start answering the questions.

**THE COURT:** I got you, Mr. Clayton. That time

you did cut him off. And I'm having a hard time understanding.

**MR. CLAYTON:** Let me try it again.

**THE COURT:** Thank you.

**BY MR. CLAYTON:**

**Q** Did the conversation come up about the injunction from Baton Rouge on that August 24 or August 26 meeting, 25th or 26th meeting, with your presidents?

**A** At some point, that would have been part of the conversation.

**Q** Thank you. Now and you ended that meeting with a missive or statement that the SEC is adopting rules to punish any school that allows a pro athlete to come back and play ball; correct?

**A** That's not precise to what was said.

**Q** Make it precise.

**A** Well, there's a memo that's been entered that we have a common set of expectations among our 16 universities. The presidents and chancellors directed the Commissioner under the authority assigned to apply certain accountability if an institution chooses to add an athlete in that professional category in the interconference transfer category to its roster.

**Q** My law partner here, Mr. Downton, I thought did a great job getting you to say y'all had that meeting, he showed you an affidavit. My question as I go to my seat is that memo that you guys wrote or that emanated from that meeting flew in the face of the injunction against the NCAA, didn't it, sir?

**A** I don't believe so.

**MR. CLAYTON:** Sure you don't. No further questions.

**THE COURT:** Thank you, Mr. Clayton. Next.

RECROSS-EXAMINATION

BY MR. DOWNTON:

Q Only have a few topics. You mentioned you don't want schools to, the coaches to be spending their time recruiting professional athletes; correct?

A That was part of the description, yes.

Q You have a definition of what makes someone a professional athlete?

A When we were speaking about that, I was referencing specifically going to NFL training camps and recruiting in that environment.

Q Outside of what you were talking about with Mr. Clayton, what is the SEC's definition of a professional athlete?

A I think we identified that in our communication back on August 24/25 and embedded in the memo as I reference I think in earlier conversations about the responsibility to dig further in sports that have never been asked questions about has a professional threshold been crossed.

Q Do you make any distinction -- strike that. Back in the first communication the SEC put out in August, you referenced athletes who choose to leave school and become a professional. Has the SEC made any distinction between athletes who choose to leave school and athletes who were told you're out of eligibility but later get it back?

A No.

Q You understand that these plaintiffs did not choose to leave school to become professional athletes; correct?

A I don't know all of their circumstances but we're obviously here talking about the change in the base eligibility rule.

Q You'll hear from them -- are you able to stay this afternoon?

A I don't know. I've been here a while as you can understand.

MR. CLAYTON: Judge, I'm going to ask under the powers that I have to hold him here because we may have to call him back. I ask him don't get on his jet, to stay here till we finish this whole hearing.

THE COURT: All right. We'll get there. Thank you, Mr. Clayton.

BY MR. DOWNTON:

Q Hopefully you're going to be able to hear from the athletes this afternoon. And I'll tell you that universally they're all going to say this wasn't a choice if they had been given a choice and told you've got a fifth year, --

MR. WILLIAMS: Judge, that's not a question.

BY MR. DOWNTON:

Q -- they all wanted to stay in school?

THE COURT: There was an objection, what's your objection?

MR. WILLIAMS: Judge, I'm objecting to all this commentary of people giving speeches in the middle of an examination. Mr. Clayton's telling people what they can do in your courtroom and now we're --

THE COURT: I'm not listening to Mr. Clayton over there and I want everybody in here to know that. And Mr. Clayton already know this too, he don't run this over here, he's just being his verbose and boisterous and bombastic as he wants to be just like you, Mr. Williams. Because I know you too.

MR. CLAYTON: I'm renting space in his head though, Judge.

THE COURT: Again, like I said we don't have a jury in here, I know how to parse through all of the

show and tell, we're good. I promise you we're good.

**MR. WILLIAMS:** Judge, I'm just objecting to the unnecessary statement instead of a question.

**THE COURT:** Rephrase your question, counselor.

**MR. DOWNTON:** I don't even remember it anymore. He did such a good job of interrupting.

**THE COURT:** I know it was so long ago. You started talking about these individual students and their comments and how it may relate to Mr. Sankey.

**BY MR. DOWNTON:**

**Q** That's right. I was trying to give a predicate that just in case Mr. Sankey's not here to hear. But if all of these students universally say if I had been given a choice, if I had been told I can either go professional or I can play a fifth year, universally if all of them say I would've stayed in school, should that matter?

**A** I think it will depend on what they say. You're describing. I understand that's part of the testimony that informs a decision. I mean that respectfully.

**Q** Is there anything -- is there anything an athlete can tell you who went to an NFL training camp that would make you think in this circumstance maybe he should get to play?

**MR. WILLIAMS:** Objection to the form, Judge, with regards to this TRO.

**THE COURT:** Overruled.

**A** Not in the moment.

**BY MR. DOWNTON:**

**Q** We'll hear what they say later. So in your memo at this point, you have not decided how the SEC is looking at professionalism for sports other than men's and women's basketball and football; correct?

**A** Those are the ones identified, and as acknowledged, we

have that responsibility.

Q So understanding that, I'm going to now confine my questions to those sports. Okay. If someone's taken in a draft and I'm confining my rules only to this year. We are not here about the SEC's rules going forward for anyone other than these plaintiffs. So my rules are confined to this factual situation not to what the SEC is going to have in place in the future. Okay.

If someone was taken in a draft out of these plaintiffs, does that provide a problem under SEC rules as you've explained them?

A I don't know the nature of the draft. I'm not a subject matter expert on each and every draft. That's part of that research responsibility.

Q Okay. Sorry and I'm confining this to NBA, NFL, WNBA. If someone was taken in one of those drafts, is that a problem for being able to come back out of this group of plaintiffs?

A I'd need to know the individual circumstance.

Q Tell me what you would need to know other than the draft took place, they were selected, they may have done other things afterwards you'll have a problem with but if they were selected and did not sign a contract?

A That's where I don't know the specifics or the circumstance. You have to understand that reality.

Q I get where you're going. So the draft in a vacuum is not a problem. You need to know the other circumstances to determine if there is a problem?

A It could be but that's one of the issues that's been identified in our policy.

Q Tell me how the draft by itself could be a problem.

A Then I have to understand what happened after the draft. There are opt-in situations and non-opt-in situations, the

drafts do vary.
Q If a person is out of eligibility, the NBA and NFL automatically have their name in the draft; correct?
A I don't know the specifics of that entry.
Q You're telling me you're not able to answer the question today if someone entered the draft but did not sign a contract, let's do it sport by sport. NBA. Someone was drafted, never signed a professional contract? Can they go back to school if the NCAA, at an SEC school, if the NCAA is enjoined?
A I'll go back to previously declared for the draft and did not appropriately withdraw, signed a contract. We tried to spell that out to answer those questions. But that's part of understanding the specific circumstances rather than just saying there's a broad piece to it but then there's a specific piece to it.
Q That's what I'm trying to get beyond. I've seen what you've defined and I'm trying to address the situations where you haven't defined. So someone was placed in the draft because all athletes are automatically in the draft when they're out of eligibility. They got drafted, they did not sign a contract, are they eligible?
A But I don't know what happened after that. There are any different set of avenues that could be pursued.
Q What else do you need to know about the avenues to answer that question?
A They could have signed a contract someplace else. What are their draft rights, what did they do after and you're asking me to define each of those activities and we've tried to be as clear as we can with responsibility there may be something different to consider.
Q That's why I'm trying to help with the hypothetical. No contracts of any sort anywhere, they were drafted, let's say

it's NBA. They participate in summer league. They did not sign a 10-day contract, a 2-way contract, an NBA contract?
A It's hard to deal with hypotheticals. I mean that respectfully. And that may be frustrating but there's information that has to be understood.
Q It is. It's also very hard to advise athletes when the SEC has never had rules on this other than incorporating the NCAA's and then they put out a memo that only addresses some specific situations, can you understand how that would be challenging for athletes?
A Yeah and there are situations that have been addressed previously that are consistent with what we've addressed.
Q Is attending, is participating in an NFL minicamp a problem for these plaintiffs, not for athletes going forward, not for athletes who chose to be in the draft, for these plaintiffs who are out of eligibility, if they participated in NFL minicamp, is that a disqualifying factor from the SEC's perspective?
A It depends on the relationship with the team is my understanding. There are tryouts, somebody could end up in minicamp and they're gone the next day. That doesn't seem to bump up as a problem. I don't know the extent of the relationship based on the hypothetical and it's hard to understand that but for a specific circumstances.
Q You referenced NFL training camp, if someone participated in NFL training camp, does the SEC consider that disqualifying?
A That would seem to be.
Q But NBA summer league is not disqualifying?
A Again, the specific circumstances of each need to be understood.
Q What is it that makes NFL training camp disqualifying but not NBA summer league?

A I'll go back you're not describing the complete circumstance and relationship with the franchise or the league so trying to guess at what the circumstance may be is difficult.

Q Mr. Chambliss is playing at Ole Miss because a court order made him eligible; correct?

A That's correct.

Q Ole Miss has not faced any potential penalties for allowing him to play under the court order; correct?

A Correct.

Q Mr. Bediako played for Alabama under a court order; correct?

A He did.

Q It was later reversed; correct?

A It was.

Q Once it was reversed, he no longer played; correct?

A That's right.

Q And Alabama was not punished for playing him while there was a court order in place; correct?

A Considered, not punished. First time I've experienced that, same with our league in that circumstance and that has caused conversations to continue and obviously the situation is very different than that one first time I've ever experienced that and the presidents and chancellors weighed in to say here's the expectation of how oversight will be applied.

Q You agree we're a nation of laws; correct?

A Yes.

Q And we have courts to fairly enforce those laws for everyone; correct?

A Yes.

Q How can our legal system continue to function if people are given a choice obey a court order and allow someone to play

but then you may face a draconian multimillion dollar penalty or say I don't care about that order because I'm scared of the penalties so the kid can't play. How does the SEC see our world functioning when people cannot rely on court orders?

A We are also a nation that respects conferences and the voluntary associations there and those groups come together to set rules and standards for themselves and expect members to abide by those. Those are the balances that exist in our society and I mean that with full respect to laws, to courts, and to decisions in a private association, a voluntary association.

Q You also expect all of the schools' members within your conference to comply with any court orders; correct?

A As I've communicated previously. I'll also insert I've been clear. We need national standards for college sports. We want competition across state borders, across jurisdictions, across the country leading to the kind of exciting end of season competition we're accustomed to. That's part of our challenge right now, and that's when I reference respectfully that balance.

Q I think throughout your testimony today you've been making a distinction between the professionalism issue and the five-year issue; is that fair?

A Yes.

Q The SEC right now is focused on the professionalism issue; correct?

A That's one of the elements.

Q As far as the five-year issue, the event the courts across this country decide that all athletes from the Class of 2022 should have a fifth year to play, as the NCAA Manual on its face gives them, the SEC has no problem with that; correct?

A We'd have to see the court orders across the country that

you reference.
Q Let's just do this court.
A As I said previously, we respect court orders that apply.
Q Does the SEC have any basis that it believes looking at the Bylaw you looked at and sitting here today why an athlete from the Class of 2022, who is still within five years of their 19th birthday and five years of starting school, should not be allowed to play?
A Those are in court discussion right now across the country, those are decisions that are being made at that level. So there are courts that have not decided the answer to that question in certain jurisdictions.
Q I'm not asking for the court's decision. I'm asking for the SEC's position. You saw the Bylaws. The SEC incorporates those Bylaws into its own Bylaws. What is the SEC's position on whether athletes from the Class of 2022 who remain within five years of their 19th birthday and five years of starting school, can they be eligible in the SEC right now?
A The understanding of the SEC was it did not apply, that rule change did not apply to 22-23. That's part of why we're having the conversations at the court level.
Q And you saw today that that's not what the Manual says?
A I saw what you showed me.

**MR. DOWNTON:** Thank you for your time.

**THE COURT:** Next, Mr. Kee.

**RECROSS-EXAMINATION**

**BY MR. KEE:**

Q Mr. Sankey, I see that you got around to answering some of the questions I asked last time so I wrote down specific answers you gave Mr. Williams just to make sure that I got them right. You said that the SEC is concerned with the ecosystem of college athletics; correct?

A I'm going to accept that you quoted me correctly.
Q You said that you guys are concerned with fairness across the board; correct?
A That's one of the conversations that has been very much front and center of late.
Q You used the terminology the common good of the athlete; correct?
A I don't recall that one.
Q You said we want them to have common experience that is commonly good for all athletes. You were talking about it in the context of the 17- and 18-year-olds.
A Yeah, I want them to have an opportunity. I want them to have that ability to access to the experience. I think that was my reference. I don't recall specifically those words but forgive me I've had a lot of words this afternoon.
Q No problem, you can take my word for it. The common, what about the common good of these athletes in the box who have all played with fifth and sixth year students who were 20-something years old when they were 17, 18, do you think that they're in the same position as the 17- and 18-year-old now?
A I think they were as 17- and 18-year-olds. I think they've had the opportunity that was presented to them.
Q Do you think they should be the only Class of 2022, that should be looked over?
A It wouldn't be the only class because it didn't extend prior.
Q I'm just asking do you think that they should be excluded now?
A I think there was good reason as it was explained to me that the NCAA established the effective date that was presented.
Q That doesn't sound like it's commonly good, does it?

A It could be, yeah, for others who have access that wouldn't have otherwise. That's the balance. Hey, tough issues.

Q Tough love for them?

A Tough realities for us all.

**MR. KEE:** Thank you, sir.

**THE COURT:** Thank you. That's right we started as an opposing witness so that was on cross, direct, and recross. Commissioner, you may step down and there has been some indication that he is to remain under the order of the court's subpoena. He may be called back at some point in time later. So you can exit but please remember you'll still be under oath. Thank you, Commissioner.

**MR. WILLIAMS:** Judge, for the record, Commissioner Sankey came voluntarily, there was no subpoena.

**THE COURT:** Voluntarily, wonderful. I'm going to ask you personally then if you'll please stick around in case they want to call you back. Thank you so much. I appreciate that.

**THE WITNESS:** Can I just leave it here?

**THE COURT:** I don't know. Do you anticipate the next witnesses to need all of the documents that were provided up here, or, tell you what, Commissioner. You leave it up here and then I'll let y'all come and pick it up. Thank you.

(The witness was excused.)

**MR. CLAYTON:** Judge, I noticed you work hard, hard, hard, but some of us kind of old, can we take a break or get something to eat, something?

**THE COURT:** Something to eat?

**MR. CLAYTON:** Something quick.

**THE COURT:** I'll give everybody a break. Let's see, it's a bunch of y'all here. What you got for me?

**MR. DOWNTON:** We've got two women who have a game tonight. Can we get them on and off? I think they'll be about five minutes. I guess we have a lot of people in the room so I hate to say how long.

**THE COURT:** Fine by me, let's go.

**MR. WILLIAMS:** Judge, we're fine with pressing through. I can get somebody to go get Mr. Clayton a Snickers or something.

**THE COURT:** Look, here's what we're going to do. I'm going to try to get these two, three women out here. If you need to step out during the testimony, I don't anticipate this is going to be very contentious. That's my point with these two. So let's go ahead on and start these two witnesses and then we'll break.

**MR. DOWNTON:** Who wants to go -- let's call Jazmin Ferguson to the stand.

**THE COURT:** All right. Ms. Ferguson, Jazmin Ferguson, stand up right here where you are, we're going to swear you in.

(The witness was duly sworn.)

**THE COURT:** Come on up and have a seat, ma'am, and same thing as I asked the Commissioner earlier, if this bothers you, let me know and I'll cut it off. Okay.

**THE WITNESS:** Okay. Thank you.

**J A Z M I N F E R G U S O N,** was called on behalf of the plaintiff, after being duly sworn, did

testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Good morning, Ms. Ferguson.
**A** Good morning or afternoon.
**Q** Can you please introduce yourself to the judge?
**A** I'm Jazmin Ferguson.
**Q** Where are you from?
**A** Conyers, Georgia.
**Q** Where are you attending school?
**A** Louisiana State University.
**Q** How long have you been going to LSU?
**A** Going on three years now.
**Q** Where were you before that?
**A** East Carolina University.
**Q** Have you enjoyed your time here?
**A** At LSU?
**Q** Yeah.
**A** Yes, I have.
**Q** Are you currently enrolled at LSU?
**A** Yes.
**Q** What sport do you play?
**A** Women's soccer.
**Q** How long have you played that?
**A** Like, my whole life.
**Q** Let's just do college.
**A** I've played four years.
**Q** When you completed your fourth year -- what season does women's soccer player in college?
**A** In the fall.
**Q** So when you completed soccer last fall, did you think you had any additional eligibility coming to you in the NCAA?

A No.
Q So what did you do?
A I had to move on.
Q And in moving on, did you try to find a way to continue playing soccer?
A Yes.
Q Where did you play?
A I didn't, like, actually play, but I went to Tampa.
Q You went to Tampa. They have some sort of do you call it a professional, quasi-professional, what league are they in?
A The USL.
Q You went to Tampa and signed a contract in the USL?
A Yes.
Q Did they pay you any money?
A Yes, they did.
Q You much did they pay you?
A Roughly 4,500.
Q Did you ever play any games for Tampa?
A No, I did not.
Q When you found out you might be able to get a fifth year, what did you do?
A I went to the general manager at Tampa and told her the whole thing. And, obviously, talked to my coach here at LSU just like knowing all the logistics about that and then I repaid all my expenses that I endured while being at Tampa.
Q You gave the 4,500 back?
A Yes.
Q Terminated your contract?
A Yes.
Q Came back to LSU?
A Yes.
Q Filed with this court to ask to get your eligibility?

A Yes.
Q You gotten to play a couple of games so far under this court's order?
A One.
Q Did your coach have to cut anyone from the roster to find a spot for you?
A No, she didn't.
Q Is your coach here today?
A No, she's not.
Q Do you know why she isn't here?
A LSU wouldn't let her be here to, like, speak on behalf of anything going on.
Q Is that because they were worried about being punished for it?
A Yes.
Q I'm giving you a memo from NCAA Board of Directors, I'm guessing you've never seen it before.
A No, I have not.
Q I'm not going to ask you to interpret or anything like that, I'm just going to ask you to read a little bit. Can you read the bottom two paragraphs to the judge, please?
A Coaches and any other athletic department officials who encourage these lawsuits and even support them on the premises that is to benefit only one student athlete are undermining the very rules that their schools have voted to approve and abide by and depriving future student athletes of meaningful opportunities to compete. The Division I Board will explore fair ways to hold accountable institutions electing to not follow the rules that they have supported.
Q Is it possible that this memo is one of the reasons that LSU won't let your coach come support you?
A Yes.

Q Did you play against fifth and sixth year players in your career?
A Yes, probably every year.
Q You think it would be fair for you to get an opportunity to have a fifth year too?
A I think it would be fair.
Q Is there anything else you'd like to tell the judge today?
A I think also every year that I've been in college athletics I've also had a fifth or a sixth year senior on my team. So I feel like every single year there's been someone who's had an extra year of eligibility, sometimes two.
Q And you think it's your turn?
A Yes.
Q And that would be fair?
A That would be fair.
**MR. DOWNTON:** Thank you. I'll pass the witness.
**CROSS-EXAMINATION**
**BY MR. ASKEW:**
Q Hello.
A Hi.
Q First I want to say congratulations on a really outstanding career. You must be great if you've already gotten a contract, USL. Can you tell me what position you play?
A Center back.
Q Are there other center backs on LSU's soccer team?
A Yes.
Q When you played in that one game for LSU under this Court's TRO, whose place did you play in?
A I'm not sure.
Q Was there somebody behind you that would have played in that game if you hadn't participated?
A I'm not sure what my coach, who she would have put on the

field.
Q But there would have been somebody, right, you're not going to play without a center back?
A Probably.
Q You said at the end of last year you understood that your eligibility had expired; is that correct?
A Right.
Q And then I believe you said at some point you learned that it may not have?
A Like it had been exhausted?
Q That you may have an additional year? I'm sorry.
A Could you rephrase that, please.
Q Sure. When did you start believing that you might be able to play for a fifth season?
A I think I heard a little speculation like last year sometime. Nothing went into effect or anything and then I think leaving LSU, I was under the impression there wasn't going to be a fifth year. So I heard about it around, like, end July, I heard there was an opportunity.

**MR. ASKEW:** May I approach the witness, your Honor?

**THE COURT:** You may.

**BY MR. ASKEW:**
Q I don't know if you've seen this document before, but I'm going to ask you if you have?
A I have not.
Q Do you see the date at the top here? You see the date at the top?
A Yes, I do.
Q April 27, 2026. If I represent to you that this is a release from the NCAA about a potential change to eligibility rules, would you have any reason to disagree with me?

A I don't think so at the moment.
Q Do you see that bullet point or those two bullet points in the middle of the page?
A I do.
Q Do you see that that second one after the semicolon says new rules are not expected to be retroactively or not expected to retroactively apply to student athletes whose eligibility is or will be completed by the end of Spring 2026?
A Yes, I do see that.
Q So that predates -- that predates your understanding that you may have an opportunity to play again?
A Are you asking a question?
Q Yeah. Does that predate your understanding of when you believe you may have an opportunity to play this season?
A Can you rephrase that question?
Q Sure. So if you learned in July that you thought you had a fifth season.
A Right.
Q This press release from NCAA would contradict that; right?
A From this, yes.

**MR. ASKEW:** I'd ask to approach the witness one more time, your Honor.

**THE COURT:** Sure.

**BY MR. ASKEW:**
Q You ever seen this document before?
A No, I have not.
Q If I represented to you that this is another update from the NCAA, would you have any reason to disagree with me?

**MR. CLAYTON:** Judge, I don't know if those documents are into evidence. Even if they are, the witness doesn't know anything about them. The first one it got by me that he just said, well, did it

predate that. You can't just show a witness a document without laying any kind of foundation and then cross-examine her on it. She's never seen it before.

THE COURT: I got all that. I guess my first question is whose witness is this?

MR. CLAYTON: You're right.

THE COURT: Thank you, Mr. Clayton.

MR. DOWNTON: Mr. Clayton, made such a good objection, I got to adopt it now.

THE COURT: All right. Now let me hear it again. Again, she's already indicated that she doesn't recognize the document. She's never seen this document. That was the first one, this is also the second one. Tell me about it, what's going on?

MR. ASKEW: Sure.

THE COURT: I'm assuming these letters are to the Board of Directors.

MR. ASKEW: They're updates that are sent to everybody, they are public documents.

THE COURT: Got it. Okay.

MR. ASKEW: Two reasons, first, I think we can all recall the number of times Mr. Sankey was asked a hundred questions where he said I don't have any background information on this.

THE COURT: Good for the goose, good for the gander, that's different. But the fact that this is actually sent out to a bunch of folks or broad publication, I'll let you fly with that one even though she said she didn't see it. Go ahead.

MR. ASKEW: The second point, your Honor, to the extent it were not -- to the extent the Rules of

Evidence were being applied strictly to an injunction hearing, I do want to tell your Honor that the reason we are saying this is to undermine whether or not it was reasonable for this class to expect that the rule could have been applied to them when there had been consistent communication that this is how it would be implemented.

**THE COURT:** Even that, I'm only going to be able to give that as much weight as I can under the circumstances. I got kids and I'm saying kids, forgive me, y'all. I hated that when I was college age. I have young adults, I've got people that have lives going on, I got all that stuff.

**MR. ASKEW:** Understood.

**THE COURT:** Whether they're catching every single bulletin --

**MR. ASKEW:** Sure.

**THE COURT:** -- about their eligibility, et cetera but, anyway, go ahead, --

**MR. ASKEW:** Understood.

**THE COURT:** -- ask your questions.

**BY MR. ASKEW:**

**Q** So the date of this one is June 23, 2026, you see that?

**A** Yes.

**Q** If you flip to the second page, got it highlighted, there's a chart that shows how this new rule would be implemented. You see that?

**A** Yes, I do.

**Q** And at the very top it talks about students who use their final season of competition during the 25-26 year. You see that it says no additional eligibility?

**A** Yes.

Q This is just to confirm, this is the first time you've seen it; right?
A First time.
Q Okay. Thanks. If you're not able to play soccer for LSU for the rest of the season, do you think you would be able to go to back to Tampa and play?
A I'm not sure.
Q Would you try?
A I'm not sure.

**MR. ASKEW:** I don't have any other questions for you. I really appreciate your time and wish you nothing but the best. Thank you.

**THE WITNESS:** Thank you.

**THE COURT:** Is there any redirect?

**MR. DOWNTON:** No, no redirect.

**MR. WALSHE:** Your Honor, SEC has no questions for this witness.

**THE COURT:** Again, apologies. I appreciate that. Thank you.

**MR. CLAYTON:** The next witness is mine and let me ask you this and I join in with -- Ms. Jocelyn --

**THE COURT:** Mr. Ferguson, you may step down, ma'am. Thank you, ma'am.

**THE WITNESS:** Thank you.

(The witness was excused.)

**THE COURT:** Again, I want to be clear since we started this precedent, she's going to be free to go, right, we're not anticipating having to call her back for anything?

**MR. CLAYTON:** Judge, we just talked, we're also going to let -- unless you guys want, let Mr. Sankey go back, he can go too?

**THE COURT:** Let me do one thing then because I did have a question for clarification for Mr. Sankey. Mr. Sankey, if y'all don't mind.

**MR. CLAYTON:** Not at all.

**THE COURT:** For clarification. You're still under oath, Mr. Sankey. Again, I only got, like, one or two brief questions.

**G R E G S A N K E Y,** was recalled on behalf of the Court, after previously being duly sworn, did testify as follows:

**FURTHER EXAMINATION**

**THE COURT:** I guess it's apropos that it comes after Mr. Ferguson. Mr. Sankey, you're still under oath. Earlier you answered as it relates to your interpretation of it relating back we've got these campuswide memos, et cetera, et cetera or not campuswide, public wide broadcast for all athletes and anybody else to be able to see as far as the conversations, how they'll be going prospectively or not. But you indicated and I may be conflating what counsel stated as far as if a rule is prospective or retro or reactive, retroactive, can you again tell me, tell the Court again because your understanding as far as the Bylaws in the Division I Manual, your understanding as it relates to SEC, what would have to have been written as it relates to incoming classes, lead classes leaving, et cetera, et cetera, your understanding of that.

**A** My understanding would be having seen those if I can reference, your Honor, those two documents, the communication was ongoing about how the rules would apply. As I recall, I referenced, okay, I see the effective date but there was more

documentation provided around the onset of this rule and how it is to be applied. I think that's consistent with what was provided.

**THE COURT:** And then my last follow-up question is in quotes in here, you indicated as it related to the opportunities again, counsel has asked the question that, I guess, gets it even more specific as far as playing time. My question is would your answer change if the rosters basically I haven't used, I haven't exhausted all my scholarships, I still have positions available on my spot, in other words, all these high school kids that we was talking about earlier, they ain't coming here no way. So would your answer change as it relates to these students that have not changed anything, would that matter?

**A** Well, there were two components, one is roster access. I don't know if everyone's at their roster limit. The other one is playing time and the opportunity for a young person to access playing time and I think we heard both of those described. So bringing folks back alters that playing time access.

**THE COURT:** Again, based on that answer I move forward now, this is hopefully my last for clarification as well. There were a lot of hypothetical questions talking about going forward in years to come. How often do the different committees actually meet to update, modify, change rules, et cetera?

**A** Frequently.

**THE COURT:** I figured it.

**A** It's a complex -- I think I received notice of some

Cabinet or board meeting. I'm not part of it but it shows up in my email.

**THE COURT:** In fact, it could also be posited that irrespective of the ruling of this Court, rule changes can be put into effect, language can be tightened up going forward to affect prospective individuals; is that also a fair assumption? Because, again, this has been posited every single way of they're letting professional athletes come into college sports. Hold on, I don't know that but I'm just asking.

**A** On that one, that's not --

**THE COURT:** Just the one year. Again, the question, again, it's been posed, the question has been posed as it relates to that one.

**A** Can I?

**THE COURT:** Yeah, go ahead.

**A** And you said irrespective of the courts, I want to be respectful of the Court in answering that. Certainly rules are reviewed on an ongoing basis. What are the bright lines and on the professionalism one, in particular, that's one of those bright lines that's existed. There's a lot more that's in there that just hasn't been part of the conversation. As I was indicating, I was assigned work and I think the NCAA has some work to do on that.

**THE COURT:** I would agree with you on that. Thank you, Commissioner.

**THE WITNESS:** Thank you.

(The witness was excused.)

**THE COURT:** I'm sorry, I belabored us another five minutes for the bathroom break. You can call your next witness. I know this young lady has to

leave, right? Come on up, Mr. Clayton.

**MR. CLAYTON:** Yes, sir. Ms. Jocelyn Ollivierre.

**THE COURT:** Come on up, ma'am. You're going to be sworn in right here.

(The witness was duly sworn.)

**THE COURT:** Come on up, have a seat and same thing if this bothers you, let me know and I'll cut it off.

**MR. CLAYTON:** May I proceed?

**THE COURT:** You may.

**J O C E L Y N O L L I V I E R R E,** was called on behalf of the plaintiff, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. CLAYTON:**

**Q** Ms. Jocelyn, state your full name and spell your last name for the court reporter.

**A** My name is Jocelyn Ollivierre. My last name is O-L-L-I-V-I-E-R-R-E.

**Q** Tells us a little about yourself, what are you doing now?

**A** I am back at LSU. I am enrolled in classes. I -- I'm playing soccer. I've been playing soccer since I was, like, seven. So it's, like, my whole life. Yeah.

**Q** Tell Judge Jorden, if you will, your brief stint once you finished your four years eligibility at LSU, would did you do next?

**A** I got a job. I had to move on with my life. I got a job as an assistant in Medicaid. I did that, worked about 20 hours a week. Did that. And then I started, I'm enrolled to start school, that I pushed back, to MRI school. I enrolled to start January 1.

**Q** Did you further your soccer career in any shape, form or

fashion?
A Say the question again.
Q Did you to further -- did you take steps to further your career?
A No. Wasn't my journey. I didn't want to go pro.
Q Where are you domiciled? You live here in Louisiana?
A Yes.
Q You intend to remain here?
A I don't know, I haven't figured it out yet.
Q You got to like our food though.
A Makes you a little big, but I like it.
Q There goes that Snickers. Anyway, were you aware in January that you had an opportunity to play -- were you aware in January -- strike that. If you were aware when you left LSU that you could've had a fifth year to play soccer, would you have exercised that right?
A Yes.
Q Do you want to exercise that right?
A Yes.
Q Tell this judge why you want to continue your education and claim another year of soccer?
A LSU is the best four years of my life. My teammates are people that I can call my sisters now. Not only is it the soccer program, the schools' amazing, like, the culture, the atmosphere. I got my degree and I think having a degree is important. Yeah, I think last year our soccer run was something I could be proud of and I want to continue that.
Q I want to talk to you so much but I can't. I thank you. You've gotten what I needed out of you.
**MR. CLAYTON:** I tender you to these guys.
**THE COURT:** All right.
**MR. ASKEW:** Just want to say congratulations on

an outstanding career. Thank you and good luck.

**THE COURT:** Thank you.

**MR. WALSHE:** No questions.

**THE COURT:** All right. You may step down. Thank you so much. Again, staying with the same theme, I always like to repeat the same things that way I won't forget, is she free to go, relieved of any of her obligations? So those two witnesses are free to go.

(The witness was excused.)

**THE COURT:** Commissioner Sankey, based on the conversation earlier, I believe, Mr. Clayton agreed he will also be free to go. Again, I know you're a busy man. If you want to stay, you can. I will abide by what the body wants. I'll give you 30 minutes.

**MR. CLAYTON:** I can eat two Snickers.

**THE COURT:** Thirty minutes. We will resume, it's about 3:20, 3:50. Thank you everybody.

(A recess was taken.)

**THE COURT:** You all may be seated. Old habits, right, does either side wish polling. Never mind, don't worry about it.

**MR. CLAYTON:** Waive polling, Judge.

**THE COURT:** There you go. When we broke and I know we're a couple of minutes later than when I said when we broke, you were presenting your witnesses as it relates to the harm, et cetera. So I will allow you to go ahead, you may call your next witness.

**MR. DOWNTON:** Thank you, your Honor. Let's call Thomas Marsala.

**THE COURT:** Thomas Marsala. Come on up, sir.

When you make your way here, we're going to swear you in the same thing. I'm turning this back on. If this is a problem for you, let me know.

(The witness was duly sworn.)

**THE COURT:** All right. Mr. Marsala, have a seat.

**T H O M A S M A R S A L A,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Good afternoon. Would you please introduce yourself to the judge?
**A** My name is Thomas Marsala. I play baseball at Northwestern State.
**Q** Where is Northwestern State located?
**A** Natchitoches, Louisiana.
**Q** How many years did you play at Northwestern State?
**A** I played last year. This will be my second year if I'm allowed to.
**Q** Where did you play before Northwestern State?
**A** I played at year at Baton Rouge Community College, a year at Hinds Community College, a year at Western Kentucky University and then Northwestern.
**Q** How old are you?
**A** I'm 22.
**Q** Have you heard of something called the Pavia waiver?
**A** Yes.
**Q** Can you tell the judge what you understand that to be?
**A** The graduating Class of '21 got an extra year of eligibility because they played junior college.
**Q** So not everyone in '21 got the year, it's if you finished

in '21 and you went to junior college before college, you got an extra year?
A Yes.
Q You went to junior college; right?
A That's right.
Q Did you also get an extra year for the NCAA?
A I did not.
Q So the people that came before you if they went to junior college they got five years including junior college, but for you and everyone else in your class, you just got four?
A Correct.
Q Are you familiar with prep schools?
A Yes.
Q Do you know any kids that went to a prep school and played baseball?
A A few.
Q Can you tell the judge, if he's not familiar, your understanding with what a prep school is?
A It's like a school where you can, it's kind of hard to explain, but you just go and play your sport at this school and you don't lose a year of eligibility.
Q You take classes?
A Yeah.
Q It's after high school?
A Correct.
Q You compete against sometimes junior colleges?
A Correct.
Q Do you play in leagues with NCAA players?
A Right.
Q If you're in junior college, the NCAA counts that as a year towards your limit; right? But the prep school kids you play against, that doesn't count for them?

A Correct.
Q Do you have an interest in playing at Northwestern State this year?
A Hundred percent.
Q Are you enrolled in school?
A I am.
Q Do they have a roster spot for you?
A They do.
Q Did you play against fifth and sixth year players in your career?
A Yes.
Q You think it would be fair to allow you to have the chance to have your fifth year?
A I do.
Q Anything else you'd like to tell the judge today?
A Thank you for having us.

**MR. DOWNTON:** I'm going to pass the witness.

**THE COURT:** All right. Tender for cross.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

Q Hey, Mr. Marsala, how are you today?
A I'm good.
Q If understand you correctly, you played four years of college baseball?
A Correct.
Q And so you understand that the NCAA treats that as the entirety of your eligibility; right?
A I do.
Q And you were talking about the Pavia waiver a second ago, have you ever read the Pavia waiver?
A I have not.
Q Do you know how it came to be or anything like that?

A Maybe not as good as you.
Q Do you know whether or not it actually changed the eligibility rules versus whether it was a one-time waiver in response to litigation?
A I was under the understanding it was a one-time waiver.
Q So that means it wasn't going to continue on to the next year?
A Correct.
Q So you knew it wasn't going to apply to you; right?
A Correct.

**MR. ASKEW:** I don't have any other questions for you. Thank you so much.

**MR. WALSHE:** No questions, your Honor.

**THE COURT:** Thank you. Any redirect?

**MR. DOWNTON:** No redirect.

**THE COURT:** Thank you so much. You may step down, sir.

(The witness was excused.)

**MR. DOWNTON:** I'd like to call Ckelby Givens.

**THE COURT:** Ckelby Givens, come on up Mr. Givens. Please watch your step, you're going to be sworn in as well. After that, you're going to come up and have a seat, sir.

(The witness was duly sworn.)

**THE COURT:** Again, same thing. If this bothers you, let me know, I'll cut it off.

**C K E L B Y G I V E N S,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Would you please introduce yourself to the judge?

A How you doing? I'm Ckelby Givens.
Q Ckelby, how old are you?
A Twenty-three years old.
Q When did you finish high school?
A Finished high school in 2022.
Q Where did you go when you finished high school?
A I went to Southern University.
Q And how long have you been at Southern?
A Been to Southern for four years.
Q Played football all four years?
A Played football all four years.
Q Did you play against fifth and sixth year players in your career?
A Fifth, sixth and sometimes seventh.
Q When you finished up this year, did you think you were out of eligibility?
A As far as I knew, I was out of eligibility.
Q What did you do?
A I went in training for the NFL draft.
Q Did you get drafted anywhere?
A Didn't get drafted anywhere but I had a minicamp invite.
Q Which team invited you to minicamp?
A Buffalo Bills.
Q Did you sign a contract with Buffalo Bills?
A I did not.
Q Did you ever play a game with the Buffalo Bills?
A I did not.
Q Did you to make a roster with the Buffalo Bills?
A I did not.
Q Did they pay you any money?
A They did not.
Q Do you have any other connection to the Buffalo Bills or

any other NFL team?
A No.
Q Would you like to play another year at Southern?
A I would.
Q You on the roster?
A Yes.
Q When's your first game?
A I had my first game last week.
Q You get to play?
A Yes.
Q That was because you had an order from this Court; correct?
A Yes.
Q Anything else you'd like to tell the judge today?
A I would just like to be treated fairly as everyone else.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Tender for cross.

**MR. ASKEW:** I don't have any cross for this witness. Thank you, Mr. Givens.

**THE COURT:** All right.

**MR. WALSHE:** No cross.

**THE COURT:** I've got one question. For clarification, you say you were invited to Bills, was it Bills rookie camp?

A Rookie minicamp.

**THE COURT:** The rookie minicamp, right. So about how many days were you actually up there?

A Like one and a half.

**THE COURT:** All right. And then after that, professionally, where you been working at?

A Professionally, I became a graduate assistant for Southern University.

**THE COURT:** As far as you know, as far as roster spots are concerned, if you know, are you aware if you took somebody's spot?

**A** As far as I know, I didn't take anyone's spot.

**THE COURT:** I'm not talking about depth chart wise. I'm just talking about this kid was a scholarship athlete now he got to go sit down.

**A** No one's money was taken away from them as far as I know.

**THE COURT:** I'm glad you said that about money. Let me ask you this. NIL, it hadn't been brought up yet but I'm just curious. At Southern, you get any NIL deals?

**A** NIL, yeah I have had some NIL deals at Southern.

**THE COURT:** You have had some. Just being on the team, do you blanketly get any NIL money, just being on the team?

**A** Not at Southern.

**THE COURT:** Thank you.

(The witness was excused.)

**THE COURT:** You may call your next witness.

**MR. DOWNTON:** Let's call Dae'Quan Wright.

**THE COURT:** Dae'Quan Wright. Come on down, Mr. Wright. Going to swear you in right here.

(The witness was duly sworn.)

**THE COURT:** Come on up, have a seat. Again, if this bothers you, I'll cut it off. Okay.

**D A E' Q U A N W R I G H T,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Mr. Wright, would you please introduce yourself to the

judge?
A I'm Dae'Quan Wright.
Q Where you from?
A I'm from Perry, Georgia.
Q When did you finish high school?
A 2022.
Q How old are you?
A I'm 22.
Q What did you do when you finished high school?
A Went to Virginia Tech.
Q What sport do you play?
A Football.
Q How many years at Virginia Tech?
A Two.
Q What did you do after that?
A I got in the portal and I went to Ole Miss for two years.
Q So after your two years at Ole Miss, what did you do?
A I ran out of eligibility so I pursued the NFL.
Q Let's talk back about college a little bit. Did you have any significant injuries in college?
A Yes, last season in 2025, first game I tore my labrum in my right shoulder.
Q Labrum, that's a pretty big muscle; right?
A Yes, sir.
Q Do you know what a redshirt is?
A Yes, sir.
Q Can you tell the Court, the Court knows what redshirt is --

**THE COURT:** For the record.

**BY MR. DOWNTON:**

Q For the record, can you explain what a redshirt is?
A You can -- you do get a medical as well, but you get a

redshirt year which means you don't play more than four games that season.

Q That's football. Do you know if the other sports, if they're allowed to play four games and still just take a redshirt?

A I don't know.

Q We'll ask maybe some of these people about that one. So once you tore your labrum, did you think about redshirting?

A Yes, I thought about it for sure.

Q In your experience, who ultimately gets to decide on redshirts, is that the player or the coach?

A Mostly the coach.

Q So here, you tore your labrum, you talked to the coach about, hey, coach, I'm hurt. Maybe it would be better for me to sit this year out and practice and come back next year, have those conversations at all?

A It ain't really like, you know, go like that but kind of just, you know, just the coach just telling you, like, we need you, you're an important player. Just letting all that get in my head which kind of, kind of forced me to, you know, keep going.

Q Yeah, because you're an important player on the team and coach said I know you're hurt, but you can play through this and you can help us.

A Correct.

Q And you're a team player; right?

A Yes, sir.

Q So what did you say?

A I will do it.

Q So you played last year with a torn labrum all year?

A Yes, sir.

Q You get paid some NIL money when you were at Ole Miss?

A Yes, sir.
Q High six figures?
A Yes, sir.
Q In your experience, over your four years from your first year to your second year, did your NIL go up?
A Yes, sir.
Q Second year to third year, did it go up?
A Yes, sir.
Q Third year to fourth year?
A Yes, sir.
Q When you finished last year at Ole Miss, if you had known you had eligibility, would you have done anything with the NFL?
A No, sir.
Q How much money do you think you would've gotten in an NIL deal if you would known you were eligible again at the end of the season?
A Seven figures for sure.
Q Did it ever enter your mind last year when you were hurt, man, that's a lot of money. I could just sit this year out and I come back and get a million dollars. I'd quit on my teammates but that's a lot of money. Did you ever think about doing that?
A Definitely, definitely crossed my mind.
Q But what did you decide?
A To play.
Q Because you're a man of your word and you're a good teammate?
A Yes, sir.
Q Even though for your financial interest you would've been a lot better off saying I've got a torn labrum, I just need to come back last year, you didn't do that?
A No, sir.

Q That wouldn't have been fair to your team?
A Correct.
Q And did you play against fifth and sixth year players in your career?
A Yes, sir.
Q Do you know that everyone coming after you is getting a fifth year, you've heard that?
A Yes, sir.
Q Do you think it would be fair for you to get a fifth year too?
A Yes, sir, definitely.
Q What would you like to do this year?
A Play for LSU.
Q Are you on the LSU roster right now?
A No, sir.
Q Do you know if they've got a roster spot available?
A Yes, sir.
Q Have you talked to the coach, do they have to kick anyone off for you to have the roster spot?
A No, sir.
Q Your coach here is the coach you played for before; correct?
A Yes, sir.
Q When did you find out that there was a possibility you might be able to come back?
A I definitely heard it, like, last year. I definitely heard them in talks about it for sure. And then they passed it this year, like, June.
Q And then we're not going to get into any conversations you've had with lawyers. Did you talk to your family about it?
A Yes, sir.
Q You talked to your agent about it?

A Yes, sir.
Q Explored what options there were for you?
A Yes, sir.
Q Let's talk briefly about your connection to the NFL. Did you get drafted?
A No, sir.
Q Did you get a chance to go to a rookie minicamp?
A Yes, sir.
Q Whose minicamp did you go to?
A The Eagles.
Q Did they offer you a contract?
A Yes, sir.
Q And you signed a contract with them?
A Yes, sir.
Q How much did you get paid under that contract?
A It was like a $25,000 signing bonus.
Q After the signing bonus, have they paid you anything?
A No.
Q You ever play in an NFL game?
A No, sir.
Q You ever been on an NFL roster?
A No, sir.
Q If you can play in college again, would you give back that money?
A Yes, sir.
Q If you had had an opportunity to continue in college, would you ever have signed a contract with them in the first place?
A No, sir.
Q Do you think it would be fair for this Court to put you back in the position you were in at the end of your last season where you would've had a choice to go back to college --

**MR. WILLIAMS:** Objection to the form, Judge, and the whole thing's been leading.

**THE COURT:** Sustained, sustained, sustained. Rephrase, do it a different way.

**BY MR. DOWNTON:**

**Q** What are you asking this judge to give you an opportunity to do?

**A** Just be treated fairly, you know, get my fifth year back as well.

**Q** Is there anything else you'd like to tell the judge today?

**A** No, sir.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Tender for cross.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

**Q** Hello, Mr. Wright.

**A** How you doing?

**Q** How much money do you think you've made playing college football up to this point?

**A** Oh, I mean, over seven figures for sure.

**Q** So you've made over a million dollars already?

**A** Yes, sir.

**Q** If you come back to play for LSU, what position do you play?

**A** Tight end.

**Q** You think you'd be a starter on LSU's team?

**A** Yes, sir.

**Q** So you're going to be starting in somebody else's place; right?

**A** I'm not really sure how it's going to all work out. I mean, that's up to the coaches.

**Q** Sure, sure. But you would agree with me though that you

can only have 11 players on the field; right?
A Correct.
Q So if you're on the field playing one of the 11 positions, that means somebody else is not on the field doing that; right?
A Yes.
Q You said that you heard last year that you might have the opportunity to play a fifth season?
A Yeah, it was always conversations about it but --
Q Was that anybody from the NCAA that told you that or was that just rumors?
A Just like rumors.

**MR. ASKEW:** All right. I don't have anything else. I wish you the best of luck sir.

**THE WITNESS:** Appreciate it.

**THE COURT:** SEC?

**MR. WALSHE:** Mr. Williams jumped. I wasn't going to object. I was going to --

**THE COURT:** Look, we've been here, I appreciate it. Tony didn't say nothing.

**CROSS-EXAMINATION**

**BY MR. WALSHE:**

Q Good afternoon, Mr. Wright.
A Good afternoon.
Q As an Ole Miss grad, I really appreciate everything you did last year.
A Appreciate you.
Q Great year. Let me ask you a question. Do you know what the NFL Combine is?
A Yes.
Q What is it?
A Just, like, when a bunch of athletes from college, you know, get invited to show off their skills.

Q Does everyone who finishes their eligibility get invited?
A No.
Q Were you invited to the Combine?
A Yes.
Q So you had an opportunity to try out for NFL scouts?
A Yes. But I was hurt so I couldn't.
Q You said that during your last year of college you earned six-figure NIL money; correct?
A Yes.
Q You also said that last year you played with a torn labrum; correct?
A Correct.
Q There was some discussion that Coach Kiffin asked you to play through that torn labrum; right?
A Yes.
Q Okay. And you said you decided to play?
A Correct.
Q So then you were asked you thought this year, if you had another year, you would have had a seven-figure NIL; right?
A Yes.
Q But that was based on you actually playing last year; correct? Had you not played last year, you don't know that; right?
A Correct.
Q In addition to the Eagles, you did go to camp with the Cleveland Browns; right?
A Yes.
Q You actually suited up for a preseason game for the Cleveland Browns; correct?
A Yes, never played.
Q But you went through warm-ups with the team on the field?
A Yes.

Q You just did not get into the game?
A Yes.
**MR. WALSHE:** No more questions.
**THE COURT:** Redirect?
**REDIRECT EXAMINATION**
**BY MR. DOWNTON:**
Q You said at the Combine you couldn't even participate?
A No, sir.
Q With the Browns, did they pay you anything?
A No, sir.
**MR. DOWNTON:** No other questions.
**THE COURT:** Wait, whoa. Come back. I got that, $25,000, the Eagles, bye-bye. Now you get to put on a uniform, you go to Cleveland, the Cleveland Browns, the team that plays football up there, Paul Brown, them people, they didn't give you a dollar?
A Didn't pay me. I got claimed off the waiver but I didn't make any money.
**THE COURT:** All right. Got it. Yeah, that makes sense. Thank you. You may step down. I'm sorry, did you have any other questions?
**MR. DOWNTON:** No, nothing else for him. I was just looking to see, I thought they were done.
**THE COURT:** All right. My bad. You can step down.
(The witness was excused.)
**MR. DOWNTON:** I'll call Zxavian Harris.
**THE COURT:** Zxavian Harris. Yeah, I guess that does make sense if you're claimed off waiver because they already paid you.
(The witness was duly sworn.)
**THE COURT:** Same thing, sir, please have a seat,

if this bothers you, let me know and I'll cut that off.

**Z X A V I A N H A R R I S,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Please introduce yourself to the judge.
A Zxavian Harris.
Q Where are you from, Zxavian?
A Canton, Mississippi.
Q How old are you?
A Twenty-two.
Q When did you finish high school?
A I finished Class of 2022.
Q What did you do when you finished high school?
A Went to Ole Miss.
Q How long did you stay at Ole Miss?
A Four years.
Q What sport do you play?
A Football.
Q What position?
A D-tackle.
Q Did you have any significant injuries in your career?
A Last season I broke my foot without realizing I broke it but I ended up still playing on it for my last, like, eight to seven games.
Q You didn't even know you had a broken foot, how does that happen? Did you go see the trainers?
A Yeah, I seen the trainers. They were really just telling me that it might just been a bruised, like, ligament or something. It wasn't that serious. So they told me it was

fine, so I just went on with it and plus I ain't really want to stop playing if it was, like, something serious because I wanted to win. So I kept playing.

Q To help your team?

A Uh-huh.

Q If you had been given the chance at the end of the season to play again in college, would you have taken that chance?

A Yes, sir.

Q When you finished your fourth year, did you think you had another chance to play in college?

A I heard speculations, especially like talking to Trinidad, like, me and him was talking back and forth before he had his little thing and, like, I just been hearing rumors about coming back for another year.

Q Trinidad Chambliss?

A Yeah.

Q So when you didn't have another you when you finished, what did you do?

A I had got invited to the Combine by I end up going there but that's when I found out that my foot was broken at the Combine after the MRIs and stuff and I was flagged for doing anything. So I was just there just to show my face really basically.

Q So the college trainers didn't find your broken foot, you played through all of last year on a broken foot?

A Yeah.

Q Then you got to the Combine and they said?

A I had a broken, I can't really pronounce, like, naticular (phonetic), it's like the arch, the bone in your foot in the arch was just broke in two.

Q Did you get drafted in the NFL draft?

A No. No, sir.

Q Did go to a minicamp?
A I did. I only went to one and that was with the Saints.
Q And then the Saints, you didn't sign a contract with them, did you?
A I did. I signed with the Saints.
Q What was your contract for?
A Nothing. I didn't get anything, no signing bonus or nothing. I was just there.
Q So you signed a contract, got no money?
A Yeah.
Q For the minicamp, did they give you any money for gas or anything?
A They gave me like $190, that's about it for gas. Because I wasn't that far from the Saints. But still that was all I got.
Q For minicamp, you got $190.
A Uh-huh.
Q Did you go to the preseason camp in the summer?
A No, I didn't.
Q You have any relationship with the Saints other than signing a contract where you got paid no money, going to minicamp and getting $190 to cover gas?
A The only -- was there to try to do a little bit of rehab because my foot obviously I was in a boot the whole time. So basically --
Q So when you were in minicamp, you couldn't even play, you were just doing rehab and working with trainers?
A The whole time I've been with the Saints, I just been doing rehab. I did nothing football related since February.
Q You ever on the Saints NFL roster?
A No.
Q Have you ever played in a football game for the Saints?

A No.
Q Ever played in any NFL football game?
A No.
Q Got money from any NFL team other than $190 for gas?
A That's about it.
MR. DOWNTON: Pass the witness.
THE COURT: Tendered for cross.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

Q Mr. Harris, did you have the opportunity to earn NIL money when you were at Ole Miss?
A Yeah, I did.
Q Did you earn some your freshman year?
A No, it was just my sophomore, junior year, and senior year.
Q But you played as a freshman; right?
A Sort of special-teams but, yeah, you can say that.
Q Would you agree with me that playing time is important to increase NIL values for the next year?
A Yeah, I was my freshman year for sure I was the only freshman D-tackle to come in so it really wasn't about playing time, it was just getting my opportunity from time to time.
Q Sure. So the opportunity at the beginning was important so that you could then build some tape and some credentials and credibility as a player to increase your NIL earnings; right?
A Yeah, you could say that. I wasn't too big of NIL when I first got to college, I wasn't really too big about money and stuff. So, yeah.
Q How much money do you think you've earned over your college career now?
A I would say just about seven figures.
Q So you'd agree with me though and I think it's laudable

you came in wanting to play, but you'd agree with me though the opportunity to play even as a freshman and a sophomore that increased your ability to earn money playing football; right?

**A** Yeah, sure.

**Q** Because the schools don't pay players who don't play as much; right?

**A** They don't pay people that can't produce.

**Q** Right. You'd agree with me though despite the rumors that you discussed, you knew when you played last year even with the broken foot, that you knew that was your last season; right?

**A** I heard more of, like, towards before my last couple of games that there was going to be opportunity for me to earn an extra year. So, yeah.

**Q** But you still went to the NFL draft; right?

**A** Yeah, because it wasn't like on paper or anything. It was all in the air. So it was just the next thing I could do be able to help my foot and stuff.

**Q** Sure. Just fair to say that nobody from the NCAA had ever told you, hey, Mr. Harris hang on, you may not want to go to the NFL because we may give you another year or something like that; right?

**A** No. Not until it came out in July or June, whatever it was.

**Q** You recall those pieces of paper I put up earlier with one of the student athletes I was talking about?

**A** I can't recall.

**MR. ASKEW:** Okay. I appreciate your time, sir. I wish you nothing but the best. Thank you.

**THE COURT:** Thank you.

**MR. DOWNTON:** No redirect.

**THE COURT:** We got SEC.

**MR. WALSHE:** No questions, your Honor, but just

since I thanked Dae'Quan, I'll thank you too, Mr. Harris for Ole Miss last year.

**THE WITNESS:** You're welcome.

**THE COURT:** Now, no redirect?

**MR. WILLIAMS:** It's telling, Judge, they keep forgetting about the SEC.

**MR. DOWNTON:** Now I got redirect.

**REDIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Did you play against Vanderbilt last year?

A Last year, I don't think we did.

Q Thank you for not -- thank you for not playing Vanderbilt last year.

**MR. DOWNTON:** That's it. Thank you.

**THE COURT:** Thank you so much, sir. You may step down.

(The witness was excused.)

**MR. DOWNTON:** Carmelia Muccilli. Muccilli.

**THE COURT:** Muccilli. Come on up. We're going to swear you in.

(The witness was duly sworn.)

**THE COURT:** Come on up, ma'am, have a seat. If this bothers you, let me know and I'll cut it off.

**C A R M E L I A M U C C I L L I,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Ms. Muccilli, please introduce yourself to the judge.

A Hi. I'm Carmelia Muccilli.

Q Where are you from?

A I'm from Santa Cruz, California.

Q How old are you?
A I'm 22.
Q What sport do you play?
A Softball.
Q Where do you currently play?
A I was at Nicholls State University.
Q Take us through after you finished high school, what did you do with your career?
A After high school? Went straight to Nicholls State and I've played there for four years.
Q Did -- do you know what a waiver is with the NCAA?
A Yes.
Q Can you tell the judge for the record what a waiver is?
A You can file a waiver basically, you have the hardship waiver, many different waivers, pretty sure. I'm not exactly keen on it, but yes.
Q Do you have teammates and opposing players you know that have received different waivers over the years to get an extra year to play?
A Yes.
Q You also requested a waiver from the NCAA?
A Yes.
Q That was for individual circumstances and this case is not about those, so I'm not going to go into them right now. But you filed a waiver request and you believe you had good compelling reasons why you should get another year of competition; correct?
A Yes.
Q Did the NCAA grant your waiver?
A No.
Q How long is it pending?
A It was pending for about three months.

Q While it was pending, did your season end?
A After my season ended, I filed. And it was about three, two months, two, three months and then I -- it was denied.
Q While your waiver was pending, were you hopeful they'd grant it and you'd get another year?
A Yes.
Q So do you know what the transfer portal is?
A Yes, sir.
Q For the record, can you explain what the transfer portal is?
A The transfer portal is something that you can go into to go to a different school.
Q If you -- did you enter the transfer portal?
A I did.
Q If you had not had a waiver request on file, can you think of any reason you would have entered the transfer portal when you had no eligibility left?
A No.
Q Do you have an opportunity to play on a full scholarship for this year?
A For this coming year, yes.
Q What school has offered you that opportunity?
A Elon University.
Q What would you like to do this year?
A This year I'd love to play. I'd love to enjoy this game that I actually really love.
Q Is it about money?
A No, not for me.
Q Is there anything else you'd like to tell the judge today?
A No, sir.

**MR. DOWNTON:** Pass the witness.

**THE COURT:** Tender for cross.

**MR. ASKEW:** No questions from the NCAA.

**THE COURT:** All right. SEC?

**MR. WALSHE:** No questions, your Honor.

**THE COURT:** Thank you very much. You want to tell her thank you?

**MR. DOWNTON:** Thank you.

**THE COURT:** You may step down. Thank you so much.

(The witness was excused.)

**THE COURT:** Nicholls State didn't play against Vanderbilt, I don't think. You may call your next witness.

**MR. DOWNTON:** Vandi doesn't have a softball team.

**THE COURT:** I didn't know that.

**MR. DOWNTON:** Let's call Keenan Landry.

**THE COURT:** Mr. Landry, come on up, you're going to be sworn in.

(The witness was duly sworn.)

**THE COURT:** Come on up, have a seat. If this bothers you, let me know, I'll cut it off.

**K E E N A N L A N D R Y,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Please introduce yourself to the judge.

**A** Keenan Landry from Jennings, Louisiana

**Q** How old are you, Mr. Landry?

**A** Twenty-three.

**Q** When did you finish high school?

**A** 2021.

Q So you're a little different than these other guys because you finished in '21. What did you do after high school?
A Went to Mississippi Junior College, Mississippi Gulf Coast.
Q How long were you there?
A Just for one season.
Q What did you do after that?
A Transferred to the University of Florida as a preferred walk on.
Q In your first year at University of Florida, did you how many games did you play in?
A Just one.
Q So you were redshirt?
A Yes, sir.
Q Then where did you go after that?
A I played another year there and then I transferred to Kent State.
Q How long were you at Kent State?
A Just for one season.
Q Where did you go after that?
A Went back home to McNeese State.
Q How long were you at McNeese?
A Just for one season.
Q When did that finish?
A This past year.
Q So how many years of college Division I football have you played?
A Only four.
Q One of those years was a redshirt?
A Yes, sir.
Q Are you familiar with the Pavia waiver?
A Yes, sir.

Q What's your understanding of the Pavia waiver?
A Pretty much if you played junior college it doesn't count against your eligibility.
Q Did you get the benefit of that?
A No, sir.
Q We talked about it a little earlier the NCAA said that was just a one-year waiver, right. You were in college when they issued the Pavia waiver; right?
A Yes, sir.
Q And you had played in junior college just like Diego Pavia; right?
A Yes, sir.
Q Has anyone from the NCAA or anywhere else ever explained to you why certain junior college players from that time period got the extra year but you did not?
A No, sir.

**THE COURT:** Before you go any further and I know there hasn't been any objection, I want to be clear on something. I thought we were talking about Class of 2022 and I'm getting your foundation, you're telling me about the Pavia waiver. I didn't think that the Court was asked to supplement my judgment for the NCAA and their are we going to give another year of eligibility. So clarify, I guess, if you don't mind taking a break just explain to me how your request if we go on here is not to do that.

Again, I had a blanket bunch of 2022 folks and even from what you told me on cross with Greg Sankey we were talking about or the testimony was there was no indication about timeliness irrespective of that, this has already been addressed so for me to make a ruling on his eligibility, how is that not me coming

in and saying they did it wrong in that particular case again that was different than the blanket rule change to the five years, tell me about this.

**MR. DOWNTON:** Sure. So we're still operating under the five years. He is a little bit different than everybody else. So I want to explain it. One of our arguments for the five year notwithstanding we just found out that when they changed it there is no limit and these guys weren't excluded. Before we knew that, our argument was largely that their waivers and their standards were arbitrary and capricious and unreasonable for determining who gets an extra year and who didn't.

**THE COURT:** Sure.

**MR. DOWNTON:** And so for the junior college guys that came before him, they ruled your first year of JUCO didn't count. So if his first year of JUCO didn't count, well, he redshirted a year, he doesn't need any other relief. If the first year of JUCO did count and he got five years, he would be in. So we allowed him to be part of this group because other courts that have looked at it have said, yeah, this treatment of JUCO guys also seems arbitrary and capricious tied to the five year rule and who got the waiver and who didn't. So that's why everyone's here.

**THE COURT:** I'll let you keep asking questions but just know that you got a hurdle in my mind already.

**MR. DOWNTON:** I understand.

**THE COURT:** But go ahead.

**BY MR. DOWNTON:**

Q Did you have any injuries in your career?
A Yes, sir.
Q What was your injury?
A I had a meniscus tear leaving my junior college and I also this past season in 2024, I tore my labrum.
Q Did you get a medical redshirt either of those years?
A No, sir.
Q Did you ask for one?
A Yes, sir.
Q Did you file a hardship waiver with the NCAA?
A Yes, sir.
Q It was denied?
A Yes, sir.
Q You've been trying to get eligibility back for a while; right?
A Yes, sir.
Q You tried to file you sought relief from a court on the hardship waiver?
A Yes, sir.
Q And what kind of relief did you ask for? Do you know what it was called?
A Just a medical hardship waiver.
Q You asked for a temporary restraining order?
A Yes, sir, temporary restraining order.
Q Did the judge give you that?
A No, sir.
Q Did you --
A They did grant the temporary restraining order but they denied the injunction.
Q And then did you continue with that case or did you have your lawyer just drop that?
A He just dropped it.

Q Did you ask the federal court on the JUCO issue for any relief?
A No, sir.
Q The only other case you filed was trying to get relief for the hardship waiver?
A Yes, sir.
Q You're not asking this Court to revisit what another judge denied, are you?
A No, sir.
Q Is there anything else you have that you want to tell this Court to explain why you believe that you should get a fifth-year?
A I just feel like I should be treated fairly just based on my circumstances having to relearn how to walk and both my injuries or just using my arm all over again and not getting a fair opportunity.
Q So your first year in JUCO, was 2021?
A Yes, sir.
Q And then you redshirted in 2022?
A Yes, sir, at the University of Florida.
Q Then you had injuries in the years after that but did not get a medical redshirt?
A I got hurt going to Florida at the end of the season and I could have got the medical but they was telling me I was going to play which I didn't play like I was supposed to and that could have been my medical year right there. And then the year after I kept having problems. Got an MRI, wasn't able to see the MRI, they just kept telling me it was growing pains. And that was pretty much it.
Q How old are you now?
A Twenty-three.
Q So you're still -- you understand the NCAA calls their new

rules age-based eligibility; right?
A Yes, sir.
Q When was your first year at an NCAA school?
A 2022.
Q So you have only been at NCAA schools for the last four years?
A Yes, sir.
Q So under the five-year rule, if it only counts from when you start at an NCAA school, you're still within the framework?
A Yes, sir.
Q But if the judge decides that going to a JUCO should start your clock even though you weren't yet 19, then you don't fit; is that fair?
A Yes, sir.
Q And you're not asking the judge to treat you differently than anyone else, you're just asking to be treated fairly; right?
A Yes, sir.
Q And so it's really up to whether the Court decides in the Court's judgment that either it wasn't fair that you didn't get the extra redshirt or it wasn't fair that people who go to a junior college, which is not an NCAA school, starts their clock even if they're still under 23?
A Yes, sir.
Q You have anything else you'd like to share with the Court today?
A Just to be treated fairly, honestly.

**THE COURT:** Tender for cross-examination.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**
Q Mr. Landry, just want to confirm for the Court. This is the second time you've been in the Louisiana state courtroom

asking for an additional year; right?
A Yes.
Q And the first time I think I was in the courtroom with you that day. The first time, the court denied the injunction; correct?
A Yes.
Q So is there anything different about this claim than the one that you filed in Lake Charles?
A Yes.
Q What's different about it?
A Five for five.
Q Wasn't that rule already passed when we were there?
A I'm not sure exactly.

**MR. ASKEW:** Thank you. I wish you nothing but the best.

**THE COURT:** SEC?

**MR. WALSHE:** No questions.

**THE COURT:** All right. Redirect?

**MR. DOWNTON:** No redirect, your Honor.

**THE COURT:** All right. You may step down. Thank you, Mr. Landry.

(The witness was excused.)

**THE COURT:** You may call your next witness.

**MR. DOWNTON:** Let's do Paytn Monticelli, please.

**THE COURT:** Ms. Monticelli. We're going to swear you in right here.

(The witness was duly sworn.)

**THE COURT:** Come on up, have a seat. If this bothers you, let me know, I'll cut it off.

**P A Y T N  M O N T I C E L L I,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Will you please introduce yourself to the Court?
A Hi, my name is Paytn Monticelli. I'm from Cedarbrook, Wisconsin.
Q I got them backwards. Mucelli, Monticelli.
A Monticelli, yes.
Q What did you do after high school?
A After high school, I pursued my athletic and academic career at the University of Wisconsin-Madison for my freshman season.
Q What did you do after that?
A I transferred to the University of Oklahoma after my freshman year and spent two years there.
Q Where did you play your fourth year?
A I played my fourth year at Louisiana State University this past season.
Q What sport?
A Softball.
Q You moved around a little bit. Did you enter the transfer portal before you moved each time?
A Yes, I did enter the transfer portal twice.
Q And the second time you entered the transfer portal, did you move from one SEC school to another?
A I did. I moved from the University of Oklahoma to Louisiana State University. That was the first year that Oklahoma was in the SEC. After that season is when I transferred but it was under the *House versus NCAA* settlement, I was named a designated student athlete and that was my transfer portal window was at the end of July and I had until August 5 to enter.
Q You did not enter into the transfer portal window

immediately after your season?
A No, I did not.
Q And you're aware that the SEC says if you go from one SEC school to another, you had to enter at that time?
A Yes, I'm aware.
Q So when you entered later what did the SEC say?
A I was deemed ineligible but that wasn't communicated to me by my compliance at Oklahoma before I entered the transfer portal and I had committed to LSU. So once I got to LSU, it became a problem. So I had to fulfill a waiver with the SEC to pursue my athletic career.
Q Did the SEC grant that waiver?
A Yes, they did.
Q So you're aware of times in the past where athletes did not enter the transfer portal, the regular one, a court created another one, in this case the *House* court, athletes entered and the SEC okayed it?
A Yes, sir.
Q But you heard Mr. -- actually I don't know if they're pushing that or not anymore. So what would you like to do this year?
A I want to play softball.
Q Do you know where you want to play?
A At LSU.
Q Do you know if they've got a roster spot for you?
A They do have a roster spot for me.
Q If you don't come back, have you heard there's a high school student that they're going to get to enroll in college next month and take your spot?
A No, but I heard they have four roster spots available, so yeah.
Q So even if they found a high school student to enroll

late, you'd still have a spot?
A Correct.
Q Have you ever played any professional softball?
A Yes. I played for the Atlanta Smokes this past summer in the PSL, which is the professional softball league.
Q How much money did they pay you in the PSL?
A My contract was for $10,000.
Q Did you get all 10,000?
A I did.
Q Would you have taken the contract in the PSL if you had known that you could have another year of eligibility?
A I would not have.
Q Are you willing to give the money back that you got as a condition of playing college softball this year?
A Absolutely. I would do anything to play college softball again.
Q Did you play against fifth and sixth year players in your career?
A I played with and against fifth year and sixth year players in my entire career.
Q Do you think it would be fair for you get another chance to play college softball?
A Yes.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Tender for cross.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

Q Hello, Ms. Montichelli, did I say that right?
A Monticelli.
Q Monticelli, okay. You talked about transfer portal opening up pursuant to the *House* settlement; right?
A Yes, sir.

Q You'd agree with me then that that was court-order settlement or court-approved settlement that the SEC and the NCAA were a party to?
A Yes.
Q That wasn't something the NCAA and SEC were fighting against, it was an agreed-upon settlement that allowed the students to transfer after roster reductions; right?
A I don't believe so. I mean, I wasn't in the room where all that stuff was discussed. But, yeah, I mean, it happened.
Q When you say you don't believe so, do you mean you don't know so?
A I mean I don't know what I don't know, you know.
Q Okay. Understood. But you do agree with me that happened pursuant to a settlement agreement?
A Yes, sir.
**MR. ASKEW:** Thank you so much. I wish you nothing but the best.
**THE WITNESS:** Thank you.
**THE COURT:** SEC?
**MR. WALSHE:** No questions.
**THE COURT:** I have a couple just to be clear if y'all don't mind. PSL Smoke, ATL Smoke.
A Yes.
**THE COURT:** How long was the season?
A It was from the middle of June until the middle of August.
**THE COURT:** Forgive me, I'm not familiar. I know it exists, but how many games?
A I want to say roughly 40 maybe, 30 maybe. I'm not entirely sure. I pitched 11 innings and four of them were against current college athletes, current NCAA athletes. They have exhibition teams in the PSL.
**THE COURT:** I got it. I was going to say y'all

didn't tell me something. Okay. So you completed the contractual obligations?

A Yes.

**THE COURT:** That's what that is.

A Yes.

**THE COURT:** Again, I'll just say I'm claiming ignorance for the record, NIL money for LSU softball?

A I mean, our coach has said that there's no NIL money for us. So we're coming back just because we love to play.

**THE COURT:** Again, that's been brought up a couple of different times or whatever, so I just want to be clear on that. I have no further questions. Thank you.

**THE WITNESS:** Thank you.

**MR. DOWNTON:** Hold on, I got just a little follow-up.

**THE COURT:** Based on my questions there's a redirect. Again, I'll give you an opportunity if necessary.

**REDIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q So when you were playing softball in Atlanta, your team played against teams that included current college students?

A Yes.

Q So those current college students were playing in games against professional softball players?

A Yes.

Q But no one said they're losing eligibility for playing in those games; correct?

A No.

Q And you heard Commissioner Sankey today, he's also not saying that the SEC is going to take your eligibility for

playing in those games; correct?
A Yes.
**MR. DOWNTON:** Pass the witness.
**THE COURT:** Wait a minute. I do have a follow-up now because, again, I caught it but I didn't really catch it until just now. You said there were exhibition games. Was there a gate that was paid or were these free, were they gratis?
A Like for spectators?
**THE COURT:** In other words, for spectators. Did somebody make money for the Atlanta Storm to play against this exhibition college team? Was money actually earned for that event to happen or was that just free for the public?
A People did pay to enter these games.
**THE COURT:** If y'all have any other questions now based on that, I'm sure you do.

**RECROSS-EXAMINATION**

**BY MR. ASKEW:**
Q Doesn't the NCAA allow softball and baseball to participate in summer leagues for exhibition purposes?
A Yes.
Q So that's not just a rule that applies only to some college softball players and baseball players? All of those individuals have the opportunity to do that?
A Yes.
Q And that's never counted against eligibility, has it?
A No.
**MR. ASKEW:** Thank you.
**THE COURT:** Thank you so much. SEC, no questions?
**MR. WALSHE:** Right.

**THE COURT:** I know I threw a monkey-wrench in that one. You may step down. Thank you so much.

**THE WITNESS:** Thank you.

(The witness was excused.)

**THE COURT:** You may call your next witness.

**MR. DOWNTON:** I'm sorry, I don't know everybody's name.

**THE COURT:** I know that's embarrassing.

**MR. DOWNTON:** It is embarrassing.

**THE COURT:** I get it.

**MR. DOWNTON:** Your Honor, call Lee Amedee.

**THE COURT:** Come on up, Mr. Amedee. We're going to swear you in right here first, sir.

(The witness was duly sworn.)

**THE COURT:** You may have a seat and again, if this bothers you, let me know and I'll cut it off.

**L E E A M E D E E,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Will you please introduce yourself to the judge?
**A** Lee Amedee.
**Q** Where are you from, Mr. Amedee?
**A** I'm from Gonzales, Louisiana.
**Q** When did you finish high school?
**A** 2022.
**Q** How old are you now?
**A** Twenty-two.
**Q** What did you do when you finished high school?
**A** Went to the University of Louisiana-Lafayette and I've been there for the last four years.

Q What sport do you play?
A Baseball.
Q Did you play against fifth and sixth year players in your career?
A Yes, with and against.
Q Have you ever played any professional baseball?
A Yes. I just played in the Frontier League which is independent baseball, which is not affiliated with, like, not affiliated with MLB teams.
Q And how much did you get paid?
A 1,200 a month, but I did not accept the payment.
Q How much cash have you actually received?
A None, nothing.
Q If you had had the opportunity when the school year was ending to have another year, would you have gone and taken money, well, you didn't take money, would you have played independent league baseball?
A No, actually. I definitely would have went back to school for another year.
Q Do you have a roster spot available for you for this year?
A I do.
Q At which school?
A University of Louisiana Lafayette.
Q Are they going to take a roster spot away from anyone else to let you be on that team?
A No, sir.
Q Do you have anything else you'd like to tell the judge today?
A Not really. Just want a chance to be treated fairly. I think a lot of us have kind of just went through the same injustice, like, all played against and with fifth and sixth years my entire college career, COVID, all that stuff like I

was promised coming out of high school that I was going to play a lot and freshman year had probably 10 to 12 fifth or sixth years I had to compete with.

Q Did you get on the field at all your freshman year?

A I did. I had, like, 20 at-bats throughout the whole year.

Q You may have heard earlier the football guys said if they play four regular season games, they can redshirt. In baseball, if you play one regular-season game, can you redshirt?

A No. If you get in the game at any point in time you cannot redshirt.

Q Baseball play is what, 30-something games, 40-something games?

A 56 regular-season. So, for instance, this past year we went to Regional and played 70 games.

Q So 70 games, but if you are on the field for one minute of one game even if you get no at-bats, you lose a year of eligibility?

A Yes, sir.

Q You lost a year your freshman year for you said 10 to 20 at-bats, not games, just at-bats?

A 20 at-bats.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Cross?

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

Q It's Abedee?

A Amedee.

Q Amedee.

**THE COURT:** You're not from here.

**MR. ASKEW:** No. I speak weirder though.

**BY MR. ASKEW:**

Q Have you read the complaint in this lawsuit?
A The complaint about --
Q The formal document that's filed in the proceedings to initiate the lawsuit?
A About the Five-for-Five?
Q Yeah, it's a big long one.
A Yeah.
Q It's got your name on the top of it. Did you read the whole thing?
A Maybe not the whole thing.
Q Did you sign anything that --
A Yes, I did.
Q You verified it but you didn't read the whole thing?
A I read it but not, like, I don't remember it word for word.
Q I appreciate that.

**MR. ASKEW:** I don't think I have anything else for you, man, I wish you nothing but the best.

**THE COURT:** SEC?

**MR. WALSHE:** No questions.

**THE COURT:** Thank you. Redirect? None?

**MR. DOWNTON:** No redirect.

**THE COURT:** You may step down, Mr. Amedee. Like Gauthier Amedee, y'all done seen the commercials. Anyway, go ahead. Call your next witness.

(The witness was excused.)

**MR. DOWNTON:** Nathan Cox.

**THE COURT:** Mr. Cox. Y'all tell me how y'all want to do it.

(The witness was duly sworn.)

**THE COURT:** Same thing, Mr. Cox, if this bothers you, have a seat, let me know and I'll cut it off.

**N A T H A N C O X,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. KEE:**

**Q** Good afternoon, could you introduce yourself to Judge Jorden, please?
**A** Nathan Cox.
**Q** Mr. Cox, how old are you?
**A** Twenty-two.
**Q** Where are you from?
**A** Lake Charles, Louisiana.
**Q** What year did you graduate from high school?
**A** 2022.
**Q** Did you have the occasion to go to college?
**A** Yes, I did go to college.
**Q** Where did you go to college?
**A** Vanderbilt University.
**Q** And at Vandi, did you play college athletics?
**A** Yes, I played tennis.
**Q** Tennis, how many years did you play tennis?
**A** Four years.
**Q** During the time that you were playing tennis, did you receive any NIL money?
**A** Some.
**Q** Not like those guys --
**A** Nothing like the football guys.
**Q** Tennis is not as lucrative as football?
**A** No quite.
**Q** In fact, the first couple years you got nothing?
**A** Yeah. Yeah, the first two years, nothing.
**Q** You're asking this Court to play a fifth year?

A Yes.
Q When you were in college you had the occasion to play here in Louisiana?
A Yes.
Q Where did you play?
A I played at LSU, three times. Twice, like, against LSU and then they hosted the SEC tournament one year.
Q So you're a resident and you played here in Baton Rouge?
A Yes.
Q Also did you receive any scholarships while you were in college?
A Yes.
Q You already said you received a little NIL, when did you graduate from Vandi?
A 2026.
Q What was your degree in?
A Climate studies.
Q When you left Vanderbilt and indicated that you had graduated, would you have stayed longer if you knew you had a fifth year?
A Yes.
Q But you didn't learn that until after you had graduated?
A Exactly.
Q Did you have the occasion to play anymore tennis after that?
A Yes. I wanted to go pro.
Q And you played at the ITF, ATP?
A Yes, ITF.
Q Tell us a little something about that.
A So basically you start at the ITF level which is, like, the lowest level and you play 15Ks and 25Ks that are worth, like, if you win the whole tournament you make maybe two or

$3,000. You lose first-round, you make like a hundred bucks.
Q Did you ever, during the course of your playing in those leagues, win more than $10,000?
A No.
Q Collectively, have you won more than $10,000?
A Probably not, probably not throughout my entire life.
Q What is your desire to do now that you know that you have an opportunity to play again?
A I would love to go back to school and play another year.
Q Have you had the opportunity to find out whether or not there's a roster spot waiting for you at Vandi?
A At Vandi particularly, yes, but I don't think I would be able to go back until the Spring because of some of the rules.
Q Depending on what happens now?
A Exactly.
Q But had you known that before you graduated, you would have just stayed at Vandi?
A Yes.
Q And you would have had a roster spot?
A Yes.
Q Have you reached out to other schools to see before --
A Yes, I just actually just started reaching out to other schools.
Q What were you told?
A That I needed to enter the portal in order to contact them.
Q Has anybody indicated to you that if they allow you on the team, you're going to take someone's roster spot?
A No.
Q In fact, I believe you told me that if someone told you that if there's no roster spot, they just wouldn't bring you in.

A Exactly. Yeah, once the roster spots are filled for this year, teams aren't taking anyone else.
Q Anything else you want to tell the judge about your intentions, what you desire to do?
A No.
**MR. KEE:** Judge, I tender.
**THE COURT:** Tender for cross.
**CROSS-EXAMINATION**
**BY MR. ASKEW:**
Q Hey, Mr. Cox, short, short, short. Just to confirm, at the end of last season, you understood your NCAA eligibility had run its course; right?
A Yes.
**MR. ASKEW:** Thank you.
**THE COURT:** SEC?
**MR. WALSHE:** No questions.
**THE COURT:** I got one. You graduated in, you said, climatology.
A Climate science, yes, sir.
**THE COURT:** Climate science. So your idea would be to go back to school and enroll in some graduate program, I'm guessing?
A Yes.
**THE COURT:** Just for the opportunity to be able to play some more tennis?
A Yes, and further my education.
**THE COURT:** All right. Look, I'm hearing it, okay. Thank you. You may step down.
(The witness was excused.)
**MR. DOWNTON:** I call Jalia Lassiter.
**THE COURT:** Jalia Lasko? Come on up, we're going to swear you in right here, okay.

(The witness was duly sworn.)

**THE COURT:** All right. Come on, have a seat. Let me know if this bothers you, I'll cut it off.

**J A L I A L A S S I T E R,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Please introduce yourself to the judge.
**A** I'm Jalia Lassiter.
**Q** Where you from?
**A** I'm from Alabama.
**Q** Where'd you -- how old are you?
**A** I'm 22.
**Q** When did you finish high school?
**A** 2022.
**Q** What did you do when you finished high school?
**A** After high school, I went to Ole Miss and played for two years, softball. My freshman year, I was just on book scholarship and my sophomore year, I ended up earning, you know, a little more.
**Q** After your two years at Ole Miss, what did you do?
**A** I transferred to LSU.
**Q** And played two years here?
**A** Yes.
**Q** What would you like to do this coming year?
**A** Play for LSU again.
**Q** Do they have a roster spot for you?
**A** They do. They have four roster spots.
**Q** Did you ask your coach to come support you?
**A** I did.
**Q** Is your coach here?

A No, she's not.
Q Did she give you an indication of why?
A Again, because of the ruling with the SEC and being sued and all those matters.
Q Did you play any professional softball?
A Yes.
Q AUSL?
A Yes.
Q How many games did you play?
A I played in 19 games.
Q That was this summer?
A Yes.
Q If you would have had the choice to have a fifth year or go play softball with the AUSL this summer, what would you have done?
A I would definitely come back to college.
Q How much money did you get paid?
A Around 13K.
Q If you get to come back, you willing to give up that money?
A Absolutely.
Q Redshirt rule in softball, is it like baseball where one game and you're out or is it like football where you can play a bunch of the season?
A If you touch the field or in the lineup, any part, your eligibility is done. You won't have another redshirt year.
Q Does that seem fair to you that if you're on the field for one minute you lose a year of eligibility?
A I've actually kind of questioned that my whole life kind of knowing that because I knew, like, how football was and other sports so I never really understood that rule to begin with.

Q You played against fifth and sixth year players in your career?
A Yes, my whole career.
Q What are you asking this judge for today?
A Just to go an opportunity. I think coming in I had to earn my way through the COVID years and kind of all the things that was passed before me and just want to be able to be fair and get the other opportunity.
Q Anything else you want to tell the judge today?
A No.
**MR. DOWNTON:** I'll pass the witness.
**THE COURT:** All right. Cross-examination?

**CROSS-EXAMINATION**

**BY MR. ASKEW:**
Q Same question I've asked some other people, do you understand at the end of last season, that was going to be your last year of eligibility under NCAA rules?
A I do.
Q How many games are in a softball season in college?
A Oh gosh. Really not for sure kind of depends if we make postseason and that adds on a couple games. Then you have NCAA tournament, regionals, plus championship games so we could play around maybe 70 games if that.
Q Seventy?
A Maybe. I'm not for sure a number. I just play the games.
Q Do you know how many games a college football season is?
A Not as long.
Q Twelve maybe.
A Yeah.
Q So if there's four seasons and you got 12 opportunities to play, that would be 48 games in four years; right? So in a softball season, you can get up to 70 games in just one season.

So if I'm doing 70 times four, that's 280 games; right?
A Yeah.
Q Versus 48 total games.
A Sure.
Q But that might make sense as to why there's a little bit more of a relaxed redshirt rule in football because there's overall less opportunities to play.
A I mean, not really but, I mean, truthfully. If you want to keep everything kind of equal, I don't think that kind of adds up.

**MR. ASKEW:** I appreciate your time. I wish you nothing but the best.

**THE WITNESS:** Thank you.

**THE COURT:** Hold on. SEC?

**MR. WALSHE:** You keep forgetting us. No questions.

**THE COURT:** Thank you. All right. You may step down. Thank you so much.

**MR. DOWNTON:** Hold. I got a math question.

**REDIRECT EXAMINATION**

**BY MR. DOWNTON:**

Q Seventy games in softball, if you play one, you lose a year of eligibility?
A Yeah, I've never thought that was fair. It makes no sense.
Q Less than two percent of the season?
A I mean, you could get hurt you don't know when so I never thought that made sense.
Q Football, you can play four out of 12, --
A Twelve whole games.
Q -- a third of the season, and you don't lose a year?
A Yep.

Q Okay. I was just checking the math. No other questions.

**THE COURT:** You may step down, Thank you, ma'am.

**THE WITNESS:** Thank you.

(The witness was excused.)

**MR. DOWNTON:** Your Honor, I think that's all the players. We have one more witness.

**THE COURT:** How's everybody doing? Do we need to take any breaks, everybody feel good? All right. Let's keep it going.

**MR. DOWNTON:** We're going to call Mark Peper.

**THE COURT:** Come on up.

**MR. WILLIAMS:** Judge, we would object to this. I believe 3.7 advocate witness rule makes it impermissible for a lawyer to call his cocounsel to testify in a hearing. I know a TRO is not a trial but 3.7 is very clear they can't do it in a TRO either unless they fit certain exceptions and they have not even expressed any exceptions to this Court. So I would object. It's just self-serving testimony and improper.

**THE COURT:** Let's hear it.

**MR. DOWNTON:** My understanding is that the lawyer witness rule is to deal with jury confusion. There is no jury here; there is no possibility of --

**THE COURT:** When Mr. Williams says it also relates to TRO as well, you would just say, that's flat out, you disagree with him on that?

**MR. DOWNTON:** That it relates to TRO?

**THE COURT:** Yeah, like, in other words, it would still carry the same rule would still apply as it relates to the restraining order.

**MR. DOWNTON:** I am not an expert on Louisiana Rules of Civil Procedure.

**THE COURT:** Let me pull it up right quick.

**MR. CLAYTON:** I'll step up a little bit here. Judge, he's not participated in this hearing. If he were involved in it, questioning and doing all that then we would have an issue. But there's no rule against him calling the lawyer sitting at the table to take the stand. Probably couldn't call me but I don't see why he can't call Mr. Peper.

**MR. WILLIAMS:** Judge, as you well know, it's not just what we say in court, it's what we put down in briefs, it's what we file. It's completely improper. We're making a record for another higher court that they will see. We just can't throw all the rules out of college football and the practice of law in one day, Judge.

**THE COURT:** We going to try, are we? Let me do this. Let me get 10 minutes right quick. That's all. Just 10 minutes right quick. I'm going to just do a quick little look at it and then we'll be right back.

(A recess was taken.)

**THE COURT:** All right. Question. Y'all forgive me. You all may be seated. Trying to call counsel to the stand, what exactly is he trying to testify to? What are we calling him for?

**MR. DOWNTON:** He is a licensed college sports agent. So I want to talk to him about his knowledge of the process of the rule change from his role as an agent. It's got nothing to do with his role as a lawyer in this or any other case.

**THE COURT:** All right. Anything else on that? I'm going to give Mr. Williams an opportunity, it was his objection.

**MR. DOWNTON:** Yes, your Honor. From -- I went to Louisiana Rules of Professional Conduct 3.7 in the notes. Louisiana First Circuit Court of Appeal has held, quote, there's nothing in the Rules of Professional Conduct or the Louisiana Code of Evidence providing that an attorney is not a competent witness in a trial in which he represents a party. He's only prohibited from acting as an advocate at trial which is italicized. He can do pretrial matters without being disqualified, it does deal with confusion and he is not, this is not a trial and even if it was, he's not participated as a lawyer.

**THE COURT:** Not yet. Thank you. Mr. Williams, any response?

**MR. WILLIAMS:** With regards to the TRO, Judge, it is a trial and you've got to make a decision and this person's been working on the brief, sitting at the table and doing everything that every other lawyer over there is involved in. And to now say, I mean, can I pick one of these guys and call them to the stand next? It's just improper, Judge, and the rules don't allow it.

**THE COURT:** One other thing to follow up on here, I'm looking at number one, the testimony relates to an uncontested issue. So a lawyer shall not be called as an advocate or act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless, and then that first one,

the testimony relates to an uncontested issue. You're telling me he's also a licensed sports agent so get me back on that, tell me a little bit more about that. I haven't heard anything about that point yet. So go ahead.

**MR. DOWNTON:** He's a licensed agent in South Carolina. And so we heard Mr. Sankey testify that the rule change has been under consideration for a couple of years. There's no one here from the NCAA for me to ask to take through that timeline. So the rule also says if there's a hardship, you can call a lawyer. And so I was planning on talking to the NCAA about the timeline of the rule change but they're not here. So I found the someone with personal knowledge that I could ask.

**THE COURT:** Interesting that they're not here. All right. Based on that information, anything else for me, Mr. Williams?

**MR. WILLIAMS:** Judge, that is not the legal definition of a hardship, number one. And number two, it almost sounds like they want to call him as a subject matter expert and it's just improper.

**THE COURT:** Hearsay is admissible. I note your objection. Let me hear him. Come on up, let's swear him in. Watch your step, please, same thing.

**MR. DOWNTON:** Your Honor, on reflection, I don't want to create any issues on appeal in this matter and --

**THE COURT:** We don't have enough already, you don't think?

**MR. DOWNTON:** Okay. Fine, he can get up there.

**THE COURT:** It's up to you. Because, look, if

not, the other thing that I was thinking about and pondering in my head was I'll let you proffer his testimony at the end and then let the First Circuit or whoever let them say you should have let him in or you should have considered it or something like that. That's the other thing I was thinking about.

**MR. DOWNTON:** Let me just proffer --

**THE COURT:** Judge, if it were a jury, yes. It's you. You get to accept what he says or reject what he says so it's not even harmless error.

**THE COURT:** There's already that too. That's another thing. Come on, man, we're going to swear you in.

(The witness was duly sworn.)

**THE COURT:** Come on, have a seat.

**M A R K P E P E R,** was called on behalf of the plaintiffs, after being duly sworn, did testify as follows:

**DIRECT EXAMINATION**

**BY MR. DOWNTON:**

**Q** Will you please introduce yourself to the judge?
**A** My name is Mark Andrew Peper, Senior.
**Q** And Mark, what do you do for a living?
**A** I primarily practice law in South Carolina. Been Pro Hac in several states including here, New Mexico, Florida, North Carolina and some other. My main job, as I tell my wife, is a practicing attorney.
**Q** We're not going talk at all about being practicing attorney today. What is your other side job?
**A** So in 2024, I became a licensed sport agent representative in the state of South Carolina. Just after that, I became the general manager of the College of Charleston men's basketball

program and actually the general manager for most of their athletic program.

Q What does a college general manager do?

A It manages rosters. It certainly works directly with athletic directors, head coaches, compliance. It monitors NCAA rules and regulations, it builds rosters, speaks to other agents, negotiates contracts, et cetera, et cetera.

Q In your role as a general manager and an agent, are you familiar with the ongoing conversation over the last couple of years concerning the potential of a five-year eligibility rule?

A I am.

Q I've got various articles that we're going to put into evidence and just show you them to help work through the timeline. Do you have a first time you remember the potential of Five-for-Five coming up?

A It was certainly in 2025. It may have been late 2024 when a number of the conferences started discussing it.

**MR. WILLIAMS:** Judge, let me just lodge an objection. This appears to be a photocopy of a Twitter post. I don't think this is proper evidence for a TRO. I've got to lodge an objection to this.

**THE COURT:** I'm hearing it. Comments.

**MR. DOWNTON:** I don't know, it's been admitted in 10 other states in proceedings. It's you can consider hearsay, you'll give it what weight you choose.

**THE COURT:** I know I said it. I don't even know if it's necessary because I mean, he's telling you he's kind of vaguely remembering some conversations, but go ahead. Keep going. Overruled.

**BY MR. DOWNTON:**

Q We're going to ignore '24, we'll just start in the

beginning of '25. Do you know who a gentleman named John Rothstein is?

A I do.

Q What is your understanding of who Mr. Rothstein is?

A Mr. Rothstein is a sports reporter/NIL/he's very heavily involved in Twitter, he's very active in the athletics, NCAA, not necessarily organization but follows these topics very much and constantly tweets.

Q We may have a few journalists with us today in the audience.

A I apologize.

Q What did Mr. Rothstein say on January 3, 2025?

A He was like he typically likes to do --

Q Just read what he said.

A The NCAA is considering allowing five years of eligibility for players in all sports moving forward per an NCAA official. The topic will continue to be discussed in early 2025.

Q To your knowledge, did the NCAA actually move forward and pass Five-for-Five in 2025?

A No.

Q Are you familiar with a lawsuit that was filed later in 2025 called *Patterson versus NCAA*?

A Yes.

Q What's your recollection or what was that lawsuit about?

A Class action case, I believe, out of Tennessee where those that needed a fifth year all got together, applied for their relief in the court and I believe it's still pending, correct me if I'm wrong.

Q In the fall of '25, there is a January '25, the NCAA's considering going to five years. Fall of '25, a lawsuit's filed saying NCAA, you got to throw out this redshirt stuff, just give everyone five years, don't put coaches and players in

that situation?
A That's correct, yes.
Q Show you an article from October 23, 2025. This is just after the lawsuit was filed, what is the headline?
A NCAA Will Not Implement Five-for-Five Eligibility Rules Anytime Soon Internal Memo Says.
Q Then after this -- I ask the Court to take judicial notice of the docket in that case where there was a preliminary injunction hearing. You were not at that hearing, you're not involved in that case; correct?
A I'm not.
Q You've heard of a gentleman from the NCAA, Mr. Vaughn, who's been referenced today?
A I have.
Q Well will put in the transcript for your Honor where Mr. Vaughn has been questioned and Mr. Vaughn stated, conceded that he told the court back at this time in Tennessee that the NCAA --

**MR. WILLIAMS:** Judge, I'm going to lodge an objection. This is hearsay within hearsay and he's leading not just this witness but cocounsel. We're breaking all kind of rules here, Judge.

**MR. CLAYTON:** It's not hearsay, your Honor, and because he's an employee --

**THE COURT:** Hold on, Mr. Clayton, hold on.

**MR. WILLIAMS:** What's going on here, Judge, about this rule?

**THE COURT:** Hold on now. Look, we've been doing a good job so far everybody, we're not going to turn this thing into a donnybrook

**MR. CLAYTON:** He brought me a Snickers.

**THE COURT:** All right. Thank you. Let me hear

your response, look, yes, leading. The hearsay on top of hearsay. We haven't even gotten to the transcript. Response to Mr. Williams' objection?

**MR. DOWNTON:** Sure. So the statements from Mr. Vaughn are not hearsay, they're admissions by a party opponent. They're going to be a transcript, you're going to get the transcript in evidence. I'm not asking the witness, I guess I am moving a little to try to speed this along, just tell you what's in the transcript and if you prefer I not do that, I can not do that.

**THE COURT:** If Mr. Williams is going to object every single time, I'd rather you not and just slow it down and we just got to sit here a little longer.

**MR. DOWNTON:** Okay.

**THE COURT:** All right. Go ahead.

**BY MR. DOWNTON:**

**Q** So that was October. Let's move to January -- this was January of this year, what's the headline of this article?

**A** FBS Coaches Vote Unanimously to Adjust Sports Redshirt Rule.

**Q** Can you read that top paragraph there?

**A** Number of coaches push for more expansive approach. A full five years of playing time in a five-year window. However, concerns about potential litigation in the wake of some controversial eligibility rulings, chief among them the Ole Miss quarterback, Trinidad Chambliss, led the group to nine game compromise.

**Q** So we've got the football coaches in January saying we want our players to be able to play nine out of 12 games and as a redshirt, it doesn't count?

**A** That is correct.

Q We're going to move ahead to April. This is from the NCAA governance update. What's the headline here?
A D-1 Cabinet Adopts Changes to Eligibility Rules for Prospects.
Q I'm going to take you to page 3 of this, have you read starting with the third line, the concept explores.
A The concept explores eliminating, quote, seasons of competition and instead implementing an age-based model that allows student athletes to be eligible for D-1 competition for a window of five years starting the academic year immediately after a prospective student athlete's high school graduation or 19th birthday, whichever occurs first.
Q There's nothing in here about excluding the Class of '22 from the new rule?
A There is not.
Q I'm going to show you another tweet.
**MR. DOWNTON:** You want to give an objection on it?
**MR. WILLIAMS:** No, Judge, I don't think it's going to get sustained. I'm not going to object.
**THE COURT:** All right.
**BY MR. DOWNTON:**
Q This tweet is from a man named Jeff Goodman, you know who he is?
A I know him well.
Q What's his job?
A He runs On3, he's also a constant tweeter, but he's in college sports.
Q He retweets about a man named Rick Petino, do you know who he is?
A Oh, yeah.
Q Who is Coach Petino?

A Head coach at St. John's.

Q All right. Mr. Goodman says if the NCAA grants everyone a fifth year, including the senior class, quote, it would be pure chaos, most teams have used 80 percent of their NIL. Next year makes sense, don't get me wrong. I would love to have my seniors back but our NIL is just about finished.

A That's correct.

Q You are in the industry, you were around at this time. He mentions having the seniors back, what was the general sense as to whether the seniors were going to get to come back?

**MR. WILLIAMS:** Judge, objection, Mr. Goodman's sense, his sense?

**THE COURT:** Yeah, clarify.

**MR. WILLIAMS:** What are we doing?

**THE COURT:** Clarify.

**BY MR. DOWNTON:**

Q Your sense?

A Based on my understanding at the time as a sports agent, as a general manager of a team constantly monitoring all of the different tweets that would include memos, et cetera, it was still up in the air. There was a -- seemed to be a general consensus that this thing was going to get through, it was just a matter of the when. I completely understand and can relate to what Coach Petino is saying there because most of the programs across the country have already built their roster for the next year by this time in April, almost the end of April. You've got the guys getting ready to graduate. Are they coming back, are they not coming back? If they're not, do we go spend the other 20 percent of our NIL budget for next year or do we hold some back? It was, to use the word chaos, it was complete chaos because no one knew even at the end of April whether the Five-for-Five was going to go through.

Q Did schools hold back a roster spot to give themselves the ability to be flexible?
A The College of Charleston --
**THE COURT:** Hold on, hold on, hold on, hold on.
**MR. WILLIAMS:** Lodge an objection, Judge. Unless I missed it, I don't think he's been qualified as some sort of expert.
**THE COURT:** I think he started to try to answer it more specifically to what his general knowledge is, but I'm going to ask, for the record, if you'll rephrase the question. Sustain the objection.
**BY MR. DOWNTON:**
Q What is your knowledge from schools you were involved with about whether the schools you were involved with kept a roster spot?
A First of all, as the general manager of College of Charleston, I can tell you we definitely kept a roster spot. We still have a roster spot open; and secondly, as an agent talking to other agents and general managers across the country in April, May, June everyone was holding at least one roster spot open. As we've heard today, there are multiple teams that have roster spots open now for this exact reason.
Q Mr. Askew showed this earlier, this was two weeks later, April 27, you see that?
A Yes, sir.
Q Mr. Askew showed it earlier this is when the NCAA said we're not going to let these guys have an extra year. To your knowledge, is this the first time that the NCAA said they were going to try to exclude these players?
A To my knowledge, yes.
Q Have you seen the new NCAA Manual before today?
A I had.

Q When did you first see it?
A I read through it before it came out, when it was being drafted and then certainly read it when it came out in August, I suppose it was, first of August.
Q No one else has said it came out the first of August. You know it came out the first of August?
A My understanding is that the rules were implemented the first of August, yes.
Q I understand the rules were implemented. When did they release the Manual?
A It's been attached, if I'm not mistaken, it's been attached to a number of different lawsuits that I've seen recently. The answer is I don't know when it came out.
Q The Manual attached to the lawsuits is last year's Manual.
A Okay. You talking about the '26 Manual.

**MR. WILLIAMS:** Your Honor, they had a lot of time to work on this.

**THE COURT:** He said he doesn't know. I heard him. You can move on.

**MR. DOWNTON:** I'll pass the witness.

**THE COURT:** Tender for cross-examination.

**CROSS-EXAMINATION**

**BY MR. ASKEW:**

Q Hi, Mr. Peper.

**MR. ASKEW:** Your Honor, may I approach the witness, I'm going to hand him a document?

**THE COURT:** Sure.

**BY MR. ASKEW:**

Q I've premarked that as Defense Exhibit 4. Have you ever read the proposal that the NCAA Division I Cabinet voted on when it passed the rule that's at issue here, the new age-based eligibility rule?

A Can you tell me when it was proposed because it's possible?

MR. ASKEW: Your Honor, may I approach the witness?

THE COURT: You may.

**BY MR. ASKEW:**

Q Premark that one as Defense Exhibit 3. I'll put that one up to answer your question, Mr. Peper, if I get the ELMO back up. So if you see here at the top it says NCAA Division I Proposal Number 2026-44?

A Yes, sir.

Q And then at the top it's the report of the NCAA Division 1 Cabinet, June 23 and 24th, see that?

A I do.

Q Have you ever read proposal number 2026-44?

A I don't believe so.

Q And have you heard discussion or argument today about how the rule that was voted on doesn't actually say that the Class of 2022 would be excluded?

A I'm sorry?

Q Have you heard testimony or argument today from counsel or witnesses that --

A Yes.

Q -- talks about the text of the rule that says it doesn't say that the Class of 2022 would be excluded?

A Yes.

Q If you'll flip to or you'll change documents to that one that's marked D-4, put this up on the screen. This is a copy of proposal number 2026-44; right?

A It appears to be, yes.

Q If you flip towards the back and it's not numbered but Section E, Bylaws, I can put it up here for you, it talks about

the effective date of this rule change.
A Okay.
Q You see that?
A Yes.
Q It says effective date August 1, 2026, may be applied to student athletes with eligibility remaining seasons and period of eligibility who initially enrolled full-time in any collegiate institution before August 1, 2026. You see that?
A I do.
Q That means that in order for this new rule to apply, you had to have eligibility remaining as of August 1, 2026, under the new rules; right?

**MR. DOWNTON:** Your Honor, I'm going to object to asking him to interpret a document he's never seen before.

**THE COURT:** Overruled.

**BY MR. ASKEW:**
Q That's what it says; right?
A Yeah, I understand what your argument is, Taylor. But the point is you guys been working on this for six, eight months. How are these athletes supposed to know when they left school in April or May that you guys were going to change the rules?
Q You're asking me how they would know in April, I put up that exhibit that Mr. Downton just showed you that said new rules are not expected to retroactively apply to student athletes whose eligibility is or will be completed by the Spring of 2026.
A You have to show me the date on that.
Q What's that?
A What's the date on that? I don't have it in front of me. April 27, that's correct.
Q April 27. So they would have known by April that whatever

the NCAA was discussing wouldn't have applied to them right if they read this document?

A If, yes.

Q And you said as part of the College of Charleston collective that you're keeping up with NCAA announcements and legislation so you can advise your clients; right?

A I do.

Q So this would be something that you would need to know; right?

A Yes.

**MR. ASKEW:** I don't think I have any other questions.

**THE COURT:** SEC? I think Mr. Williams wanted to get some of this.

**MR. ASKEW:** Your Honor, I'd move into evidence what's been marked as Defense Exhibits 1, 2, 3, and 4.

**THE COURT:** All right. Pass those up to me too.

**MR. ASKEW:** And Mr. Peper has the other two and I've premarked them for you.

**THE COURT:** You may proceed when ready, Mr. Williams.

**MR. WILLIAMS:** Thank you, Judge.

**CROSS-EXAMINATION**

**BY MR. WILLIAMS:**

Q Mr. Peper, you are enrolled as active counsel of record for the plaintiff in this lawsuit?

A Yes, sir.

Q And you sat at the counsel table today; correct?

A I did.

Q You participated in the drafting of this TRO motion?

A Yes, sir.

Q You helped design strategy to bypass the NCAA and SEC eligibility rules?
A Yes, sir.
Q So when you stepped up to the witness stand, you do so with complete intimate understanding of the exact legal threshold required to secure an emergency injunction; correct?
A I don't know that anybody has complimented me quite that way but, yes, sir.
Q So you know the words, you know the factual triggers this judge needs to hear in order to grant this TRO; don't you?
A No, I don't know this judge, per se.
Q A judge, let's just say a judge.
A I understand the law. Yes, sir. I understand the law.
Q You're aware that under the new NCAA age-based eligibility rule, the five-year clock triggers automatically at age 19 or full-time enrollment, whichever comes first; correct?
A The earlier, that's correct.
Q You also know that this new rule explicitly eliminates the traditional hardship waivers and clock extensions that players used to be able to rely on; correct?
A Yes, as my role as a general manager and a sports agent, I understand that, yes.
Q So when you are receiving your client's records and timelines, you weren't looking at them as a neutral archivist, you were looking for a loophole to stop that age clock from running against your client; correct?

**THE COURT:** One second. Objection.

**MR. DOWNTON:** Your Honor, I'm going to object to that as invasive of the attorney-client privilege and attorney work product.

**MR. WILLIAMS:** They kind of opened that door, Judge. They knew he was an attorney before they put

him up here. They can't limit cross-examination because of that.

**THE COURT:** They did. You made your point. I'm going to do it though because you made your point though. As far as his potential, just his position as he actually presents information. But I am going to sustain the objection. I'm not going to let it go any further than that.

**MR. WILLIAMS:** Thank you, Judge.

**BY MR. WILLIAMS:**

Q You talked a little bit about professional status and whether this action triggered the SEC and the NCAA professionalism restrictions, you answered a few questions on that?

A I don't believe so.

**MR. DOWNTON:** Your Honor, I think that's beyond the scope.

**THE COURT:** That is beyond the scope of this cross, he didn't ask any of those. He was limited.

**BY MR. WILLIAMS:**

Q Would you agree with me that you do understand with your dual role that the SEC and the NCAA have strict prohibitions against allowing players who have crossed the line into professionalism to retain that amateur eligibility?

**MR. DOWNTON:** Your Honor, I don't think I went into any of that with him. I went through a timeline of the --

**THE COURT:** I agree, sustained. He was talking about tweets, Mr. Williams, a whole bunch of tweets that I can't believe that this Court has to actually consider tweets, but we are here nonetheless.

**MR. WILLIAMS:** They still call them tweets,

Judge?

**THE COURT:** I do, I'm old. So. I think it's X. I don't know. Threads is a new thing now.

**BY MR. WILLIAMS:**

Q Would you agree with me you have a pretty massive professional incentive for the way you're testifying to the Court today?

A No, not -- no.

Q You want this side to win; correct?

A I believe in the rule of law. I also believe in equity. I believe in fairness and I believe that these kids should get a fifth year, yes.

Q We should all believe in those things and I think we all do. But my question is, you are hired and retained to help plaintiffs win. In fact, you are plaintiffs' counsel; correct?

A I am but my testimony was limited to my experience and my professional understanding based on my role as a general manager and a sports agent.

Q Limited by whom, limited by you?

A No, by opposing counsel of yours who limited my testimony on direct to just those issues.

Q Your cocounsel?

A I said your opposing counsel.

Q Who happens to be your cocounsel?

A Yes, correct, yes.

Q We're relying on them to limit how self-serving your testimony can be; is that correct?

A I don't make the rules. Just follow them.

Q Do you?

A Of course, I do.

Q You're aware of ABA Model Rule 3.7; correct?

A I don't know all the rules off the top of my head, but

yes, I've been familiar with the Rules of Professional Conduct.

Q That's a lawyer as a witness rule and you're aware that a lawyer is generally prohibited from acting as an advocate at a proceeding where they're going to also act as a necessary fact witness, you're aware of that?

A I am aware and I'm aware of the Court's ruling to take this testimony under advisement and determine whether or not it's proper or not.

Q And you chose to enroll in this case anyway knowing that you were going to be testifying today?

A No.

Q Well, you sat at the table?

A I didn't know -- can I finish?

Q Please.

A I had not been asked to testify until about an hour ago.

Q So y'all just came up with that today?

A Yes.

Q You didn't plan it last week?

A Of course not. We assumed the NCAA would have somebody present to call as a witness.

Q Tony said his grandmother said something about a rabbit having a gun, do you know what my grandmother said about when you assume things?

A No, but I can't wait.

**THE COURT:** Good thing there's no jury here. I'll be getting both of y'all right now.

**BY MR. WILLIAMS:**

Q To get this TRO, you know that your clients must prove immediate irreparable injury; correct?

**MR. DOWNTON:** Your Honor --

**THE COURT:** Hold on, hold on. Let me hear your objection.

**MR. DOWNTON:** He keeps calling it a TRO. That's not what we're here on.

**MR. WILLIAMS:** You're right. You're right. I apologize.

**THE COURT:** Go ahead, Mr. Williams.

**BY MR. WILLIAMS:**

Q You know your clients must prove immediate irreparable injury to succeed here today; correct?

A I do. But, again, my testimony is based not on my role as attorney for those clients. I appreciate the questions and I'm trying to work with you here, but the answer's yes. But, again, on direct I was asked questions directly related to my role elsewhere.

Q The answer is yes you know your clients must prove immediate irreparable injury, I just need to be clear on that one part.

A Right, and we already have. That's why we're here today.

Q And no record has been made by the plaintiffs that have testified about irreparable injury; correct?

A No, that's not correct.

Q You're not an NFL scout or anything like that?

A I am not.

Q You're not an expert in sports analytic or draft valuation or anything like that; correct?

A No, sir.

Q Would you at least agree with me that you have a desire to see your clients succeed as you sit in this courtroom today?

A Yes.

Q But you somehow believe that you can separate your role as an advocate trying to win in this matter today from your role as a sworn witness to give unbiased fact testimony?

A I not only believe it, I believe I've done so and I'm

trying to continue doing so despite your questions that are a little outside the scope of my direct.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** Thank you, Mr. Williams. Any redirect?

**MR. DOWNTON:** No, your Honor.

**THE COURT:** Mr. Peper, you may step down.

(The witness was excused.)

**THE COURT:** All right.

**MR. DOWNTON:** Plaintiffs have no more witnesses for today, your Honor.

**THE COURT:** Plaintiffs have no more witnesses. The matter has been submitted. To the defense, do you have any case or any witnesses that you guys want to present for the Court?

**MR. ASKEW:** The NCAA does not have any witnesses, your Honor, but we would move pursuant to an agreement with Mr. Downton that the exhibits attached to our response be moved into evidence. Your Honor already has those.

**THE COURT:** All right. Wonderful. That was that acceptance. Let me move to the SEC. Do you all wish to put on a case for the defense?

**MR. WILLIAMS:** Judge, they called the Commissioner and he testified. I do, Judge, believe that there was a commitment from plaintiffs' counsel to have, I think, they said by lunchtime --

**THE COURT:** Yeah, it was going to be those carved out participants. I was going to come back to that as soon as you guys told me that y'all are going to submit the matter as well. And with that, I'm assuming that's what that is, right, Mr. Williams,

you've submitted?

**MR. WILLIAMS:** We submit it, Judge. We have exhibits to his testimony, but I think those are already in the record.

**THE COURT:** Again, I'll accept all the exhibits accordingly that I've previously allowed in. Let me get that finalized list. Did y'all work on it or did I keep y'all in here too long working through the restroom breaks?

**MR. CLAYTON:** Did defense just rest and say they're not calling any witnesses?

**THE COURT:** That's what they did.

**MR. CLAYTON:** Good.

**THE COURT:** So no rebuttal. Look, I'm giving you a second to go ahead on and type that list up then. Because what I planned on doing is for summations, y'all are all professionals here. I know y'all don't need a whole lot of time for summations but I was going to give you a few minutes to get your thoughts together.

**MR. CLAYTON:** Let me ask you this, Judge.

**THE COURT:** I'm listening.

**MR. CLAYTON:** You heard it, the NCAA, they didn't even call a witness.

**THE COURT:** I'm going to let y'all argue now, Mr. Clayton.

**MR. CLAYTON:** Before you say it, Judge, you heard it. I'm going to hear from Mr. Williams and he's going to hear from me. Can we submit it to you?

**THE COURT:** That's up to y'all.

**MR. CLAYTON:** You're probably one of the smartest judges I've come across and I mean it,

Judge. The Attorney General was telling me how smart you are. Can we just submit it instead of listening to us?

**THE COURT:** Y'all can absolutely do that but I'm going to give everybody an opportunity -- you know me. I'm one of those guys. But go ahead on and let me get that list from you.

**MR. PEPER:** Working on it.

**THE COURT:** Before Mr. Williams and Mr. Walshe jump up and down on me.

If y'all need to, just email it to Ms. Turner here and she'll print it out for me and I'll make sure it's what y'all want it to be and then we'll go from there.

I tell you what, this will also give y'all an opportunity to get your thoughts together. It is 5:43 by that clock, so let's go 6 o'clock. Y'all don't need that much time.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** Just make sure you email it to Ms. Turner.

**MR. PEPER:** Yes, your Honor.

(A recess was taken.)

**THE COURT:** You all may be seated. I haven't gotten the email yet. This is what I'm going to do, I know I asked you guys for it. I want to keep the trains rolling. We're going to go ahead and move to summation. Just make sure I get it. I can tell you guys right now, I'm taking this seriously even though -- never mind, I'm going to keep that comment to myself. I'm going to take a moment to review what has been submitted. A few of these extra exhibits

specifically before I come back and make a final ruling, but I am going to rule this evening. So I just want to be clear on that.

Let's go ahead, let's get started.

**MR. DOWNTON:** May I proceed, your Honor?

**THE COURT:** You may.

**MR. DOWNTON:** We haven't talked about it much, the evidentiary phase, but I anticipate the NCAA is going to talk about jurisdiction and some other predicate issues. So I'm going to hit that quickly.

The Court clearly has jurisdiction over this case. Under the Louisiana long-arm statute, the federal Constitution we need to show the NCAA's purposely availed themselves to the laws of Louisiana. We need to show that injuries arose in Louisiana and we need to show that jurisdiction is reasonable under the circumstances.

I don't think there's really much question about purposeful availment. There are a number of NCAA institutions in Louisiana including Louisiana State University here at LSU. The NCAA regularly puts on sporting events here, not just through its universities but its own independent events such as March Madness Tournament. And it requires the universities here to enforce its rules. So the NCAA has purposely availed itself of being in Louisiana.

The area the NCAA usually focuses on is the injury. We've asserted that these plaintiffs were injured every time they play a game against a fifth or sixth year player and they were not afforded the same opportunity. So as far as the athletes who are Louisiana residents or went to a Louisiana school or

intend to go to a Louisiana school, they've all played here many, many times. We also have a few plaintiffs who did not go to school here but came to Louisiana to play against fifth and sixth year players and we believe the Court has essentially supplemental jurisdiction over those claims because you've got the NCAA here and therefore it's reasonable to look at the claims for the group.

The case I think governs this is the *Ford Motor Company* case out of the United State Supreme Court. The test is that the claims must arise out of or relate to the defendant's contacts with the forum state, with Louisiana. The example there is a car accident. You've got a car manufacturer who is sued for a defective automobile and the accident took place in another state. Let's say it took place in Montana. And Ford, the motor company, they say you can't sue us in Montana because we didn't make the car in Montana, we didn't sell the car in Montana, you chose to drove there, you got in a wreck, you can't sue us in Montana.

That's the NCAA's argument here. They say we're in Indianapolis, we make rules in Indianapolis. But the injury occurred in Louisiana. And the but for causation test they're looking for has been rejected by the Supreme Court.

As with the *Ford* case, the NCAA has a host of forum connections, has engaged in significant activities here and has continuing obligations between itself and the NCAA member institutions here. In another eligibility case out of Tennessee, the court looked at that and quoted extensively on it.

We don't think jurisdiction is really an issue.

The next question is what are we suing for? We've got a number of claims tied to the Louisiana Constitution, we've got claims tied to trade practices and we've got a breach of contract claim. The contract at issue is the Manual, the Bylaws between the NCAA and its member schools, the athletes are third-party beneficiaries. Those Bylaws contain sections concerning athlete's name, image, and likeness and how they are compensated for that. They've got sections on student athlete well-being and a section saying they have voting representation on the Board of Governors.

Mr. Vaughn's been asked this question. He was asked are the advisory committee that was established, is that meant to benefit student athletes. His answer is yes. As a result, the NCAA has conceded the athletes are intended third-party beneficiaries of the Manual; therefore, they have the right to sue under it. And the athletes do have to sign the acknowledgment of those NCAA rules each year. If they don't sign, they cannot play.

Other courts have looked at that and a dozen courts around the country have concluded they are third-party beneficiaries.

South Carolina case, we'll skip that. The NCAA also argues that it is a voluntary organization. We think it's not as voluntary as they make it out to be. If a school wants to compete at the highest level of intercollegiate sports, it must be a member of the NCAA. There is no option, they cannot play NCAA schools unless they are part of the program.

If an athlete wants to play at the highest level of college sports, he must go to an NCAA school. The NCAA argues that in a voluntary association, the state can't, not the state, a court cannot examine their rules. Well, there are exceptions. One of the exceptions is property rights and here there are property rights involved for all of these athletes; the right to earn a living in the occupation of their choice. And we've had courts around the country look at that and find that is a property right. I won't take you through all the caselaw tonight. If you'd like a brief, we can get it to you sometime.

In addition to the issue of property rights, you've got the question of is the NCAA making arbitrary and unreasonable decisions because even with voluntary organizations, courts can step in and look at their application of Bylaws to determine if they are arbitrary or unreasonable. Here we believe historically while these athletes have been in school, the NCAA has made a number of arbitrary and unreasonable decisions. And we'll go through some of their issues.

For former pro athletes, the redshirt rule, former JUCO players, waivers, and then the Five-for-Five timeline. First, the former professionals. We mentioned James Nnaji earlier from Baylor, played professionally in Spain, played professionally in Turkey, drafted by Detroit, traded to Charlotte, traded to New York, NBA summer league, historical precedent, you would think he would be disqualified but in December 2025, he got four additional years of eligibility despite his pro career before that time.

In 2022 to '23, he played in 54 professional games. During that same time period, some of the plaintiffs here, we heard one athlete say that he had 20 at-bats. 54 professional games, he still got four more years. 20 professional at-bats, he lost a year. 20 college at-bats.

We have Mr. Johnson, spent three years in the G-League, $1.1 million. NCAA says, well, the rules have not changed but we changed how we apply them and interpret them because the environment around college athletics has shifted. Now our schools play these players.

It's permissible, according to Jerry Vaughn of the NCAA, it's permissible for our own schools to pay a million dollars to players so how do we hold a perspective student athlete accountable for that. Here we're not talking about any of these athletes getting a million dollars. I think the compensation we heard ranged from $200 in gas money from a professional team to a $20,000 signing bonus. Yet the NCAA says these players are permanently ineligible and the SEC says these players are permanently ineligible because they accepted that money. Yet, in the past year, the NCAA has also said well a former pro athlete got paid a million dollars, we can't hold that against them, we have to let them play. That's arbitrary and unreasonable. That athlete had played for three years professionally, he got two more years from the NCAA so he got five years.

Redshirt rule. Why did it exist? You have to attend every practice, every team meeting, every

workout, every class, every game but don't set foot on the court or the field. If you do, you lose one of your years. And redshirt, the term, it's not even in the Manual. The new manual they might have put it in. But in the old Manual, Mr. Vaughn said that's not an official term. That's just something everyone uses.

So the NCAA has these extra Manual rules that it applies and it applies them as it chooses with the waiver process, that's often arbitrary. So the redshirt rule, basketball, most other sports you heard softball, you play one minute, one at-bat, one time on the field, you lose. Football, four regular-season games.

Unless you have a good year, conference championship game, you can come back and play that. You make the playoffs, you can play that. You make a bowl game, you can play that. You might play nine games in football and it's a redshirt. But in another game, another league, you're out. Same issues with injuries, we'll skip through that.

JUCO players, JUCO is not part of the NCAA. JUCO athletes do not earn any money, they don't earn any NIL, they play prep schools. Prep school athletes don't lose a year, but the JUCO players lose a year. There are waivers for this. They granted a waiver for all of the JUCO kids who finished eligibility in 2024-25, but none of the other JUCO kids who were still in college at that time. There is no reason for that distinction. It's another arbitrary and unreasonable choice.

So you compare JUCO and the G-League. Player

could graduate high school in 2022, he can play in the G-League and then go to college and play for four years. But if he went to JUCO, where he didn't get paid, he could go to college and only play three years. Another arbitrary and unreasonable distinction.

The NCAA has a waiver process, it could have solved this issue at any point in time and still could. The committee on student-athlete reinstatement or its designated committee can, at any time, by a two-thirds vote of members present and voting, approve any waiver of the five-year rule it chose.

So with all of this controversy, they've given waivers to lots of other people. They've given waivers to an entire class of JUCO players. They could have addressed this through the waiver process, they've chosen not to.

The timeline's a little troubling. The NCAA could have done this two years ago. They could've done it a year ago. They had discussions back in 2024, they continued, as you saw, in early 2025. They got sued in late 2025. When they get sued, they said we're putting this on ice. We're not going to be doing moving forward with Five-for-Five anytime soon.

They said explicitly that the old rules four years, not five are going to stay in place for this year, for 2026-27 and then they changed.

Once the court in Tennessee denied the injunction against the NCAA seeking everyone to have a fifth year, the NCAA began moving forward in this

spring with giving everyone that fifth year. And they've taken inconsistent positions about the need for a fifth year.

Back in the fall, the NCAA told the court allowing athletes to stay in school five years decreases opportunities for high school athletes. That was the reason they gave for the court should deny the injunction. Now move forward, now they say that those five years actually aligns with what we want for athletic participation.

Mr. Sankey and the conference commissioners now say that five years of eligibility aligns the time permitted for intercollegiate athletics with the pursuit of an undergraduate education. If that's true going forward, why isn't it true for these athletes?

April 15, they proposed the rule change, they say it's likely coming. There's nothing about excluding the Class of 2022. Coaches complain we're out of money. We don't want the administrative hassle. We'd love our seniors back, but how are we going to pay for it. They're not talking about scholarship money, they've got that. They're talking about NIL. And no one's asking LSU or any other school to pay these players.

If they can raise money from third parties in NIL contracts, that's wonderful. If they can't, most of these players are going back to school because they want to play their sport and they want to work on their education. A few may get large sums of money but that is not what matters for most to these players.

Two weeks later, the NCAA says we're going to exclude this class. They also change the name, they didn't want to call it Five-for-Five because of existing litigation. They've called it aged-based eligibility.

Now is that different? Haven't really been able to say. One you get five years to play in five years, the other you get five years to play in five years. But I think the Court should focus on the name; aged-based eligibility. That's what the NCAA has said is the primary concern. They're essentially creating a 24 and under league. You've got to start your last season in college before you turn 24 years old. And you can't be there more than five years at an NCAA school.

All of the plaintiffs in this case have not had five years at an NCAA school and they are still under 24 years old. They fit squarely within the age-based eligibility rule that the NCAA has set forth.

The NCAA enacted this as emergency legislation in June. Why was this an emergency in June when it could've been addressed two years earlier through the regular process? If you get comments, avoid the situation. You have an orderly transition. Everyone before got five years. If they make this change when they talked about it two years ago, then the upper class has already had their five years and it would have applied to the younger classes.

The NCAA has ignored the coaches. They had no coaches at the Cabinet meeting that made this decision. National Association of Basketball Coaches suggested to deal with this situation through a one-

time expansion of rosters to make sure no one lost a roster spot. The NCAA rejected that.

The NCAA did not allow a separate vote on the Cabinet as to whether this class should be included in the rule. The NCAA controlled the timing, they could've done it long ago.

We also have constitutional concerns that's tied to the motion to show cause. The NCAA has told its schools don't participate in these lawsuits, don't show up to court. And if you do, we're going to find ways to hold you accountable.

That's a problem. It's a problem when courts issue injunctions and SEC member schools decide they don't have to follow them. Georgia refusing to put a kid in the portal. For the rule of law to function in this country, people need to follow court orders and when they willfully disregard them, the court needs to address it.

Here, Mr. Sankey conceded the SEC does not have any of its own rules on professionalism. Their rules are a hundred percent an incorporation and adoption of the NCAA's rules that this Court enjoined. And with full knowledge that those rules had been enjoined, the NCAA moved forward, the SEC moved forward with issuing a press release and a statement saying we are going to enforce our long-standing rules.

You saw today, they have no independent long-standing rules. They have the NCAA's rules that this Court enjoined and they ignored the injunction. And we're not trying to interfere with their right to make any statements they want to make but they cannot

go and issue punishments that the result of which is these plaintiffs don't get meaningful relief.

If this Court enjoins rules but the SEC issues statements saying we're not going to follow it, we're making up new rules, we're making up new punishments that aren't in any Bylaws or any directive or ever existed before because I'm the Commissioner and I've got discretion to make up new punishments and those punishments are so draconian that the result is this Court issues an injunction, the players are cleared to play and not a single SEC school will take them. That's a problem with the rule of law and it's something we'd like the Court to address.

The SEC has fines, we're not suggesting that the SEC should be fined 50 percent of their operating budget like the SEC proposes fining schools. SEC football budgets are tens of millions of dollars. That would be excessive; that would be unreasonable as it is for the SEC.

The SEC has other fines. If a team cannot control its student section and those students run on the field or run on the court, the SEC fines them half a million dollars every time it happens. Here, if the NCAA and the SEC and the member schools if they can't keep control over themselves to stay within the bounds the Court has considered, then I think the Court should consider a similar punishment, say reasonable fine for the circumstances. And if they're going to keep doing it all season, well, every time someone ruses the field, it's another $500,000 fine.

These athletes aren't asking for that money.

The NCAA has said that the Student Assistance Fund all of the fines that they collect from storming the field, that's all supposed to go into the Student Assistance Fund. Last month, they passed something, they said we're diverting that. That money is not going to the Student Assistance Fund anymore, we need that to pay legal fees for the next three years for these lawsuits, for these fights. So we suggest if you're going to consider a sanction with the NCAA and the SEC that --

**THE COURT:** And I want to pause you there. That I think we're going to still have another thing after I rule on this, there will be another, you guys get an opportunity to grab a bite at the apple as it relates to the sanctions that were requested. So I want to make sure that we don't forget that but thank you for reminding everybody in here. But if there's nothing else as it relates to the issue, the underlying issue, I would like you to, I guess, kind of wrap it up if you're close.

**MR. DOWNTON:** Sure. To wrap up, under the old Manual, we think they were arbitrary, capricious and unreasonable. Everyone before got five years, they should get five years too. Under the new Manual, we saw for the first time today, they are eligible now.

**THE COURT:** Clarification. I know I told you it was a sticking point on Mr. Landry over here. Even under the new Manual, let's say that I think that it applies across the board, wouldn't he have already gotten through his five years but you're saying because of the JUCO year or you think that that shouldn't be counted against him?

**MR. DOWNTON:** Yeah, because when he went to JUCO, he was still under 19 and under the new rules you get five years that starts earlier of going to school or your 19th birthday. But going to prep school doesn't count.

**THE COURT:** I get that part.

**MR. DOWNTON:** Going pro doesn't count. So that's the argument. Why is JUCO treated differently than prep school than going pro, than sitting on the couch.

**THE COURT:** Didn't Larry Fitzgerald go to prep school? I think he did, Larry Fitzgerald.

**MR. CLAYTON:** I don't know.

**THE COURT:** I think he did before he went to Georgia Tech if I'm not mistaken. Anyway, go ahead.

**MR. DOWNTON:** Anyway. So you do that, you go to prep school, you turn pro for a year, you take a year and sit on the couch, you don't lose a year under the NCAA's new rules as long as you're not 19. So for him, he wasn't 19, he went to JUCO, so we think he should still, he's still under the age limit. That's our argument for him.

**THE COURT:** Thank you.

Mr. Clayton.

**MR. CLAYTON:** Judge, I'll will be short. I won't say anything he said. But I want to draw your attention to 3605. 3605, if you can see it from here, Judge, talks about the content and the scope of an injunction and restraining order. And it reads as it goes, an order granting either a preliminary or final injunction or a temporary restraining order shall describe in reasonable detail, not by mere

reference. But it goes on, the order shall be effective against the parties restrained, their officers, agents, employees, counsel, and those persons acting in active concert or participation. It's that line there that I want to bring your attention to. I think the NCAA, LSU or SEC, I'm sorry, we're not an agent of the NCAA, I agree you're not. But you're a member and they acted in concert to violate the injunctions, not just from you, from Judge Ron Johnson also and that's what they did. And then he readily admitted inventory in the end that that meeting that they had on August 24 and 25th that they met to talk about those rules. And let me tell you what they did and I'm going to wrap it up from here.

That rule that they passed, the SEC, targeted the specific athletes and specific conduct your injunction protected. And it went on, its sanctions are disproportionate to any legitimate independent conference interested and instead were calibrated instead to coerce compliance with the enjoined restriction.

So in other words, they met and you remember when Downton went over that with them, they never really had any issues with sanctioning any school before, but they met after your injunction, they met arbitrarily and capriciously just to send a message to you and the rest of the judges that they don't care.

Let me add a little bit more meat to that gumbo. When they filed their suit today in Alabama, they couldn't, I mean the symmetry of that, Alabama, the

team that LSU -- they filed suit there. What do you think that Alabama judge is going to do? They don't care, Judge. The NCAA can stand up here and fold their arms at you and every other judge because they don't care.

I ask that you serve as a brick wall of justice to stop them. You know, Marcus Cicero once said that we are in bondage by the law in order that we may go free. We are in bondage by the law in order that we may go free. What Marcus Cicero meant was we are a nation of laws not of Sankey and Jason Williams. We are laws. We are a nation of laws.

Now I'll end with this, Judge, I told you I'll be short. I'm going to ask that you put LSU, if you rule in our favor, you add LSU and the reason why I ask you to add LSU is because they act in concert, all of them. They are going to if you rule in our favor, they're going to take sanctions against LSU. You know what, let's just follow the law. Order LSU not to take any prohibitive actions against these players. So when you put that in your injunction and that protects LSU, and so we can do that because they acted in concert and participation with because they going to get on LSU, believe you me. Well, we going to punish you, that stops them. Thank you, Judge

**THE COURT:** Thank you, Mr. Clayton.

Mr. Kee.

**MR. KEE:** Judge, I don't want to add too much seasoning to his roux and mess that up. But I admit and I think counsel has done a great job talking about the law, I won't talk about that. I'll talk about the practicalities. I have middle child

syndrome because I grew up in a family of seven. Three over me and three under me and I sometimes got lost but my mom, she's the dictator, and she made sure the guy in the middle didn't get left out.

And when I look at what's happening to these young people, this ain't about these grown people in the room. I wish the NCAA was here so we can look them in the face like I would look at my mom if she didn't feed me like she fed my brothers. I want to look them in the face and ask the question why you doing this? Why you doing this to '22? They didn't do it to '21 or '20, you didn't do it to '23 or '24, '25, why are you doing this to '22? Are they on punishment? Are they lesser children than somebody else? You said they not kids, but I got kids their age. I didn't like being called a kid either but somebody has to fight for them, that's what we're over here doing, Judge. We want to stare NCAA in the face and say you cannot disregard these children.

Why do they get less than what everybody else got? Why don't they get their fifth year? Why should they have fear of retribution if they transfer? Why should their schools be sanctioned and be afraid to take their call when they're ready? Did you hear about the injuries? Did you hear about their sacrifices? Did you hear about the $190 in gas somebody got to play pro bowl? Hell yeah, he would have went back to school.

Judge, there's no question that what they've done is like the parent who forgets the middle child. It's arbitrary. They haven't given any explanation. In fact, they asked each one of these nice kids

before they said, thank you, I wish you good luck they asked them didn't you know you only had four years when you went home, when you took it to the house? That's just so undermining to these babies.

We're just asking for the same thing, for mama NCAA that anybody else would want. Judge, the equities denote that there are no other remedies of law to get these kids more education, to get them more academics, to get them more development and to possibly get them more NIL and to give them the same opportunity that everybody else had. Let's not leave '22 out and let's not allow the NCAA to get away with disregarding the authority of this Court and the SEC's backhanded way of saying we might get you if you do. Thank you, Judge.

**THE COURT:** Thank you. Moving to the response.

**MR. ASKEW:** Thank you, your Honor. This is important. This is important. I know we've laughed a little bit today, had fun, kept it light, that's good. That's good. Keeps everybody engaged, let's everybody feel like they've had their day, but this is important. And it is.

What have you heard in any of what was just said that walks you through the elements of a claim? Have you said at any point today in your head what are we talking about? What is going on here? What's the rule that's at issue? Is it the pro rules? Is it the JUCO rules? Is it the age-based rules? Is it the waivers? Is it the transfer portal? Is it the rule -- what are we talking about? What is it?

You are going to be cited all over the country. This is not the only one of these going on. Your

words are going to matter and I told you at the beginning of this how are we going to craft this order? How are we going to do it? We have to ask ourselves under a breach of contract theory what's the contract? The answer that you got was it's the bylaws. Which one? Nobody answered that question. Which one? 25-26?

The reason that I asked all these young men and women did they know their eligibility was up after last year is because that's what the 25-26 Manual said they were going to get. They haven't played under the 26-27 Manual.

Heck, the sports agent that testified said he thought he'd read it, but he was talking about the 25-26 Manual. Mr. Sankey saw it for the first time today. These players haven't played under it. And what does that Manual say? What does it say?

We saw the proposal that was voted on with the effective date explaining that the new age-based rule would apply prospectively as Louisiana law presumes that it will and that it was only applicable to those who still had eligibility remaining at the end of the 25-26 year.

Why is that important? Why is that important here? Because we know under First Circuit precedent that private association rules are not subject to just a court saying what could be a different rule. Sure it could be different rule. It could be six years, it could be two years, it could be whatever. It could be a different rule. That's not the question.

The question is was it applied inconsistently?

Absolutely not. Every single one of these young athletes has been treated the exact same way. That can't be arbitrary. It can't be arbitrary; it's consistency. You've heard -- you've heard, I don't know if it's proof, you've heard argument that look at these pro rules, look at that. James Nnaji. We don't have any proof on his background but look at that guy. Look at this other dude from Louisville, how about him? What are you supposed to do with that?

They're asking you to turn around and say this one guy from Louisville came in and this other guy got to come back so rewrite the rulebook. Like, literally, if you are going to grant this injunction which was premised on the new age-based rules saying they're not applied consistently or today it's now, well, it actually says they're eligible to, okay, maybe it doesn't actually say that because I now see for the first time that in the amendment it does say that and you did announce it in April and then you did say it again in June, so it's one of those.

But in order to grant relief under that, you then have to change the JUCO rule because that counts. There's no proof that's been arbitrarily applied, you've got to change that one. Then you've got to take out the rule that prohibits professional play, strike that one. Then you've got to take out the rule that prohibits signing a professional contract, take that one out. Then you've got to change in one instance the JUCO rule plus extend the five-year clock out to six years. Then you've got to change --

**THE COURT:** Let me stop you right there. Technically, I wouldn't have to do none of that. I would just be saying what y'all did was wrong and in violation and then it's up to y'all to fix it.

**MR. ASKEW:** But the impact of that, your Honor, is an injunction. What are you enjoining? In order for these players to play, all of those rules have to be enjoined. It's not just the -- it's not just the age-based one. It's all of those.

**THE COURT:** I got you.

**MR. ASKEW:** So if we're sitting here going what's the contract, we don't know. They hadn't told you. They haven't pointed you to a document. If you walk back into your chambers to consider this, and I know you will, which one of those documents are you going to pick up? Which one? Are you going to pick up the 5/6 or the 6/7? Nobody's told you that.

If you're going to look at the breach, which document are you going to look at that says it's been breached? You're going to look at the 25-26 or the 2026-27? If it's 25-26, they got everything under it. If it's the 26-27, they're not eligible under it. What are you going to write down as the breach?

And for damages, what's the damage? If it's a lost season that they were never entitled to, how is that a contract damage? You cannot sue for breach of contract unless you have lost a benefit. The purpose of contract damages is to restore the parties to where they would have been had the contract been fully performed. They are asking for something, respectfully, that the contract never entitled them to. You cannot get a windfall damage.

The damage for the breach here is I just get something that the contract didn't say I was going to get which takes me back to the what are you enjoining. You have been told these rules don't make sense to me. They don't make sense. I don't know why the NCAA does it this way. You have not been told that the NCAA doesn't do it that way actually. They do do it that way. They do.

If that's the proof, the Court of Appeal in Louisiana said that's just not the proper place and I can understand anybody who is looking at these could say, well, maybe they could do it that way, maybe they can do it that way. That's not me saying, you know, this is an insane thought. It's just that's what a private association can do. They can set the rules for themselves, they can. Courts don't step in and say private associations you got to do it our way. The only thing they can do is if you promise somebody that you're going to do it one way, you got to do it that way and that's, the proof is that we've done it that way. That can't be the grounds for an injunction. It just can't be.

And you haven't been told, you've been shown a letter that's like look at this threat from the NCAA. They didn't put the date up there. That was from November of 2025, had nothing to do with your injunction. Had nothing to do with it. It's almost a year old.

You've been told, you know, there's a property right, this is a property right to make a living and earn. But then you're told, hang on a second, it's not about the money, they don't want to make any

money on this, they just want to play. If that's the case, then it can't be a property right. You're being told two different things to meet each kind of emotional angle that each argument makes but neither one of them has a legal basis and I understand the emotional aspect of it.

You were a college athlete; Mr. Williams was a college athlete. I was a college athlete. The ball deflates for everybody, it does. And it's a hard pill to swallow. I tore my ACL my senior year. I get it. I get it. But we are being disingenuous if we are saying that the experiences that these young people have had are not critical to their life experience and they've received them. They are better people because if it. They absolutely are.

Nobody's trying to take anything like that away from them. But the rules on eligibility exists for that reason is it cycles that opportunity through. You cannot ignore the fact that, well, it's not taking a scholarship away, it's not taking a roster spot away. The idea that playing time is not part of that development, the idea that playing time is not why you're on a team or helping you earn NIL, we are taking playing time away.

**THE COURT:** Well, now I got to stop you there.

**MR. ASKEW:** Okay.

**THE COURT:** I was a freshman and I took that senior's spot. If you're good enough, if you earn it you going to take that spot. You going to get on that field and, look, I get it. I went to Millsaps, I don't mind saying it. It ain't LSU, it ain't Southern, but dammit, I still had to put my tugs on

just like everybody else. I had to buckle up that chin strap, so I get what you're saying. I do take umbrage though on that one and that's been for all of these arguments as it relates to that spot and that opportunity.

Even before NIL came here, I was, I always knew this is an unforgiving game that I'm playing and I'm going to either put it on the field and I'm going to take it. It is what it is. I know that they don't give a damn. I was taking vioxx for broke hands too and didn't even know that I had a broken hand and they was talking about no, no, no, it's not fractured you'll be all right. And I played on that, I'm up in Colorado with a broke hand still making tackles and doing all kind of other stuff. So I get it. And I'm hearing all of these things but on that one, I got to just kind of hmm.

**MR. ASKEW:** Let me try to remove that umbrage then. Because the point that I'm making there is that these are good players and you've heard argument, well, they had to compete against 25 or five years, six years. They get on the field as freshman. They proved your point. They proved your point. It can't be a hindrance that they had to play against older players because as your Honor just pointed out, the cream rises to the top regardless of age and guess what, they all played. They all got to play. The idea that they have been harmed by having these older players there cannot be true.

**THE COURT:** And that's the thing. Look, I still get your point. I'm not accepting every single one of these arguments as this is what I'm going to hang

my hat on. I'm going to weigh everything that I've heard. I guess just because I said that just letting you know I'm still open-minded. I'm still fair game on this thing. Just because y'all said it doesn't mean that I'm taking it as the gospel truth. That's all. But, go ahead.

**MR. ASKEW:** I appreciate the back-and-forth. I honestly --

**THE COURT:** This is the time I get to do it. I can't do it in front of a jury.

**MR. ASKEW:** I want you to ask me every question you think I haven't answered. If you think I said something dumb, tell me.

**THE COURT:** I appreciate that.

**MR. ASKEW:** But the point here too is we have to prove, we don't have to prove, they have to prove a likelihood of success on the merits. They have to prove it, it's their burden. To have -- go ahead.

**THE COURT:** I was about to say that's a hard one for me. I'm going to tell you why just because it ain't happened yet, I don't necessarily know that that's not a real thing. Look, Mr. Williams started off with this when he came up here and he talked about how when we played when the dinosaurs still roamed the earth, right. And when we was wearing leather helmets and what not.

**MR. ASKEW:** We've all lost our hair.

**THE COURT:** Exactly. Absolutely. And that's part of it, right. But it was so different then. There's so many things have changed and I get in here and you don't know who the hell I'm talking about but, Judge Holdridge, he gets to talking to me all

the time and I ask him questions about with this global market shrinking now, we talk about personal contacts and all this other stuff and I go back to the law school question about International Shoe and all that and I'm, like, do you think eventually we're going to get that overturned, talking about purposeful availment to the laws, et cetera, et cetera. Again, that's not necessarily the question or it kind of is. But at some point I asked him and I always say is it changing, this changing world. And I keep saying it's close because I get those arguments all the time here in the 19th JDC. I don't need to be here. I'm a doctor from New York looking at, you know, what is it, x-rays and because I missed something I shouldn't be hailed in to come to court, right. I shouldn't be brought in on a malpractice suit. Well, I don't know. You keep saying that but at some point in time Ochsner keeps reaching out to you. Our Lady of the Lake keeps reaching, I mean, all these people keep reaching out to you, at some point in time, the facts, the totality of the circumstances, are going to change. Is this it? So I posit that to you right there. Is this it?

**MR. ASKEW:** Not for purposes of the law.

**THE COURT:** I got you.

**MR. ASKEW:** And if we're going to sit here and look at what it means to have a likelihood of success on the merits, the world is changing in sports. The ecosystem is shifting.

**THE COURT:** Which my man said, too, in the transcript by the way, Vaughn.

**MR. ASKEW:** For sure. For sure he did. He

wasn't lying to you. We wouldn't stand up here and say the college sports today looks like it did 10 years ago which is why the likelihood of success on the merits analysis here is so important because this is new. This is new. So what do you have to look at to determine what gives you that likelihood of success on the merits? You've got to look at least the other courts that have considered this which would be the Colorado District Court in the *Wisne* case that did grant injunctive relief under an antitrust theory. The 10th Circuit Court of Appeal stayed it. You've got to look at the Ohio case, the first one filed back in late June or early July of this year, granted an injunction. Court of Appeal stayed it. Then you got to go to Tennessee. Granted an injunction. Court of Appeal stayed it.

**THE COURT:** A stay doesn't mean it won't succeed though.

**MR. ASKEW:** But in order to stay it, though, in order to stay it if you look at those orders, the Court of Appeal had to find that the NCAA had proven it had a likelihood of success to succeed.

**THE COURT:** I got you.

**MR. ASKEW:** And then you look to the South Carolina court this Monday, denied. You look at a Colorado State court two weeks ago, group of plaintiffs, denied. The trend is not the NCAA is so obviously wrong you just rubberstamp this thing. Hold the plaintiffs to their burden of proof here. Make them articulate to you what it is exactly under the rules that the NCAA has been inconsistent on and keep them from just saying that's not fair because

the thrust is the rule isn't fair. Not that the rule is being applied in an unfair manner meaning it's inconsistent.

So taking all that together, knowing that this is important, I know you're taking it seriously and I appreciate that but we've got to sit here and say what's going to be the impact of this. Do the laws of Louisiana matter when it says private associations are free to make their rules as long as those rules are consistently applied and the proof is we don't like the rules, we don't like that they are what they are so change them. That's just a step too far for this Court, your Honor.

And if you have any other questions, I'd be happy to answer them.

**THE COURT:** No, you've been a good sport because I know I peppered you at the end right there. So I appreciate it.

**MR. ASKEW:** Thank you, sir.

**THE COURT:** Thank you.

Mr. Williams.

**MR. WILLIAMS:** Your Honor, counsel opposite, all three of them, spent the lion's share of their closing argument, of their examinations and of their opening presentations saying NCAA. And then when they didn't do that, they used NCAA and SEC interchangeably. And I think that's telling. It goes to the first or rather the second matter we took up earlier today which was talking about that improper cumulation because there's a number of plaintiffs who don't have any beef, any issue with the SEC and we're still waiting for plaintiffs'

counsel to dismiss those counts or provide those names to the Court so that we don't have to defend against things that should not be facing the SEC.

There are many issues surrounding this case, Judge: NCAA eligibility, waivers, individual circumstances of these athletes. But as to the SEC, the question is very, very narrow. Can 16 universities voluntarily establish common rules governing just their competition and reasonably decide the participation in professional sports marks the end point of SEC athletic competition? And if so, may they enforce that rule equally among all of those institutions?

I remind this Court that the president of LSU was at that August meeting and agreed. Agreed to the standards. We submit, Judge, that the answer to both of those questions is yes.

Now the SEC has been accused of punishing and penalizing players. Mr. Clayton said it a number of times. However, Judge, you can look at the evidence that has been submitted in this record that is patently and demonstratively false. In fact, the Commissioner made it very clear when he was on the stand that he, he's not talked about sanctioning a single athlete. He said it today, it's been stated in the press statement and in the SEC memorandum from August 26, it was made abundantly clear. Paragraphs 3 and 4, coaches, institutions, staff members who promote, pursue or engage in the recruitment of rostering former professional athletes on a college team. Nothing about a single player. But he kept saying the SEC was going to punish players.

**THE COURT:** What's the allegation -- I'm going to stop you there because I feel like I can do this. What's the allegation, and again, I say allegation and I keep saying allegations, Colin Kaepernick, you're familiar with him?

**MR. WILLIAMS:** Yes.

**THE COURT:** There was this term called collusion.

**MR. WILLIAMS:** Yes.

**THE COURT:** That was bantered around with the NFL. And I have no idea whatever became of that but the theory of the case was something about the NFL colluded to keep Colin Kaepernick out of the league based on his political stances, et cetera, whatever. I bring that up right now because the effect of that league, again if that's whatever happened, while it is the owners that decide in secret or whatever the effect is now on Colin Kaepernick if that is, in fact, what happened because again he's not making money, he's not being able to participate, et cetera, et cetera. Here, and I will let you know, that kind of sticks in my craw a little bit. There was a rule about not having professional players, whatever that means, and I asked you, what is an amateur? What's the difference?

You tell me about, I find out about from 1911 and this is what we're trying to avoid and we come all the way up and I'm hearing about and it's, again, it's enough I accept it because, again, this is now common knowledge some of this stuff about G-League players and this and we talk about arbitrary application of the law, et cetera, and the rule and

then during the time of an injunction when I absolutely heard the testimony, there was no codified discipline that is here. That sounds an awful like open, wide open colluding that any of y'all do this, this is going to be the punishment, this is what's going to be happening and while, yes, you are absolutely correct, players, y'all not going to get it but who do those downstream benefits of the punishment, who does that affect if there's an open market or not?

These players came from where? Somebody want to sign them. Somebody want them back on the team. These individual schools by themselves somebody is looking at it and it goes to your earlier argument about the competitive lines, right, they're blurred, there's this, there's that. And you got to keep these people in check. And for the longest that's what the NCAA was able to do. But, again, when you come out with that rule on the 24th, 25th and, again, I don't want to say rule, when you come up with the sanction on the 24th, 25th that looks a whole lot like, I'm telling y'all right now, in front of me, you're going to say what you going to say, LSU, yeah, I'm with it. But yet still at the same time, where do these boys come from? They just showed up at LSU's door? Like, I don't get it. Texas, I see the Big Ten came out with their stuff the day before. I hear all of that. I get everything that you're saying but please help me figure that out, Mr. Williams, and yes, it's not directly named but who actually has that affect and as they're talking about it, that's these people who will not be able to

continue their education because from what I heard, I had a couple of them that may have graduated, but that is a actual tangible benefit still too. So explain it to me.

**MR. WILLIAMS:** Gladly, Judge. And I remember when you asked that question earlier on in the day, you asked the question about the punishment being codified after the TRO. I wrote that down.

But the truth of the matter, Judge, is the punishment codification predates this litigation. The rules were already on the books and codified in the SEC Constitution. All they did was issue a press release about what is contained on page 7 of the SEC Constitution, Article 4 and I'll submit it to the Court.

**THE COURT:** Thank you.

**MR. WILLIAMS:** When you look at it, the SEC Constitution, Article 4 it says right there, 4. -- 4.3, penalties and sanctions. Without limitation, the Commissioner shall have the following powers and authority with respect to penalties and sanctions. The Commissioner may impose fine or other penalties or sanctions appropriate under the circumstances in his discretion or her discretion against any member institution that violates any provisions of this Constitution, Bylaws, or other rules, regulations, or legislation of the conference or the NCAA. The Commissioner may impose fine or other penalty, sanction appropriate under the circumstances in his discretion against any athletic director, coach, or other member of an athletic department or member of institution who violates any provisions of the

Constitution, the Bylaws, the rules, regulations, the conference or the NCAA. The penalties that the Commissioner may impose and it's all laid out, include but are not limited to. It could be more, singly or in combination, suspension from contest and other athletic-related activities, limiting coaching duties, including those related to recruiting, public and private remands. The Commissioner may declare ineligible either permanently or for a shorter period as Commissioner, in his or her discretion, may determine to be appropriate.

Judge, this was there and, in fact, you know it predates this because it says his or her. They didn't know it would be Commissioner Sankey, this predates him. And so all they really did, Judge, was issue a press release about what was in the Constitution and they still have yet to sanction a school. They still have yet to sanction a coach. They use their mouth. They use their words like I tell my toddler, use your words. And that's all they did. They did not violate a court order. They reiterated their rules because their members asked them to.

Sixteen schools, 16 universities said that these are the standards we must uphold to maintain the sanctity of college football, of college athletics. All of them agreed. Now one abstained from the sanctions but they all agreed to the standard.

The SEC did not create a new rule for LSU or these plaintiffs. The line between college and professional athletics has existed since 1911. There's nothing arbitrary and there can't be anything

discriminatory about enforcing a long-standing rule that applies equally across all 16 universities.

These rules, these are the rules that they agreed to play by. The SEC is a completely separate organization from the NCAA. The SEC participates in the NCAA governance, but the NCAA does not govern the SEC's internal competition rules, its members decides. President Rousse participated in that decision. SEC has its own Constitution, its own Bylaws, its own governance. its own Commissioner and its own obligations dictated by its members.

So, your Honor, your Honor does not need to decide whether every NCAA eligibility determination was correct. That's not before the Court. The question here is whether these 16 universities can govern themselves and if they can't, why have a conference at all. This man did all. Why do fiercely competitive institutions agree to common rules? Because competition creates incentives.

Lane Kiffin is as cold as ice. He's wonderful to watch. He pushes every limit to try to win a game because he's supposed to. That's his job. But if one SEC institution gains that advantage then the 15 others must consider doing that exact same thing. If one school can recruit former professionals, why shouldn't every school be able to do it? If it weren't a competitive advantage, we wouldn't be in here in your courtroom this late in the day. Without a common rule, the NFL cut down day becomes clearly another recruiting period. Coaches would be monitoring professional transaction wires alongside high school recruiting and the transfer portal asking

everyday who was released, who cleared waivers and who might have a little bit of remaining eligibility. And that is precisely why the conference has these rules.

The SEC exists, in part, to prevent individual competitive incentives from destroying the common conditions that make college football great. Judge, these equities extend beyond the plaintiffs that are in court. They do.

There is an inherent asymmetry in any injunction here because people are asking relief only for the people who were standing in court. But there injuries have names, they have faces, they have exceptional lawyers but the people affected by granting relief, there's a lot of them who are not in this courtroom. Some of them aren't even on a college campus yet. The plaintiffs are talented young people who want another opportunity and the Court should consider their interest. But they're not the only athletes who matter.

Other athletes may lose opportunities if former professionals enter college rosters and just because one school has open roster slots doesn't mean that all 16 have open roster slots. Some freshman are waiting for their very first snap. Some sophomores who have been practicing for years, some juniors who finally believe now it is my turn. There are only so many roster spots, Judge, now that is a fact. There are only so many scholarships, I know that to be true and there are only so many playing opportunities. When one athlete enters the system another moves backwards.

The injury may be the opportunity that never occurs for some athletes. The scholarship that's never offered because there were better choices who got cut from the NFL. The roster spot that never opens or the high school senior who got up early every single morning and did every single exercise and ate right but his telephone never rings because they can still pull from the NFL.

We may not be able to put a name and a face on that athlete in court today but that doesn't make his interest any less real. Your Honor, as we said I played, you played, we remember that final snap high school year. We remember that final game. Went by so quick and you hope when you want to play a little bit more just like you heard from some of these players, you hope that someone at the next level would see enough in you to give you a chance to progress to college just as these college athletes some of them want to progress to professional leagues.

Some young athletes are living that experience at this very moment. They may not have an NIL deal, they may not have an agent, they may not have a lawyer seeking another season. All they got is talent, hard work, and hope and that is what college sports is supposed to represent. I understand that because I was one of them. I would have loved one more year in high school. I would've loved a 13th grade, but it's not allowed. Eventually, I had to leave just like you had to leave because another group is waiting for its opportunity. That's part of sports. That's a special part of sports because some

of its messy and ugly but that is a special part of the game that we're talking about. For these plaintiffs, this case concerns one more opportunity. For the people I'm talking about who aren't in this room, for other athletes, this may be their first opportunity.

This Court has to consider both and I'm speaking specifically about the professional participation line. These plaintiffs had their college opportunity and then achieved, some of them, what thousands of college athletes hope to achieve, to enter professional sports. The SEC would never criticize them for that accomplishment because it is an accomplishment. They are one percenters. But historically entering professional sports marked a transition. College athletics was on one side and professional athletics was on the other.

And some of these players, they're not just simply older college players as plaintiffs lawyers like to describe. They entered professional organizations, training environments, camps, competitions. The SEC members are entitled, these 16 institutions, they are entitled to conclude that crossing that line actually still does mean something regardless of the fact that NIL has changed everything. For most of the history of college sports, that distinction required no explanation.

Commissioner Sankey said he was surprised we were even having this conversation. If you went pro, it meant your college career was over and nobody had to tell you that. Rules bind the members.

I heard a lot of talk about the rule of law.

Rules bind the members. The SEC is not preventing these plaintiffs from playing football or pursuing professional opportunities nor is it asking this Court to decide all of the NCAA eligibility. The SEC is just trying to govern its own institutions who signed up for it, who voted for it. LSU voluntary belongs to this conference as do 15 other universities. Membership brings substantial benefits to them all. But it also, if you want the benefits, it also carries certain obligations, obligations that your president and chancellors have agreed to. A voluntary association cannot function if a member accepts only the collective benefits while disregarding a common rule whenever compliance creates a competitive disadvantage.

Bless you, your Honor.

**THE COURT:** Thank you.

**MR. WILLIAMS:** The consequences of the injunction. What happens the day after the injunction? Every SEC coach will now have to ask if one school can do this, why can't I? If recruiting former professionals can help institutions win, the competitive reality will push the other institutions to do the same thing. The professional transaction wire becomes another recruiting list. Meanwhile a college athlete who was waiting for this year, waiting for his turn wondering if that opportunity was going to come, wondering if the position he earned will still exist after NFL cut day.

An injunction should not give one member institution a competitive advantage that the other 15 agreed would be unavailable to all of them. That is

the predictable consequence of eliminating the line that we're talking about and preventing that arms race, that's why these institutions agreed to govern themselves collectively. They saw this coming and they put rules in place to protect college sports.

The approaching season does not, I know they tried to create this sense of urgency, the approaching season does not change the analysis. Rosters have been built. Athletes have been preparing and players have been waiting for opportunities.

Changing the rules now affects more than the plaintiffs before the Court, it affects every other player playing college sports today. And courts have been very careful about intervening, you just heard about what happened in certain spots but I just want to lay out a little math. Of the roughly 40 decisions nationwide addressing challenges to the NCAA eligibility rules, the overwhelming majority have denied injunctive relief outright because they know what a drastic memory it is. And every injunction that has reached appellate review was either reversed, vacated, or stayed. No injunction against the NCAA's eligibility rules has survived preliminary appellate review to date.

Now these cases aren't identical. And I'm not suggesting they are. But they tell us something very important about this drastic measure that the plaintiffs are asking for. Courts should be careful about changing the rules of sports in the middle of the game especially through a preliminary injunction before the case has been fully decided. So, Judge,

you don't need to solve all of college sport, we're going to be in this pickle for a very long time. College athletics is changing drastically seemingly by the minute. NIL and transfer portals have altered the landscape in a way that I don't even recognize it. And the distinction between the student athlete and the college athlete is more complicated than it ever was but the Court need not decide what college athletics should look like in 10 years.

I know it feels like it's a lot on you but this Court does not need to resolve every NCAA eligibility dispute or determine whether the college rule is even wise. The question is narrower. Is it reasonable for 16 universities to decide that professional sports marks the endpoint of athletic competition in their conference? It is not reasonable, Judge. In fact, it's one of the clearest lines that is left in collegiate sports.

Your Honor, these plaintiffs matter, their aspirations matter greatly. Their opportunity matters, but they're not the only athletes who matter. Somewhere tonight there's a 17-year-old thinking about playing their last high school game hoping somebody will give them a chance. Some of these folks in colleges don't have NIL deals, it's not all about NIL. They don't have an agent. They don't have a lawyer. All they got is ability, hard work, and hope. And I know that your Honor knows that feeling and has lived that experience that thousands of other young men and women know.

For these plaintiffs, the case might be about one more opportunity but for some, Judge, it's about

the first opportunity. The SEC has an obligation to consider both of those athletes in those categories. That is why 16 universities agreed upon a rule. That is why those rules have to be applied equally and that is why one institution's understandable desire to win cannot dictate the rules for everybody else. The rule did not change. What changed is that someone decided to test the line.

The Southeastern Conference is entitled to hold it. And for those reasons, your Honor, we respectfully request that this Court deny the preliminary injunction and dissolve the TRO presently entered against the Southeastern Conference.

**THE COURT:** Thank you, Mr. Williams.

Rebuttal. For those that aren't aware, they're the individuals, you guys are the individuals bringing the cause of action. Because the burden is here and you carry such a heavy burden, you go first, they get to argue, and then you get to respond. Go ahead.

**MR. DOWNTON:** Let me start by narrowing this case a little bit. Mr. Pyburn dismisses his claims against everybody. He's out of the case, Jack Pyburn. Mr. Jamil Muttilib, Michael Eley, Andrew Burnette, Thomas Marsala, Asia Nicholson, Peitok Machar, Jasmine Jones, Sam Pissis, DQ Smith, Dan Rouzan, Trey Tomlinson, Carmelia Muccilli, Lee Amedee, Ryley Boyne, and Ckelby Givens all dismiss their claims against the SEC.

**THE COURT:** I appreciate that for the record. That was a little fast for my people that have to notate it.

**MR. DOWNTON:** We'll email you.

**THE COURT:** So just make sure you supplement at the end. Go ahead.

**MR. DOWNTON:** I'll pick up where the SEC finished off. Start with the numbers. The numbers of the cases, they sound a little off to me. Last I heard, I think they were approaching a hundred around the country. I think I've done 12 so far.

Eleven of the trial courts have granted injunctions for my players. One has denied it. Only two of those have been stayed on appeal, none have been reversed. One of the appellate courts did not find the NCAA had a likelihood of success. They said there was a question on the merits and they should look at it. I am aware of one decision that I have not involved with out of Colorado that has been stayed. As far as I know, none have been reversed.

The SEC said the question is can the SEC make their own rules. That's not the question. That's not what the Court's injunction went to. The question is can the SEC say it is going to enforce NCAA rules that have been enjoined by saying they're our rules too. We helped create them and even though they don't exist in your Manual other than a reference that we incorporate NCAA rules, well, now we're saying there are independent rules that we can enforce even if the NCAA can't. No, they can't do that.

The NCAA can make rules about professionalism. They issued some they may want to put in their Bylaws but they need to make them prospectively. They can't make them after a court enjoins the NCAA from

enforcing those very same rules and then claim they're independent.

Punishments, those aren't there. The Commissioner has discretion, that's what was there. The Commissioner testified he didn't come up with the threat of punishing a school with half their budget or suspending a coach for half the season. That's what he was directed to do by the presidents after this Court entered its injunction.

The SEC said the line has existed since 1911 between professionalism and amateurism. And it used to require no explanation. If the line's so clear, why can't they articulate it? Why couldn't Mr. Sankey explain where the line was where the SEC had concern? All he could point to was for three sports: men's basketball, women's basketball, football. And for them he had some defined criteria he put out. Had to do with entering a contract, playing in a professional game.

He also said at this point they didn't know if they were going to have an issue with any of the women and the professional contracts they signed. I'm trying to figure out the logic. So where is the line?

In tennis, prize money is apparently okay. How is prize money different than a payment? In baseball and softball apparently a college student can go play against professionals in the summer and they're getting paid. And that's okay. But if an athlete accepts an invitation to a training camp in the NFL and doesn't get paid, that's a problem.

In basketball, you can have foreign players

getting paid professionally they can come to college. A year ago they said you can be in G-League and come to college. Now going forward, you can't go to G-League and go to college. I don't see an issue with college being college, get professionals out of it. These guys are not professional athletes.

They did not choose to leave college to go pro. Their eligibility was determined ended and they moved on with their life and they found occupations and made a living and they're asking you to not do anything complicated, put them back where they were. Seems like the NCAA and SEC were suggesting there's a monetary threshold. That could be why the NFL and NBA and WNBA count, other sports don't count. In the other sports, they're not making any more money than they would working, one of the athletes worked at Medicaid.

Reasonable and necessary expenses have always been okay but that's changed what's reasonable and necessary. Apparently a million dollars can now be reasonable and necessary. None of these athletes made anywhere close to that.

In this case, the SEC is focused on the football players. None of them played in an NFL game, none of them got NFL money in terms of meaningful big money. NFL cut down day will never become another recruiting period. That is not what is before the Court. This is a unique one time event where the NCAA changed the rules when the season was ending.

**THE COURT:** You say that because obviously I guess what, next year everybody would apply so you already have five years. So if you leave, you

knowingly, intelligently, and voluntarily left school early to pursue your pro career; therefore, you accept the responsibilities if you are cut subsequent to that and if you are now cut, because the NFL changed cut down day, I think they do all their cuts at one time now instead of the two or three. You left fully knowing that these were your options.

**MR. DOWNTON:** Exactly.

**THE COURT:** That's what I thought.

**MR. DOWNTON:** Mr. Askew for the NCAA asked which document are you going to pick up, the old rules or the new rules. You can pick up both. You can start with the old rules and the old rules said you got eligibility for a five-year window, you can only play in four of them. You got to sit on the bench in one and call it a redshirt. That's arbitrary. Under the old rules, you can look at how they treated JUCO players. That's arbitrary and unreasonable. You can look at who controlled the redshirts, it's not the players even though they say it is, it's the coaches; arbitrary and unreasonable. You can look at the waivers they granted and who they didn't grant them to; arbitrary and unreasonable.

Even easier, just look at the new rules. There's no need to rewrite the rulebook. Just look at the rule. I'll put it up one more time if I can get this work.

Rule 12.6, effective 8-1-2026, an individual's period of eligibility for practice and competition shall be limited to five years. An individual's five-year period of eligibility begins with the earlier of the following: the regular academic term

when you're enrolled in a collegiate institution full-time or the beginning of the year following your 19th birthday. Nothing in this rulebook about excluding the Class of '22. They are all within five years of starting at an NCAA school; they are all within five years of their 19th birthday.

If someone walked here off the street that had never been to college before and walked onto a college campus this month and said I want to play football, I am 23 years old, under this rule, they can play. They don't need to come to court. They just get to play. If the NCAA had published this earlier, we would not be here.

They talk about legislative history, they say that's not our intent. This is what they put in their rulebook with the $300 million they spent on lawyers in the last five years. They wrote the rules, they published the rules, they can live with the rules they made. And under their rules, these people are eligible and it is a breach of contract to deny them eligibility under their own rulebook.

Your Honor, we very much appreciate all the time you've given us today. Do you have any questions for me before we go?

**THE COURT:** No, I think I'm good, thank you. Mr. Clayton, any rebuttal?

**MR. CLAYTON:** No rebuttal, Judge.

**THE COURT:** All right. Mr. Kee, any rebuttal?

**MR. KEE:** Nothing further, Judge.

**THE COURT:** Thank you. So the matter has been submitted for the Court. It is 7:24. I told you guys give me about -- I don't even think I need 30

minutes. Let me just make sure that I review a couple of the things, take a couple good notes. I took some notes rather, and then I'll come back out with a ruling. Once that's done I'd like to get right into the sanction issue, okay. Court stands at recess. Like I said, about 25 minutes or so.

(A recess was taken.)

**THE COURT:** You all may be seated. It's been a long, long night. Those that are used to practicing in front of me, y'all know that this is about my time when I can tend to start pontificating but y'all not here to hear me talk even though there have been some statements that irrespective of what I do, the language, right, my reasoning, it may have some impact reaching far and wide, not just across the state but other states, et cetera in going forward. And I guess in that vein, I'm not necessarily afraid, I don't like the courage of my convictions. If I did, I wouldn't have ran for this position and I don't think I'd be here today.

However, when hearing all of the arguments, Mr. Williams you were absolutely right, it brought me back, man, when he started talking about the last time I put on them pads, the last time I suited up, irrespective I had a good experience, bad experience, high school. When I was over here in Baton Rouge we lost in the playoffs. It was Woodlawn whooped us. College, walking off that field, you know, I had a mixed response of how I actually enjoyed my time, et cetera; but nevertheless, it was over and I knew it was over and I was all right with that.

I think about because it came up, eligibility,

and I just, you know, you got to naturally go on your own experiences with it, redshirt rules and all that and I played with a guy from right up here in Scotlandville if any of those that are familiar at the time, his name is Mike McKenzie, he was running back. At the time that I left Mississippi, he was in the Mississippi State Hall of Fame, he was, like, one of the all time leading in yards, right, for a career. And I remember that last season for whatever reason, that last game he's going to get out there and want to be on kickoff team and, bam, just like how you was talking about, he tore his Achilles. Like literally was stuck in quicksand, couldn't move. He got that redshirt or he was given an extra year. I really have no idea how it happened because I'm like, wasn't this the last game. I digress. They let him go play at Jackson State the next year.

The thing about in high school I had a buddy of mine, Scott Vandermeer, got drafted out of high school to Tampa Bay Rays organization. I'm going to say the Rays because it wasn't the Rays at the time, it was something else. I remember he got drafted out of high school, pitcher. Scott ended up messing up his arm and I never got to quite have that conversation with him, Scott, man, if you had the opportunity -- because he never made it to the big show. If you had that opportunity, would you have gone back and played. Never had that opportunity to get a full answer from him. But I know now he's back in New Orleans so he's doing all right.

Then I think of others, you know, you got all of that when you talk about the folks that have had

issues, needed to get a medical redshirt, needed to get that and, look, we all know this as players for those that don't know this, you going to play. You're going to play. It's the coaches that will either tell you no, you're not going to get out there or they're going to have that type, but the player, you're going to always get out there and play. That's just what it is. And to ask a player otherwise, can, I want to take my redshirt, again, it's that question and it came up so many times drawing the line between a professional and not, that's different between Andre Iguodala who got plantar fasciitis or something like that, you know, and he wants to get back out here versus somebody else, right, the college athlete because he only has but so many opportunities in his mind, while the NBA player, he has to consider am I going to be healthy enough for my next big contract. It's a different mindset altogether.

I said earlier that it's curious to me because I'm realizing that times are changing in this country as it relates to college sports. Amateur athleticism. I look at the amicus brief that was provided by the Attorney General of this state and I find myself, I was reading some of the quotes from Supreme Court Justice Cavanaugh, the NCAA controls the market for college athletes. This is what he says, *NCAA versus Austin*. I'm sorry, Cavanaugh concurring NCAA often exerts their control too without any opportunity for players to obtain relief from an unbiased decision-making. When I'm hearing all of that and I apply some of these thoughts to the

facts here, when we talk about the SEC, SEC didn't necessarily have general rules, they just adopted the NCAA rules, right. So again, that keeps all of that together.

The controlled market, thus the individual must make decisions against that ever moving target of NCAA rules. Talk about that. I'm hearing it, landscape. We had the conversation 2024, we had the conversation 2025. I'm up here, y'all got me looking at tweets. Come on, man. Recognizing the importance of the uniformity from the NCAA perspective, courts in this state typically do not interfere in NCAA rule determinations except in cases when the affairs and proceedings have not been conducted fairly and honestly or when the action complained of is capricious, arbitrary, or unjustly discriminatory and that's *Jones v NCAA*.

I tell y'all this when I got here even though my questions may have sounded a little bit differently, I was very, very skeptical of these people over here and these people over here. Let me tell you why. Standing. That very, very first thing, right. That was going to be hard row to hoe for y'all. It's going to be hard for y'all to get there.

When I look at how the rules are applied, I can tell you straight up and down from what has been presented, arbitrary and capricious, it don't make no rhyme or reason, it don't make no sense. Yes, there was conversation. Why didn't y'all do this a year earlier? You know you're going to do it. Why y'all got to do it right now? Do it in January, do it in December of the same year. Y'all meeting, I'm

hearing Commissioner Sankey, they meet all the time about this stuff. Why do you have to do it right right now? Or why didn't you do it four months ago?

This one can get -- this is a professional and that's not a professional. That don't make nobody sense nowhere. If you want to make a determination about professional or not, go on a college campus for God's sake. Hell, go to high school in Texas and walk on campus and look at how much money they actually spending over here, it's crazy. I've been there.

I remember when I had some of my partners, they was telling me we got a Whataburger right there on campus, what. When you go to these facilities and you're actually seeing the type of coaching they're getting. They're hiring -- Belichick, is a college coach. And you mean to tell me they can't get the same development if not better or there's some magic juice or something. Last I checked, the NFL, they ain't developing quarterbacks like they used to unless you go to about four or five different teams. Everybody else, you either got it or you don't. Then you get that label in two years, he's a bust. Same thing in any of these other positions, tight ends, D-tackle, whatever the case may be. And then when I actually see that we're trying to distinguish what a professional is and what is not, and I asked that question maybe three times today and I still don't know.

If I get $190 in my gas, for gas, am I a professional? Arbitrary and capricious. Yeah, I took a $25,000 contract but oh, by the way, in

college I made upwards of probably six, seven figures. That don't make no kind of sense, at least not to me. It doesn't. Not at all. When I'm listening to these young ladies who were playing softball, and again, it's the same thing. You got a WNBA, you get excluded. I played softball and I got $10,000. I played a whole season and then I also got, I can play exhibition games against these same SEC girls and ain't nobody getting kicked out. This is the testimony that I heard here. But like I said, the hardest part, standing. Even with all that silliness right there, but that makes common sense to me, yeah, they got all kind of problems but if they don't have standing, we don't get here.

And I was ready to come out here and say y'all gave it a good shot. You don't have standing. I'll see y'all later, the TRO is going to be dismissed. The permanent, I'm not doing an injunction, I'll see y'all in February for the trial on the merits or whatever and we can go from there. And then something happened.

Y'all brought up Rule 12.6, I think is what it was, or the new one. And we talked about the testimony and Commissioner Sankey even said it himself relying on the testimony of the witness. There was about a rabbit got a gun and assuming and grandma and somebody else said that dog don't hunt. That's what I'll add, that will be the third one to go in there. When considering that fact that the rule did not specifically say with specificity, right, that these individuals are excluded or these individuals are included, hell, either way, write a

damn double negative, I don't care, something. And irrespective of because we got all these intents, these emails, these back-and-forth and this is the proposed order and this is that -- come on, man. Y'all going to make me do it? I got to put my hat back on when I'm a college student, man, I'm not paying attention to not a damn thing that's coming through that email wire about any of this stuff. Either y'all going to tell me I'm eligible or I'm not.

If you're telling me they're having conversations that's about the extent. I am not diving into, well, what is the legislative intent of this. So at its, on its face at the very, very least, I think these individuals have shown that they have standing, the named plaintiffs. And what I'm talking about, I'm saying, I'm talking about as it relates to the NCAA, it's all of these individuals that have been named, I do find that they have standing.

When we talked about cognizable damages I know there was a lot about NIL, is that what we're talking about, the money, is that it? I think that's that, I guess, one way to look at it. I know the courts, in fact, I've looked at it like this. Anything of any value, I think this will Michelle Getty taught me when I was in law school, something like that, when they talk about theft and it can be of anything, right. No matter what it is, it could be this ink pen. Well, that's the actual perceived value that if I'm not at LSU, I'm not getting, right. If I'm not at ULL, I can't get that if I had the opportunity to

get it before. Again, I do find that there is some damages as well.

As it relates to the named individuals because the SEC has indicated that they have simply adopted the rules of the NCAA, those named individuals earlier on the record, again, they will not be moving forward against the SEC. So the Court will not sign a preliminary injunction as it relates to or against the SEC for Jamil Muttilib, Michael Eley, Mr. Pyburn, Thomas Marsala, Asia Nicholson, Peitok Machar, Jasmine Jones, Sam Pissis, DQ Smith, Dan Rouzan, Trae Tomlinson, Carmelia Muccilli, Lee Amedee, Ryley Boyne, and Mr. Ckelby Givens. As it relates to all individuals, I am signing the restraining order, protective order. I am enjoining the NAACP, NAACP -- Lord have mercy -- NCAA from taking, and I guess if I need to stylize it, from taking any action, implicitly, explicitly in its rules that would consequently or subsequently affect these players and their ability to be able to play the games or the sports in which they wish to play.

As it relates to the wording or the language, as I indicated I think in closing, I find it simply enough that as it relates to the year of those individuals affected, I'm only talking about my named individuals. I'm only talking about this year as far as the carveout and, again, to take no actions that would negatively impact these individuals. Same as it relates to the SEC as it relates to those plaintiffs that have asked to enjoin the SEC from taking any action, that is the same ruling for the Court.

I note your objection for the record. I intend that you were going to be asking me for a stay in which I plan on denying. Unless you're actually moving for it, it will be up to the First Circuit or the Supreme Court to, they would have to grant that stay if they believe it's necessary.

Mr. Clayton?

**MR. CLAYTON:** I'm sorry to stand up during your ruling, Judge, but I asked you during closing will you name LSU in that because --

**THE COURT:** I think it's appropriate to give them some level of protection based on what has come out. I am going to enjoin LSU from taking any further action as well even though they weren't named specifically, I think it's necessary based on the actions of named defendants in this case. I'm not moved by what was it, Rule 7E or Rule E. I'm not moved by that because I do think that at some point just saying that you do have the authority and now I'm actually taking this actual step and I'm putting it out there, I'm showing I got a big gun. I'm showing you if you feel froggish, go ahead on and leap. I'm showing you if you want to jump off that porch, go ahead on. So, yeah, I do feel some type of way. I still feel some type of way.

Because I told you not to do something and now this is the opportune time that you decide and with all due respect, I appreciate Commissioner Sankey for coming down here because ain't nobody from NCAA even came here. That almost in a way also told me kind of like what they think about it a little bit but that's fine. But for him to actually come down here, that

was a big deal and that took guts. But again, like I said, I do feel some type of way about that while I said please don't take any action. Because, again, it leaves me with nothing but the assumption that, yeah, you really letting everybody know if you do something, I'm going to drop the hammer on every last one of y'all. This might as well be the death penalty. I'm like, when did we become SMU. They not the pony express.

For those of you that don't know what I'm talking about look it up. Anyway, let's move on to the sanctions, the request for sanctions. Go ahead.

**MR. DOWNTON:** Your Honor, we think the Court's order was clear, it enjoined the NCAA and everyone working in concert with them.

**THE COURT:** I'm going to ask, again, give me the judgment, circulate the judgment. Once y'all circulate the judgment, get it to me and I'll sign it, but go ahead.

**MR. DOWNTON:** We think the Court's order from August was clear, it enjoined the NCAA and everyone working in concert with them. We think the SEC unquestionably worked in concert with NCAA. Commissioner Sankey filed a declaration with multiple courts saying that his conference helped create these rules. They created the rules, they supported the NCAA's position in the lawsuit when the rules got enjoined. They went and put out public statements that they were going to enforce the rules.

They came today and said there our own rules but when you look into it, they didn't have any rules. They simply adopted the NCAA's rules. So it was a

clear and intentional act to try to get around the Court's rule, Court's order, enjoining the NCAA rules by enforcing the NCAA rules under a different name.

We think that is an issue that's why we filed the show cause and so we'd just like them to show cause why they should not be sanctioned.

**THE COURT:** All right.

**MR. ASKEW:** Thank you, your Honor. I think we proved today to the extent they're trying to raise the point that the SEC was acting in concert with us, I believe Commissioner Sankey testified the SEC was acting independently and I don't think there's any proof that the NCAA did anything. We didn't put out a message, we've done nothing --

**THE COURT:** I want to be clear, the sanctions that you're requesting, is it from SEC or from NCAA and SEC?

**MR. DOWNTON:** We asked for both, your Honor.

**THE COURT:** All right. Go ahead.

**MR. ASKEW:** So I mean what proof was there today that the NCAA did anything with respect to that tweet or with respect to that meeting? The testimony was the presidents of the universities got together and directed Commissioner Sankey to put out a statement. Had nothing to do with NCAA action. The NCAA has complied with the TRO. That's how these players have been able to go play in the soccer games.

**THE COURT:** That's a big one because I know Mr. Givens, if I'm not mistaken, he even played in the first game. Didn't he get a sack? I think he got a sack or something too.

**MR. ASKEW:** The point being is we've taken no

action whatsoever to hinder the Court's enforcement of its TRO or to otherwise impact these individuals' ability to rely on that TRO. And for purposes of looking at what the standard of review is for contempt, understanding that it's an incredible power that the Court wields, it's a heightened burden there and there's been no proof.

**THE COURT:** I don't even know who they want to give the money to if they going to say that. Who they're going to pay the money to, lawyers?

**MR. DOWNTON:** Yeah, your Honor, I will say that. We want it to go to the athlete, the Student Assistance Fund that the NCAA has.

**THE COURT:** Mr. Williams, I know you're going to tell me that it was a good faith effort by the SEC, they didn't think they were violating this Court order when they actually said it because you gave me the whole law on it, right?

**MR. WILLIAMS:** Judge, you took the words out of my mouth so I won't have to be long-winded and we can all -- .

**THE COURT:** Attorney General said I am kind of smart.

**MR. WILLIAMS:** -- go to dinner. And you are. But we're talking about actions and we're talking about statements. Issuing a statement that reiterates something that is already codified in the Constitution, Judge, is not an action. To the athletes in controversy, have been practicing with LSU, and there has been no sanctions on the coach, on the institution, or these players. So the SEC did not do anything in violation of this Court's order.

**THE COURT:** Thank you. Let me get your response.

**MR. CLAYTON:** I waived mine but I've got to respond to what he just said in his brief.

**THE COURT:** Come on, Mr. Clayton.

**MR. CLAYTON:** I'll say it from here, you just sued LSU.

**MR. WILLIAMS:** No, I didn't.

**MR. CLAYTON:** The SEC sued them and you represent the SEC. So it falls on its face and going back to the NCAA, they were the big brothers that was holding the hammer over the SEC which is why the SEC colluded, acted in concert and defied your court orders. That's my story and I'm sticking to it.

**THE COURT:** I tell you what. This is where I'm going to go on that. I hear what you're saying, Mr. Clayton. That's a tricky one as far as filing suit. While I agree with you, that's a very extreme step, I guess. I never want to be accused of not or denying anyone access to the courts and just the same way that in a way that the jurisdiction and the venue was right here, theoretically, it's also still right over there. It would've made a lot of sense for judicial efficiency and economy maybe if you want to do it to bring it here too. But I do have to kind of also go back to the counterpoint about actions and until an actual action is taken I think the threats are big, I do. Because that's you're going to do what I tell you to do and blink twice, you know what I'm saying. That's how I take that. Blink twice if you're all right with this one. Blink once, you know what I'm saying? That's what I got. However, there's nothing

cognizable as far as what this Court can see at this time and while I do think that there's this weird question, this weird symbiotic, again, how Commissioner Sankey had to come up here and testify to his knowledge of things of the NCAA, again, it's all of that. I'm not ready to actually impose sanctions at this time. I note your objection for the record.

**MR. CLAYTON:** Thank you.

**THE COURT:** With that, does that conclude our business here this evening, folks?

**MR. CLAYTON:** Thank you, your Honor.

**MR. WILLIAMS:** Thank you, Judge.

**THE COURT:** Thank you everybody. Thank y'all for your patience. Court is going to be adjourned.

(Court was adjourned.)

(END OF TRANSCRIPT)

## C E R T I F I C A T E

I, Kimberle' F. Cobb, CVR-M, CCR, Certificate No. 24003, Certified Court Reporter, Official Court Reporter for the Nineteenth Judicial District Court, do hereby certify that the foregoing *287* pages represent a true and correct transcript of **EXCEPTIONS AND PRELIMINARY INJUNCTION** in the matter of **JACK PYBURN, ET AL** VERSUS **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL**, Docket Number 783299, heard on SEPTEMBER 3, 2026, and that this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my skill and ability; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board or by the Supreme Court of Louisiana, and that I am not related to counsel or to the parties herein nor am I otherwise interested in the outcome of this matter.

THIS CERTIFICATION is valid only for a transcript accompanied by my original signature, seal and stamp on this page.

IN WITNESS WHEREOF, I have hereunto affixed my signature at Baton Rouge, Louisiana, on SEPTEMBER 14, 2026.

Kimberle' F. Cobb

KIMBERLE' F. COBB, CVR-M, CCR
CERTIFICATE NO. 24003

## R E P O R T E R ' S N O T E S

I, Kimberle' F. Cobb, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken do hereby state on the record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a court reporter's transcription of proceedings; that the dashes (--) do not indicate that words or phrases have been left out of this transcript; and that any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."

KIMBERLE' F. COBB, CVR-M, CCR

CERTIFICATE NO. 24003

# Exhibit 2

JAZMIN FERGUSON, JAMIL MUTTILIB, AMIYA JOYNER, RASHAD KING, MICHAEL ELEY, ANDREW BURNETTE, WYDETT WILLIAMS, KEENAN LANDRY, THOMAS MARSALA, PERCY DANIELS, JOSHUA "GREEDY" WILLIAMS, DAE'QUAN WRIGHT, DERRIAN FORD, ASIA NICHOLSON, ZXAVIAN HARRIS, CHANDLER JACKSON, PEITOK MACHAR, TJ HARDEN, BLAKE COTTON, ETHAN JOHNSON, ANTHONY TARJAE HANKERSON, JASMINE JONES, WEYLIN LAPUAHO, EMILEE BOYER, LUKE DRZEWIECKI, TRENT HENDRICK, BRYLAN GREEN, AVERY STRICKLAND HURST, SAM PISSIS, JUNIOR TUIHALAMAKA, DQ SMITH, DAN ROUZAN, JALIA LASSITER, PAYTN MONTICELLI, TRAE TOMLINSON, JOCELYN OLLIVIERRE, RYAN STARR, TREY THOMAS, CKELBY PHILIP GIVENS, KENNEDY BUNKER, PAUL MANNING. AMANI GIVENS, CARMELIA MUCCILLI, QUINTRAVEOUS "TREY TAYLOR, MELVIN PRIESTLY, LEE AMEDEE IV, AMAREE ABRAM, AND RYLEY BOYNE

VERSUS

NATIONAL COLLEGIATE ATHLETIC ASSOCATION, SOUTHEASTERN CONFERENCE, AND GREG SANKEY, SOLEY IN HIS ROLE AS COMMISSIONER OF THE SEC

FILED______________________

NO. C-783299, DIV. D

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

______________________________

DEPUTY CLERK OF COURT

**ORDER**

On September 3rd, 2026, the Court considered Verified Petition in Intervention for Temporary Restraining Order and Preliminary Injunction with Request for Declaratory Relief and Permanent Injunction, Defendants' Exception of Improper Cumulation of Action, Plaintiffs' Second Amended Verified Petition for Temporary Restraining Order and Preliminary Injunction, with Request for Declaratory Relief and Permanent Injunction, Plaintiffs' Motion for Contempt.

The Court, having considered the Petition for Intervention, evidence, applicable law, and argument of the Plaintiff-in-Intervention:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Petition for Intervention is GRANTED. The Intervenor, Nathan Cox, is hereby allowed to intervene in these

proceedings and shall be made a party to this action.

Next before the Court was the Defendants' Exception of Improper Cumulation of Actions filed on behalf of the Southeastern Conference and Commissioner Greg Sankey. After considering the pleadings, evidence, applicable law, and arguments of the parties, which the Plaintiffs stipulated to dismiss all claims against the Southeastern Conference and Commissioner Greg Sankey for all Plaintiffs other than those currently attending SEC schools or intending to attend an SEC school in the upcoming 2026-2027 season. The Court accepted this stipulation.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Exception of Improper Cumulation of Actions is SUSTAINED in accordance with the agreed and accepted stipulation by the parties as noted above.

Next before the Court was the Plaintiffs' Second Amended Verified Petition for a Preliminary Injunction. The Court, having reviewed the verified petition, finds that the requirements of La. C. Civ. Pro. Art. 3601 and 3602 for the issuance of a preliminary injunction have been met; and, accordingly, this **PRELMINARY INJUNCTION** is hereby issued, as follows:

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Second Amended Verified Petition for a Preliminary Injunction is **GRANTED.**
2. The following orders apply to the Defendants National Collegiate Athletic Association ("NCAA") for all Plaintiffs. The following orders apply to the Southeastern Conference ("SEC") and Greg Sankey, in his capacity as Commissioner of the SEC ("Sankey"), as to all Plaintiffs other than Jamil Muttilib, Michael Eley, Andrew Burnette, Thomas Marsala, Asia Nicholson, Peitok Machar, Jasmine Jones, Sam Pissis, DQ Smith, Dan Rouzan, Trae Tomlinson, Carmelia Muccilli, Lee Amedee, IV, Ryley Boyne, and Ckelby Philip Givens.
3. Defendants NCAA, SEC, and Sankey (collectively, "Defendants"), and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from enforcing NCAA Bylaw 12.6, or any other NCAA or SEC bylaw or rule, to preclude Plaintiffs from competing in NCAA Division I athletics during the 2026–2027 season on the basis that Plaintiffs have already competed in four seasons of competition.
4. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that the Plaintiff did not enter the NCAA transfer portal or violated any SEC transfer rule.
5. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting any Plaintiff from participating at any NCAA Division I institution during the 2026–2027 season on the basis that they played at a junior college prior to starting their NCAA careers and counting their first season of junior college competition against their years of NCAA eligibility and start of their eligibility clock;

6. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with them, are hereby temporarily restrained and enjoined from prohibiting Plaintiffs from competing in SEC or NCAA Division I athletics during the 2026–2027 season based on any actions Plaintiffs took to participate in or market themselves for participation in professional athletics after the conclusion of their 2025-26 season, such as signing a professional contract, agent contract, or playing in a professional sporting event, so long as they terminate any such contract and repay any compensation they have received prior to playing in a collegiate game. **To be clear, it is the Court's intention to place Plaintiffs in the position they were in at the end of their last college sports season. As long as they would have been eligible, academically and otherwise, to continue playing college sports in the following semester if they had a fifth year of eligibility, they are eligible today.**

7. Defendants, and their officers, agents, employees, representatives, successors, assigns, members, and all persons acting in concert or participation with are further temporarily restrained and enjoined from enforcing NCAA Bylaw 12.9.4.2 (the Rule of Restitution), the ghost transfer rule, and/or any SEC rule or proposed penalty against:

   a. Plaintiffs;

   b. Any NCAA member institution or coach for which Plaintiffs choose to compete during the 2026–2027 season; and

   c. Any NCAA member institution or coach that competes against Plaintiffs.

8. The NCAA is ordered to open the transfer portal for all Plaintiffs for one week from entry of this Order and, upon request of any Plaintiff, his/her NCAA member institutions shall immediately place such Plaintiff in the national transfer database without any other requirements or delay;

9. To the extent the NCAA and/or SEC believes it has another basis to declare a Plaintiff ineligible to compete in the 2026-27 season, the NCAA and/or SEC shall come before this Court and explain such reason through a motion seeking leave of this Court to declare any Plaintiff ineligible to play a collegiate sport in 2026-27

10. Further, as a member of the NCAA and SEC, Louisiana State University ("LSU") is restrained and enjoined from take any action adverse to any current LSU athletes or any other Plaintiff in this case who enrolls as a student at LSU.

11. This Preliminary Injunction shall remain in effect until trial of this case.

12. The Court orders that Plaintiffs shall post a nominal bond in the amount of $100, pursuant to applicable law.

Finally, before the Court was the Plaintiffs' Motion for Contempt and Sanctions. After considering the pleadings, evidence, applicable law, and arguments of the parties, the Court issued the following ruling:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Motion for Contempt and Sanctions is DENIED.

THUS DONE AND SIGNED, this 9 day of September, 2026, at Baton Rouge, Louisiana.

JUDGE, 19TH JUDICIAL DISTRICT COURT

# Exhibit 3

RJ LUIS, JR

VERSUS

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

SUIT NO.: C-782241 DIVISION L

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

# JUDGMENT

This matter came before the Court on August 24, 2026 pursuant to a hearing on a *Motion for Preliminary Injunction* filed by RJ Luis, Jr. Present in court were:

**A.M. "Tony" Clayton** and **Chandler C. Agee** of Clayton, Frugé & Ward; **Elliot S. Abrams** of Cheshire Parker Schneider & Abrams, PLLC; and **Samuel B. Hartzell** of Womble Bond Dickinson (US), LLP, on behalf of **RJ Luis, Jr**; and

**Richard F. Zimmerman, Jr** of Butler Snow LLP and **David J. Zeitlin** and **Taylor Askew of Holland & Knight**, on behalf of **National College Athletic Association ("NCAA")**.

Considering the Motion, the pleadings filed by Mr. Luis and the NCAA, the memoranda and correspondences submitted by the parties, the evidence submitted, the arguments of counsel, and for reasons orally assigned:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the *Motion for Preliminary Injunction* is **GRANTED** and, upon Plaintiff's, RJ Luis, Jr., posting of security as set for herein, that a preliminary injunction be issued in favor of Plaintiff, RJ Luis, Jr., and against Defendant, NCAA, as follows:

1. The NCAA and all persons and entities acting in concert or participation with it are prohibited from declaring, treating, or reporting RJ Luis, Jr. as ineligible to practice or compete in intercollegiate basketball at Louisiana State University during the 2026-27 academic year, and from enforcing or giving effect to any determination that he is ineligible to participate in NCAA intercollegiate athletics during that year, including by applying, enforcing, or giving effect to any bylaw, guideline, policy, directive, or interpretation to the same effect.
2. The NCAA and all persons and entities acting in concert or participation with it are prohibited from interfering, directly or indirectly, with the participation of RJ Luis, Jr. as a member of the Louisiana State University men's basketball team during the 2026-27 academic year, or with Louisiana State University's decision to permit him to participate, and from taking any action to prevent, restrict, or condition that participation, including his practice, training, competition, team travel, and other athletically related activities; his

Certified True and Correct Copy
CertID: 2026111900445
Doug Welborn
East Baton Rouge Parish
Clerk of Court
Generated Date:
11/19/2026 12:27 PM
Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

participation in conference championship competition and in NCAA championship competition; his receipt of athletics aid; and his receipt of compensation available to Louisiana State University student-athletes.

3. The NCAA and all persons and entities acting in concert or participation with it are prohibited from imposing, threatening to impose, encouraging, or authorizing any sanction, penalty, forfeiture, vacatur of records, or other adverse consequence against RJ Luis, Jr., Louisiana State University, or the coaches, staff, student-athletes, teams, or athletic programs of Louisiana State University, by itself or any other entity, on account of the participation of RJ Luis, Jr. in athletic competition or practice in reliance on an order of this Court, including any action under the NCAA's Rule of Restitution or any other provision, rule, guideline, policy or procedure.

4. The NCAA and all persons and entities acting in concert or participation with it are prohibited from finding, reporting, or otherwise treating the participation of RJ Luis, Jr. in NCAA athletic competition as a violation of any provision of the NCAA Division I Manual or any other provision, rule, guideline, policy or procedure by RJ Luis, Jr., by Louisiana State University, or by any of its coaches, staff, or student-athletes, and from treating the certification by Louisiana State University of the eligibility of RJ Luis, Jr. as such a violation.

5. The NCAA and all persons and entities acting in concert or participation with it are prohibited from accomplishing indirectly what paragraphs 1 through 4 prohibit it from doing directly, including by requesting, encouraging, directing, authorizing, approving, or ratifying any such action by a member institution or a member conference, and from recognizing or giving effect to any determination by a member conference that RJ Luis, Jr. is ineligible to practice or compete at Louisiana State University during the 2026-27 academic year. The NCAA and all persons and entities acting in concert or participation with it are further prohibited from reporting or otherwise communicating to any member institution or member conference that RJ Luis, Jr. is ineligible, or that his participation in reliance on this judgment constitutes a violation of any provision of the NCAA Division I Manual or any rule of any other entity, and any person, including any member conference of the NCAA and its officers, agents, and employees, who acts in concert or participation

Certified True and Correct Copy
CertID: 2026111900445

Doug Welborn
East Baton Rouge Parish
Clerk of Court

Generated Date:
11/19/2026 12:27 PM

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

with the NCAA in the doing of any act prohibited by this preliminary injunction is subject to the contempt power of this Court.

6. All costs of this proceeding are assessed against the NCAA.
7. Each paragraph of this preliminary injunction, and each sentence within each paragraph, is severable, and each independently supports the relief granted. If any paragraph, sentence, or finding is modified, vacated, or set aside the remaining provisions and findings shall remain in full force and effect, and the relief granted against the NCAA shall be unaffected.

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that security is hereby approved and fixed in the amount of $25,000.00.

**JUDGMENT RENDERED IN OPEN COURT** on 24th day of August, 2026.

**JUDGMENT READ, RENDERED, AND SIGNED** in Baton Rouge, Louisiana, this 27th day of August, 2026.

**HONORABLE JUDGE RONALD R. JOHNSON-ROBERTSON**
**NINETEENTH JUDICIAL DISTRICT COURT**
**DIVISION L**

**PLEASE SEND NOTICE TO ALL PARTIES AND COUNSELS OF RECORD.**

**I HEREBY CERTIFY THAT ON THIS DAY A COPY OF THE WRITTEN REASONS FOR JUDGMENT / JUDGMENT / ORDER / COMMISSIONER'S RECOMMENDATION WAS MAILED BY ME WITH SUFFICIENT POSTAGE AFFIXED.**
**SEE ATTACHED LETTER FOR LIST OF RECIPIENTS.**

**DONE AND MAILED ON August 31, 2026**

**DEPUTY CLERK OF COURT**

DOUG WELBORN STATE OF LOUISIANA CLERK OF COURT PARISH OF EAST BATON ROUGE

**Certified True and Correct Copy**
CertID: 2026111900445

**Doug Welborn**
East Baton Rouge Parish
Clerk of Court

Generated Date:
11/19/2026 12:27 PM

Alteration and subsequent re-filing of this certified copy may violate La. R.S. 14:132, 133, and/or RPC Rule 3.3(a)(3).

# Exhibit 4

# LSU Basketball Coach Will Wade Will Not Roster RJ Luis Despite Local Judge Ruling That He Could



LSU basketball coach Will Wade will be ignoring a Baton Rouge judge, who said on Wednesday that he could roster signee RJ Luis despite Luis signing with two NBA teams in 2025. (Tiger Rag photo by Jonathan Mailhes).

By GLENN GUILBEAU, Tiger Rag Editor

LSU basketball coach Will Wade will be ignoring East Baton Rouge Parish Judicial District Court judge Ronald S. Johnson's signing of an injunction on Wednesday that made former LSU signee RJ Luis temporarily eligible to play this season.

Johnson's injunction claims it would have stopped the Southeastern Conference from imposing penalties on LSU if it rostered and played Luis, according to Luis' attorney Tony Clayton of Baton Rouge.

"I thought all of our eligibility stuff was over," Wade said with a chuckle at a press conference Thursday to discuss his team's season opener on Tuesday against LSU-New Orleans. "I'd like to talk about some eligibility stuff, but I'm not talking about that. I can't talk about that in light of what happened yesterday (on Wednesday with Judge Johnson), or the other day, or whenever it was."

WATCH: Will Wade shares updates on LSU men's basketball and

WBRZ

Watch on

Wade had said recently that he would not be rostering Luis because Southeastern Conference commissioner Greg Sankey did not want him to as Luis had signed with the Utah Jazz and Boston Celtics in the NBA after not being selected in the 2025 NBA Draft. Luis, the Big East Player of the Year in 2024-25 for St. John's, left St. John's after that season to enter the NBA Draft.

"I want to be clear about this," Wade said. "I've made my stance very clear on things. And my stance has not changed. And I will be happy to talk about the 14 guys who are on our roster."




## LSU Basketball Signee R.J. Luis Not Giving Up Legal Fight To Play, And Gets Court Order Saying He Is Eligible

By GLENN GUILBEAU, Tiger Rag Editor Former St. John's Big East Player of the Year R.J. Luis, who signed two NBA contracts in 2025 after not being selected in the '25 NBA Draft, is still … Continue reading

TR TigerRag.com 0

Wade had 14 on his roster before judge Johnson's ruling. An addition of Luis would be a total of 15.

Luis had signed with LSU last May with Wade and LSU officials knowing it was a long shot to ever get Luis on its roster because of his two signings with NBA teams.

"We're going to follow all the SEC protocols with him," Wade said about Luis at SEC Media Day in Birmingham on Oct. 13. "I think it's been pretty clear what the SEC protocols are on all that. He didn't travel with us to McNeese, and he hasn't been rostered."

A week later, Wade decided Luis would not be on his roster, period, according to Matt Norlander of CBS Sports. Norlander's report said Wade and LSU had "given up their fight for Luis to be eligible," because it would be in violation of SEC rules preventing pro roster members from returning to college after signing pro contracts.

**Glenn Guilbeau**
@SportBeatTweet · **Follow**

X

Dale Brown Celebration of Life ceremonies will be at the site he made the place to be back in the day - the Pete Maravich Assembly Center - on Nov. 11:

tigerrag.com
Dale Brown Celebration Of Life Ceremonies Will Be Nov. 11 At Pete Mar...
TIGER RAG NEWS SERVICES LSU basketball coaching legend Dale Brown's life will be celebrated in the very place he turned into the place to be in ...

1:31 PM · Oct 29, 2026

31 Reply Copy link

**Read more on X**

Luis has not been practicing with LSU for several weeks now.

"We're all in at this point," Wade said. "There are no contingencies."

GILAD LEVY UPDATE

Wade is counting 14 players on his roster because he is counting 7-foot-3 center Gilad Levy, a native of Tel Aviv, Israel, who previously played for the Palencia pro team in Spain. Levy has not yet been cleared by the NCAA because he turned 24 on July 3 and is too old, according to the NCAA's new age-based rule passed last June that allows college athletes to play five seasons over five years instead of four years.

The five-year clock for overseas pro players who have never been to college, like Levy, begins with the first full-time semester after they turn 19. Levy turned 19 on July 3, 2021, so his clock at LSU, or another

school, began with the 2021-22 season. His five-season window, therefore, ended when the 2025-26 season ended.

But the NCAA allows exceptions to that rule for a variety of reasons, including military service. And LSU is confident it will get an exception with Levy as he served three years in the Israel Defense Forces, according to Wade, and conceivably would be considered a sophomore when cleared.

“We’re still done one little thing there,” Wade said Thursday about Levy. “He was in the Israeli military. There’s a military exemption. We’ve turned in the last of his stuff (information to the NCAA). I anticipate he’ll be fine.”

Wade considers of 11 of his 14 players “permanently eligible.”

Two are “eligible through the courts,” he said. Those are fifth-year senior UCLA transfer guards Donovan Dent and Skyy Clark, who may be the best two players on the roster. They were cleared by judges as were hundreds of other college players from all sports via various lawsuits by the class of 2022 players against the NCAA over its new rule passed last June allowing athletes to play five seasons in five years instead of the previous four in five years. That rule, however, begins with the class of 2023, which led to a multitude of lawsuits from the class of 2022.

And the eligibility of the 14th player – Levy – is pending.

# Exhibit 5

EAST BATON ROUGE PARISH C-782241
Filed Oct 27, 2026 9:48 AM CIV.L
Deputy Clerk of Court

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: "CIV. L" |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | * | |
| | * | STATE OF LOUISIANA |
| | * | |

**TEMPORARY RESTRAINING ORDER, RULE TO SHOW CAUSE ON PRELIMINARY INJUNCTION, AND ORDER UNDER LA. C.C.P. ART. 3609**

Considering the First Amending and Supplemental Petition, verified by plaintiff, with its Exhibits A through P; the Application for Temporary Restraining Order and Motion for Preliminary Injunction; the memorandum in support; and the certification of counsel;

THE COURT FINDS that specific facts shown by the verified petition and its exhibits establish that immediate and irreparable injury, loss, or damage will result to plaintiff RJ Luis, Jr. before the Southeastern Conference, its Commissioner, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "LSU Board") can be heard in opposition. This Court's Judgment of August 27, 2026, enjoins the National Collegiate Athletic Association and all persons and entities acting in concert or participation with it from giving effect to any determination that Mr. Luis is ineligible to compete at Louisiana State University during the 2026-27 academic year, and from interfering with his participation or penalizing Louisiana State University on account of it. Louisiana State University's preseason is under way, its regular season opens November 3, 2026, and this is Mr. Luis's last season of eligibility. Louisiana State University has not rostered him, and its head coach has said that Louisiana State University will follow the Southeastern Conference's protocols as to him. The Southeastern Conference and its Commissioner are located in Birmingham, Alabama, and must be served under the long-arm statute, and La. R.S. 13:3205 provides that "no hearing may be held on a contradictory motion, rule to show cause, or other summary proceeding . . . until thirty days after the filing in the record of the affidavit" of that service, so a hearing on a preliminary injunction cannot be held before Louisiana State University's next games. The relief against the LSU Board rests on the same policy, described in paragraph 1 below, and the same facts as the relief against the Southeastern Conference and its Commissioner, and the rule against all of them should be heard at once. Each

game Mr. Luis misses during his final season of eligibility cannot be replayed. Counsel for plaintiff gave notice of this application as stated in the certification of counsel.

IT IS ORDERED that a temporary restraining order issue, and that the Southeastern Conference and Greg Sankey, solely in his role as its Commissioner, and their officers, agents, employees, and counsel, and those persons in active concert or participation with them who receive actual knowledge of this order by personal service or otherwise, are RESTRAINED and PROHIBITED from the following.

1.

Enforcing, applying, or giving effect to the policy announced by the Southeastern Conference on August 25, 2026, providing that "[a]n SEC institution is not permitted to have an athlete on its roster who has: 1. Previously declared for the NFL, NBA, or WNBA draft, and did not appropriately withdraw, 2. Signed a contract with an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) team, or 3. Been listed on an NFL (or other professional football league), NBA/G-League, or WNBA (or affiliate) roster," or any materially identical policy or rule, including any application of Southeastern Conference Bylaw 14.01.1 or of NCAA Bylaw 12.2.4 as incorporated by it, against Louisiana State University, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, or their coaches or staff, on account of the presence of RJ Luis, Jr. on the LSU men's basketball roster or his practice or competition;

2.

Imposing, threatening, or announcing any fine, penalty, sanction, probation, suspension, forfeiture, loss of voting privileges, or withholding of Conference funds against Louisiana State University, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, or their coaches or staff, on that account;

3.

Declaring RJ Luis, Jr. ineligible, or communicating to Louisiana State University that he may not be rostered or may not compete, under the policy described in paragraph 1, on any of the grounds it states, or on the ground that he enrolled in college before he signed a professional contract; and

4.

Taking or threatening any adverse action against Louisiana State University, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, or their coaches or staff, on account of compliance with this order or with any other order of this Court in this action.

IT IS FURTHER ORDERED that the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, and its officers, agents, and employees, and those persons in active concert or participation with them who receive actual knowledge of this order by personal service or otherwise, are RESTRAINED and PROHIBITED from applying, enforcing, or giving effect to the policy described in paragraph 1 above, or to any penalty or threat under it, as a ground for any decision about the eligibility, roster status, practice, competition, team travel, or athletically related aid of RJ Luis, Jr.

IT IS FURTHER ORDERED that nothing in this order requires the Southeastern Conference, its Commissioner, or the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College to take any affirmative action, including to issue any clearance or certification, to roster or play RJ Luis, Jr., to provide him athletically related aid, or to make any coaching decision, and that nothing in this order confers eligibility on RJ Luis, Jr.

IT IS FURTHER ORDERED that this temporary restraining order is effective upon the furnishing of security in the amount of $**10,000.00**, and expires ten days after its entry unless extended by the Court for good cause shown or by consent.

IT IS FURTHER ORDERED that the Southeastern Conference, Greg Sankey, solely in his role as its Commissioner, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College appear and show cause on the **13th** day of **November**, 2026, at **9:30** o'clock **a**.m., in Division L of the 19th Judicial District Court, 300 North Boulevard, Baton Rouge, Louisiana, why a preliminary injunction should not issue in the terms of this order.

IT IS FURTHER ORDERED that the application for preliminary injunction may be heard upon the verified pleadings and supporting affidavits, and upon such other proof as the Court receives at the hearing, that a copy of this order be served on the Southeastern Conference, its

Commissioner, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College with the notice of hearing, and that notice of the hearing be given to the National Collegiate Athletic Association through its counsel of record.

IT IS FURTHER ORDERED that this order is effective against those it restrains from the time they receive actual knowledge of it by personal service or otherwise.

Signed and entered at Baton Rouge, Louisiana, this 28 day of October, 2026, at 10:24 o'clock a.m.

**HONORABLE JUDGE RONALD R. JOHNSON**
NINETEENTH JUDICIAL DISTRICT COURT
DIVISION L

**PLEASE SEND NOTICE TO ALL PARTIES AND COUNSEL OF RECORD**

**PLEASE SERVE CITATION, THE PETITION FOR DECLARATORY JUDGMENT, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION FILED AUGUST 3, 2026, THE FIRST AMENDING AND SUPPLEMENTAL PETITION WITH ITS EXHIBITS A THROUGH P, THE MOTION FOR LEAVE TO FILE FIRST AMENDING AND SUPPLEMENTAL PETITION, THE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AGAINST THE SOUTHEASTERN CONFERENCE, ITS COMMISSIONER, AND THE LSU BOARD WITH THE MEMORANDUM IN SUPPORT AND CERTIFICATION OF COUNSEL, THE ORDER GRANTING LEAVE, AND THIS TEMPORARY RESTRAINING ORDER, RULE TO SHOW CAUSE ON PRELIMINARY INJUNCTION, AND ORDER UNDER LA. C.C.P. ART. 3609, *VIA THE LONG-ARM STATUTE*, ON (please issue citation and certified copies, and return them to undersigned counsel for service under La. R.S. 13:3204).**

**SOUTHEASTERN CONFERENCE**
Through its managing official, Commissioner Greg Sankey
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

**-And-**

**GREG SANKEY, solely in his role as Commissioner of the Southeastern Conference**
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

**PLEASE SERVE CITATION, THE PETITION FOR DECLARATORY JUDGMENT, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION FILED AUGUST 3, 2026, THE FIRST AMENDING AND SUPPLEMENTAL PETITION WITH ITS EXHIBITS A THROUGH P, THE MOTION FOR LEAVE TO FILE FIRST AMENDING AND SUPPLEMENTAL PETITION, THE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AGAINST THE SOUTHEASTERN CONFERENCE, ITS COMMISSIONER, AND THE LSU BOARD WITH THE MEMORANDUM IN SUPPORT AND CERTIFICATION OF COUNSEL, THE ORDER GRANTING LEAVE, AND THIS TEMPORARY RESTRAINING ORDER, RULE TO SHOW CAUSE ON PRELIMINARY INJUNCTION, AND ORDER UNDER LA. C.C.P. ART. 3609, UNDER LA. R.S. 13:5107(A), ON**

**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND**
AGRICULTURAL AND MECHANICAL COLLEGE
Through its Chair, Lee Mallett, and Wade Rousse, President of Louisiana State University
3810 West Lakeshore Drive
Baton Rouge, Louisiana 70808

**-And-**

**ATTORNEY GENERAL ELIZABETH B. MURRILL**
1885 North 3rd Street
Baton Rouge, Louisiana 70802

**-And-**

**THE LOUISIANA OFFICE OF RISK MANAGEMENT**
By and through its Director, Rachel Dunaway
1201 North 3rd Street
Baton Rouge, Louisiana 70802

**PLEASE SERVE THE FIRST AMENDING AND SUPPLEMENTAL PETITION WITH ITS EXHIBITS A THROUGH P, THE MOTION FOR LEAVE TO FILE FIRST AMENDING AND SUPPLEMENTAL PETITION, THE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AGAINST THE SOUTHEASTERN CONFERENCE, ITS COMMISSIONER, AND THE LSU BOARD WITH THE MEMORANDUM IN SUPPORT AND CERTIFICATION OF COUNSEL, THE ORDER GRANTING LEAVE, AND THIS TEMPORARY RESTRAINING ORDER, RULE TO SHOW CAUSE ON PRELIMINARY INJUNCTION, AND ORDER UNDER LA. C.C.P. ART. 3609 ON**

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**
Through its counsel of record,
Richard F. Zimmerman, Jr. and Julie M. McCall
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, Louisiana 70802

EAST BATON ROUGE PARISH Clerk of Court
300 NORTH BLVD
BATON ROUGE, LA 70801
Telephone: (225) 389-3982 Fax: (225) 389-3392

**RManuel**

**Deposit Receipt**

| | |
|---|---|
| Receipt Number: | 1362694 |
| Receipt Date: | 10/28/2026 03:28:07 |
| Suit Number: | C-782241 |

RJ LUIS, JR
VS
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

| | |
|---|---|
| Escrow Deposit - Check (check #47724) | $10,000.00 |

| | |
|---|---|
| Received From: | CLAYTON, A.M. TONY |
| Attorney Info: | 21191<br>A.M. TONY CLAYTON<br>3741 LA HIGHWAY 1 SOUTH<br><br>PORT ALLEN, LA 70767 |

# Exhibit 6

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: “CIV. L” |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| NATIONAL COLLEGIATE | * | PARISH OF EAST BATON ROUGE |
| ATHLETIC ASSOCIATION, ET AL. | * | |
| | * | STATE OF LOUISIANA |
| | * | |

# REPLY EXHIBIT 4

Affidavit of RJ Luis, Jr.

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: “CIV. L” |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL. | * | |
| | * | STATE OF LOUISIANA |
| | * | |

# AFFIDAVIT OF RJ LUIS, JR.

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for the State and Parish aforesaid, personally came and appeared RJ LUIS, JR., who, after being duly sworn, did depose and state:

1.

I am the plaintiff in this action. I am over the age of eighteen, and I make this affidavit on my own personal knowledge. If called as a witness, I could and would testify to these facts.

2.

LSU, through Head Coach Will Wade, offered me a place on the men’s basketball team for the 2026-27 season, a full scholarship, and revenue-share money. I accepted. I enrolled at LSU as a full-time student, and I have been on campus and with the team since early June 2026.

3.

My understanding from discussions with LSU’s coaching staff was that the only condition on my place on the team was that the NCAA not successfully bar my eligibility. The Court entered a preliminary injunction against the NCAA in August 2026. After that ruling, I understood that the NCAA could not enforce the challenged eligibility rule to prevent me from playing while that injunction remained in effect. Before the SEC’s public statements in August of 2026, no one at LSU told me that anyone other than the NCAA could keep me off the team.

4.

From the time I arrived on campus until October 28, 2026, LSU provided me with meals, academic support, coaching, and athletic training. I attended classes, practiced with the LSU men’s

basketball team, and trained with my teammates and LSU's coaches and staff. As of this date, I am still attending classes.

5.

I am healthy, I am in good academic standing, and I am ready and able to play. On October 29, 2026, LSU coaching staff told me that, for the time being, I could not participate in team activities. Specifically, Coach Wade told me that, due to the position of the SEC, there was a question about whether LSU would allow me to be a member of the team.

6.

LSU supported me in this lawsuit against the NCAA. Head Coach Will Wade, Associate Head Coach Rick Stansbury, two of my teammates, and numerous other members of LSU's staff attended the hearing in this case on August 24, 2026. After the Court ruled in my favor, they congratulated me and were excited about the ruling. Coach Wade told me to get ready for practice and said that we should make this the best season of my college career.

7.

Ever since this Court ruled in August 2026 that the NCAA could not enforce its rule against my playing, Coach Wade has told me that the SEC was pressuring LSU not to play me, and that the SEC's threats are the only thing possibly standing in the way of me playing. He has said this to me more than once. In particular, the week before Halloween, he told me a couple of times that the conference is the one making it difficult, and when I was told that, for the time being, I could not participate in team activities, Coach Rick Stansbury told me that it was because of the SEC.

8.

Coach Wade told me that the only reason he could not put me on the roster was pressure from the SEC, including threatened consequences for LSU and for its coaches. He told me that the SEC's commissioner is the one making it difficult for me.

9.

No one at LSU has told me that I am off the roster because of my play, my health, my grades, my conduct, or anything else about me. The only reason anyone at LSU has given me is the SEC. I know of no other reason. LSU recruited me and offered me a place on the team, payment, a scholarship, training, and extensive support—including support for this lawsuit against the NCAA. After the Court granted the Judgment preventing the NCAA from saying I am not

eligible, I practiced and trained with the team, and my teammates, the coaching staff, and I all planned for me to be on the team.

To my knowledge, LSU has kept a roster spot available for me. Based on what Coach Wade and other LSU personnel have told me, I understand that the SEC's threatened sanctions—not any concern about my health, grades, conduct, or performance—are the only reason why LSU has not placed me on the roster or allowed me to practice or play.

10.

This is my last season of college eligibility, and I want to play it at LSU. I have been here with my teammates since the summer. I gave up a lot to come here. I moved, left my family, and have poured everything I have into being ready for this last college season.

This season means everything to me, academically and athletically. It is my final opportunity to compete in collegiate basketball. I had surgery in October 2025 and did not play in any game last season. Competing this season would allow me to return to live games, develop with my teammates and coaches, and demonstrate my abilities after rehabilitation—all the while working toward my goal of playing in the NBA. Each game I miss is a game I cannot play later. A payment of money after the season cannot give me back those games, my final year with the team, or the opportunity to compete.

I asked this Court again to let me stay here and play. I understand that the SEC has now said it will penalize LSU or my coaches if LSU plays me. But the SEC did not penalize LSU for other basketball players, such as my teammate Saliou Niang, who was drafted in the 2025 NBA Draft and then actually played professionally. I have never been drafted or played professionally in any regular season game. I think it is unfair that the SEC attempts to stop me from competing based on me being a professional, because I am not a professional. I stayed in college taking classes at St. John's the entire time the NCAA and SEC say I was a professional, I have a year of eligibility left, and I already have a court order saying I can play. So many other SEC players are actual professionals, who actually played professional seasons and are allowed to play. So many other SEC players have court orders letting them play a fifth season after their eligibility ended. The SEC lets them play, but it is threatening my coaches and my school if I play. It will harm me tremendously if the SEC's threats keep me off the team.

I ask the Court to protect me, my family, and my future.

RJ LUIS, JR.

SWORN TO AND SUBSCRIBED before me, Notary Public, at Baton Rouge,

Louisiana, this 12th day of November, 2026.

NOTARY PUBLIC
Printed name: Chandler C. Agee
Notary ID or Bar Roll No.: 39779
My commission expires: At death

# Exhibit 7

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: "CIV. L" |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | |
| | * | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL. | * | |
| | * | STATE OF LOUISIANA |
| | * | |
| | * | |

**JUDGMENT**

This matter came before the Court on November 13, 2026 on a hearing on a Motion for Preliminary Injunction filed by RJ Luis, Jr. against the Southeastern Conference (the "SEC"), Greg Sankey, solely in his role as its Commissioner, and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "LSU Board").

Considering the Motion, the pleadings and the memoranda submitted by the parties, the evidence submitted, the arguments of counsel, and for reasons orally assigned:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Motion for Preliminary Injunction is GRANTED and, upon Plaintiff's, RJ Luis, Jr., posting of security as set forth herein, that a preliminary injunction be issued in favor of Plaintiff, RJ Luis, Jr., and against Defendants, the SEC, its Commissioner, and the LSU Board, as follows:

1. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from interfering, directly or indirectly, with the participation of RJ Luis, Jr. as a member of the Louisiana State University men's basketball team during the 2026-27 academic year, or with Louisiana State University's decision to permit him to participate, and from taking any action to prevent, restrict, or condition that participation, including his practice, training, competition, team travel, and other athletically related activities; his participation in conference championship competition and in NCAA championship competition; his receipt of athletics aid; and his receipt of compensation available to Louisiana State University student-athletes.

2. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from declaring, treating, or reporting RJ Luis, Jr. as ineligible to practice or compete in intercollegiate basketball at Louisiana State University during the 2026-27 academic year, including under Article 4.4.2(c) or Article 4.4.3(c) of the Constitution of the SEC, and from communicating to Louisiana State University that he may not be rostered or may not compete.

3. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from enforcing, applying, or giving effect, against Louisiana State University, the LSU Board, their coaches or staff, or RJ Luis, Jr., to any provision of the Constitution or Bylaws of the SEC, to any NCAA bylaw as incorporated or applied by the SEC, or to any other rule, regulation, legislation, policy, memorandum, interpretation, deadline, limit, or directive, however named and whenever adopted, that prohibits, restricts, conditions, or penalizes the presence of RJ Luis, Jr. on the LSU men's basketball roster, the date on which he is added to it, or his practice, competition, team travel, or receipt of athletically related aid, during the 2026-27 academic year. This paragraph reaches every rule, deadline, limit, or other restriction on the designation, size, composition, or change of a roster, including SEC Bylaw 17.2 and its subparts and NCAA Bylaw 17.2 as applied by the SEC, so that none may be used to prevent the addition of RJ Luis, Jr. to the roster or his participation. This paragraph also reaches every rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted, including NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules." This paragraph does not reach rules of general application on academic standing, conduct, or health and safety.

4. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from imposing, threatening to impose, encouraging, or authorizing, by themselves or through any other entity, any sanction, penalty, forfeiture, vacatur of records, or other adverse consequence against RJ Luis, Jr., Louisiana State University, the LSU Board, or the coaches, staff,

student-athletes, teams, or athletic programs of Louisiana State University, on account of the presence of RJ Luis, Jr. on the LSU men's basketball roster, the date on which he is added to it, his participation in athletic competition or practice, or reliance on this judgment, on the Temporary Restraining Order of October 28, 2026, or on this Court's Judgment of August 27, 2026, including any fine, probation, suspension, reprimand, exclusion from SEC regular-season, tournament, or postseason competition, loss of voting privileges, withholding or reduction of SEC funds, or suspension or termination of membership, and including any action under Article 3.1.3, Article 3.1.5, Article 4.1.2, or Article 4.4.3 of the Constitution of the SEC.

5. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from finding, reporting, or otherwise treating the presence of RJ Luis, Jr. on the LSU men's basketball roster, the date on which he is added to it, or his participation in athletic competition or practice, as a violation of any provision of the Constitution or Bylaws of the SEC or any other provision, rule, guideline, policy or procedure by RJ Luis, Jr., by Louisiana State University, or by any of its coaches, staff, or student-athletes.

6. The SEC, its Commissioner, and all persons and entities acting in concert or participation with them, including any member institution of the SEC, are prohibited from accomplishing indirectly what paragraphs 1 through 5 prohibit them from doing directly, including by requesting, encouraging, directing, authorizing, approving, or ratifying any such action by a member institution, by the Chief Executive Officers or the Executive Committee of the SEC, or by any other person or entity, and any person, including any member institution of the SEC and its officers, agents, and employees, who acts in concert or participation with the SEC in the doing of any act prohibited by this preliminary injunction is subject to the contempt power of this Court.

7. The LSU Board and all persons and entities acting in concert or participation with it are prohibited from: (a) declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA, the SEC, or any other entity, including any rule on professionalism, amateurism, or

involvement with professional teams, however named and whenever adopted (among them NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules"), any provision described in paragraph 3, and any roster rule, deadline, or limit of its own; (b) acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, any member institution, any member conference, or the NCAA; and (c) on any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr. to be a member of the LSU men's basketball team and to practice, participate, and compete with the team throughout the 2026-27 season, including access to team facilities and activities, team travel, and athletically related aid. This paragraph does not reach rules of general application on academic standing, conduct, or health and safety.

8. This preliminary injunction remains in force until trial on the merits or the end of the 2026-27 academic year, whichever is first, including all SEC and postseason competition, unless modified by further order of this Court.

9. All costs of this proceeding are assessed against the SEC.

10. Each paragraph and each sentence of this preliminary injunction is severable. If any is modified, vacated, or set aside, the remainder shall remain in full force and effect. Nothing in this judgment modifies or limits this Court's Judgment of August 27, 2026.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that security is hereby approved and fixed in the amount of $10,000.00, which Plaintiff furnished on October 28, 2026 and which remains posted.

JUDGMENT RENDERED IN OPEN COURT on 13th day of November, 2026.

JUDGMENT READ, RENDERED, AND SIGNED in Baton Rouge, Louisiana, this ____ day of November, 2026.

______________________________
HONORABLE JUDGE RONALD R. JOHNSON
NINETEENTH JUDICIAL DISTRICT COURT, DIVISION L

**PLEASE SEND NOTICE TO ALL PARTIES AND COUNSELS OF RECORD.**

# Exhibit 8

| | |
|---|---|
| RJ LUIS, JR | SUIT NO.: C-782241, DIVISION L |
| VERSUS | 19TH JUDICIAL DISTRICT COURT |
| | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL | STATE OF LOUISIANA |

# JUDGMENT

This matter came before the Court on November 13th, 2026 pursuant to a hearing on a *Motion for Preliminary Injunction* filed by RJ Luis, Jr. Present in court were:

A.M. "Tony" Clayton and Chandler C. Agee of Clayton, Frugé & Ward and **Elliot S. Abrams** of Cheshire Parker Schneider & Abrams, PLLC on behalf of **RJ Luis, Jr**; and

**Michael Q. Walshe, Jr.** and **Walter F. Metzinger, III** of Stone Pigman Walther Wittman, L.L.C on behalf of **Southeastern Conference** ("SEC").

**Robert W. Barton** of Taylor, Porter, Brooks & Phillips, L.L.P. on behalf of **The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College.**

Considering the Motion, the pleadings filed by all parties, and the memoranda and correspondences submitted by the parties, the evidence submitted, the arguments of counsel, and for reasons orally assigned:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the *First Amending and Supplemental Petition for Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* is **GRANTED** and, upon Plaintiff's, RJ Luis, Jr., posting of security as set for herein, that a preliminary injunction be issued in favor of Plaintiff, RJ Luis, Jr., and against Defendant, SEC, as follows:

The SEC and those persons and entities in active concert or participation with it who receive actual knowledge of this Judgment by personal service or otherwise, from: (a) declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC, including any rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted (among them NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules"), and any provision described in paragraph 3; and any roster rule, deadline, or limit of its own; (b) acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA; and (c) on any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr. to be a member of the LSU men's basketball team and to practice, participate, and compete with the

team throughout the 2026-27 season, including access to team facilities and activities, team travel, and athletically related aid.

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that the *First Amending and Supplemental Petition for Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* is **DENIED** against Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College.

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that security is hereby approved and fixed in the amount of $100.00.

**JUDGMENT RENDERED IN OPEN COURT** on 13th day of November, 2026.

**JUDGMENT READ, RENDERED, AND SIGNED** in Baton Rouge, Louisiana, this 13 day of November, 2026.

HONORABLE JUDGE WILLIAM M. JORDEN, *PRO TEMPORE*
NINETEENTH JUDICIAL DISTRICT COURT
DIVISION L

PLEASE SEND NOTICE TO ALL PARTIES AND COUNSELS OF RECORD.

# Exhibit 9

**From:** Elliot Abrams <elliot.abrams@cheshirepark.com>
**Sent:** Wednesday, November 18, 2026 7:33 AM
**To:** Price, Donald W.
**Cc:** Tony Clayton; Chandler Agee; adupre@duprelawfirm.com; Walshe, Michael Q.; Metzinger, Fritz; Fuller, Robert
**Subject:** Re: RJ Luis, Jr. v. NCAA [IMAN-ACTIVE.FID2003973]

**CAUTION: This is an external email. Do not click links or open attachments unless you are expecting the email and know the content to be safe.**

Donald,

Thank you for your November 16 email. LSU plays tonight, so I need to close one gap this morning.

The November 13 Judgment enjoins the SEC and those in active concert with it from "giving effect to any penalty or threat of penalty by the SEC" and from refusing to allow RJ to compete this season. Your email says the SEC "will not impose penalties or fines." Yesterday the SEC announced that LSU's statements explaining its interpretation of the Judgement is "inconsistent with the expectations and responsibilities of membership."

Please confirm by 10:00 a.m. CT today that neither the SEC nor its member institutions or their chief executive officers will impose or threaten any adverse consequence, including suspension or termination of LSU's membership, at any time, on account of RJ's place on the roster, his participation, or LSU's reliance on the Court's orders.

If the SEC will not give that confirmation, please tell me that.

Thank you.

Elliot

Elliot S. Abrams
Cheshire Parker Schneider & Abrams, PLLC
133 Fayetteville Street, 4th Floor
Post Office Box 1029
Raleigh, North Carolina 27602
Tel: (919) 833-3114
Fax: (919) 832-0739
www.cheshirepark.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Price, Donald W. <dprice@stonepigman.com>
**Date:** Monday, November 16, 2026 at 2:48 PM
**To:** Elliot Abrams <elliot.abrams@cheshirepark.com>
**Cc:** Tony Clayton <tclaytonlaw@aol.com>; Chandler Agee <cagee@claytonfrugelaw.com>; adupre@duprelawfirm.com <adupre@duprelawfirm.com>; Walshe, Michael Q. <MWalshe@stonepigman.com>; Metzinger, Fritz <fmetzinger@stonepigman.com>; Fuller, Robert <rfuller@rbh.com>
**Subject:** RJ Luis, Jr. v. NCAA [IMAN-ACTIVE.FID2003973]

Elliot:

The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if places Mr. Luis on its men's basketball roster.

STONE PIGMAN

**Donald W. Price**

Main 504.581.3200
Direct 225.490.5812
dprice@stonepigman.com
www.stonepigman.com

**Stone Pigman Walther Wittmann L.L.C.**

This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication. The sender's name and other information in this e-mail are for informational purposes only and are not electronic signatures.

# Exhibit 10

LSU

Legal Affairs & General Counsel

Email: jones@lsu.edu
Telephone: (225) 578-6332

November 17, 2026

**VIA EMAIL**
Jessica Presnall
Southeastern Conference
2201 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203

RE: RJ Luis, Jr.

Dear Jessica:

LSU signed RJ Luis, Jr. on May 19, 2026.[1] After going undrafted in 2025, Mr. Luis signed a two-way contract and was later waived. He played three pre-season games for a total of approximately eight minutes. Once signed, LSU applied for reinstatement. When the NCAA would not issue a determination, Mr. Luis filed suit.

On August 3, 2026, Mr. Luis filed a Petition for Declaratory Judgment, Preliminary Injunction, and Permanent Injunction against the NCAA. At the hearing on August 24, 2026, the Court granted a preliminary injunction in favor of Mr. Luis in open court, enjoining "the NCAA and all persons and entities acting in concert or participation with it" from "declaring, treating or reporting RJ Luis, Jr. as ineligible to practice or compete in intercollegiate basketball at Louisiana State University during the 2026-27 academic year." The judgment was signed on August 27, 2026 and remains in effect.[2]

Unlike in prior cases involving eligibility reinstatement, the SEC's reaction was to immediately push a new rule interpretation.[3] On August 25, 2026, ***the day after the injunction hearing***, the SEC held a meeting of the Presidents, Chancellors and Athletics Directors in Birmingham. At that meeting, the SEC presented and held a vote on a never-before-presented, more aggressive interpretation of eligibility language related to professionalism:

---

[1] Other SEC institutions, including Missouri, Oklahoma and Texas A&M, pursued similarly situated players around the same time. None of them involved an injunction of the SEC's August 25, 2026 policy interpretation, however.
[2] The NCAA has filed an appeal. The First Circuit and Louisiana Supreme Court have denied requests to stay the judgment pending appeal. The appeal remains pending.
[3] This is not the first such similar situation. In January 2026, Charles Bediako sought an injunction against the NCAA seeking eligibility to play for Alabama. Mr. Bediako had played 82 games in three seasons in the G-League. After the NCAA denied reinstatement, an Alabama state court granted a temporary restraining order. Alabama played Mr. Bediako in five games and later removed him from the roster when his preliminary injunction motion was denied. The SEC opposed the injunction, but there was no outrage, no threat of expulsion and no emergency rule interpretation at the time. ***In fact, the SEC took no action to issue a new rule interpretation for almost six months, and then only after Mr. Luis was granted a preliminary injunction by a Louisiana state court.***

*An SEC member institution is not permitted to have an athlete on its roster who has:*

1. *Previously declared for the … NBA … draft, and did not appropriately withdraw;*

2. *Signed a contract with an … NBA/G-League … team; or*

3. *Been listed on an … NBA/G-League … roster.*

Importantly, it did so ***after*** Mr. Luis committed to LSU and ***after*** the state court in Louisiana granted an injunction in his favor. Nothing in the language adopted by the SEC indicates retroactive application of the new policy interpretation.

On October 27, 2026, Mr. Luis amended his lawsuit to add the SEC, Commissioner Sankey and LSU as defendants. After a hearing on November 13, 2026, a preliminary injunction was rendered against the SEC, prohibiting the SEC (and those persons and entities in active concert or participation with it) from:

(a) *Declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC, including any rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted (among them NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules"), and any provision described in paragraph 3; and any roster rule, deadline, or limit of its own;*

(b) *Acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA; and*

(c) *On any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr., to be a member of the LSU men's basketball team and to practice, participate, and compete with the team throughout the 2026-27 season, including access to team facilities and activities, team travel, and athletically related aid.*

On November 16, 2026, local SEC counsel wrote to Mr. Luis' attorney and stated:

*The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if [sic] places Mr. Luis on its men's basketball roster.*

LSU is now in the impossible position of having to choose between honoring a Louisiana state court order (directed to the SEC and those in participation with it), the SEC's August 25, 2026 policy

interpretation issued ***after*** Mr. Luis received his preliminary injunction against the NCAA, and contracts between LSU and Mr. Luis entered into in June and July 2026.

Mr. Luis has been eligible since August 24, 2026. Because the SEC's August 25, 2026 policy interpretation has been the only reason Mr. Luis has not been rostered to date, LSU is in an untenable situation and sees no viable alternative but to comply with the November 13, 2026 Court order. There is no truthful, non-SEC reason not to do so. Accordingly, the President has directed me to notify you that LSU intends to roster Mr. Luis.

Sincerely

Carlton (Trey) Jones III
Vice President and General Counsel
Louisiana State University

cc: President Wade Rousse

# Exhibit 11

# STATEMENT FROM THE SOUTHEASTERN CONFERENCE:

LSU's decision today to rely on its own interpretation of the Court's order to justify its actions is inconsistent with the expectations and responsibilities of membership in the Southeastern Conference.

This is a deeply concerning and disappointing development. The Conference will continue to uphold and defend the standards and policies established by its member universities.

IT JUST MEANS MORE.

# Exhibit 12

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: "CIV. L" |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | |
| NATIONAL COLLEGIATE | * | PARISH OF EAST BATON ROUGE |
| ATHLETIC ASSOCIATION, et al. | * | |
| | * | STATE OF LOUISIANA |

**PLAINTIFF'S MOTION FOR CONTEMPT AND INCORPORATED MEMORANDUM IN SUPPORT AND FOR RULE TO SHOW CAUSE AGAINST THE SOUTHEASTERN CONFERENCE AND ITS COMMISSIONER**

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, RJ Luis, Jr. ("Plaintiff"), who respectfully moves this Court to hold defendants, the Southeastern Conference (the "SEC") and Greg Sankey, solely in his role as Commissioner of the Southeastern Conference (the "Commissioner"), in constructive contempt of this Court's Judgment signed November 13, 2026 (the "Judgment"), and to issue a rule ordering them to show cause why they should not be so held, and in support states the following.

1

This matter came before the Court on November 13, 2026, on Plaintiff's Motion for Preliminary Injunction, with counsel for the SEC present. **(Exhibit 1).** The Court granted a preliminary injunction against the SEC, denied relief against the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, fixed security at $100.00, and rendered and signed the Judgment that day. **(Exhibit 1).** The Judgment provides that the preliminary injunction issue upon Plaintiff's posting of security, and Plaintiff posted the $100.00 security on November 16, 2026.

2

The Judgment enjoins the SEC, and those persons and entities in active concert or participation with it who receive actual knowledge of the Judgment by personal service or otherwise, from the following. **(Exhibit 1).**

> (a) declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC, including any rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted (among them NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules"), and any provision described in paragraph 3; and any roster rule, deadline, or limit of its own; (b) acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA; and (c) on any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr. to be a member of the LSU men's basketball team and to practice, participate, and compete with the team throughout the 2026-27 season, including access to team facilities and activities, team travel, and athletically related aid.

3

On November 16, 2026, counsel for the SEC wrote Plaintiff's counsel, "The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if [it] places Mr. Luis on its men's basketball roster." **(Exhibit 2).**

4

The SEC acts through the Commissioner, who is a defendant in this action solely in his role as Commissioner of the Southeastern Conference. On November 17, 2026, Louisiana State University ("LSU") decided to roster RJ Luis, Jr. on its men's basketball team. The same day, the SEC published on its official account on X (@SEC) a post that reads "SEC statement on LSU's decision to roster men's basketball player RJ Luis," with an image headed "STATEMENT FROM THE SOUTHEASTERN CONFERENCE" that reads in full as follows. **(Exhibit 3).**

> LSU's decision today to rely on its own interpretation of the Court's order to justify its actions is inconsistent with the expectations and responsibilities of membership in the Southeastern Conference.
>
> This is a deeply concerning and disappointing development. The Conference will continue to uphold and defend the standards and policies established by its member universities.

5

The statement violates the Judgment. The Judgment forbids the SEC from "declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC, including any rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted." **(Exhibit 1).** The SEC's statement is, in its own words, about "LSU's decision to roster men's basketball player RJ Luis." **(Exhibit 3).** Declaring that decision "inconsistent with the expectations and responsibilities of membership in the Southeastern Conference" treats RJ Luis, Jr. as ineligible under the SEC's standards, and the Judgment reaches any rule or provision of the SEC "however named and whenever adopted."

6

The statement is also a threat of penalty. A penalty is an adverse consequence. By telling LSU in public that its "decision today to rely on its own interpretation of the Court's order" is "inconsistent with the expectations and responsibilities of membership in the Southeastern Conference," and stating that it "will continue to uphold and defend the standards and policies established by its member universities," the SEC warned LSU and every other member that relying on this Court's Judgment will cost them. **(Exhibit 3).** The SEC's words track its own Constitution, which makes "any conduct deemed to be incompatible with membership" grounds for suspending a member. **(SEC Const. art. 3.1.3, attached hereto as Exhibit 4).** The Judgment forbids the SEC from "acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA." **(Exhibit 1).**

7

The violation is wilful. Counsel for the SEC were present when the Judgment was rendered in open court. **(Exhibit 1).** On November 16, its counsel wrote that the SEC "will abide by the terms of the preliminary injunction while it remains in place." **(Exhibit 2).** The next day, the SEC published the statement. **(Exhibit 3).** On November 18, with LSU set to play that night, Plaintiff's counsel wrote the SEC's counsel at 6:33 a.m. Central: "LSU plays tonight, so I need to close one gap this morning." He asked the SEC to confirm "that neither the SEC nor its member institutions or their chief executive officers will impose or threaten any adverse consequence, including

suspension or termination of LSU's membership, at any time, on account of RJ's place on the roster, his participation, or LSU's reliance on the Court's orders," and added, "If the SEC will not give that confirmation, please tell me that." **(Exhibit 10).** As of the filing of this motion late that afternoon, the SEC has not responded.

8

The statement also singles out RJ Luis, Jr. and LSU for treatment the SEC gives no one else, in at least three respects:

(1) **<u>The SEC admits that RJ Luis, Jr. is eligible</u>, yet it threatens LSU for allowing him to play**.

(2) **<u>Thirteen of the SEC's sixteen members have rostered players who played professionally, while RJ Luis, Jr. has never played in a regular-season professional game</u>, yet he is the only player the SEC has targeted.**

(3) **<u>Athletes at no fewer than fourteen of the SEC's sixteen members have competed under court orders</u> across all sports this season, and in men's basketball alone eight members have at least one rostered player who is eligible only because of court orders, <u>yet LSU is the only member the SEC has targeted for rostering one</u>.**

The SEC's targeting of LSU, and through LSU of RJ Luis, Jr., confirms that its violation of the Judgment is wilful.

<u>First</u>, the SEC admits that RJ Luis, Jr. is eligible. On November 5, 2026, the SEC told this Court that he "is currently eligible for NCAA competition" and that "the choice belongs to LSU." **(SEC Defendants' Opposition to Motion for Preliminary Injunction at 20–21 (filed Nov. 5, 2026) ("SEC Opp."), attached hereto as Exhibit 4).** The Commissioner has sworn that the SEC "has not and will not apply" its Professionalism Rules to "declare any plaintiff . . . ineligible for SEC or NCAA competition." **(Affidavit of Greg Sankey ¶ 3(d), filed with SEC Opp., attached hereto as Exhibit 4).** And he testified before Judge Jorden on September 3, 2026, in *Pyburn v. National Collegiate Athletic Association*, No. 783299, that when a court enjoins an NCAA rule and nothing in the SEC's Bylaws differs, the athlete is "eligible to compete in the SEC," and that "the SEC has no separate Bylaw governing professionalism." **(Sept. 3, 2026 Tr. 57:23–28, 62:25–**

**27, attached hereto as Exhibit 5).** By the SEC's own account, then, RJ Luis, Jr. is eligible under SEC Bylaws.

Second, SEC rosters include actual professionals, whereas this Court found, after an evidentiary hearing, that RJ Luis, Jr. "did not actually play professional ball," and he has never played in a regular-season professional game. **(Aug. 24, 2026 Tr. 191:7–8 (capitalization altered), attached hereto as Exhibit 6; Pl.'s Reply Ex. 4 ¶ 10 (filed Nov. 12, 2026) ("Reply Ex."), attached hereto as Exhibit 7).** Thirteen of the SEC's sixteen members, by their own athletics departments' published accounts, have rostered men's basketball players this season or last who have actually played for professional teams (i.e., who are, unlike RJ, actually professional athletes). One member's official biography describes its player as a "[v]eteran international player overall with 150 professional games under his belt." **(Reply Ex. 1 at 64, attached hereto as Exhibit 8).** The SEC has taken no action against any of those members. **(Reply Ex. 4 ¶ 10, Exhibit 7).** Nor did RJ Luis, Jr. leave college. He remained enrolled, taking classes at St. John's, the entire time the NCAA and the SEC say he was a professional. **(Reply Ex. 4 ¶ 10, Exhibit 7).**

Third, the SEC does not penalize members for rostering players who are eligible because of court orders. Across all sports this season, athletes at no fewer than fourteen of the SEC's sixteen members have competed under court orders. In men's basketball alone, eight of the SEC's sixteen members have at least one rostered player this season who is eligible only because of court orders against the NCAA, and the SEC has taken no action against any of them. **(Reply Ex. 5, attached hereto as Exhibit 9).** The Commissioner agreed under oath that Ole Miss "has not faced any potential penalties" for playing an athlete under a court order, and he testified that Alabama was "[c]onsidered, not punished" for doing the same. **(Sept. 3, 2026 Tr. 134:5–20, Exhibit 5).**

Twelve days after telling this Court that "the choice belongs to LSU," and one day after stating in writing that it would abide by the preliminary injunction and would "not impose penalties or fines on LSU" for rostering RJ Luis, Jr., the SEC published its statement, which tracks the SEC Constitution's standard for suspending a member. **(Exhibits 2, 3; SEC Const. art. 3.1.3, Exhibit 4).**

The only roster decision the SEC has declared "inconsistent with the expectations and responsibilities of membership" is the decision to roster the one player this Court's Judgment protects, the decision the SEC said in writing it would not penalize LSU for making. **(Exhibit 2).** So the SEC's threat against LSU does more than break its written commitment to Plaintiff's counsel and violate this Court's Judgment. It singles out LSU and RJ Luis, Jr. for conduct in which most SEC members engage.

9

La. C.C.P. art. 3611 provides that "[d]isobedience of or resistance to a temporary restraining order or preliminary or final injunction is punishable as a contempt of court." La. C.C.P. art. 224(2) provides that a constructive contempt of court includes "[w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court." La. R.S. 13:4611(1)(g) provides that "[t]he court may award attorney fees to the prevailing party in a contempt of court proceeding provided for in this Section."

10

La. C.C.P. art. 225(A) provides that "a certified copy of the motion, and of the rule to show cause, shall be served upon the person charged with contempt in the same manner as a subpoena at least forty-eight hours before the time assigned for the trial of the rule." The SEC and the Commissioner are located in Birmingham, Alabama, and Plaintiff will serve them under the Louisiana Long Arm Statute.

11

LSU's Southeastern Conference schedule begins January 2, 2027, and the SEC's statement remains published. Plaintiff therefore asks that the rule be set and heard on an expedited basis.

**WHEREFORE,** plaintiff, RJ Luis, Jr., prays that the Court issue a rule ordering the Southeastern Conference and Greg Sankey, solely in his role as Commissioner of the Southeastern Conference, to show cause, on an expedited basis, why they should not be adjudged in constructive contempt of this Court's Judgment signed November 13, 2026.

Plaintiff further prays that, after the hearing, the Court adjudge the Southeastern Conference and Greg Sankey, solely in his role as Commissioner of the Southeastern Conference, in constructive contempt of the Judgment.

Plaintiff further prays for an award of reasonable attorney fees under La. R.S. 13:4611(1)(g), all costs of this proceeding, and all other relief that is just and equitable.

Respectfully submitted,

CLAYTON, FRUGÉ, WARD & HENDRY
3741 La. Highway 1 South
Port Allen, Louisiana 70767
Telephone: (225) 344-7000
Facsimile: (225) 383-7631
Email: tclaytonlaw@aol.com
cagee@claytonfrugelaw.com

*/s/ A.M. "Tony" Clayton*
**A.M. "Tony" Clayton (#21191)**
Michael P. Frugé (#26287)
Michael C. Hendry (#35819)
Brilliant P. Clayton (#36829)
Keondra K. Riley (#38386)
Chandler C. Agee (#39779)

-and-

Elliot S. Abrams, N.C. Bar No. 42639
Cheshire Parker Schneider & Abrams, PLLC
133 Fayetteville Street, 4th Floor
Post Office Box 1029
Raleigh, North Carolina 27602
Tel: (919) 833-3114
Email: Elliot.Abrams@cheshirepark.com

*Counsel for Plaintiff RJ Luis, Jr.*

**PLEASE SERVE THE MOTION FOR CONTEMPT AND FOR RULE TO SHOW CAUSE, WITH EXHIBITS 1 THROUGH 10, AND THE RULE TO SHOW CAUSE, ON THE FOLLOWING**

**SOUTHEASTERN CONFERENCE**
Through its Commissioner, Greg Sankey
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

And

**GREG SANKEY, solely in his role as Commissioner of the Southeastern Conference**
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

Via the Louisiana Long Arm Statute, La. R.S. 13:3201 and 13:3204
(certified copies to be returned to undersigned counsel for service)

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: “CIV. L” |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al. | * | PARISH OF EAST BATON ROUGE |
| | * | |
| | * | STATE OF LOUISIANA |

**CERTIFICATE OF SERVICE**

I certify that a copy of this Motion for Contempt and for Rule to Show Cause, together with the proposed Rule to Show Cause and Exhibits 1 through 10, has this day been served on all counsel of record by electronic mail, by facsimile, by hand delivery, by commercial courier, or by United States mail, postage prepaid and properly addressed, including the following.

Richard F. Zimmerman, Jr., La. Bar No. 13800
Julie M. McCall, La. Bar No. 29992
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, Louisiana 70802
Richard.Zimmerman@butlersnow.com
Julie.McCall@butlersnow.com

**-And-**

Taylor J. Askew, Tenn. BPR No. 033193
David J. Zeitlin, Tenn. BPR No. 037664
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

**-And-**

Harvey S. Bartlett III
Maggie M. Daly
Carla C. Mayer
FISHMAN HAYGOOD LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
tbartlett@fishmanhaygood.com
mdaly@fishmanhaygood.com
cmayer@fishmanhaygood.com
Attorneys for defendant, National Collegiate Athletic Association

**-And-**

Michael Q. Walshe, Jr., La. Bar No. 23968
Donald W. Price, La. Bar No. 19542
Walter F. Metzinger III, La. Bar No. 37799
STONE PIGMAN WALTHER WITTMANN L.L.C.
909 Poydras Street, Suite 3150
New Orleans, Louisiana 70112
mwalshe@stonepigman.com
dprice@stonepigman.com
fmetzinger@stonepigman.com

**-And-**

Jason Rogers Williams, La. Bar No. 25539
JASON WILLIAMS & ASSOCIATES, LLC
607 St. Charles Avenue, Suite 300
New Orleans, Louisiana 70130
jason@jrwilliamslawfirm.com
Attorneys for defendants, Southeastern Conference and Greg Sankey, solely in his role as Commissioner of the Southeastern Conference

**-And-**

Robert W. Barton, La. Bar No. 22936
TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.
450 Laurel Street, 8th Floor
Baton Rouge, Louisiana 70801
bob.barton@taylorporter.com

**-And-**

Board of Supervisors of Louisiana State University and Agricultural and Mechanical College
c/o Office of General Counsel
3810 West Lakeshore Drive, Suite 124
Baton Rouge, Louisiana 70808

**-And-**

Honorable Elizabeth B. Murrill, Attorney General of Louisiana
Office of the Attorney General
1885 North 3rd Street
Baton Rouge, Louisiana 70802
For defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

Port Allen, Louisiana, this 18th day of November, 2026.

*/s/ A.M. "Tony" Clayton*
A.M. "Tony" Clayton (#21191)

| | | |
|---|---|---|
| RJ LUIS, JR. | * | SUIT NO.: C-782241 DIV: "CIV. L" |
| | * | |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| | * | |
| | * | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al. | * | |
| | * | |
| | * | STATE OF LOUISIANA |

**RULE TO SHOW CAUSE**

Considering Plaintiff's Motion for Contempt and for Rule to Show Cause against the Southeastern Conference and its Commissioner,

**IT IS ORDERED** that defendants, the Southeastern Conference and Greg Sankey, solely in his role as Commissioner of the Southeastern Conference, show cause on the ______ day of ____________________, 20____, at ________ __.m., in the Nineteenth Judicial District Court, Division L, 300 North Boulevard, Baton Rouge, Louisiana, why they should not be adjudged in constructive contempt of this Court's Judgment signed November 13, 2026, for the publication on November 17, 2026, on the Southeastern Conference's official account on X (@SEC), of its statement on Louisiana State University's decision to roster RJ Luis, Jr., and why the Court should not grant the relief prayed for in the motion. Given the ongoing 2026-27 season, this rule is set on an expedited basis.

Baton Rouge, Louisiana, this ______ day of ____________________, 2026.

___________________________________

HONORABLE JUDGE WILLIAM M. JORDEN, PRO TEMPORE
NINETEENTH JUDICIAL DISTRICT COURT
DIVISION L

**PLEASE SERVE THIS RULE, WITH A CERTIFIED COPY OF THE MOTION, ON THE FOLLOWING**

**SOUTHEASTERN CONFERENCE**
Through its Commissioner, Greg Sankey
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

And

**GREG SANKEY, solely in his role as Commissioner of the Southeastern Conference**
2201 Richard Arrington Jr. Boulevard North
Birmingham, Alabama 35203

Via the Louisiana Long Arm Statute, La. R.S. 13:3201 and 13:3204
(certified copies to be returned to undersigned counsel for service)

**<u>INDEX OF EXHIBITS</u>**

to Plaintiff's Motion for Contempt and for Rule to Show Cause against the Southeastern Conference and its Commissioner

*RJ Luis, Jr. v. National Collegiate Athletic Association, et al.*, No. C-782241, Div. L, 19th Judicial District Court

| Exhibit | Description |
|---|---|
| **1** | Judgment signed November 13, 2026, granting a preliminary injunction against the Southeastern Conference. |
| **2** | Email from Donald W. Price, counsel for the SEC, to Plaintiff's counsel, November 16, 2026. |
| **3** | Statement from the Southeastern Conference, published on its official X account (@SEC), November 17, 2026. |
| **4** | Excerpts: SEC Defendants' Opposition to Motion for Preliminary Injunction (filed Nov. 5, 2026), pp. 20–21; Affidavit of Greg Sankey, ¶ 3(c)–(e); SEC Constitution, Article 3 (art. 3.1.3, Suspension of Membership). |
| **5** | Transcript excerpts, September 3, 2026 hearing, *Pyburn v. National Collegiate Athletic Association*, No. 783299 (19th JDC), pp. 57, 62, and 134 (testimony of Commissioner Greg Sankey). |
| **6** | Transcript excerpt, August 24, 2026 preliminary injunction hearing in this action, p. 191, lines 2–17 (the Court's oral ruling). |
| **7** | Affidavit of RJ Luis, Jr., ¶ 10 (Plaintiff's Reply Ex. 4, filed Nov. 12, 2026). |
| **8** | Official Texas A&M athletics biography of Rubén Dominguez (Plaintiff's Reply Ex. 1, p. 64 of 70). |
| **9** | Table of SEC men's basketball student-athletes eligible for the 2026-27 season under court orders (Plaintiff's Reply Ex. 5, pp. 1–2 of 74). |
| **10** | Email from Plaintiff's counsel to Donald W. Price, counsel for the SEC, November 18, 2026, requesting confirmation. |

The portion of each exhibit cited in the motion is highlighted. Highlighting has been added by counsel.

| | |
|---|---|
| RJ LUIS, JR | SUIT NO.: C-782241, DIVISION L |
| VERSUS | 19[TH] JUDICIAL DISTRICT COURT |
| | PARISH OF EAST BATON ROUGE |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL | STATE OF LOUISIANA |

# JUDGMENT

This matter came before the Court on November 13th, 2026 pursuant to a hearing on a *Motion for Preliminary Injunction* filed by RJ Luis, Jr. Present in court were:

> **A.M. "Tony" Clayton** and **Chandler C. Agee** of Clayton, Frugé & Ward and **Elliot S. Abrams** of Cheshire Parker Schneider & Abrams, PLLC on behalf of **RJ Luis, Jr**; and
>
> **Michael Q. Walshe, Jr.** and **Walter F. Metzinger, III** of Stone Pigman Walther Wittman, L.L.C on behalf of **Southeastern Conference ("SEC")**.
>
> **Robert W. Barton** of Taylor, Porter, Brooks & Phillips, L.L.P. on behalf of **The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College**.

Considering the Motion, the pleadings filed by all parties, and the memoranda and correspondences submitted by the parties, the evidence submitted, the arguments of counsel, and for reasons orally assigned:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the *First Amending and Supplemental Petition for Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* is **GRANTED** and, upon Plaintiff's, RJ Luis, Jr., posting of security as set for herein, that a preliminary injunction be issued in favor of Plaintiff, RJ Luis, Jr., and against Defendant, SEC, as follows:

The SEC and those persons and entities in active concert or participation with it who receive actual knowledge of this Judgment by personal service or otherwise, from: (a) declaring or treating RJ Luis, Jr. as ineligible to practice or compete during the 2026-27 academic year under any rule, bylaw, or other provision of the NCAA or the SEC, including any rule on professionalism, amateurism, or involvement with professional teams, however named and whenever adopted (among them NCAA Article 12 as incorporated by SEC Bylaw 14.01.1 and what the SEC calls its "Professionalism Rules"), and any provision described in paragraph 3; and any roster rule, deadline, or limit of its own, (b) acceding to or giving effect to any penalty or threat of penalty by the SEC, its Commissioner, or the NCAA; and (c) on any ground described in (a) or (b), or for want of a further order of this Court, refusing to allow RJ Luis, Jr. to be a member of the LSU men's basketball team and to practice, participate, and compete with the

team throughout the 2026-27 season, including access to team facilities and activities, team travel, and athletically related aid.

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that the *First Amending and Supplemental Petition for Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* is **DENIED** against Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that security is hereby approved and fixed in the amount of $100.00.

**JUDGMENT RENDERED IN OPEN COURT** on 13th day of November, 2026.

**JUDGMENT READ, RENDERED, AND SIGNED** in Baton Rouge, Louisiana, this 13 day of November, 2026.

HONORABLE JUDGE WILLIAM M. JORDEN, *PRO TEMPORE*
NINETEENTH JUDICIAL DISTRICT COURT
DIVISION L

PLEASE SEND NOTICE TO ALL PARTIES AND COUNSELS OF RECORD.

## Chandler Agee

**From:** Price, Donald W. <dprice@stonepigman.com>
**Sent:** Monday, November 16, 2026 1:47 PM
**To:** elliot.abrams@cheshirepark.com
**Cc:** tclaytonlaw@aol.com; Chandler Agee; adupre@duprelawfirm.com; Walshe, Michael Q.; Metzinger, Fritz; Fuller, Robert
**Subject:** RJ Luis, Jr. v. NCAA [IMAN-ACTIVE.FID2003973]

Elliot:

The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if places Mr. Luis on its men's basketball roster.

STONE PIGMAN

**Donald W. Price**

Main 504.581.3200
Direct 225.490.5812
dprice@stonepigman.com
www.stonepigman.com

**Stone Pigman Walther Wittmann L.L.C.**

This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication. The sender's name and other information in this e-mail are for informational purposes only and are not electronic signatures.

**Southeastern Conference**
@SEC

SEC statement on LSU's decision to roster men's basketball player RJ Luis:




Last edited 6:03 PM · Nov 17, 2026 · **165.2K** Views

of proving irreparable harm attributable to or caused by the SEC.[72] Second, Plaintiff's alleged injury is not irreparable in nature.

**1. Plaintiff cannot establish the requisite causation.**

Causation is a threshold issue. The First Circuit and other appellate courts have made clear that the party seeking an injunction must establish that the purported irreparable injury he would suffer without injunctive relief is "attributable to" or "caused by" the complained-of conduct.[73] As another division of this Court has held, a preliminary injunction is not warranted if "the actions that Plaintiffs seek to enjoin will not even protect Plaintiffs from 'harm' they allege."[74]

Such is the case here. **Enjoining the SEC from enforcing the Professionalism Rules will not guarantee Plaintiff a spot on LSU's men's basketball roster.** As Plaintiff acknowledges, restraining the SEC from penalizing LSU leaves "every coaching decision to LSU," including the decision to omit Plaintiff from the roster.[75] Indeed, the SEC Defendants are currently restrained from enforcing the Professionalism Rules with respect to Plaintiff, and LSU ***still*** has not included Plaintiff on its roster, even with one roster spot available.

That LSU has the ability to add Plaintiff to its men's basketball roster but has not done so illustrates the impossibility of Plaintiff ever establishing a causal link between the SEC's conduct and Plaintiff's alleged injury. The SEC does not purport (and has never purported) to determine whether Plaintiff has remaining eligibility. Plaintiff, per this Court's prior Preliminary

72 *See City of Baton Rouge v. State, ex rel. Dep't of Soc. Servs.*, 2007-0005, p. 15 (La. App. 1 Cir. 9/14/07), 970 So. 2d 985, 994; *Yokum v. 544 Funky, LLC*, 2015-1353, p. 17 (La. App. 4 Cir. 9/28/16), 202 So. 3d 1065, 1076, *writ denied*, 2016-2231 (La. 1/25/17), 215 So. 3d 685; *Tobin v. Jindal*, 19th JDC No. 599,282, 2011 WL 9159780 (La. Civil D.Ct. Feb. 24, 2011).

73 *See City of Baton Rouge*, 970 So. 2d at 994 (affirming denial of preliminary injunction where police officers would have had duty to monitor registered sex offenders in area regardless of whether city obtained injunctive relief prohibiting state from using local site as emergency shelter for such offenders); *Yokum*, 202 So. 3d at 1076 (holding that irreparable harm was not established where it was unclear to the district court whether noise allegedly damaging plaintiffs was caused by defendant night club or other French Quarter businesses).

74 *Tobin*, 2011 WL 9159780 (denying application for injunction of study regarding potential merger of colleges where results of study ultimately would not determine whether a merger actually occurred).

75 Memorandum in Support of Motion at 4.

Injunction, is currently eligible for NCAA competition. Consequently, the SEC Defendants cannot prevent LSU from adding Plaintiff to its roster purely via enforcement of the Professionalism Rules. Conversely, if enjoined from enforcing the Professionalism Rules, the SEC Defendants cannot force LSU to add Plaintiff (or any other individual) to an athletic roster.

Regardless of the outcome of Plaintiff's Motion, therefore, the choice belongs to LSU. Should it desire, LSU can add Plaintiff to the roster and accept whatever consequences flow from that decision. On the other hand, LSU can opt against placing Plaintiff on the roster, whether out of a desire to comply with the rules of the voluntary association to which it belongs or for any other reason. Either way, it is LSU, not the SEC, that will determine whether Plaintiff suits up for LSU this year. As a result, and as the jurisprudence of this state establishes, the alleged irreparable harm of "losing" this season of competition cannot be attributed to or caused by the SEC Defendants.[76]

**2. Plaintiff's alleged harm is not irreparable in nature.**

Even if Plaintiff could prove the SEC Defendants caused him harm, the injury he alleges to have suffered is not irreparable. To the contrary, the evidence establishes that the harm he would suffer is monetary in nature.

In both his Petition and during his testimony at the August 24, 2026 hearing, Plaintiff cited his desire to financially support his family and role as a financial provider as primary motivations for seeking to compete at LSU during the 2026-27 season.[77] His pleadings likewise spotlight the loss of NIL and revenue-sharing income he claims he would receive if he had the opportunity to play.[78] These alleged lost opportunities are monetary in nature and thus do not give rise to injunctive relief.

---

76 *See City of Baton Rouge*, 970 So. 2d at 994; *Yokum*, 202 So. 3d at 1076; *Tobin*, 2011 WL 9159780.

77 Original Petition at ¶ 15, Transcript at 47:16-22.

78 *See* Original Petition at ¶ 46; First Amended Petition at ¶ 70.

c. The actions taken by the SEC and our public statements during the week of August 24, 2026, have not been based on any newly adopted Bylaws or rules that were not in effect prior to the week of August 24, 2026.

d. For the 2026-27 academic year, the SEC has not and will not apply any NCAA or SEC Bylaws limiting student-athletes entering college in 2022 to four years of eligibility or requiring student-athletes to enter a transfer portal to be eligible to transfer and for competition (the "Eligibility/Transfer Rules") or any Professionalism Rules to penalize any plaintiff or declare any plaintiff (in this or any other lawsuit naming the NCAA as a defendant, whether the SEC is a party defendant or not) ineligible for SEC or NCAA competition based on any violation of any of such Rules. The SEC Presidents and Chancellors have made it clear that any penalties that may be imposed by the SEC as a result of violation of such Rules will be imposed only against SEC member institutions, SEC Presidents or Chancellors, SEC coaches, and other SEC athletics personnel, all of whom are subject to and must comply with the SEC Bylaws and rules as set forth below.

e. The SEC is not an agent or functionary of the NCAA and has not interacted with or coordinated with the NCAA in making the determinations and decisions summarized in the prior two subparagraphs. As explained below, the SEC is a separate entity and is independent from the NCAA. The SEC makes decisions independently about adoption, implementation, and enforcement of its own Bylaws and rules.

Accordingly, to be clear, the SEC has not and has no intention of imposing any penalty against a plaintiff in this lawsuit (or any other lawsuit referenced above) or declaring any such plaintiff ineligible for competition in the SEC during the 2026-27 academic year based on violations of the Professionalism Rules or Eligibility/Transfer Rules.

CONSTITUTION, ARTICLE 3

# SEC Membership

3.0 General Principle ........ 3
3.1 Membership, Termination, Suspension and Dues ........ 3

## 3.0 GENERAL PRINCIPLE

The Southeastern Conference is both a competitive body and a legislative body, as defined in Articles 3.02.1 and 3.02.2 of the NCAA Constitution.

## 3.1 MEMBERSHIP, TERMINATION, SUSPENSION

***3.1.1 Number of Members.** The number of members of the Conference shall be set by the Chief Executive Officers. [*Revised: 5/30/91*]

***3.1.2 Granting of Membership.** Membership may be granted by invitation of the Conference at a meeting of the Chief Executive Officers. A vote of at least three-fourths of the members is required to extend an invitation for membership. [*Revised: 5/30/91*] [*Clarified/Conformed: 6/1/11*]

***3.1.3 Suspension of Membership.** Membership may be suspended at a meeting of the Chief Executive Officers. A member may be suspended at any time by a vote of at least two-thirds of the members, either indefinitely or for a stated period, for any conduct deemed to be incompatible with membership. [*Clarified/Conformed: 6/1/11*]

***3.1.4 Withdrawal from Membership.** A member may only withdraw from membership in the Conference after providing written notice to the President and the Commissioner of the date of its withdrawal at least two years prior to the date on which the withdrawal will be effective. The withdrawal notice must specify a withdrawal date of July 15 in the year in which the withdrawal will be effective. [*Adopted: 1/14/21*]

(a) A member shall be deemed to have withdrawn from the Conference if and when the member either (i) fails or refuses, or renounces its obligation, to field a team to compete in Conference football competition or basketball competition, or (ii) fails or refuses to fulfill or renounces its obligations to field teams and participate in Conference sports competitions and championships, including but not limited to its obligations under SEC Bylaws 22.1.1 or 22.1.2, as such SEC Bylaws may be renumbered or amended from time to time, or NCAA Bylaw 20.9.6, as such NCAA Bylaw may be renumbered or amended from time to time. Any determination that a deemed withdrawal has occurred shall be made by the Commissioner and shall specify the effective date of such deemed withdrawal (which date may be prior to the date of determination by the Commissioner).

(b) In the event that, upon request of the member deemed to have withdrawn pursuant to Section 3.1.4(a), the Commissioner determines that a failure of the member to fulfill its obligations is attributable to and caused by circumstances or events beyond the reasonable control of the member, the member shall not be deemed to have withdrawn from the Conference under Section 3.1.4(a) and the prior determination of withdrawal shall be deemed rescinded, provided that the member comes into full compliance with such obligations at such time as the Commissioner determines that the circumstances or events no longer prevent fulfillment of such obligations.

(c) Any member may appeal any determination of the Commissioner under this Section 3.1.4 to the Chief Executive Officers. A quorum of the Chief Executive Officers may, by a vote of a majority of all the Chief Executive Officers, reverse or modify any determination of the Commissioner. The Chief Executive Officer of a member that has failed, refused, or renounced its obligations shall be eligible to vote.

***3.1.5 Termination of Membership.** Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any motion to terminate membership shall specify the effective date of the proposed termination. [*Revised: 1/14/21*]

***3.1.6 Effect of Withdrawal from or Termination of Membership.** As of the effective date of the termination, withdrawal, or deemed withdrawal of a member of the Conference, such member shall not have a right to receive and will not be paid any distributions of revenue from the Conference, including but not limited to distributions pursuant to Bylaw 31. [*Adopted: 1/14/21*]

that correctly?
A You did.
Q It's in the SEC Bylaws; correct?
A It is, yes, correct.
Q And all SEC member institutions are required to comply with those Bylaws; correct?
A Correct.
Q If we go down to 14.1, it has General Eligibility Requirements. You can see that?
A Yes.
Q 14.1.1, Regular-season and Postseason Competition. Unless otherwise specified in these Bylaws, regular-season and post season eligibility rules for the Southeastern Conference are the same as the eligibility rules for NCAA championships. Did I read that correctly?
A You did.
Q Is that accurate?
A It is.
Q So unless there's something different in your Bylaws, if an athlete, if one of these plaintiffs is eligible under NCAA rules, they are also eligible to compete in the SEC; correct?
A That is correct.
Q So unless we're dealing with something specific in your Bylaws that is different from the NCAA Manual, if this Court enjoins NCAA from enforcing an NCAA rule, as long as there's not something else in your Bylaws that's different, they are eligible to compete in the SEC; correct?
A I think I understand your question. That's correct, yes.
Q Let's look at the transfer rule. Let's get down to 14.5.5. Section 14.5 on page 17 of the Bylaws concerns transfer regulations; correct?
A Yes.

A Correct.

Q So the only rule you have to enforce is not an SEC rule, it's an NCAA rule, isn't it?

A Student athlete could be eligible to play. What we have said is we have expectations among our member universities and it was not a new rule, it was a direction on how accountability would be applied because we have agreed to that common template for competition among our 16.

Q But you don't have separate rules on competition, do you? Outside of the Bylaws.

A We have the separate rules that are presented here. We have this rule specifically.

Q You have the SEC Bylaws and if something is not, if something is in the SEC Bylaws different from the NCAA, you go to your Bylaw; correct?

A We go together.

Q If your Bylaw is silent on an issue, we looked at earlier, the default is whatever the NCAA says; correct?

A Among our universities as specified.

Q Right, that's what 14.1.1 says. Unless otherwise specified in these Bylaws, eligibility for the SEC is the same as eligibility for the NCAA; correct?

A That's what our members have said among the 16, that is the standard.

Q And the SEC has no separate Bylaw governing professionalism; correct?

A That's correct.

Q So when the SEC found out that the NCAA's Bylaw on professionalism had been enjoined, it put out a statement that it was going to enforce long-standing rules about professionalism; correct?

A There's a lot in the memo. It identified the common

A I'll go back you're not describing the complete circumstance and relationship with the franchise or the league so trying to guess at what the circumstance may be is difficult.
Q Mr. Chambliss is playing at Ole Miss because a court order made him eligible; correct?
A That's correct.
Q Ole Miss has not faced any potential penalties for allowing him to play under the court order; correct?
A Correct.
Q Mr. Bediako played for Alabama under a court order; correct?
A He did.
Q It was later reversed; correct?
A It was.
Q Once it was reversed, he no longer played; correct?
A That's right.
Q And Alabama was not punished for playing him while there was a court order in place; correct?
A Considered, not punished. First time I've experienced that, same with our league in that circumstance and that has caused conversations to continue and obviously the situation is very different than that one first time I've ever experienced that and the presidents and chancellors weighed in to say here's the expectation of how oversight will be applied.
Q You agree we're a nation of laws; correct?
A Yes.
Q And we have courts to fairly enforce those laws for everyone; correct?
A Yes.
Q How can our legal system continue to function if people are given a choice obey a court order and allow someone to play

I HEARD THE TESTIMONY OF WITNESSES TO SUGGEST THAT NO ONE HAS BEEN ALLOWED TO PLAY COLLEGIATE SPORTS WHO HAVE SIGNED THE N.B.A. CONTRACT OR, AND OR SIGNED AN AGREEMENT. THE QUESTION IN THE COURT'S MIND WHAT IS PARTICIPATION IN PROFESSIONAL SPORTS? IT WAS CLEARLY IN THE COURT'S MIND THAT MR. LUIS DID NOT ACTUALLY PLAY PROFESSIONAL BALL, ALTHOUGH HE PRACTICED WITH A PROFESSIONAL TEAM FOR A LIMITED DURATION. THESE RULES, 12.2 POINT 4, POINT ONE AND 12.2 POINT TWO POINT 2 POINT ONE, THE COURT HAS REVIEWED THOSE RULES AND TAKES THOSE RULES INTO CONSIDERATION IN IT'S RULING. THEY ALLEGE, THE N.C.A.A., THAT THE PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS. ARBITRARY CAN, TO THIS COURT, SUGGEST THAT THERE ARE TWO DIFFERENT GROUPS OF PERSONS BEING TREATED DIFFERENTLY.

eligible, I practiced and trained with the team, and my teammates, the coaching staff, and I all planned for me to be on the team.

To my knowledge, LSU has kept a roster spot available for me. Based on what Coach Wade and other LSU personnel have told me, I understand that the SEC's threatened sanctions—not any concern about my health, grades, conduct, or performance—are the only reason why LSU has not placed me on the roster or allowed me to practice or play.

10.

This is my last season of college eligibility, and I want to play it at LSU. I have been here with my teammates since the summer. I gave up a lot to come here. I moved, left my family, and have poured everything I have into being ready for this last college season.

This season means everything to me, academically and athletically. It is my final opportunity to compete in collegiate basketball. I had surgery in October 2025 and did not play in any game last season. Competing this season would allow me to return to live games, develop with my teammates and coaches, and demonstrate my abilities after rehabilitation—all the while working toward my goal of playing in the NBA. Each game I miss is a game I cannot play later. A payment of money after the season cannot give me back those games, my final year with the team, or the opportunity to compete.

I asked this Court again to let me stay here and play. I understand that the SEC has now said it will penalize LSU or my coaches if LSU plays me. But the SEC did not penalize LSU for other basketball players, such as my teammate Saliou Niang, who was drafted in the 2025 NBA Draft and then actually played professionally. I have never been drafted or played professionally in any regular season game. I think it is unfair that the SEC attempts to stop me from competing based on me being a professional, because I am not a professional. I stayed in college taking classes at St. John's the entire time the NCAA and SEC say I was a professional. I have a year of eligibility left, and I already have a court order saying I can play. So many other SEC players are actual professionals, who actually played professional seasons and are allowed to play. So many other SEC players have court orders letting them play a fifth season after their eligibility ended. The SEC lets them play, but it is threatening my coaches and my school if I play. It will harm me tremendously if the SEC's threats keep me off the team.

BIO RELATED STATS




**2025-26 (Sophomore):**

- Played in all 34 games, making 27 starts, and finished the year averaging 10.2 points.
- Ranked fifth in the SEC shooting 40.0-percent from 3-point range, while also sitting in seventh with 86 total 3-pointers made and eighth making 2.5 3's per game.
- Set a new Texas A&M single-game record with 10 3-pointers en route to a 30-point night in the win over Manhattan, helping the Aggies set a new single-game record as a team with 18 3-pointers.
- His 86 made 3-pointers were the second-most in a season in program history.
- Knocked down five 3-pointers to add 17 points in the win over Kentucky.
- Led the way with 21 points, connecting on 7-of-12 (58.3%) from beyond the arc against Florida State.

**Before Texas A&M:**

- Veteran international player overall with 150 professional games under his belt.
- Won silver and gold medals in FIBA U16 and U19 competition and was also named the 2019 FIBA World Championship MVP after averaging 13.4 points, 3.4 rebounds and 2.3 assist to lead Spain to the title.
- Named the Spanish ACB Week 13 Player of the Week after posting 35 points on 13-of-18 shooting, including 8-of-10 from deep against CB Coruna.

# SEC MEN'S BASKETBALL STUDENT-ATHLETES ELIGIBLE FOR THE 2026-27 SEASON UNDER COURT ORDERS

The orders and each school's official 2026-27 roster follow this table. Page cites are to the pages of this exhibit.

| Team | Player | Court and case | Order | Source (exhibit page) |
|---|---|---|---|---|
| Auburn | Kolby King | Hamilton County (Ohio) Court of Common Pleas, No. A2603352, Judge Christopher Wagner (Borovicanin v. NCAA); Supreme Court of Ohio, No. 2026-1353 | Entry Granting Plaintiffs' Motion for Preliminary Injunction, entered July 9, 2026. Supreme Court of Ohio entries of Oct. 14 and Oct. 29, 2026, which name King as an appellant, stayed the court of appeals' Oct. 2, 2026 judgment. The Oct. 29 entry states: "The order of the Hamilton County Common Pleas Court remains in effect pending this court's consideration of the memorandum in support of jurisdiction." | pgs. 8, 22–23, 66 |
| Florida | Denzel Aberdeen | Circuit Court of the Eighth Judicial Circuit, Alachua County, Florida, No. 01-2026-CA-002874 (Aberdeen v. NCAA) | Order Granting Temporary Injunction, filed Oct. 6, 2026, after a hearing held Sept. 29, 2026. | pgs. 24, 26, 38, 67 |
| LSU | Skyy Clark | Jefferson Circuit Court (Kentucky), Division Eleven, No. 26-CI-007009, Judge Brian C. Edwards (Wells v. NCAA) | Opinion and Order Granting in Part Plaintiffs' Motion for Temporary Injunction, entered Oct. 16, 2026. Clark is a named plaintiff in the Second Amended Complaint filed Aug. 27, 2026. | pgs. 40, 56, 58, 68 |
| LSU | Donovan Dent | Superior Court of California, County of Santa Clara, No. 26CV498334, Judge Beth McGowen (Glancey v. NCAA) | Order Granting Preliminary Injunction, filed Nov. 6, 2026, on a hearing held Oct. 20, 2026. Dent is listed as a plaintiff in the caption and in Attachment 1 to the order. | pgs. 3, 6–7, 68 |
| Mississippi State | Kimani Hamilton | Superior Court of California, County of Santa Clara, No. 26CV498334, Judge Beth McGowen (Glancey v. NCAA) | Order Granting Preliminary Injunction, filed Nov. 6, 2026, on a hearing held Oct. 20, 2026. Hamilton is listed as a plaintiff in the caption and in Attachment 1 to the order. | pgs. 3, 6–7, 70 |
| Missouri | Mark Mitchell | Jefferson Circuit Court (Kentucky), Division Eleven, No. 26-CI-007009, Judge Brian C. Edwards (Wells v. NCAA) | Opinion and Order Granting in Part Plaintiffs' Motion for Temporary Injunction, entered Oct. 16, 2026. Mitchell is a named plaintiff in the Second Amended Complaint filed Aug. 27, 2026. | pgs. 40, 56, 58, 71 |
| Oklahoma | Duke Brennan | Superior Court of California, County of Santa Clara, No. 26CV498334, Judge Beth McGowen (Glancey v. NCAA) | Order Granting Preliminary Injunction, filed Nov. 6, 2026, on a hearing held Oct. 20, 2026. Brennan is listed as a plaintiff in the caption and in Attachment 1 to the order. | pgs. 3, 6–7, 72 |

| Team | Player | Court and case | Order | Source (exhibit page) |
|---|---|---|---|---|
| Oklahoma | B.J. Edwards | District Court of Cleveland County, Oklahoma, No. CJ-2026-1542 (Tockey v. NCAA) | Temporary Restraining Order for Additional Plaintiffs, filed Oct. 30, 2026, naming Edwards as one of five "Moving Plaintiffs." It supplements the temporary restraining order entered Sept. 3, 2026 for the original plaintiffs. | pgs. 59, 62–63, 72 |
| Ole Miss | Corey Stephenson | Superior Court of California, County of Santa Clara, No. 26CV498334, Judge Beth McGowen (Glancey v. NCAA) | Order Granting Preliminary Injunction, filed Nov. 6, 2026, on a hearing held Oct. 20, 2026. Stephenson is listed as a plaintiff in the caption and in Attachment 1 to the order. | pgs. 3, 6–7, 73 |
| Texas A&M | Jordan Pope | Superior Court of California, County of Santa Clara, No. 26CV498334, Judge Beth McGowen (Glancey v. NCAA) | Order Granting Preliminary Injunction, filed Nov. 6, 2026, on a hearing held Oct. 20, 2026. Pope is listed as a plaintiff in the caption and in Attachment 1 to the order. | pgs. 3, 6–7, 74 |

**Documents attached**

pgs. 3–7 — Order Granting Preliminary Injunction, Glancey v. NCAA, No. 26CV498334, Superior Court of California, County of Santa Clara (filed Nov. 6, 2026).

pgs. 8–21 — Entry Granting Plaintiffs' Motion for Preliminary Injunction, Borovicanin v. NCAA, No. A2603352, Hamilton County (Ohio) Court of Common Pleas (entered July 9, 2026).

pg. 22 — Entry, Borovicanin v. NCAA, No. 2026-1353, Supreme Court of Ohio (filed Oct. 14, 2026).

pg. 23 — Entry, Borovicanin v. NCAA, No. 2026-1353, Supreme Court of Ohio (filed Oct. 29, 2026).

pgs. 24–39 — Order Granting Temporary Injunction, Aberdeen v. NCAA, No. 01-2026-CA-002874, Circuit Court of the Eighth Judicial Circuit, Alachua County, Florida (filed Oct. 6, 2026).

pgs. 40–57 — Opinion and Order Granting in Part Plaintiffs' Motion for Temporary Injunction, Wells v. NCAA, No. 26-CI-007009, Jefferson Circuit Court, Kentucky (entered Oct. 16, 2026).

pg. 58 — Second Amended Complaint, Wells v. NCAA, No. 26-CI-007009 (filed Aug. 27, 2026) (first 1 of 51 pages).

pgs. 59–61 — Order (temporary restraining order), Tockey v. NCAA, No. CJ-2026-1542, District Court of Cleveland County, Oklahoma (entered Sept. 3, 2026).

pgs. 62–65 — Temporary Restraining Order for Additional Plaintiffs, Tockey v. NCAA, No. CJ-2026-1542, District Court of Cleveland County, Oklahoma (filed Oct. 30, 2026).

pg. 66 — Auburn University, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 4 pages).

pg. 67 — University of Florida, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 8 pages).

pg. 68 — Louisiana State University, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 3 pages).

pgs. 69–70 — Mississippi State University, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 2 of 7 pages).

pg. 71 — University of Missouri, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 3 pages).

pg. 72 — University of Oklahoma, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 8 pages).

pg. 73 — University of Mississippi, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 5 pages).

pg. 74 — Texas A&M University, official 2026-27 men's basketball roster (printed Nov. 12, 2026 UTC) (first 1 of 4 pages).

**Wednesday, November 18, 2026 at 2:37:31 PM Eastern Standard Time**

| | |
|---|---|
| **Subject:** | Re: RJ Luis, Jr. v. NCAA [IMAN-ACTIVE.FID2003973] |
| **Date:** | Wednesday, November 18, 2026 at 7:33:22 AM Eastern Standard Time |
| **From:** | Elliot Abrams |
| **To:** | Price, Donald W. |
| **CC:** | Tony Clayton, Chandler Agee, adupre@duprelawfirm.com, Walshe, Michael Q., Metzinger, Fritz, Fuller, Robert |
| **Attachments:** | image695218.jpg, image544728.png, image345890.png |

Donald,

Thank you for your November 16 email. LSU plays tonight, so I need to close one gap this morning.

The November 13 Judgment enjoins the SEC and those in active concert with it from "giving effect to any penalty or threat of penalty by the SEC" and from refusing to allow RJ to compete this season. Your email says the SEC "will not impose penalties or fines." Yesterday the SEC announced that LSU's statements explaining its interpretation of the Judgement is "inconsistent with the expectations and responsibilities of membership."

Please confirm by 10:00 a.m. CT today that neither the SEC nor its member institutions or their chief executive officers will impose or threaten any adverse consequence, including suspension or termination of LSU's membership, at any time, on account of RJ's place on the roster, his participation, or LSU's reliance on the Court's orders.

If the SEC will not give that confirmation, please tell me that.

Thank you.

Elliot

Elliot S. Abrams
Cheshire Parker Schneider & Abrams, PLLC
133 Fayetteville Street, 4th Floor
Post Office Box 1029
Raleigh, North Carolina 27602
Tel: (919) 833-3114
Fax: (919) 832-0739
www.cheshirepark.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please

contact the sender by reply email and destroy all copies of the original message.

---

**From:** Price, Donald W. <dprice@stonepigman.com>
**Date:** Monday, November 16, 2026 at 2:48 PM
**To:** Elliot Abrams <elliot.abrams@cheshirepark.com>
**Cc:** Tony Clayton <tclaytonlaw@aol.com>; Chandler Agee <cagee@claytonfrugelaw.com>; adupre@duprelawfirm.com <adupre@duprelawfirm.com>; Walshe, Michael Q. <MWalshe@stonepigman.com>; Metzinger, Fritz <fmetzinger@stonepigman.com>; Fuller, Robert <rfuller@rbh.com>
**Subject:** RJ Luis, Jr. v. NCAA [IMAN-ACTIVE.FID2003973]

Elliot:

The SEC will abide by the terms of the preliminary injunction while it remains in place and will not impose penalties or fines on LSU if places Mr. Luis on its men's basketball roster.

STONE PIGMAN

**Donald W. Price**

Main 504.581.3200
Direct 225.490.5812
dprice@stonepigman.com
www.stonepigman.com

**Stone Pigman Walther Wittmann L.L.C.**

This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication. The sender's name and other information in this e-mail are for informational purposes only and are not electronic signatures.

# Exhibit 13

LSU

Office of the President

FOR IMMEDIATE RELEASE

November 19, 2026

**LSU SYSTEM PRESIDENT WADE ROUSSE RELEASES THE FOLLOWING REGARDING RJ LUIS:**

BATON ROUGE, La.- The following statement has been issued by President Wade Rousse on behalf of the LSU System regarding LSU Basketball player, RJ Luis.

"In my role as President of the LSU System, after further review, I have instructed LSU Men's Basketball Coach Will Wade not to play RJ Luis."

###

**Media Contact:**
Meg Casper Sunstrom
Chief Communications Officer
Office of the President
225-978-6686
**msunst1@lsu.edu**

# Exhibit 14

WBRZ 2 abc INVESTIGATIVE. IN-DEPTH.

78°

NEWS WEATHER SPORTS INVESTIGATIONS 2 ON YOUR SIDE TRAFFIC VIDEOS COMMUNITY ABOUT US

# RJ Luis Jr. drops legal fight over eligibility after LSU president instructed not to play him

November 19, 2026 9:41 PM in News Source: WBRZ By: WBRZ Staff Share:



BATON ROUGE — RJ Luis Jr. has abandoned his legal battle to play for the LSU men's basketball team, ending his tenure with the Tigers just one day after his debut.

West Baton Rouge attorney Tony Clayton told The Advocate on Thursday night that Luis decided to step aside to protect his teammates, coach Will Wade and the school after LSU President Wade Rousse ordered Wade not to play the former St. John's guard.

"In essence, he told me that the juice is just not worth the squeeze," Clayton told The Advocate, calling Luis an "honorable kid to fall on the sword" for the program.

The move follows direct talks Thursday between Rousse and SEC Commissioner Greg Sankey, with Yahoo Sports reporting that some conference presidents were prepared to consider voting to expel LSU or boycott its basketball team over rostering the former NBA signee.

**Trending News**

- **Habitat for Humanity helps single mom with new Baton Rouge home**
- **WATCH: Body cam footage, crash report sheds light on incident involving Christian Munn-Holliday**

Clayton told The Advocate his team will drop its motion to hold the SEC in contempt of court—though Luis still reserves the right to sue for damages. While praising Wade and Rousse as honorable men for backing Luis, Clayton aimed sharp criticism at Sankey: "We are a nation of laws and not of men, and he's not an honorable man."

Report a Typo

## More News








Desktop News
Click to open Continuous News in a sidebar that updates in real-time.

RADAR 7 DAYS




## News Video



Tickets on sale now for 2027 New Orleans Jazz and Heritage Festival

## Sports Video



REPORT: Saints working with Dutchtown alum Justin Reid to grant his release